**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: | Chapter 11 |
| ONE TABLE RESTAURANT BRANDS, LLC, *et al.*,[1] | Case No. 24-11553 |
| Debtors. | (Joint Administration Requested) |

**MOTION OF DEBTORS PURSUANT TO SECTIONS 105, 362, 363, 364, 503 AND 507 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 4001, AND LOCAL RULE 4001-2, FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING AND USE CASH COLLATERAL; (II) GRANTING PRIMING AND OTHER LIENS AND SUPER-PRIORITY CLAIMS AND ADEQUATE PROTECTION; (III) MODIFYING THE AUTOMATIC STAY; AND AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by their undersigned counsel, hereby file this motion (the "Motion") for the entry of an interim order (the "Interim Order") and a final order (the "Final Order") authorizing the Debtors to obtain postpetition financing in accordance with the Senior Secured Super-Priority Priming Debtor-In-Possession Loan and Security Agreement between the Debtors, on one hand, and Breakwater Management LP in its capacity as lender (together with its affiliates, "Breakwater" or "DIP Lender") (who acts as the administrative agent and collateral agent for Breakwater Credit Opportunities Fund II LP, H&W Irrevocable Trust; Randall Capital Group, LLC; 2014 MSM Irrevocable Trust; and Schuyler and Dina Joyner Revocable Trust Dated 11/12/2003 (collectively,

---

[1] The Debtors in these Chapter 11 cases, along with the last four (4) digits of their federal tax identification numbers are (1) One Table Restaurant Brands, LLC, a Delaware limited liability company (9853); (2) One Table Restaurant Operations, LLC, a Delaware limited liability company (7280), (3) Tender Greens OpCo, LLC, a Delaware limited liability company (7827); (4) Tocaya Holdings LLC, a Nevada limited liability company (8815); (5) Tocaya Organica, LLC, a California limited liability company (6720); (6) Tocaya Management LLC, a Nevada limited liability company (6789); (7) BLT Steak LA LLC, a California limited liability company (4688); (8) Tocaya Venice LLC, a California limited liability company (0159); (9) Tocaya South Bay, LLC, a California limited liability company (0401); (10) Tocaya Toluca, LLC, a California limited liability company; and (11) Tocaya Santa Monica LLC, a California limited liability company (8134). The Debtors' mailing address is: 1201 W. 5th Street, Suite T-400, Los Angeles, CA 90017.

the "Prepetition Lenders")[2] on the other, a copy of which is attached to the Interim Order as Exhibit

"1" (the "DIP Credit Agreement" and, with related documents, the "DIP Documents") in the

principal amount of up to $3,000,000.00, pursuant to sections 105(a), 362, 363 364, 503, and 507

of title 11 of the United States Code (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules of

Bankruptcy Procedure of the United States Bankruptcy Court for the District of Delaware (the

"Local Rules"): (a) to obtain postpetition financing in the form of the DIP Facility (defined below),

including the granting of priming liens and superpriority claims, as such relief is more particularly

described herein, (b) to use cash collateral as such term is defined in 11 U.S.C. §363 ("Cash

Collateral") pursuant to sections 362 and 363 of the Bankruptcy Code, (c) modifying the automatic

stay, (d) scheduling a final hearing, and (e) granting related relief.

In support of this Motion, the Debtors rely upon, and incorporate by reference, the First

Day Declaration of Harald Herrmann in Support of First Day Pleadings (the "First Day

Declaration") filed in support of the Debtors' voluntary petitions for chapter 11 relief, commencing

the above-captioned chapter 11 cases (the "Cases"), the Declaration of Richard Klein (the "Klein

Declaration"), the Declaration of Cody Clarke (the "Clarke Declaration"), and the first day

pleadings and applications filed concurrently herewith, each of which is incorporated by reference

as if set forth herein, and in further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION, VENUE, AND STATUTORY PREDICATE

1.    The United States Bankruptcy Court for the District of Delaware (the "Court") has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing

---

[2] Four out of five of the Prepetition Lenders are also lenders under the DIP Facility. The only Pre-Petition Lender not participating in the DIP Facility is Randall Capital Group, LLC.

Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.

2.     This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Local Rule 9013-l(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The statutory bases for the relief requested herein are sections 105(a), 362, 363, 364, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 4001 , and Local Rule 4001-2.

## BACKGROUND

### A.     Commencement of the Debtors' Bankruptcy Cases

5.     On July 17, 2024 ("Petition Date"), the Debtors filed their respective voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Debtors are continuing in possession of their property, and operating and managing their businesses, as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6.     No trustee, examiner, or committee has been appointed in the Cases.

### B.     Description of the Debtors' Businesses

7.     The Debtors consist of two restaurant chains -- Tender Greens, a "farm-to-fork" concept ("Tender Greens"), and Tocaya, a modern Mexican eatery ("Tocaya").  The Debtors operate 15 Tocaya and 24 Tender Greens restaurants throughout California and Arizona (collectively, the "Restaurants").

8.     In the ordinary course of business, the Debtors' sole source of revenue is the revenue produced from the operation of the Restaurants.

9.     A more detailed description of the Debtors' background, structure, operations and recent financial history is contained in the First Day Declaration.

**C.**     **Equity Ownership of the Debtors**

10.     The Debtors' parent is One Table Restaurant Brands, LLC ("OTRB").  Non-debtors T.Y.P Restaurant Group, Inc. and New Tocaya Holdings, LLC each own 47.5% of OTRB. The remaining 5% of OTRB is owned by non-debtor Big Table Brands Management, LLC.

11.     One Table Restaurant Operations, LLC ("OTRO") is owned 100% by OTRB. Tender Greens OpCo, LLC ("Tender Greens OpCo") is owned 100% by OTRO.  Tocaya Holdings LLC ("Tocaya Holdings") is also owned 100% by OTRO, which in turn owns 100% of Tocaya Venice, LLC and Tocaya Organica, LLC ("Tocaya Organica").  Tocaya Organica owns 100% of Tocaya Management, LLC; Tocaya South Bay, LLC; and Tocaya Toluca, LLC. Tocaya Organica also owns a 67% interest in Tocaya Santa Monica, LLC ("Tocaya SM").  Finally, Tocaya Holdings owns a 67% interest in Tocaya Sunset, LLC which in turns owns an 80% interest in BLT Steak LA, LLC.  A corporate ownership chart is attached to the First Day Declaration as **Exhibit A.**

12.     As noted in the First Day Declaration, the Debtors are experiencing a liquidity crisis and the DIP Facility provides financing for a limited period of time.

**D.**     **The Debtors' Prepetition Indebtedness**

13.     The following creditors have security interests in certain of the Debtors' assets: (1) the DIP Lender; and (2) the Bridge Lenders (defined below).

14.     On July 23, 2021, OTRO, Tender Greens OpCo, and Tocaya Holdings entered into a credit agreement (as amended from time to time, the "Prepetition Credit Agreement") for a $28.8 million senior secured term loan credit facility (the "Prepetition Loan") with OTRB as parent, each of the subsidiaries of OTRB as guarantors, and Breakwater in its capacity as lender (as administrative agent and collateral agent for Breakwater Credit Opportunities Fund II LP, H&W Irrevocable Trust; Randall Capital Group, LLC; 2014 MSM Irrevocable Trust; and Schuyler and Dina Joyner Revocable Trust Dated 11/12/2003 (the "Prepetition Lenders"), who are the same five lenders under the DIP Facility).

15.     Concurrently with the Prepetition Credit Agreement, the parties entered into a security agreement, guarantee agreement, and certain control agreements which granted

Breakwater, for the benefit of the Prepetition Lenders, a first priority security interest in all of the assets of the Debtors.

16.    The Prepetition Credit Agreement has been amended three times of August 8, 2023, February 23, 2024, and May 20, 2024.

17.    The Prepetition Loan has a variable interest rate based on the secured overnight financing rate plus a margin of 9.6%.  Currently, the interest rate is 15.9% and interest payments total roughly $4.5 million annually.

18.    As of the Petition Date, approximately $28.8 million remains outstanding under the Prepetition Loan, plus accrued and unpaid interest, fees and expenses.

19.    Bank of America, N.A. (the "Bank") also has a pre-petition secured claim on certain of the Debtors' assets.  Specifically, in 2016, the Debtors and the Bank entered into a Merchant Services Agreement (the "MSA").  As part of the MSA, the Bank was given control over certain accounts and thus, perfected a lien over such accounts.

20.    In December 2021, after but as a part of the Prepetition Loan, the Bank, the Debtors, and Breakwater entered into a Deposit Account Control Agreement (the "DACA").  As part of the DACA, the Bank agreed to subordinate any security interest it had in the accounts to the liens of Breakwater, except for any debits to the accounts for various fees and other debits.

21.    On May 20, 2024, Discovery Management Company LLC and Harald Herrmann (collectively, the "Bridge Lenders") each loaned OTRB $125,000 (collectively, the "Bridge Loans").  In exchange, were issued subordinated secured promissory notes (the "Bridge Notes") which were guaranteed by certain of the Debtors,[3] and entered into a subordination agreement which subordinated the obligations under the Bridge Notes to the Debtors' obligations under the Prepetition Loan.  The purpose of the Bridge Loans was to provide the Debtors with necessary funds to continue operating pending the Debtors' out-of-court restructuring efforts.

---

[3] The promissory notes memorializing the Bridge Loans were guaranteed by Debtors Tender Greens Opco, Tocaya Holdings, Tocaya Management LLC, Tocaya Organica, Tocaya SM, Tocaya South Bay, LLC, Tocaya Venice LLC, Tocaya Toluca, LLC, Tocaya Sunset LLC, and BLT Steak LA LLC.

22. The obligations under the Bridge Notes have been paid by the Debtors and the liens related to the Bridge Notes were released and terminated on or about July 15, 2024.

23. The Debtors also owe material amounts, on an unsecured basis, to their landlords, totaling at least $1.3 million. The Debtors owe other unsecured debts to trade vendors, counterparties to various pre-petition settlements reached and the like of approximately $14.5 million.

**E.**     **Attempts to Find Alternative DIP Financing**

24. In late 2022, the Debtors engaged North Point Advisors ("North Point") and ran a formal sales process to market the businesses. North Point built a confidential information memorandum and data room which it shared with various prospective buyers.

25. North Point contacted over 36 potential buyers, 22 of which signed Non-Disclosure Agreements. While the Debtors did receive two proposals for purchases of certain of their assets, both fell short of closing.

26. In addition, Hilco Corporate Finance ("Hilco"), the Debtors' proposed investment banker, aided the Debtors in attempting to find alternative post-petition financing. Unfortunately, the Debtors were unable to find an alternative financing source because all such potential lenders required a priming lien, which was not acceptable to the DIP Lender.

**E.**     **The DIP Credit Agreement**

27. The DIP Lender has now agreed to provide the Debtors a credit facility in the principal amount of up to $3,000,000.00 pursuant to the terms of the DIP Credit Agreement ("the "DIP Facility").

28. Among other things, the DIP Credit Agreement provides for the provision of up to $3,000,000.00 in debtor-in-possession financing from the DIP Lender (approval of which is requested by way of this Motion). It also calls for a roll-up of the Prepetition Loan on a 4:1 ratio. In addition, the DIP Credit Agreement provides that in exchange for the DIP Lender agreeing to provide the DIP Facility, the Interim Order and Final Order on this Motion shall include releases of the DIP Lender, and their affiliates and others. Finally, the DIP Credit Agreement provides that

the DIP Lender may credit bid up to the full amount of all of the Obligations (as defined in the DIP Credit Agreement) in the event of a sale of the Debtors' businesses.

29.     Accordingly, the Debtors request approval of their entry into the DIP Credit Agreement.

## **RELIEF REQUESTED**

30.     The Debtors have determined that, in order for them to operate their businesses during the Cases, the Debtors will need more cash over the next approximately thirteen weeks (or until the closing of a sale of the Debtors' assets) than the Debtors can reasonably expect to be generated from their business operations.  The Debtors and their advisors have undertaken an analysis of the minimum funding necessary to maintain their business operations and to fund the chapter 11 process and has limited the amount of the postpetition loan to such amount.  To obtain the use of the necessary funds, the Debtors have negotiated with the DIP Lender with respect to it providing the necessary funds in the form of the DIP Facility.  The Debtors and the DIP Lender have reached an agreement on the terms of the DIP Facility, as set forth herein.

31.     The Debtors seek, pursuant to sections 105, 362, 363, 364, 503 and 507 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), the following:

(i)      the entry of an interim order (the "Interim Order") authorizing the Debtors to obtain postpetition financing, on an interim basis, in the amount of $1,700,000, plus a roll-up based on the interim funding of  $6,800,000 of the Prepetition Loan (the "Interim Roll-Up Loans");

(ii)     setting a final hearing (the "Final Hearing") for approval of the Debtors to borrow, based upon the DIP Facility, up to $3,000,000 plus a roll-up of $12,000,000 of the Prepetition Loan (the "Final Roll-Up Loans")

(iii)    entry of the Final Order;

(iv)     a finding that the Debtors are authorized to utilize Cash Collateral pursuant to sections 362 and 363 of the Bankruptcy Code, upon the terms and conditions set forth in the DIP Credit Agreement;

(v)     a finding that the Debtors are authorized to execute and enter into the DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(vi)    a finding that the Debtors are authorized to use the proceeds of the DIP Facility for working capital and general corporate purposes in accordance with the Approved Budget, as that term is used and defined within the DIP Credit Agreement;

(vii)   granting the DIP Lender a senior and first-priority priming lien on all of the Debtors' property encumbered by the prepetition liens of Breakwater pursuant to section 364(d) of the Bankruptcy Code;

(viii)  granting the DIP Lender superpriority administrative claims, as set forth in the DIP Credit Agreement;

(ix)    modifying the automatic stay, set forth in section 362 of the Bankruptcy Code, to the extent necessary to implement and effectuate the terms of the DIP Credit Agreement, including a waiver of any applicable stay with respect to the effectiveness and enforceability of the Interim Order and the Final Order (including under Bankruptcy Rule 6004);

(x)     authorizing adequate protection to junior secured creditor Bank of America, N.A. (the "Bank") in the form of a separately funded reserve account in an amount to be determined at the hearing on this Motion and granting it adequate protection liens, the scope and amount of which shall be determined at the hearing on this Motion; and

(xi)    such other relief as the Bankruptcy Court may find just and proper.

32.    The relief sought herein is the product of good faith, arms' length negotiations by and between the Debtors and the DIP Lender, as well as their respective counsel and advisors. Approval of the Motion is necessary because, without the ability to borrow funds from the DIP Lender, the Debtors will lack the cash to operate their businesses during the pendency of the Cases.

## MATERIAL TERMS OF THE DIP CREDIT FACILITY

33.    Pursuant to and in accordance with Bankruptcy Rule 4001(b)(1)(B) and (c)(1)(B) and Local Rule 4001-2, the material provisions of the DIP Facility, and the location of such provisions in the relevant source documents, are as follows:[4]

| | |
|---|---|
| **Borrowers/Guarantors**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>DIP Credit Agreement, p.1 | OTRO, Tender Greens Opco, and Tocaya Holdings as the "<u>Borrowers</u>," OTRB as the parent, and all other Debtors as guarantors (the "<u>Guarantors</u>"). |
| **DIP Lender**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>DIP Credit Agreement, p. 1 | Breakwater and its affiliates, in its capacity as lender. Breakwater will be the administrative agent for Breakwater Credit Opportunities Fund II LP; H&W Irrevocable Trust; MSM Irrevocable Trust; and Schuyler and Dina Joyner Revocable Trust Dated 11/12/2003.<br><br>DIP Lender is permitted to freely assign to any of its affiliates the DIP Facility without consent or restrictions. |
| **Commitment and Roll-Up Loans**<br><br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c)<br><br>DIP Credit Agreement, p. 1, ¶ 2.1; 2.2<br><br>Interim Order, ¶ 1.(b), 24 | A new money loan of up to $3,000,000 with the Initial Loan of $1,700,000. Subject to the terms and conditions set forth in the DIP Credit Agreement and the Interim Order, effective immediately upon entry thereof and the disbursement of any Tranche of the Initial Loan or any subsequent Loan, the Prepetition Loans may be "rolled up" as follows:<br>(1)    In connection with each Tranche of the Initial Loan or any subsequent Loan under Section 2.1, Prepetition Loans shall be automatically deemed (on a cashless basis) to constitute Loans under this Agreement ("<u>Roll-Up Loans</u>"), which Roll-Up Loans shall be due and payable in accordance with the terms and conditions set forth in this Agreement;<br>(2)    The total amount of Roll-Up Loans shall be no greater than $12,000,000, which equals four (4) times the Total Term Loan Commitment. The amount of each Roll-Up Loan shall be calculated as $12,000,000 |

---

[4] The below is merely a summary of the DIP Credit Agreement. The DIP Credit Agreement should be reviewed to fully understand all proposed terms of the DIP Facility. In the event of a conflict between the below and the language of the DIP Credit Agreement, the DIP Credit Agreement shall control.

| | |
|---|---|
| | multiplied by a fraction, (A) the numerator of which is the amount of the applicable Tranche of the Initial Loan or a subsequent Loan, and (B) the denominator of which is the amount of the Total Term Loan Commitment.<br><br>(3)    Upon the occurrence of any of the foregoing Roll-Up Loans, the outstanding principal balance of the Prepetition Loans shall be automatically and irrevocably deemed reduced by the amount of Lenders' Roll-Up Loans as advanced under this Agreement.<br><br>Upon any of the foregoing Roll-Up Loans, the Roll-Up Loans shall cease to be indebtedness under the Prepetition Credit Agreement and shall be deemed DIP Obligations and DIP Facility in all respects, including for purposes of having the benefit of section 364(e) of the Bankruptcy Code. |
| **Milestones**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement, Section 7.15<br><br>Interim Order ¶10. | All of the following: (i) the Bankruptcy Court shall have entered the Interim Order by the date that is no later than five (5) days after the Petition Date; (ii) the Bankruptcy Court shall have entered the Final Order by the date that is no later than thirty-five (35) days after the Petition Date; (iii) the Debtors shall have filed a motion to sell all or substantially all of the Debtors' assets through a sale pursuant to section 363 of the Bankruptcy Code in form and substance reasonably acceptable to the DIP Lender (the "Sale Motion") no later than fifteen (15) days after the Petition Date; (iv) the Bankruptcy Court shall have entered an order approving the bidding procedures of the sale contemplated by the Sale Motion (the "Sale") by the date that is no later than forty-five (45) days after the Petition Date; (v) the Bankruptcy Court shall have entered an order approving the Sale by the date that is no later than seventy-five (75) days after the Petition Date; (vi) the Sale shall be consummated by the date that is no later than fourteen (14) days after the Bankruptcy Court has entered its order approving the Sale; (vii) a  chapter 11 plan shall be consummated by the date that is |

| | |
|---|---|
| | no later than ninety (90) days after consummation of the Sale. |
| **Interest Rates**<br><br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c)<br><br>DIP Credit Agreement, ¶ 1.5, 2.8, 2.16, 3.8<br><br>Interim Order ¶ 5. | The New Money Loans and the Roll Up Loans shall accrue interest at the same interest rate as provided in the Prepetition Loan, with a default interest rate of an additional 3.00% per annum. All interest is limited to the Maximum Rate.<br><br>For additional information regarding the calculation of the applicable interest rate, see Articles II and III of the DIP Credit Agreement. |
| **Administrative and Other Fees and Expenses**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>DIP Credit Agreement, ¶ 3.2, 14.2<br><br>Interim Order, ¶ 5, 34 | Debtors shall pay to Breakwater an administrative fee in the amount of three percent (3.00%) of the DIP Facility Commitment, which such fee will be fully earned and paid on the date on which all such conditions precedent set forth in 4.1 have been satisfied or waived in writing by Lender (the "Closing Date").<br><br>DIP Lender will also be reimbursed certain expenses detailed in Section14.2 of the DIP Credit Agreement, including without limitation, reimbursement in full in cash of the DIP Lender's reasonable and documented out-of-pocket costs and expenses. |
| **Term/Maturity**<br><br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c)<br><br>DIP Credit Agreement, ¶ 10.4<br><br>Interim Order, ¶ 21 | The DIP Credit Agreement shall become effective on the Closing Date (which shall be the date on which all conditions precedent are met) and, subject to any events of default, shall continue in full force and effect for so long as any Obligations remain outstanding or Lenders have any obligation to make subsequent Loans under the DIP Credit Agreement. Notwithstanding the foregoing, Lender shall have the right to terminate its obligation to make Loans under the DIP Credit Agreement immediately and without notice upon the occurrence of any of the following, along with other Events of Default: (i) the effective date of a plan of reorganization or liquidation for the Debtors confirmed in the Cases; (ii) the date of termination of the commitments under the DIP Facility and/or acceleration of any outstanding borrowings under the DIP |

| | |
|---|---|
| | Facility, in each case, by the DIP Lender following the occurrence of an Event of Default and upon the delivery of a Termination Notice to the Remedies Notice Parties, in each case, subject to the Debtors' right to use Cash Collateral during the Remedies Notice Period as set forth above, and pending the outcome of the Stay Relief Hearing; (iii) the first business day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto; (iv) the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code unless otherwise consented to in writing (which may be e-mail) by the DIP Lender; (v) the dismissal of any of the Cases, unless otherwise consented to in writing (which may be e-mail) by the DIP Lender; (vi) the repayment in full in cash of all obligations and termination of all commitments under the DIP Facility, unless extended, with the prior written consent (which may be by e-mail) of the DIP Lender; or (vii) the the scheduled maturity date of 120 days after the Petition Date. |
| **Use of DIP Facility; Refinancing**<br><br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c)<br><br>DIP Credit Agreement, ¶ 2.7, 9.18<br><br>Interim Order, ¶ 4 | The Debtors shall use the proceeds of the Loans in accordance with the Budget (subject to any Permitted Variance) and the Orders entered in connection with the Cases exclusively for one or more of the following purposes (subject to any additional restrictions on the use of such proceeds and any such cash collateral set forth in the Interim Order): (a) post-petition working capital and maintenance capital expenditure purposes of the Debtors; (b) current interest, fees, and expenses under the DIP Facility; (c) payment of adequate protection expenses for the Prepetition Lenders; (d) the allowed administrative costs and expenses of the Cases, including professional fees and expenses; (e) payment of prepetition claims authorized by the Bankruptcy Court; (f) any forecasted cash outlays included in any Approved Budget; or (g) as otherwise agreed; solely in accordance with the Approved Budget and applicable Order.<br><br>Proceeds of the Loans shall not be used for any purpose other than provided in Section 2.8 of the DIP Credit Agreement. Additionally, no Loan Party shall use any part of proceeds of the |

| | |
|---|---|
| | Loans to purchase or carry, or to reduce or retire or refinance any credit incurred to purchase or carry, any margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System) or for any other purpose which would violate Regulation U or Regulation T or X of such Board of Governors or for any other purpose prohibited by law or by the terms and conditions of the DIP Credit Agreement. |
| | None of the Carve-Out, any Cash Collateral, the DIP Facility, the DIP Collateral, or the Prepetition Collateral may be used to challenge the amount, validity, perfection, priority or enforceability of, or assert any defense, counterclaim or offset to, the DIP Facility, the DIP Term Sheet, or the DIP Documents or the Prepetition Loan or the Prepetition Loan Documents, or the security interests and liens securing any of the DIP Obligations or the Prepetition Loan, or to fund prosecution or assertion of any claims, or to otherwise litigate against the DIP Lender, provided that up to $25,000 shall be made available to the Committee for investigation costs in respect of the stipulations contemplated below or otherwise set forth in the Interim Order or the Final Order. |
| **Borrowing Limits**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>DIP Credit Agreement, p.1; ¶ 2.1; 2.2; Budget | Subject to and upon the terms and conditions of the DIP Facility (including the satisfaction (or waiver) of the conditions precedent set forth in Sections 4.1 and 4.2 of the DIP Credit Agreement), the DIP Lender agrees to distribute the total principal amount of up to $3,000,000. Amounts borrowed under Section 2.1 or 2.2 may not be reborrowed once repaid. |
| **Borrowing Conditions**<br><br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c)<br><br>DIP Credit Agreement, ¶ 4.1 and 4.2 | The obligation of DIP Lender to make the Initial Loan (or any Tranche thereof) is subject to the satisfaction of the following conditions precedent, among others: (a) DIP Lender shall have received executed copies of the DIP Credit Agreement and the other DIP Documents; (b) the Bankruptcy Court shall have entered the Interim Order, in a form acceptable to the DIP Lender, in its sole and exclusive discretion, no later than five (5) Business Days after the Petition Date, which Interim Order shall be in full force and effect, |

and the Debtors shall be in compliance with the Interim Order; (c) Lender shall have received a certificate executed by a duly authorized officer of each Loan Party certifying (i) the names and signatures of the officers of such Person authorized to execute the DIP Documents, (ii) the resolutions duly adopted by the Board of Directors (or equivalent governing body) of such Person authorizing the execution of the DIP Credit Agreement and the other Loan Documents, as appropriate, (iii) the correctness and completeness of the copy of the Operating Agreement (or equivalent governing document) of such Person attached thereto and (iv) the correctness and completeness of the copy of the certificate of incorporation (or equivalent governing document) of such Person attached thereto; (d) approval of the transaction by the credit committee of each of the Prepetition Lenders; (e) no later than two (2) days prior to the Petition Date, the DIP Lender shall have received the Initial Approved Budget; (f) the Borrowers shall have provided the DIP Lender with a copy of the "first day" motions, including the cash management motion, and proposed orders to be filed with the Bankruptcy Court in connection with the commencement of the Cases; (g) orders approving all "first day" motions other than the Interim Order shall have been entered ; (h) other than as set forth in the DIP Credit Agreement, the Borrowers shall not have executed, entered into or otherwise committed to any plan or restructuring support agreement or any other agreement or understanding concerning the terms of a Chapter 11 plan or other exit strategy without the consent of the DIP Lender; (i) the Debtors shall be in compliance with the terms of the Interim Order or the Final Order, as applicable;

(j) the Debtors shall have provided a certificate confirming that all of the representations and warranties of the Debtors in the DIP Credit Agreement, as applicable, remain true and correct, unless otherwise agreed by the DIP Lender; and (k) there shall be no defaults or Events of Default under the DIP Documents, as applicable, or any defaults or Events of Default shall have been waived by the DIP Lender.

| | |
|---|---|
| | The obligation of DIP Lender to make subsequent advances is also subject to the additional following conditions, among others: (a) the Final Order shall have been entered by the Bankruptcy Court in a form acceptable to the DIP Lender, in its sole and exclusive discretion,, shall be in full force and effect, shall not have been vacated or reversed, shall not be subject to a stay and shall not have been modified or amended other than as acceptable to the DIP Lender in its sole and exclusive discretion; and the Debtors shall be in compliance with the Final Order; (b) all "second day orders" approving on a final basis any first day orders intended to be entered on or prior to the date of entry of the Final Order shall have been entered by the Bankruptcy Court, and  shall be in full force and effect, shall not have been vacated or reversed, shall not be subject to a stay ;  (c) the Approved Budget shall demonstrate a need for the funds to be advanced under  this Agreement for the next week following the last Loan, and the Borrower Agent shall have delivered at 3 Business Days prior to the applicable draw date (or such shorter period as the Agents may agree in its sole discretion) the Notice of Borrowing showing the proposed use of such funds within the next week in accordance with an Approved Budget that was approved by Agent prior to receipt of the applicable Notice of Borrowing within the last week; (d)  no event shall have occurred or circumstance exists that has or could reasonably be expected to have a Material Adverse Change; (e) such advance or financial accommodation shall not be prohibited by any law or regulation or any order of any court or Governmental Authority or agency; and (f) no Loan Party shall have repudiated or made any anticipatory breach or repudiation of any of its obligations under any Loan Document. |
| **Approved Budget**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>DIP Credit Agreement, ¶ 7.16(a)<br><br>Interim Order, ¶ 15, 16 | (a)    Following the Petition Date, the Debtors shall prepare for the DIP Lender's review and approval a thirteen-week (13-week) detailed rolling cash projection similar in form to the 13-week cash projection provided as part of the Initial Approved Budget which shall be thereafter updated each week (each, a "<u>Proposed Budget</u>"). Upon the Debtors' receipt of the DIP Lender's approval |

| | |
|---|---|
| | (in their reasonable discretion) of a Proposed Budget, such budget shall become an "Approved Budget" and shall replace the then-operative Approved Budget for all purposes. The Initial Approved Budget shall be the Approved Budget until such time as a new Proposed Budget is approved, following which such Proposed Budget shall constitute the Approved Budget until a subsequent Proposed Budget is approved. The Debtors shall operate in accordance with the Approved Budget and all disbursements shall be consistent with the provisions of the Approved Budget (subject to the Permitted Variance). The Debtors may submit additional Proposed Budgets to DIP Lender, but until the DIP Lender approves such Proposed Budget, it shall not become an Approved Budget and the Debtors shall continue to comply with the then-operative Approved Budget. |
| | (b)    As of any applicable Testing Date, the Debtors' cash disbursements may vary from the Approved Budget by no more than 10.0% on an aggregate basis for all disbursement line items taken together in the aggregate (the "Permitted Variance"). The Debtors shall be deemed to be in compliance with the Approved Budget for all purposes under the Orders unless, as of any Testing Date, the Debtors' actual cash receipts or disbursements vary from the Approved Budget by more than the applicable Permitted Variance as measured on any Testing Date. |
| **Other Covenants**<br><br>DIP Credit Agreement, Articles VI and VII<br><br>Interim Order ¶ 17, 18 | The DIP Credit Agreement contains usual and customary affirmative and negative covenants. *See* DIP Credit Agreement Articles VI and VII.<br><br>In addition, on a weekly basis, the Debtors shall deposit into a segregated account, funds in an amount equal to the fees and expense of persons or firms retained by (i) the Debtors pursuant to Sections 327, 328, or 363 of the Bankruptcy Code or (ii) any committee appointed in the cases ((i) and (ii) together, the "Estate Professionals") incurred during the |

| | |
|---|---|
| | previous week up to the amount of such fees and expenses set forth in the Approved Budget and only to the extent there is an adequate reserve of cash for operations as determined by the Debtors, |
| **Liens and Superpriority Claims**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i), (xi); Local Rule 4001-2(c)<br><br>DIP Credit Agreement ¶ 6.1<br><br>Interim Order ¶ 6 | (i)    Subject to the Carve-Out (as defined below), all obligations of the Debtors under the DIP Facility (the "<u>DIP Obligations</u>") shall be:<br>i.    entitled to superpriority claim status under section 364(c)(1) of the Bankruptcy Code with priority over all administrative expense claims and unsecured claims existing as of the Petition Date or arising thereafter under the Bankruptcy Code, including, without limitation, the prepetition claims and adequate protection claims of the Prepetition Lenders, subject only to the Carve-Out (the "<u>DIP Superpriority Claims</u>"). The DIP Superpriority Claims may be repaid from any cash of the Debtors, including without limitation, Cash Collateral and, following entry of the Final Order, the proceeds of Avoidance Actions (as defined below) and property received or recovered thereby (the "<u>Avoidance Action Proceeds</u>");<br>ii.    secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by valid, enforceable, first priority, fully perfected security interests in and liens on all of the Debtors' rights in property of the Debtors' estates as of the Petition Date that, as of the Petition Date, were unencumbered (and do not become perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) (including, following entry of the Final Order, Avoidance Action Proceeds) (such liens, subject only to the Carve-Out);<br>iii. secured, pursuant to section 364(c)(3) of the Bankruptcy Code, by valid, enforceable, fully perfected junior security interests in and liens on all of the Debtors' rights in property of the Debtors' estates as of the Petition Date that were subject to valid, perfected and non-avoidable liens and unavoidable liens in existence immediately prior to the Petition Date, if any, or valid liens in existence as of the |

Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (the "Permitted Prior Liens"), which security interests and liens shall be junior and subordinate only to such Permitted Prior Liens and the Carve-Out; iv. secured, pursuant to section 364(d)(1) of the Bankruptcy Code, by valid, enforceable, priming first priority, fully perfected security interests in and liens upon all of the Debtors' rights in property of the Debtors' estates as of the Petition Date, and all of the Debtors' rights in property acquired post-petition (and proceeds thereof), whether now existing or hereafter acquired or arising, that secure the Prepetition Debt (such lien, together with the liens described in clauses (i) through (iii) above, the "DIP Liens" and the collateral described in clauses (i) through (iv) above, collectively, the "DIP Collateral"), which liens shall be subject to the Carve-Out. The DIP Collateral shall also include any and all rents, issues, products, offspring, proceeds and profits generated by any item of DIP Collateral.

(ii)    The DIP Liens shall be effective immediately upon the entry of this Interim Order and shall not at any time be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of any Debtor and their estates under section 551 of the Bankruptcy Code, (ii) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of any Debtor, or (iii) any intercompany or affiliate liens of any Debtor.

(iii)    The DIP Collateral will be free and clear of other liens, claims and encumbrances, except valid, perfected, enforceable and unavoidable liens, rights of recoupment enforceable in bankruptcy, and rights of setoff permissible under section 553 of the Bankruptcy Code, in each case except as

| | |
|---|---|
| | otherwise agreed by the applicable creditor or lienholder, as applicable, in existence as of the Petition Date and permitted pursuant to the Prepetition Loan Documents, if any.<br><br>(iv)    The DIP Liens will automatically attach to the DIP Collateral and become valid and perfected immediately upon entry of this Interim Order without the requirement of any further action by the DIP Lender; provided that if the DIP Lender determines to file any financing statements, notice of liens or similar instruments, the Debtors will cooperate and assist in any such filings and the automatic stay shall be modified to allow such filing. |
| **Use of Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii); Local Rule 4001-2(c)<br><br>DIP Credit Agreement, ¶ 7.14<br><br>Interim Order, ¶ 4 | Subject to the limitations set forth in the DIP Credit Agreement, the Debtors are authorized to use the DIP Facility in accordance with the Approved Budget (subject to any Permitted Variance) and the Orders entered in connection with the Cases exclusively for one or more of the following purposes (subject to any additional restrictions on the use of such proceeds and any such cash collateral set forth in the Interim Order): (a) post-petition working capital and maintenance capital expenditure purposes of the Debtors; (b) current interest, fees, and expenses under the DIP Facility; (c) payment of adequate protection expenses for the Prepetition Lenders; (d) allowed administrative costs and expenses of the Cases, including professional fees and expenses; (e) payment of prepetition claims authorized by the Bankruptcy Court; (f) any forecasted cash outlays included in any Approved Budget; or (g) as otherwise agreed. |

| | |
|---|---|
| **Proceeds of Avoidance Actions**<br><br>Interim Order, ¶ 11 | Subject to entry of the Final Order, the DIP Superpriority Claims shall have recourse to Avoidance Action Proceeds of all of the Debtors' claims and causes of action pursuant to sections 502(d), 544, 545, 547, 548, 549, 551, 553(b), 732(2), or 742(2) of the Bankruptcy Code (the "<u>Avoidance Actions</u>"), including all of the Debtors' claims and causes of actions pursuant to section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral or postpetition transfer of DIP Facility proceeds. |
| **Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iv); Local Rule 4001-2(c)<br><br>DIP Credit Agreement, ¶ 7.14<br><br>Interim Order, ¶ 7 | Subject in all cases to the Carve-Out, the Prepetition Lenders shall receive adequate protection for the Debtors' use of the collateral securing the Prepetition Loan, including, but not limited to: (i) payment of all interest accruing under the Prepetition Loan Documents as and when due pursuant to the Prepetition Loan Documents, to be paid in kind; provided that the Prepetition Lenders reserve their rights to assert default interest pursuant to the Prepetition Loan Documents in connection with the confirmation of a plan of liquidation or reorganization for the Debtors; (ii) replacement liens and security interests in DIP Collateral and superpriority administrative expense claims under sections 503 and 507 of the Bankruptcy Code, in each case (and as applicable) junior only to the Liens granted under the DIP Credit Agreement, Permitted Liens, the Obligations, and the Carve-Out, to the extent of any diminution in the value of the Prepetition Lenders' interest in any Cash Collateral or other Prepetition Collateral arising as a result of (A) the use, sale, or lease of Cash Collateral or other collateral, (B) the granting of priming liens to secure the DIP Facility, or (C) the imposition of the automatic stay; (iii) reimbursement by the Debtors of reasonable and documented fees, costs, and out-of-pocket expenses incurred or accrued by the Prepetition Lenders (to include all unpaid prepetition reasonable and documented fees, costs, and out-of-pocket expenses) in |

| | |
|---|---|
| | connection with any and all aspects of the Cases; and (iv) delivery of reporting and information as provided for in the DIP Credit Agreement.<br><br>The foregoing adequate protection liens will automatically attach to the DIP Collateral and become valid and perfected immediately upon entry of the Interim Order without the requirement of any further action by the Prepetition Lenders; provided, that if the Prepetition Lenders determine to file any financing statements, notice of liens or similar instruments, the Debtors will cooperate and assist in any such filings and the automatic stay shall be modified to allow such filing. |
| **Carve-Out**<br><br>Local Rule 4001-2(b)(6) and (c)<br><br>Interim Order ¶ 23 | The DIP Facility and the Adequate Protection shall be subject and subordinate to the Carve-Out. The "<u>Carve-Out</u>" is defined as the following:<br>(i)    Notwithstanding anything to the contrary in the DIP Documents, or the Financing Orders, the DIP Facility and the Adequate Protection shall be subject and subordinate to the Carve-Out. The Carve-Out shall include (a) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the Carve-Out Notice), (b) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the Carve-Out Notice), and (c) to the extent allowed by the Bankruptcy Court at any time, unpaid fees and expenses ("<u>Allowed Professional Fees</u>") of estate professionals incurred through the date of delivery of a Carve-Out Notice (defined below) up to the amounts for such professional included in the Approved Budget (which includes up to $200,000.00 for any committee and its professionals) through the date of the Carve-Out trigger notice and (d) to the extent allowed by the Bankruptcy Court at any time, up to $50,000 of fees and expenses incurred by |

the Estate Professionals after the first business day following delivery of a Carve-Out Notice (excluding, for the avoidance of doubt, any success fee, transaction fee, deferred fee or other similar fee set forth in any professional's engagement letter, the amounts set forth in this clause (d) being the "Post Carve-Out Notice Cap").

(ii)    "Carve-Out Notice" means a written notice (which may be by email) by the DIP Lender to the Debtors, Debtors' counsel, the U.S. Trustee, and counsel to any committee stating that the Post Carve-Out Notice Cap has been invoked, which notice may be delivered only following the occurrence and during the continuation of an Event of Default.

(iii)    Delivery of a Carve-Out Notice shall constitute a demand to the Debtors to utilize all cash on hand (including the proceeds of DIP Facility) to fund a reserve in an amount equal to the Carve-Out, which shall be earmarked and held in trust to pay unpaid fees and expenses incurred by Estate Professionals, to the extent allowed by the Bankruptcy Court at any time, prior to any and all other claims in the Cases (the "Carve-Out Reserve").

(iv)    All funds in the Carve-Out Reserve shall be used first to pay the obligations set forth in clauses (i)(a)-(d) in the above definition of "Carve-Out" until paid in full, and second, to pay the DIP Lender until paid in full. Notwithstanding anything to the contrary in the DIP Documents or the Financing Orders, the failure of the Carve-Out Reserve to satisfy in full the fees of Estate Professionals shall not affect the priority of the Carve-Out. The DIP Lender shall not be responsible for the payment or reimbursement of any fees or disbursements of any Estate Professionals or any fees or expenses of the U.S. Trustee or Clerk of the Court incurred in connection with these Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Final Order or otherwise shall be construed to obligate the DIP Lender, in any way, to pay compensation to, or to reimburse expenses of, any Estate Professionals or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

| | |
|---|---|
| **Section 506(c) and 552(b) Waivers**<br><br>Interim Order ¶ 26, 28, 29 | Subject to the entry of the Final Order, the Prepetition Lenders' consent to use of Cash Collateral and Prepetition Collateral under the Interim Order and the Debtors' right to use Cash Collateral and Prepetition Collateral: (i) is in lieu of any section 506(c) claim, payment or priority for the costs or expenses of the administration of any of these Cases; and (ii) is granted as consideration for (among other things) the waiver of the exceptions provided in sections 552(b)(1) and (2) of the Bankruptcy Code, which exceptions are hereby waived.<br><br>All payments or proceeds remitted to the DIP Lender by or on behalf of the Debtors pursuant to the DIP Documents, the provisions of this Interim Order, or any subsequent order of this Court, shall be received free and clear of any claim, charge, assessment, or other liability, including any such claim or charge arising out of or based on, directly or indirectly, section 506(c) (subject to entry of the Final Order) or the "equities of the case" exception of section 552(b) of the Bankruptcy Code (subject to entry of the Final Order). |
| **No Marshaling**<br><br>Interim Order ¶ 27 | Subject to entry of a Final Order, the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, and proceeds shall be received and applied pursuant to this Interim Order and the DIP Documents notwithstanding any other agreement or provision to the contrary. |
| **Pre-Payment**<br><br>Interim Order ¶ 13 | The Debtors may voluntarily, at any time, prepay any of the DIP Obligations and/or reduce the commitments under the DIP Facility at par plus accrued interest. Until the DIP Facility has been repaid in full and subject to the exception below and the Carve-Out, the following mandatory prepayments will be required: (a) Concurrently with the receipt by any Debtor or any of its Subsidiaries of any proceeds from any Casualty Event, the Borrowers shall prepay the Loans in an amount equal to one hundred percent (100%) of such Net Casualty Proceeds from such Casualty Event to be applied as set forth in Section 3.12; |

| | |
|---|---|
| | and (b) 100% of any Net Disposition Proceeds from any disposition of any Collateral (other than in the ordinary course of business); (c) 100% of any proceeds received (x) under any insurance policy on account of the damage or destruction of any Collateral of any Loan Parties and (y) due to any taking or condemnation of any Collateral; (d) 100% of the Net Disposition Proceeds of the incurrence or issuance of any indebtedness or equity by any Debtor; provided that no Debtor shall incur or issue indebtedness or equity; (e) 100% of any proceeds received or any cash received by or paid to or for the account of any Debtor not in the ordinary course of business, including but not limited to tax refunds, pension plan reversions, indemnity payments and any purchase price adjustments and (f) 100% of the Net Disposition Proceeds from the consummation of any sale pursuant to a Sale Motion. Notwithstanding the foregoing, any Employee Retention Credit ("ERC") monies or refunds received by the DIP Borrower may be used by the Debtors to fund working capital. Absent consent of the Parties, any ERC monies or refunds received by the DIP Borrower will not be used to prepay any of the DIP Obligations and/or reduce the commitments under the DIP Facility. |
| **Determination Regarding Prepetition Claim; Stipulations of the Debtors, Waiver**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iii), (viii)<br><br>DIP Credit Agreement, ¶11.2<br><br>Interim Order ¶ G, 30 | Subject to entry of the Interim Order, the Debtors agree and stipulate to the following: (i) One Table Restaurant Operations, LLC ("OTRO"), Tender Greens OpCo, LLC ("Tender Greens OpCo") and Tocaya Holdings LLC ("Tocaya Holdings", collectively with OTRO and Tender Greens OpCo, entered into a credit agreement (as amended from time to time, the "Prepetition Credit Agreement" and, with related documents, "Prepetition Loan Documents") for a $28.8 million senior secured term loan credit facility (the "Prepetition Loan") with One Table Restaurant Brands, LLC ("OTRB") as parent, each of the subsidiaries of OTRB as guarantors, and Breakwater in its capacity as lender (as administrative agent and collateral |

agent for the Prepetition Lenders). The Prepetition Loan have a variable interest rate based on the secured overnight financing rate plus a margin of 9.6%. Currently, the interest rate is 15.9% and interest payments total roughly $4.5 million annually. As of the Petition Date, approximately $28.8 million remains outstanding (the "Prepetition Debt") under the Prepetition Loan, plus accrued and unpaid interest, fees and expenses. Concurrently with the Prepetition Credit Agreement, the parties entered into a security agreement, guarantee agreement, and certain control agreements which granted Breakwater, for the benefit of the Prepetition Lenders, a first priority security interest in all of the assets of the Debtors; (ii) all Prepetition Loan Documents are valid, binding, and enforceable by the Prepetition Lenders against each of the relevant Debtors; (iii) as of the Petition Date, each of the Debtors was indebted and liable, without any objection, defense, counterclaim, recoupment, challenge, or offset of any kind, to the Prepetition Lenders pursuant to the Prepetition Loan Documents, (iv) pursuant to the Prepetition Loan Documents, the DIP Lender was granted a valid, duly authorized, non-voidable, binding, perfected, first- priority security interest in the Collateral; (v) the Debtors have a critical need to obtain postpetition financing under the DIP Facility and to use Cash Collateral; (vi) in light of the Debtors' facts and circumstances, the Debtors would be unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code, or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (a) a senior lien on unencumbered assets of their estates under section 364(c)(2) of the Bankruptcy Code, and (b) a junior lien on encumbered assets under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code from sources other than the DIP Lender on terms more favorable than

| | |
|---|---|
| | the terms of the DIP Facility. The only viable source of secured credit available to the Debtors, other than the use of Cash Collateral, is the DIP Facility; (vii) after considering all of their practical alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP Lender pursuant to the terms of this DIP Term Sheet represents the best financing currently available to the Debtors; (viii) good cause exists for entry of the Interim Order and Final Order; (ix) the Debtors, the DIP Lender and the Prepetition Lenders have negotiated the terms and conditions of this DIP Credit Agreement, Interim Order and Final Order(including the Debtors' continued use of the Prepetition Collateral, including Cash Collateral) in good faith and at arm's length. |
| **Challenge Period**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii)<br><br>Interim Order, ¶ 31 | Upon entry of the Interim Order and subject to the Challenge Period (defined below), the stipulations, admissions, waivers, and releases contained in this Interim Order, including the Debtors' Stipulations, shall be binding upon the Debtors, their estates, and any of their respective successors in all circumstances and for all purposes and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (defined below) as of the Petition Date. The stipulations, admissions, releases, and waivers contained in this Interim Order, including, the Debtors' Stipulations, shall be binding upon all other parties in interest, including any Committee, chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors, and any other person acting on behalf of the Debtors' estates, unless and to the extent that a party in interest with proper standing granted by order of the Court (or other court of competent jurisdiction) has timely and properly filed an adversary proceeding or contested matter under the Bankruptcy Rules (i) before seventy-five (75) calendar days after entry of the Interim Order, (the "<u>Challenge Period</u>" and, the date of expiration of the |

Challenge Period, the "Challenge Period Termination Date"); (ii) seeking to avoid, object to, or otherwise challenge the findings or Debtors' Stipulations regarding: (a) the validity, enforceability, extent, priority, or perfection of the mortgages, security interests, and liens of the Prepetition Lenders; or (b) the validity, enforceability, allowability, priority, secured status, or amount of the Prepetition Obligations (any such claim, a "Challenge"), and (iii) in which the Court enters a final order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter. Upon the expiration of the Challenge Period Termination Date without the filing of a Challenge (or if any such Challenge is filed and overruled): (a) any and all such Challenges by any party (including any Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in these Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever barred; (b) the Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in the Debtors' Cases and any Successor Cases; (c) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected secured claims, not subject to recharacterization, subordination, or avoidance; and (d) all of the Debtors' stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, and all other waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the Prepetition Secured Parties' claims, liens, and interests contained in this Interim Order shall be of full force and effect and forever binding upon the Debtors, the Debtors' estates, and all creditors, interest holders, and other parties in

| | |
|---|---|
| | interest in these Cases and any Successor Cases. If a chapter 7 trustee or a chapter 11 trustee is appointed or elected during the Challenge Period, then the Challenge Period Termination Date with respect to such trustee only, shall be the later of (i) the last day of the Challenge Period and (ii) the date that is twenty (20) calendar days after the date on which such trustee is appointed or elected. If any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules and remains pending and the Cases are converted to chapter 7, the chapter 7 trustee may continue to prosecute such adversary proceeding or contested matter on behalf of the Debtors' estates. Furthermore, if any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules, the stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, shall nonetheless remain binding and preclusive on any Committee and any other person or entity except to the extent that such stipulations and admissions were expressly challenged in such adversary proceeding or contested matter prior to the Challenge Period Termination Date. Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including, without limitation, any Committee appointed in the Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation any challenges (including a Challenge) with respect to the Prepetition Loan Documents, the Prepetition Liens, and the Prepetition Obligations, and a separate order of the Court conferring such standing on any Committee or other party-in-interest shall be a prerequisite for the prosecution of a Challenge by such Committee or such other party-in-interest. |
| **Waiver or Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv) | (i)      Upon the occurrence and during the continuance of any Event of Default, and without further application to the Bankruptcy Court, the automatic stay |

| | |
|---|---|
| DIP Credit Agreement, ¶ 10.3<br><br>Interim Order, ¶ 36 | provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to take any of the following actions, at the same or different times: (a) issue a written notice (the "Remedies Notice") (which may be by email) to the Debtors and their counsel, counsel for any committee, and the U.S. Trustee (the "Remedies Notice Parties") declaring the occurrence of the Termination Date (as defined below); (b) issue a Carve-Out Notice; (c) declare all Obligations to be immediately due and payable without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Debtors; (d) declare the suspension or termination of the DIP Facility as to any further liability or obligation of the Lenders thereunder, but without affecting the DIP Liens or DIP Obligations (the "Termination Notice"); and (e) charge the default rate of interest under the DIP Facility. Any automatic stay otherwise applicable to the DIP Lender is hereby modified so that after the occurrence and during the continuation of any Event of Default (subject to any applicable grace periods under the DIP Documentation), and delivery by the DIP Lender of a Remedies Notice as set forth in the DIP Documentation, in each case given to the Debtor and its counsel, counsel to any Committee, and the U.S. Trustee, the DIP Lender shall be entitled to exercise its rights and remedies in accordance with the DIP Documentation without further order of the Bankruptcy Court beginning five (5) business days following delivery of the Remedies Notice (the "Remedies Notice Period") unless otherwise provided by order of the Bankruptcy Court. During the Remedies Notice Period, the Debtor, the Committee, and/or the U.S. Trustee shall be entitled to an emergency hearing before the Bankruptcy Court (a "Remedies Notice Hearing"). If an Event of Default under the DIP Documentation is determined to have occurred and be |

continuing, either by the Bankruptcy Court at a Remedies Notice Hearing or as a result of the expiration of the Remedies Notice Period without a timely response requesting a Remedies Notice Hearing having been filed, the automatic stay provisions of section 362 of the Bankruptcy Code will not be re-imposed or continue with respect to the DIP Lender without its written consent. If no response to the Remedies Notice or other responsive pleading is filed with the Bankruptcy Court during the Remedies Notice Period requesting an expedited hearing on such Remedies Notice, or if a Remedies Notice Hearing is not commenced within five (5) business days following delivery of the Remedies Notice, the automatic stay provisions of section 362 of the Bankruptcy Code shall be deemed vacated and DIP Lender may exercise all rights and remedies provided for in the DIP Documentation, without further order from the Bankruptcy Court; provided, however, to the extent a Remedies Notice Hearing is occurring, then the Remedies Notice Period shall be extended pending a determination by the Bankruptcy Court. Notwithstanding the occurrence of an Event of Default under the DIP Documentation or termination of the commitments under the DIP Credit Facility or anything herein to the contrary, all of the rights, remedies, benefits, and protections provided to the DIP Lender under the DIP Documentation shall survive after the Maturity Date. Upon the expiration of the Remedies Notice Period, the DIP Obligations shall be immediately due and payable and the DIP Lender shall have all other rights and remedies provided in the DIP Documentation. The Bankruptcy Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this paragraph and relating to the application, reimposition, or continuance of the automatic stay with respect to the DIP Lender. For the avoidance of doubt, the Remedies Notice Period shall expire no later

| | |
|---|---|
| | than the earliest date of cure or waiver of the applicable Event of Default or payment of the DIP Obligations in full in cash (or by credit bid by the DIP Lender).<br><br>The Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein. Notwithstanding the foregoing, the DIP Lender may, at is discretion, file financing statements, without notice to the Debtors, with all appropriate jurisdictions to perfect or protect the DIP Lender's interest or rights under the DIP Credit Agreement, including a notice that any disposition of the Collateral, by any of the Debtors or any other Person, shall be deemed to violate the rights of the DIP Lender under the California Uniform Commercial Code. Such financing statements may indicate the Collateral as "all assets of the Debtor" or words of similar effect, or as being of an equal or lesser scope, or with greater detail, all in the DIP Lender's discretion, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and any and all of such financing statements, mortgages, notices of lien and other documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Cases. |
| **Release, Waivers or Limitation on any Claim or Cause of Action**<br><br>Bankruptcy Rule 4001(c)(1)(B)(viii); Local Rule 4001-2(b)(3)<br><br>DIP Credit Agreement, ¶12.5, 14.12<br><br>Interim Order, ¶ 39 | Subject to entry of the Interim Order, the Debtors shall provide a full release to the DIP Lender, which would not bind the Committee or other party in interest until the expiration of the period described in the paragraph below titled "Challenge Period."<br><br>Except as otherwise provided for in the DIP Credit Agreement or by applicable law, the Debtors waive all presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, |

extension or renewal of1 any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the DIP Lender on which the Debtors may in any way be liable, and hereby ratifies and confirms whatever the DIP Lender may do in this regard;

The Debtors waive their right to a jury trial. The Debtors also waive their right to demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by the DIP Lender on which the Debtors may in any way be liable.

Furthermore, the Debtors waive:

(a) any suretyship defenses available to them under the California Uniform Commercial Code or any other applicable law, including, without limitation, the benefit of California Civil Code Section 2815 permitting revocation as to future transactions and the benefit of California Civil Code Sections 1432, 2809, 2810, 2819, 2839, 2845, 2847, 2848, 2849, 2850, and 2899 and 3433; and (b) any right to require the DIP Lender to: (1) proceed against any one of the Debtors or any other person; (2) proceed against or exhaust any security; or (3) pursue any other remedy. The DIP Lender may exercise or not exercise any right or remedy it has against any of the Debtors or any security it holds (including the right to foreclose by judicial or non-judicial sale) without affecting any of the Debtors' liability. Notwithstanding any other provision of the DIP Credit Agreement or other related document, each one of the Debtors irrevocably waive all rights that it may have at law or in equity (including, without limitation, any law subrogating the Debtors to the rights of the DIP Lender under the DIP Credit Agreement) to seek contribution, indemnification or any other form of reimbursement from any other one of the Debtors, or any other Person now or hereafter primarily or secondarily liable for any of the Obligations, for any payment made by the Debtors with respect to the Obligations in connection with the DIP Credit Agreement

| | |
|---|---|
| | or otherwise and all rights that it might have to benefit from, or to participate in, any security for the Obligations as a result of any payment made by the Debtors with respect to the Obligations in connection with the DIP Credit Agreement or otherwise.<br><br>Each Guarantor unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of nonperformance, default, acceleration, protest or dishonor and any other notice with respect to any of the Guaranteed Obligations and the DIP Facility and any requirement that Secured Parties protect, secure, perfect or insure any Lien on any property subject thereto or exhaust any right or take any action against any Loan Party or any other Person or any Collateral. In addition, the Guarantors waive all rights of revocation, all defenses, any duty to disclose, all rights of subrogation or contribution, and additional waivers as set forth in Exhibit C to the DIP Credit Agreement. They also acknowledge that DIP Lender may, without notice to or demand upon each Guarantor and without affecting the liability of each Guarantor under this Facility Guaranty, foreclose under any mortgage by nonjudicial sale, and each Guarantor hereby waives any defense to the recovery by DIP Lender against each Guarantor of any deficiency after such nonjudicial sale and any defense or benefits that may be afforded by applicable law. |
| **Events of Default** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c)<br><br>DIP Credit Agreement, 10.1<br><br>Interim Order, ¶ 19 | The DIP Credit Agreement, the Interim Order and the Final Order contain usual and customary Events of Default, including non-performance of the terms thereof. *See* <u>DIP Credit Agreement</u>, Section 10.1. |
| **Remedies**<br><br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(c) | Upon the occurrence and during the continuance of an Event of Default, and without further application to the Bankruptcy Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit |

| | |
|---|---|
| DIP Credit Agreement, ¶ 10.2, 10.3<br><br>Interim Order, ¶ 20 | the DIP Lender to take any of the following actions, at the same or different times:<br>(i)     issue a written notice (the "<u>Remedies Notice</u>") (which may be by email) to the Debtors and their counsel, counsel for any Committee, and the U.S. Trustee (the "<u>Remedies Notice Parties</u>") declaring the occurrence of the Termination Date (as defined below); (ii)     issue a Carve-Out Notice; (iii) declare all DIP Obligations immediately due and payable without presentment, demand, protest or further notice of any kind, all of which are expressly waived by the Debtors; (iv)     declare the suspension or termination of the DIP Facility as to any further liability or obligation of the DIP Lender thereunder, but without affecting the DIP Liens or DIP Obligations (the "<u>Termination Notice</u>"); and (v) charge the default rate of interest under the DIP Facility. (vi) prior to terminating the rights of the Debtors to use Cash Collateral or exercising any remedies against the DIP Collateral other than those specified in (a) – (e) above, the DIP Lender shall be required to file a motion with the Court using a CM/ECF emergency code seeking emergency relief from the automatic stay (the "<u>Stay Relief Motion</u>") on at least three (3) business days' written notice to the Remedies Notice Parties of the DIP Lender's intent to exercise its rights and remedies (the "<u>DIP Remedies Notice Period</u>"). In the event the Bankruptcy Court determines during a hearing on the Stay Relief Motion that an Event of Default has occurred, the Bankruptcy Court may fashion an appropriate remedy, which may include the exercise of any and all rights available to the DIP Lender under the DIP Documents, the DIP Credit Agreement, the Interim Order, and/or the Final Order, as applicable. |
| **Indemnification; Exculpation**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix)<br><br>DIP Credit Agreement, ¶ 14.8<br><br>Interim Order ¶ 40 | The Debtors shall reimburse the DIP Lender and its affiliates and their respective officers, employees, directors, shareholders, agents and legal counsel for all reasonable costs and expenses, including legal fees and expenses, incurred and shall indemnify and hold the Indemnified Parties harmless from and against all losses (including, without limitation, any and all Environmental Liabilities) suffered by any Indemnified Party, in any way relating to |

|  | (a) any Loans, Loan Documents, or the use thereof or transactions relating thereto, (b) any action by Secured Parties or any affiliate of Secured Parties taken or omitted in connection with any Loan Documents, (c) the existence or perfection of any Liens, or realization upon any Collateral, (d) exercise by Secured Parties or any affiliate of Secured Parties of any rights or remedies under or in any way connected to the DIP Credit Agreement, any other Loan Documents or Applicable Law, or (e) failure by any Loan Party to perform or observe any terms of any Loan Document, in each case including all costs and expenses relating to any investigation, litigation, arbitration or other proceeding, whether or not the applicable Indemnified Party is a party thereto, provided; however, no Loan Party shall be required to indemnify and hold an Indemnified Party harmless for any losses resulting from an Indemnified Party's fraud, gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final non-appealable judgment. |
|---|---|

34.     Further, in connection with any sale or disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the Uniform Commercial Code, at any sale thereof conducted under the provisions of the Bankruptcy Code, including section 363 of the Bankruptcy Code or as part of a restructuring plan subject to confirmation under section 1129 of the Bankruptcy Code, or at any sale or foreclosure conducted by the DIP Lender, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, in each case in accordance with applicable law and, with respect to any credit bid under section 363(k) of the Bankruptcy Code, the Debtors give the DIP Lender the power and right to "credit bid" the full amount of all Obligations, and no such rights shall be limited "for cause" or otherwise.  *See* DIP Credit Agreement, ¶ 13. 14.  In fact, the Debtors are advised that the DIP Lender intends to present an asset purchase agreement and stalking horse bid for consideration very shortly.

## BASIS FOR RELIEF REQUESTED

A.     **The Bankruptcy Court May Approve Postpetition Financing**

35.     Section 364(c) of the Bankruptcy Code provides as follows:

If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1) with priority over any and all administrative expenses of the kind specified in section 503(b) and 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

36.    Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith. *See, e.g. In re L.A. Dodgers LLC,* 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."); *In re Simasko Production Co*., 47 B.R. 444, 448-49 (Bankr. D. Colo. 1985) (authorizing financing agreement where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estate).

37.    The Debtors are in need of an immediate additional infusion of liquidity to, among other things, fund certain operational expenses, including rent, maintain ordinary course relationships with landlords, vendors, suppliers, and customers, and satisfy working capital needs in the ordinary course.  As of the Petition Date, the Debtors only have less than $600,000 in cash on hand with which to operate their businesses and fund the Cases.  Therefore, together with their advisors, the Debtors undertook an analysis of the incremental liquidity that would be necessary to maintain operations in connection with the filing of the Cases.  Based on the Debtors' 13-week cash flow forecast, the Debtors determined that they will have additional net cash needs of approximately $3,000,000 in the first 13-weeks of the Cases.

38.     The Debtors require the financing provided under the DIP Facility for the operation of their businesses, to preserve their going concern value, to pay landlords, vendors, suppliers and customers, to pay for certain costs and expenses related to the Cases and to satisfy the Debtors' other working capital needs.  Access to sufficient working capital and liquidity made available through the DIP Facility, as requested by this Motion, is vital to the preservation and maintenance of the Debtors' going concern value and to the Debtors' ultimate goal of selling substantially all of their assets.

39.     As discussed below, section 364 of the Bankruptcy Code is satisfied because the Debtors cannot sustain operations if they cannot obtain postpetition funds by way of a debtor-in-possession loan.  In order to do so, the Debtors must obtain financing from the DIP Lender.  However, the only way to obtain such financing is to grant to the DIP Lender the protections provided in the Interim Order, Final Order, and in the DIP Credit Agreement.

40.     In this case, substantially all of the Debtors' assets are encumbered and, despite the diligent efforts of the Debtors, working capital for the Cases was not available absent the proposed DIP Loan.  Accordingly, the Debtors believe they are required to obtain financing under section 364(c) of the Bankruptcy Code and, accordingly, the DIP Facility reflects the exercise of the Debtors' sound business judgment.  The DIP Lender was unwilling to extend financing on terms more favorable to the Debtors, and the Debtors were not able to obtain alternative sources of financing upon more favorable terms.  Further, after speaking to their advisors, the Debtors believe the terms reached generally reflect acceptable terms in the current market.

41.     The Debtors' ability to continue to operate their businesses pending a sale pursuant to section 363 of the Bankruptcy Code and to maximize value to all stakeholders depends upon their ability to obtain the DIP Facility.  Without the proposed financing, the Debtors would not have sufficient funds to operate, jeopardizing the successful sale of the Debtors as a going concern, and thereby diminishing recoveries for their stakeholders.

**B.** **Authority to Grant Priming Liens and Superpriority Claims in Connection with the DIP Facility Should be Provided**

42.     The DIP Facility requires the Debtors to provide the liens discussed herein, including but not limited to first-priority priming liens and the Superpriority Claims pursuant to sections 364(c) and (d) of the Bankruptcy Code (collectively, the "<u>DIP Liens</u>").  Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses as specified in sections 503(b) or 507(b) of the Bankruptcy Code, (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien.  11 U.S.C. § 364(c).

43.     Section 364(d) of the Bankruptcy Code, in turn, allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, after notice and a hearing, provided that (i) the debtor is unable to obtain such credit otherwise, and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.  11 U.S.C. § 364(d).  The Court may authorize the proposed first priority priming liens if either (a) the prepetition secured parties have consented, or (b) the prepetition secured parties' interests in their respective collateral are adequately protected. *See Anchor Sav. Bank FSB v. Sky Valley, Inc.,* 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

44.     As discussed below, section 364(d) of the Bankruptcy Code is satisfied by virtue of the consent of all parties with an interest in the Collateral to the priming lien being granted to the DIP Lender.  The DIP Lender, whose prepetition liens will be primed by the DIP Liens, has consented on the terms described herein and set forth in the proposed Interim Order. Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

45.     As discussed above and in the First Day Declaration and the Klein Declaration ,
despite the efforts of the Debtors and their advisors, the Debtors have been unable to (i) procure
sufficient financing (a) in the form of unsecured credit allowable under section 503(b)(1) of the
Bankruptcy Code, (b) as an administrative expense under sections 364(a) or (b) of the Bankruptcy
Code; or (ii) obtain postpetition financing or other financial accommodations from any alternative
prospective lender or group of lenders on more favorable terms and conditions than those for which
approval is sought herein. Importantly, the DIP Lender indicated that it would not agree to being
"primed" by a lender other than itself.

46.     Having determined that financing is available only under sections 364(c) and (d) of
the Bankruptcy Code, the Debtors commenced arms'-length negotiations with the DIP Lender,
and their counsel and advisors, regarding the DIP Facility.  The DIP Lender was only willing to
provide the DIP Facility, if, among other things, it was granted a first-priority priming lien on the
Collateral and the Superpriority Claims.

47.     Further, as indicated above, section 364(c) of the Bankruptcy Code enumerates
certain incentives that a bankruptcy court may grant to postpetition lenders.  Such incentives are
not exhaustive.  Bankruptcy courts frequently have authorized the use of inducements not specified
in the statute.  See e.g. *In re Ellingsen MacLean Oil Co.*, 834 F.2d 599 (6th Cir. 1987) (affirming
financing order that prohibited any challenges to the validity of already existing liens); *In re
Defender Drug Stores*, 126 B.R. 76 (Bankr. D. Ariz. 1991) (authorizing enhancement fee to
postpetition lender), aff'd, 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) ("[b]ankruptcy courts…have
regularly authorized postpetition financial arrangements containing lender incentives beyond the
explicit priorities and liens specified in section 364"); *In re Antico Mfg. Co.*, 31 B.R. 103 (Bankr.
E.D.N.Y. 1983)(authorizing lien on prepetition collateral to secure postpetition indebtedness).

48.     Section 364 of the Bankruptcy Code does not require that a debtor seek alternative
financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts
to obtain financing without the need to grant a senior lien.  *Bray v. Shenandoah Fed. Sav. & Loan
Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was

unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *L.A. Dodgers*, 457 B.R. at 313 <u>citing</u> *Ames Dep't Store*, 115 B.R. at 37 (noting the court "may not approve any credit transaction under subsection (c) [of section 364] unless the debtor demonstrates that it has attempted, but failed, to obtain unsecured credit under section 364(a) or (b)"); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most banks lend money only in return for a senior secured position"); *In re Aqua Assocs.*, 123 B.R. 192, 197 (Bankr. E.D. Pa. 1991) (debtor adequately established that some degree of priming loan was necessary if debtor were to obtain funding).

49.     Further, the mandates of section 364(d)(4) of the Bankruptcy Code are satisfied by virtue of the following.  First, as to the first priority lien on the Collateral, the DIP Lender (the only party with a lien on the Collateral) has specifically consented to the relief requested in the Motion.  As such, the Court need not make any findings with respect to the adequate protection of said interests.

50.     In this case, substantially all of the Debtors' assets are encumbered and, despite the diligent efforts of the Debtors, working capital for the Cases was not available absent the proposed DIP Liens and Superpriority Claims.  Accordingly, the Debtors believe they are required to obtain financing under sections 364(c) and (d) of the Bankruptcy Code and, accordingly, the DIP Facility reflects the exercise of the Debtors' sound business judgment.  The DIP Lender was unwilling to extend financing on terms more favorable to the Debtors, and the Debtors were not able to obtain alternative sources of financing upon more favorable terms.  The Debtors' ability to continue to operate their businesses pending a going concern sale pursuant to section 363 of the Bankruptcy Code and to maximize value to all stakeholders depends on their ability to obtain the DIP Facility.  Without the proposed financing, the Debtors would not have sufficient funds to operate, jeopardizing the successful sale, thereby diminishing recoveries for their stakeholders.

F.      **The Roll Up DIP Loans Are Appropriate**

51.     The proposed Roll-Up Loans are an appropriate exercise of the Debtors' business judgment. Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval. See 11 U.S.C. § 363(b). It is well-settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose. *See In re Abbots Dairies, Inc.,* 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code should be approved if the debtor can demonstrate a sound business justification for the proposed transaction). The business judgment rule shields a debtor's management from judicial second-guessing. *See In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

52.     DIP facilities commonly include provisions repaying prepetition debt (often referred to as a "roll-up"). The importance of "roll-up" features in DIP facilities has been repeatedly recognized by courts in this district and others, and such courts have granted relief similar to that requested herein. *See, e.g., In re True Religion Apparel, Inc.*, Case No. 20-10941 (CSS) (Docket No. 278) (Bankr. D. Del. May 29, 2020) (approving roll-up with a ratio of approximately 7.2:1 on ABL facility and approximately 5.75:1 on term loan facility); *In re Charming Charlie Holdings, Inc.*, Case No. 19-11534 (CSS) (Docket No. 253) (Bankr. D. Del. August 14, 2019) (approving roll-up with a ratio of approximately 2.7:1); *In re Cal Dive Intl, Inc.*, No. 15-10458 (Docket No. 282) (Bankr. D. Del. Apr. 20, 2015) (approving $120 million total financing, including a $99.8 million roll-up, at a ratio of approximately 4.9:1); *In re RadioShack Corp.,* No. 15-10197 (Docket No. 947) (Bankr. D. Del. Mar. 12, 2015) (approving $285 million total financing, including a $250 million roll-up, at a ratio of approximately 7:1); *In re Real Mex Rests., Inc.*, No. 11-13122 (Docket No. 392) (Bankr. D. Del. Nov. 9, 2011) (approving $49 million total financing, including a $37.5 million roll-up, at a ratio of approximately 3.25:1); *In re NEC*

*Holdings Corp.*, No. 10-11890 (Docket No. 223) (Bankr. D. Del. Jul. 16, 2010) (approving $139 million total financing, including a $110 million roll-up, at a ratio of approximately 3.79:1).

53.      As demonstrated in the First Day Declaration, the Debtors cannot fund the Cases absent the liquidity provided by the DIP Facility. The Debtors received no other actionable financing proposals. Accordingly, the Debtors believe that obtaining credit under the DIP Facility, even with the Roll Up Loans, constitutes a proper exercise of their business judgment and is in the best interest of their estates.

54.      The Roll Up Loans are reasonable, appropriate, a proper exercise of the Debtors' business judgment, and ultimately in the best interest of their estates.

**The Scope Of The Carve-Out Is Appropriate**

55.      The proposed DIP Facility subjects the security interests and administrative expense claims of the DIP Lender to the Carve-Out.  Such carve-outs for professional and other fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel.  *See Ames Dep't Stores*, 115 B.R. at 40. Neither the Final Order nor the Interim Order directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases.  *Id*. at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").

56.      In addition, subject to the Approved Budget, the Carve-Out ensures that proceeds of the DIP Facility and Cash Collateral may be used for the payment of U.S. Trustee fees and professional fees of the Debtors and any future committee notwithstanding the grant of the priming, superpriority and administrative liens and claims under the DIP Facility.

57.      Accordingly, the Debtors submit the proposed Carve-Out, as agreed to by the DIP Lender, is appropriate.

**G.**    **The DIP Lender Is Entitled to the Protections Afforded to a Good Faith Lender Under Section 364(e) of the Bankruptcy Code**

58.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Specifically, section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

59.    In this case, the DIP Documents are the result of (i) the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms available on which to obtain needed postpetition financing, and (ii) are the product of extended arms'-length, good faith negotiations between and among the Debtors and the DIP Lender and each of their counsel. The terms and conditions of the DIP Documents are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, are supported by reasonably equivalent value and fair consideration, are on par with the terms being offered in the marketplace for similar DIP financing, and are in the best interests of the Debtors, their estates and creditors.

60.    The proceeds under the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, no consideration is being provided to any party to the DIP Documents other than as described herein. and the DIP Lender extended the DIP Facility in reliance upon the protections offered by section 364(e) of the Bankruptcy Code.  Section 364(e) of the Bankruptcy Code provides a lender with a presumption of good faith.  *Weinstein, Eisen, Weiss LLP v. Gill (In re Cooper Common, LLC),* 424 F.3d 963, 969 (9th Cir. 2005).

43

61.     Accordingly, the Debtors request that the Court find that the DIP Lender has acted as a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code, and is entitled to all of the protections afforded by that section.

**H.     The Automatic Stay Should Be Modified on a Limited Basis**

62.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to grant the security interests, liens and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens.   In addition, the Final Order provides for the modification of the automatic stay to allow for the enforcement of rights and remedies by the DIP Lender under the DIP Documents upon the occurrence of an Event of Default.

63.     Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

**I.     The Debtors' Proposed Use of Cash Collateral Should be Approved**

64.     In relevant part, section 363(c)(2) of the Bankruptcy Code provides that the Debtors "may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless – (A) each entity that has an interest in such cash collateral consents."

65.     As noted above, the DIP Lender is the only secured creditor that holds an interest in the Debtors' Cash Collateral.  The DIP Lender (and each of the Prepetition Lenders for whom the DIP Lender acts as administrative agent and collateral agent) has consented to the Debtors' proposed use of Cash Collateral on the terms set forth herein.  Therefore, the Debtors respectfully request this Court to approve their proposed use of Cash Collateral with the adequate protection provisions required by the DIP Lender as set forth in the DIP Credit Agreement.

**J.     The Court Should Schedule a Final Hearing on This Motion as Soon as Possible in Accordance with the Requirements of the Bankruptcy Rules**

66.     By this Motion, the Debtors request that the Court schedule a final hearing on this Motion as soon as possible in accordance with the requirements of the Federal Rules of Bankruptcy

Procedure.  Bankruptcy Rule 4001(c)(2) provides that the Court may commence a final hearing on this Motion no earlier than fourteen (14) days after service of the Motion.  The Debtors need to obtain as promptly as possible final authorization to obtain postpetition financing consistent with the DIP Facility in order to ensure the Debtors' landlords, employees and vendors that the Debtors will be able to pay, during the course of the Cases, their ordinary operating expenses including, without limitation, rent, payroll and the expenses of maintenance and operation of their businesses.

67.    Therefore, the Debtors respectfully submit that a final hearing on this Motion should be held as soon as possible after the expiration of the fourteen (14) day period provided for by Bankruptcy Rule 4001(c)(2) in order to prevent the substantial damage to the Debtors' business which would result from any loss of support of the Debtors' landlord, customers, employees, and vendors.

**K.**    **Request for Immediate Relief and Waiver of Stay**

68.    It is roundly accepted and recognized that immediate interim relief may be crucial to the success of a corporate reorganization:

> We realize that 'in certain circumstances, the entire reorganization effort may be thwarted if emergency leave is withheld' and that reorganization under the Bankruptcy Code 'is a perilous process, seldom more so than at the outset of the proceedings when the debtor is often without sufficient cash flow to fund essential business operations.' It is for this reason that Congress specified that hearings concerning the use of cash collateral 'shall be scheduled in accordance with the needs of the debtor.'

*In re Center Wholesale, Inc.*, 759 F.2d 1440, 1449 n.21 (9th Cir. 1985) (emphasis added)(citations omitted). See also *In re Sullivan Ford Sales*, 2 B.R. 350, 355 (Bankr. D. Me. 1980).

69.    Pending a final hearing, the Debtors require immediate financing and use of existing Collateral and Cash Collateral. The Debtors' interim request represents the Debtors' good faith projection of the cash necessary to operate during the period prior to a final hearing.  It is essential that the Debtors maintain stability and continue paying ordinary operating expenses postpetition to facilitate the sale process and maximize the value of their assets.  Absent immediate

financing and use of existing collateral, the Debtors will not have any funding to pay expenses and therefore will be unable to avoid an immediate liquidation pending a final hearing.

70.     Bankruptcy Rule 6003 provides that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding . . . a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate . . . ." Fed. R. Bankr. P. 6003(b).  The Debtors submit that, because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

71.     Bankruptcy Rule 4001 has the same standard, with respect to interim relief.  Fed. R. Bankr. P. 4001(b)(2); Fed. R. Bankr. P. 4001(c)(2) ("If the motion so requests, the court may conduct a hearing before such 14-day period [after service of the motion] expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  The Debtors submit that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, and that Bankruptcy Rules 6003 and 4001 have been satisfied.

72.     In addition, in order to implement the foregoing successfully, the Debtors respectfully request a waiver of the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As set forth above, the DIP financing proposed herein is essential to prevent potentially irreparable damage to the operations, value, and ability of the Debtors to reorganize.

73.     Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable.

## NOTICE

74.     Notice of the Interim Hearing and notice of the Motion has been given by the Debtors to (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors'

thirty (30) largest unsecured creditors (excluding insiders); (ii) counsel to the DIP Lender and its counsel; (iii) all known holders of liens upon the Debtors' assets; (iv) the attorneys general in the states in which the Debtors conduct their business; (v) the Internal Revenue Service; and (vi) all parties that have filed notices of appearance pursuant to Bankruptcy Rule 2002; by facsimile transmission, email, overnight courier and/or hand delivery.

75.     Further, as the Motion is seeking "first day" relief, within two business days after the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-l(m).

76.     The Debtors respectfully submit that, under the circumstances, such notice of the Interim Hearing and the Motion constitutes adequate and sufficient notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 400, and the Local Rules, and in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

77.     The Debtors have not previously sought the relief requested herein from this or any other Court.

WHEREFORE, the Debtors respectfully request entry of an order, substantially in the form attached hereto as Exhibit A, granting the relief requested in this Motion and such other and further relief as may be appropriate and proper.

47

Dated:  July 17, 2024
Wilmington, Delaware

**RAINES FELDMAN LITTRELL LLP**

*/s/ Thomas J. Francella Jr.*
Thomas J. Francella Jr. (DE Bar No. 3855)
1200 North Broom Street
Wilmington, DE 19806-4204
Telephone: (302) 772-5805
Email: tfrancella@raineslaw.com

and

**SHULMAN BASTIAN FRIEDMAN & BUI LLP**
Alan J. Friedman (CA Bar No. 132580)
Melissa Davis Lowe (CA Bar No. 245521)
Max Casal (CA Bar No. 342716)
100 Spectrum Center Drive; Suite 600
Irvine, CA 92618
Telephone:  (949) 340-3400
Facsimile:  (949) 340-3000
E-mail:
afriedman@shulmanbastian.com
mlowe@shulmanbastian.com
mcasal@shulmanbastian.com

*Proposed Counsel to the Debtors and Debtors in Possession*