## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | Chapter 11 |
| ONE TABLE RESTAURANT BRANDS, LLC, *et al.*,[1] | Case No. 24-11553 |
| Debtors. | (Joint Administration Requested) |

### INTERIM ORDER  (I) AUTHORIZING DEBTORS  TO OBTAIN POSTPETITION FINANCING AND USE CASH COLLATERAL;  (II) GRANTING PRIMING AND OTHER LIENS AND SUPER-PRIORITY CLAIMS AND ADEQUATE PROTECTION; (III) MODIFYING THE AUTOMATIC STAY; AND AND (IV) GRANTING RELATED RELIEF

Upon consideration of the Debtors' motion (the "Motion") [2] pursuant to sections 105, 362, 363 and 364, 503 and 507, of title 11 of the United States Code (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules of Bankruptcy Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") seeking, *inter alia*::

(i)      the entry of an interim order (the "Interim Order") authorizing the Debtors to obtain postpetition financing in accordance with the terms of the Senior Secured Super-Priority Priming Debtor-In-Possession Loan and Security Agreement between the Debtors, on one hand, and Breakwater Management LP in its capacity as lender (the "DIP Lender") (as the administrative agent and collateral agent for Breakwater Credit Opportunities Fund II LP, H&W Irrevocable Trust; Randall Capital Group, LLC; 2014 MSM Irrevocable Trust; and Schuyler and Dina Joyner

---

[1] The Debtors in these Chapter 11 cases, along with the last four (4) digits of their federal tax identification numbers are (1) One Table Restaurant Brands, LLC, a Delaware limited liability company (9853); (2)  One Table Restaurant Operations, LLC, a Delaware limited liability company (7280), (3) Tender Greens OpCo, LLC, a Delaware limited liability company (7827); (4) Tocaya Holdings LLC, a Nevada limited liability company (8815); (5) Tocaya Organica, LLC, a California limited liability company (6720); (6) Tocaya Management LLC, a Nevada limited liability company (6789); (7) BLT Steak LA LLC, a California limited liability company (4688); (8) Tocaya Venice LLC, a California limited liability company (0159); (9) Tocaya South Bay, LLC, a California limited liability company (0401); (10) Tocaya Toluca, LLC, a California limited liability company; and (11) Tocaya Santa Monica LLC, a California limited liability company (8134).  The Debtors' mailing address is:  1201 W. 5th Street, Suite T-400, Los Angeles, CA 90017.

2 Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the DIP Credit Agreement a copy of which is attached hereto as Exhibit 1.

Revocable Trust Dated 11/12/2003 (collectively, the "Prepetition Lenders")[3], on the other, a copy of which is attached hereto as **Exhibit "1"** (the "DIP Credit Agreement" and, with related documents, the "DIP Documents") on an interim basis, in the amount of $1,700,000 , plus a roll-up based on the interim funding of $6,800,000 of the Prepetition Loan (the "Interim Roll-Up Loans");

(ii)    setting a final hearing (the "Final Hearing") for approval of the Debtors to borrow, based upon the DIP Facility, up to $3,000,000 plus a roll-up of $12,000,000 of the Prepetition Loan (the "Final Roll-Up Loans");

(iii)    entry of the Final Order;

(iv)    a finding that the Debtors are authorized to utilize cash collateral as such term is defined in 11 U.S.C. §363 ("Cash Collateral") pursuant to sections 362 and 363 of the Bankruptcy Code, upon the terms and conditions set forth in the DIP Credit Agreement;

(v)    a finding that the Debtors are authorized to execute and enter into the DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(vi)    a finding that the Debtors are authorized to use the proceeds of the DIP Facility for working capital and general corporate purposes in accordance with the Approved Budget, as that term is used and defined within the DIP Credit Agreement, a copy of which is attached hereto as **Exhibit "2"**;

(vii)    granting the DIP Lender a senior and first-priority priming lien on all of the Debtors' property encumbered by the prepetition liens of Breakwater pursuant to section 364(d) of the Bankruptcy Code;

(viii)    granting the DIP Lender superpriority administrative claims, as set forth in the DIP Credit Agreement;

---

[3] Four out of five of the Prepetition Lenders are also lenders under the DIP Facility. The only Pre-Petition Lender not participating in the DIP Facility is Randall Capital Group, LLC.

(ix)      modifying the automatic stay, set forth in section 362 of the Bankruptcy Code, to the extent necessary to implement and effectuate the terms of the DIP Credit Agreement, including a waiver of any applicable stay with respect to the effectiveness and enforceability of this Interim Order and the Final Order (including under Bankruptcy Rule 6004); and

(x)      such other relief as the Bankruptcy Court may find just and proper.

The Court having considered the Motion, the exhibits attached thereto, the First Day Declaration of Harald Herrmann in Support of First Day Pleadings (the "First Day Declaration") in support of the Debtors' voluntary petitions for chapter 11 relief, commencing the above-captioned chapter 11 cases (the "Cases"),  the Declaration of Richard Klein (the "Klein Declaration"), the Declaration of Cody Clarke (the "Clarke Declaration"), the DIP Credit Agreement, and the evidence submitted and arguments made at the interim hearing (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001, and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion on an interim basis is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties-in-interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Credit Agreement is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW**

A.      Petition Date. On July 17, 2024 ("Petition Date"), the Debtors filed their respective voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.   The Debtors are

continuing in possession of their property, and operating and managing their businesses, as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.      Jurisdiction. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334. This matter constitutes a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Court has the authority to enter a final order in this matter. Venue is proper in this jurisdiction pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      Service of Motion and Notice of Interim Hearing. Proper and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

D.      Findings Regarding Postpetition Financing and the Use of Cash Collateral.

(i)      Request for Postpetiton Financing.  The Debtors seek authority on an interim basis to enter into the DIP Facility on the terms described herein and in the DIP Documents and for authority to use Cash Collateral to administer their Cases and fund their operations in accordance with the Approved Budget, subject to Permitted Variances (as defined herein) and unless otherwise expressly specified in the DIP Credit Agreement. At the Final Hearing, the Debtors will seek final approval of the proposed postpetition financing and use of Cash Collateral arrangements pursuant to the Final Order, which shall be in form and substance acceptable to the DIP Lender. Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

(ii)      Immediate Need for Postpetition Financing.  An immediate and ongoing need exists for the Debtors to obtain the proceeds of the DIP Facility and to continue the use of Cash Collateral in order to permit, among other things, the Debtors to meet their obligations arising during the Cases, including the administration of the Cases, so as to maximize the value of their businesses and assets as Debtors in possession under Chapter 11 of the Bankruptcy Code. The Debtors do not have sufficient available sources of working capital to operate their businesses without access to the DIP Facility, and their existing liquidity is deteriorating at a rate that requires immediate access to the proceeds of the DIP Facility and warrants expedited consideration of the

Motion and entry of this Interim Order. The Debtors' ability to preserve and maintain their assets, make rent payments, to pay employees, and to otherwise fund operations and an orderly reorganization process, is essential to the Debtors' viability and preservation of the going-concern value of their business and the value of their assets. Without access to the DIP Facility, the Debtors' estates would suffer immediate and irreparable harm.

(iii)      <u>No Credit Available on More Favorable Terms.</u> The Debtors are unable to obtain financing on more favorable terms than the DIP Facility and are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or secured credit solely under section 364(c) of the Bankruptcy Code.

(iv)      <u>Approved Budget.</u> The Debtors have delivered to the DIP Lender the Approved Budget which is reasonably acceptable to the DIP Lender in accordance with the DIP Documents. The DIP Lender is relying upon the Approved Budget in entering into the DIP Documents

(v)      <u>Use of Proceeds of the DIP Facility and Cash Collateral.</u>  As a condition to the Debtors' entry into the DIP Documents and the extensions of credit under the DIP Facility, the DIP Lender and the Debtors have agreed that the proceeds of the DIP Facility shall be used, in each case in a manner consistent with the terms and conditions of this Interim Order and the DIP Documents and in accordance with the Approved Budget and subject to such variances as permitted in the DIP Credit Agreement (such variances, "<u>Permitted Variances,</u>") solely for the purpose set forth in (a)-(h) below, (collectively the "<u>Permitted Uses of the DIP Facility and Cash Collateral</u>"):

    a.  post-petition working capital and maintenance capital expenditure purposes of the Debtors;

    b.  current interest, fees, and expenses under the DIP Facility;

    c.  payment of adequate protection expenses for the Prepetition Lenders;

    d.  the allowed administrative costs and expenses of the Cases, including professional fees and expenses;

    e.   payment of prepetition claims authorized by the Bankruptcy Court;

    f.   any forecasted cash outlays included in any Approved Budget; or

    g.   as otherwise agreed; in each case, solely in accordance with the Approved Budget and the applicable Financing Order incorporating the terms hereof.

E.    <u>Section 506(c)</u>. Subject to the entry of the Final Order, (x) the DIP Lender's agreement that its liens and superpriority claims are subject to the Carve Out and (y) the Prepetition Lenders' consent to use of Cash Collateral and Prepetition Collateral under the Interim Order and the Debtors' right to use Cash Collateral and Prepetition Collateral: (i) are in lieu of any section 506(c) claim, payment or priority for the costs or expenses of the administration of any of these Cases; and (ii) are granted as consideration for (among other things) the waiver of the exceptions provided in sections 552(b)(1) and (2) of the Bankruptcy Code, which exceptions are hereby waived.

F.    <u>Good Faith of the DIP Lender.</u>

    (i)    <u>Certain Conditions to DIP Facility</u>. The DIP Lender's willingness to make the DIP Facility available is conditioned upon, among other things, (a) the Debtors obtaining Court approval to enter into the DIP Documents and to incur all of their obligations thereunder, and to confer upon the DIP Lender all rights, powers, and remedies thereunder, (b) the DIP Lender being granted, as security for the prompt payment of the obligations under the DIP Facility and all other DIP Obligations, perfected security interests in and liens upon the DIP Collateral, and that such perfected security interests and liens have the priorities set forth herein and (c) the Interim and Final Orders including releases of the DIP Lender, and their affiliates and others.

    (ii)    <u>Fair and Reasonable Terms</u>. The terms and conditions of the DIP Facility and the use of Cash Collateral, if any, are fair and reasonable, are the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration, have been negotiated in good faith and at arm's length between the Debtors and the

DIP Lender, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code.

G.    <u>Debtors' Stipulations</u>. After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest pursuant to the Challenge Period described in the paragraph below titled "Challenge Period," the Debtors, on their own behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree as follows (collectively, the "<u>Debtors' Stipulations</u>"):

(i)    Prior to the Petition Date, One Table Restaurant Operations, LLC ("<u>OTRO</u>"), Tender Greens OpCo, LLC ("<u>Tender Greens OpCo</u>") and Tocaya Holdings LLC ("<u>Tocaya Holdings</u>," and collectively with OTRO and Tender Greens OpCo, "<u>Borrowers</u>"),  One Table Restaurant Brands, LLC ("<u>OTRB</u>"), and certain subsidiaries of OTRB (as guarantors) entered into a credit agreement dated as of July 23, 2021 (as amended from time to time, the "<u>Prepetition Credit Agreement</u>" and, with related documents, "<u>Prepetition Loan Documents</u>") with the Prepetition Lenders and Breakwater (in its capacity as administrative agent and collateral agent for the Prepetition Lenders) for a $28.8 million senior secured term loan credit facility (the "<u>Prepetition Loan</u>"). The Prepetition Loan has a variable interest rate based on the secured overnight financing rate plus a margin of 9.6%.  Currently, the interest rate is 15.9% and interest payments total roughly $4.5 million annually. As of the Petition Date, approximately $28.8million remains outstanding (the "<u>Prepetition Debt</u>") under the Prepetition Loan, plus accrued and unpaid interest, fees and expenses. Concurrently with the Prepetition Credit Agreement, the parties entered into a security agreement, guarantee agreement, and certain control agreements which granted Breakwater, for the benefit of the Prepetition Lenders, a first priority security interest in all of the assets of the Debtors.

(ii)    All Prepetition Loan Documents are valid, binding, and enforceable by the Prepetition Lenders against each of the relevant Debtors.

(iii)    As of the Petition Date, each of the Debtors was indebted and liable, without any objection, defense, counterclaim, recoupment, challenge, or offset of any kind, to the

Prepetition Lenders pursuant to the Prepetition Loan Documents, in the principal amount of not less than $28,800,000, plus, in each case, all accrued or hereafter accruing and unpaid interest thereon and any additional amounts, charges, fees and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Loan Documents as to such Debtor) now or hereafter due under the Prepetition Loan Documents (all obligations of each Debtor arising under any Prepetition Loan Documents, including all loans, advances, debts, liabilities, principal, interest, fees, charges, expenses and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts owing to the Prepetition Lenders by such Debtor, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, shall be referred to herein collectively as the "Prepetition Obligations"), which Prepetition Obligations are legal, valid, and binding obligations of each relevant Debtor and no portion of which is subject to avoidance, disallowance, reduction, recharacterization, subordination, or other challenge pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(iv)    Pursuant to the Prepetition Loan Documents and to the extent set forth therein, as of the Petition Date, each Debtor granted to the Prepetition Lenders, to secure such Debtor's Prepetition Obligations, a valid, duly authorized, non-voidable, binding, perfected, first-priority security interest in the Prepetition Collateral (as defined in the Prepetition Credit Agreement).

(v)    The Debtors have a critical need to obtain postpetition financing under the DIP Facility and to use Cash Collateral, as applicable, to, among other things, pay the costs and expenses associated with administering these Cases, continue the orderly operation of the Debtors' businesses, maximize and preserve the Debtors' going concern value, make lease and other contractual payments, and satisfy other working capital and general corporate purposes, in each case, in accordance with the Approved Budget, and to provide adequate protection. The Debtors do not have sufficient available sources of working capital and financing to operate their

businesses or maintain their properties in the ordinary course of business without access to the DIP Facilities and the authorized use of Cash Collateral, as applicable.

(vi)     In light of the Debtors' facts and circumstances, the Debtors would be unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code, or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (a) a senior lien on unencumbered assets of their estates under section 364(c)(2) of the Bankruptcy Code, and (b) a junior lien on encumbered assets under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code from sources other than the DIP Lender on terms more favorable than the terms of the DIP Facility. The only viable source of secured credit available to the Debtors, other than the use of Cash Collateral, is the DIP Facility. The Debtors require both additional financing under the DIP Facility and the continued use of Cash Collateral, as applicable, under the terms of the DIP Documents and subject to the Final Order, to satisfy their postpetition liquidity needs. The DIP Lender has indicated a willingness to provide the Debtors with certain financing commitments, and the Prepetition Lenders authorize the use of Prepetition Collateral, including Cash Collateral, but solely on the terms and conditions set forth in the DIP Documents and subject to the Final Order.

(vii)    Accordingly, after considering all of their practical alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP Lender pursuant to the terms of the DIP Documents represents the best financing currently available to the Debtors.

(viii)   Good cause has been shown for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2. Entry of this Interim Order is in the best interest of the Debtors, their estates and creditors. The terms of the DIP Facility (including the Debtors' continued use of the Prepetition Collateral, including Cash Collateral) are in the best interest of the Debtors' estates under the circumstances, reflect the Debtors' exercise of

prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration for the Prepetition Lenders' consent thereto.

(ix)    The Debtors, the DIP Lender and the Prepetition Lenders have negotiated the terms and conditions of the DIP Facility (including the Debtors' continued use of the Prepetition Collateral, including Cash Collateral) in good faith and at arm's length, and any credit extended and loans made to the Debtors pursuant to the DIP Documents and the Debtors' Stipulations shall be, and hereby are, deemed to have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code. Subject to the paragraph below titled "Challenge Period," the Prepetition Lenders are entitled to receive adequate protection as set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code for any diminution in the value of the Prepetition Collateral, including Cash Collateral, resulting from the automatic stay or the Debtors' use, sale or lease of the Prepetition Collateral, including Cash Collateral, during these Cases.

H.    Adequate Protection. The Prepetition Lenders are entitled to adequate protection as and to the extent set forth herein pursuant to sections 362, 363 and 364 of the Bankruptcy Code. Based on the DIP Motion and on the record presented to the Court, the terms of the payment of adequate protection expenses for the Prepetition Lenders are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Collateral, including cash collateral.

I.    Finding of Good Cause. Good cause has been shown for the entry of this Interim Order and authorization for: (a) the DIP Lender to provide the Debtors with the DIP Facility and (b) the Debtors to accept, incur, and undertake the DIP Obligations pursuant to the DIP Documents during the Interim Period. The Debtors' need for financing of the type afforded by the DIP Documents is critical. Entry of this Interim Order will preserve the value of the assets of the Debtors' estates and is in the best interests of the Debtors, their creditors and their estates. The terms of the DIP Facility are fair and reasonable, including the interest rates, fees and expenses

owed thereunder, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

J.    <u>Finding of Good Faith</u>. Based upon the record presented at the Interim Hearing, the DIP Facility has been negotiated in good faith and at arm's length between the Debtors, on the one hand, and the DIP Lender, on the other. All of the DIP Obligations, including the DIP Facility made pursuant to the DIP Documents and all other liabilities and obligations of the Debtors under this Interim Order, owing to the DIP Lender shall be deemed to have been extended by the DIP Lender in "good faith," as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code. The DIP Lender shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is reversed, or modified, on appeal.

K.    <u>Immediate Entry</u>. The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2) and the Local Rules. Absent the immediate grant by the Court of the interim relief sought by the Motion, the Debtors' estates will be immediately and irreparably harmed pending the Final Hearing. The consummation of the DIP Facility in accordance with the terms of this Interim Order and the other DIP Documents, is in the best interest of the Debtors' estates, and is consistent with the Debtors' exercise of their fiduciary duties. Under the circumstances, the notice given by the Debtors of the Motion and Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 4001(c) and the Local Rules. No further notice of the relief sought at the Interim Hearing is necessary or required.

L.    <u>Notice of Interim Hearing.</u> Notice of this Interim Hearing and the relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier, or hand delivery, to certain parties-in-interest, including, among others: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel for the DIP Lender and the Prepetition Lenders; (c) the holders of the 30 largest claims against the Debtors on a consolidated basis; (d) all known holders of liens upon the Debtors' assets; (e) the attorneys general

in the states in which the Debtors conduct their business; (f) the Internal Revenue Service; and (g) all parties that have filed notices of appearance pursuant to Bankruptcy Rule 2002.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDICATED, AND DECREED as follows:**

1.    <u>Grant of Motion; Authorization of Interim Financing; Use of Proceeds</u>.

(a)    The Motion is hereby granted on an interim basis, as and to the extent provided herein, and the Court hereby authorizes and approves the Debtors' execution and delivery of the DIP Documents, and the Debtors' execution and delivery of all instruments, security agreements, assignments, pledges and other documents referred to therein or reasonably requested by the DIP Lender to give effect to the terms thereof and as will be drafted and executed as contemplated therein, in each case, in final form and substance consistent with this Interim Order and otherwise reasonably acceptable to the DIP Lender and the Debtors.

(b)    The Debtors are hereby authorized to borrow under the DIP Documents and this Interim Order an initial maximum aggregate amount of up to $1,700,000 (the "<u>Interim Advance</u>") and the Interim Roll-Up Loan in the amount of $6,800,000, during the Interim Period, subject to any conditions and limitations on availability in the DIP Documents, plus all interest, fees, and other charges payable in connection with the DIP Facility as provided in the DIP Credit Agreement and the other DIP Documents; to incur any and all liabilities and obligations under the DIP Documents; to pay all principal, interest, fees, expenses, and other obligations provided for under the Approved Budget, subject to the Permitted Variance (defined below) and the other DIP Documents. The Prepetition Loan shall be automatically and irrevocably deemed reduced by the amount of the Interim Roll-Up Loan.

(c)    The DIP Lender is not obligated to or responsible for monitoring the use of the proceeds of the DIP Facility and may rely upon the Debtors' representations that the amount of the DIP Facility requested at any time, and the use thereof, are in accordance with the requirements of this Interim Order, the Approved Budget, the DIP Documents, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

(d)     The Debtors may obtain and use the DIP Facility proceeds during the Interim Period only as permitted under the DIP Documents. For the avoidance of doubt, no DIP Facility proceeds may be used to make any payment in settlement or satisfaction of any prepetition claim or administrative claim, unless such payment is (x) in compliance with the Approved Budget or (y) separately approved or authorized by the Court upon notice to the Lender.

2.     <u>Entry into, Execution, Delivery, and Performance of DIP Documents.</u>  The Debtors are hereby authorized (a) to enter into the DIP Credit Agreement and the other DIP Documents, (b) to incur and perform the DIP Obligations arising from and after the date of this Interim Order under the DIP Facility, (c) to repay amounts borrowed, together with interest, and to pay all fees, costs, and expenses contemplated therein, as well as any other outstanding DIP Obligations to the DIP Lender in accordance with and subject to the terms and conditions set forth in this Interim Order, the other DIP Documents, and such additional documents, instruments, and agreements as may reasonably be required by the DIP Lender to implement the terms or effectuate the purpose of and transactions contemplated by the DIP Documents, the terms of which are incorporated by reference. The DIP Documents may be executed and delivered on behalf of the Debtors by any officer, director, or agent of the Debtors, who by signing shall be deemed to represent himself or herself to be duly authorized and  empowered to execute such DIP Documents for and on behalf of the Debtors; the DIP Lender shall be authorized to rely upon any such person's execution and delivery of any of the DIP Documents as having done so with all requisite power and authority to do so; and the execution and delivery of any of the DIP Documents by any such person on behalf of the Debtors shall be conclusively presumed to have been duly authorized by all necessary corporate action of the Debtors. Upon execution and delivery thereof, each of the DIP Documents shall constitute valid and binding obligations of the Debtors, enforceable against the Debtors (and any successor in interest including any chapter 7 or chapter 11 trustee) in accordance with its terms for all purposes during their Cases, any subsequently converted case of the Debtors under chapter 7 of the Bankruptcy Code (a "<u>Successor Case</u>"), and after the dismissal of any of the Cases. No obligation, payment, or transfer under the DIP Documents or this Interim Order shall be stayed,

restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law (including under sections 502(d), 544, 547, 548, 549, 550 or 553 of the Bankruptcy Code or under any applicable Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act, or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim.

3.      <u>Use of DIP Facility and Cash Collateral.</u> The Debtors are hereby authorized to use Cash Collateral solely in accordance with the Permitted Uses of the DIP Facility and Cash Collateral as set forth in this Interim Order and the DIP Documents and to the extent set forth in the Approved Budget.

4.      <u>Restrictions on Use of DIP Facility and Cash Collateral</u>.  Proceeds of the Loans shall not be used for any purpose other than provided in Section 2.8 of the DIP Credit Agreement. Additionally, no Debtor  shall use any part of proceeds of the Loans to purchase or carry, or to reduce or retire or refinance any credit incurred to purchase or carry, any margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System) or for any other purpose which would violate Regulation U or Regulation T or X of such Board of Governors or for any other purpose prohibited by law or by the terms and conditions of the DIP Credit Agreement. None of the Carve-Out, any Cash Collateral, the DIP Facility, the DIP Collateral, or the Prepetition Collateral may be used to investigate or challenge the amount, validity, perfection, priority or enforceability of, or assert any defense, counterclaim or offset to, the DIP Facility, or the DIP Documents or the Prepetition Debt or the Prepetition Loan Documents, or the security interests and liens securing any of the DIP Obligations or the Prepetition Debt, or to fund prosecution or assertion of any claims, or to otherwise litigate against the DIP Lender, provided that up to $25,000 shall be made available to the Committee[4] for investigation costs in respect of the stipulations contemplated herein or otherwise set forth in the Interim Order or Final Order (collectively, the "<u>Financing Orders</u>").

---

[4] As of the date hereof, no official committee of unsecured creditors has been appointed in these Cases pursuant to section 1102 of the Bankruptcy Code (any such committee subsequently appointed, the "<u>Committee</u>").

5.      <u>DIP Facility Interest Rate and Fees</u>. The New Money Loans and the Roll-Up Loans shall accrue interest at the same interest rate as provided in the Pre-Petition Loan, with a default interest rate of an additional 3.00% per annum.  All interest is limited to the Maximum Rate.  The DIP Facility shall provide for an administrative fee of 3% percent of the DIP Facility Commitment, which shall be paid in cash to Breakwater as administrative agent on the date on which all such conditions precedent set forth in Article IV of the DIP Credit Agreement have been satisfied or waived in writing by the DIP Lender (the "<u>Closing Date</u>").

6.      <u>Priority and Security of the DIP Liens</u>.

(i)      Subject to the Carve-Out (as defined below), all obligations of the Debtors under the DIP Facility (the "<u>DIP Obligations</u>") shall be:

i.  entitled to superpriority claim status under section 364(c)(1) of the Bankruptcy Code with priority over all administrative expense claims and unsecured claims existing as of the Petition Date or arising thereafter under the Bankruptcy Code, including, without limitation, the prepetition claims and adequate protection claims of the Prepetition Lenders, subject only to the Carve-Out (the "<u>DIP Superpriority Claims</u>"). The DIP Superpriority Claims may be repaid from any cash of the Debtors, including without limitation, Cash Collateral and, following entry of the Final Order, the proceeds of Avoidance Actions (as defined below) and property received or recovered thereby (the "<u>Avoidance Action Proceeds</u>");

ii.  secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by valid, enforceable, first priority, fully perfected security interests in and liens on all of the Debtors' rights in property of the Debtors' estates as of the Petition Date that, as of the Petition Date, were unencumbered (and do not become perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) (including, following entry of the Final Order, Avoidance Action Proceeds) (such liens, subject only to the Carve-Out);

iii.  secured, pursuant to section 364(c)(3) of the Bankruptcy Code, by valid, enforceable, fully perfected junior security interests in and liens on all of the Debtors' rights in property of the Debtors' estates as of the Petition Date that were subject to valid, perfected and

non-avoidable liens and unavoidable liens in existence immediately prior to the Petition Date, if any, or valid liens in existence as of the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (the "Permitted Prior Liens"),1 which security interests and liens shall be junior and subordinate only to such Permitted Prior Liens and the Carve-Out;

        iv.  secured, pursuant to section 364(d)(1) of the Bankruptcy Code, by valid, enforceable, priming first priority, fully perfected security interests in and liens upon all of the Debtors' rights in property of the Debtors' estates as of the Petition Date, and all of the Debtors' rights in property acquired post-petition (and proceeds thereof), whether now existing or hereafter acquired or arising, that secure the Prepetition Debt (such lien, together with the liens described in clauses (i) through (iii) above, the "<u>DIP Liens</u>" and the collateral described in clauses (i) through (iv) above, collectively, the "<u>DIP Collateral</u>"), which liens shall be subject to the Carve-Out. The DIP Collateral shall also include any and all rents, issues, products, offspring, proceeds and profits generated by any item of DIP Collateral.

      (ii)    The DIP Liens shall be effective immediately upon the entry of this Interim Order and shall not at any time be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of any Debtor and their estates under section 551 of the Bankruptcy Code, (ii) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of any Debtor, or (iii) any intercompany or affiliate liens of any Debtor.

      (iii)    The DIP Collateral will be free and clear of other liens, claims and encumbrances, except valid, perfected, enforceable and unavoidable liens, rights of recoupment enforceable in bankruptcy, and rights of setoff permissible under section 553 of the Bankruptcy Code, in each case except as otherwise agreed by the applicable creditor or lienholder, as applicable, in existence as of the Petition Date and permitted pursuant to the Prepetition Loan Documents, if any.

(iv)      The DIP Liens will automatically attach to the DIP Collateral and become valid and perfected immediately upon entry of this Interim Order without the requirement of any further action by the DIP Lender; provided that if the DIP Lender determines to file any financing statements, notice of liens or similar instruments, the Debtors will cooperate and assist in any such filings and the automatic stay shall be modified to allow such filing.

7.       Adequate Protection. Subject in all cases to the Carve-Out (as defined below), the Prepetition Lenders shall receive adequate protection for the Debtors' use of the collateral securing the Prepetition Loan, including, but not limited to:

(i)      payment of all interest accruing under the Prepetition Loan Documents as and when due pursuant to the Prepetition Loan Documents, to be paid in kind; provided that the Prepetition Lenders reserve their rights to assert default interest pursuant to the Prepetition Loan Documents in connection with the confirmation of a plan of liquidation or reorganization for the Debtors;

(ii)      replacement liens and security interests in DIP Collateral and superpriority administrative expense claims under sections 503 and 507 of the Bankruptcy Code, in each case (and as applicable) junior only to the DIP Liens, DIP Obligations, and the Carve-Out (as defined below), to the extent of any diminution in the value of the Prepetition Lenders' interest in any Cash Collateral or other Prepetition Collateral (as defined in the Prepetition Credit Agreement) arising as a result of (A) the use, sale, or lease of Cash Collateral or other collateral, (B) the granting of priming liens to secure the DIP Facility, or (C) the imposition of the automatic stay;

(iii)      reimbursement by the Debtors of the reasonable and documented fees, costs, and out-of-pocket expenses incurred or accrued by the Prepetition Lenders (to include all unpaid prepetition reasonable and documented fees, costs, and out-of-pocket expenses) in connection with any and all aspects of the Debtors' Cases; and

(iv)      delivery of reporting and information as provided for in the DIP Documents.

(v)      The foregoing adequate protection liens will automatically attach to the DIP Collateral and become valid and perfected immediately upon entry of this Interim Order without

the requirement of any further action by the Prepetition Lenders; provided, that if the Prepetition Lenders determine to file any financing statements, notice of liens or similar instruments, the Debtors will cooperate and assist in any such filings and the automatic stay shall be modified to allow such filing.

8.     DIP Conditions Precedent. The obligation of DIP Lender to make the Initial Loan (or any Tranche thereof) is subject to the satisfaction of the following conditions precedent, among others:

(i)     DIP Lender shall have received executed copies of the DIP Credit Agreement and the other DIP Documents;

(ii)     the Bankruptcy Court shall have entered the Interim Order, in a form acceptable to the DIP Lender, in its sole and exclusive discretion, no later than five (5) Business Days after the Petition Date, which Interim Order shall be in full force and effect, and the Debtors shall be in compliance with the Interim Order;

(iii)     Lender shall have received a certificate executed by a duly authorized officer of each Debtor certifying (a) the names and signatures of the officers of such Person authorized to execute the DIP Documents, (b) the resolutions duly adopted by the Board of Directors (or equivalent governing body) of such Person authorizing the execution of the DIP Credit Agreement and the other Loan Documents, as appropriate, (c) the correctness and completeness of the copy of the Operating Agreement (or equivalent governing document) of such Person attached thereto and (d) the correctness and completeness of the copy of the certificate of incorporation (or equivalent governing document) of such Person attached thereto;

(iv)     approval of the transaction by the credit committee of each of the Prepetition Lenders;

(v)     no later than two (2) days prior to the Petition Date, the DIP Lender shall have received the Initial Approved Budget;

(vi)     the Borrowers shall have provided the DIP Lender with a copy of the "first day" motions, including the cash management motion, and proposed orders to be filed with the Bankruptcy Court in connection with the commencement of the Cases;

(vii)    orders approving all "first day" motions other than the Interim Order shall have been entered;

(viii)   other than as set forth in the DIP Credit Agreement, the Borrowers shall not have executed, entered into or otherwise committed to any plan or restructuring support agreement or any other agreement or understanding concerning the terms of a Chapter 11 plan or other exit strategy without the consent of the DIP Lender;

(ix)     the Debtors the Debtors shall be in compliance with the terms of the Interim Order or the Final Order, as applicable;

(x)      the Debtors shall have provided a certificate confirming that all of the representations and warranties of the Debtors in the DIP Credit Agreement, as applicable, remain true and correct, unless otherwise agreed by the DIP Lender; and

(xi)     there shall be no defaults or Events of Default under the DIP Documents, as applicable, or any defaults or Events of Default shall have been waived by the DIP Lender

9.      DIP Conditions Precedent to All Subsequent Advances. The obligation of DIP Lender to make subsequent advances is also subject to, in addition to the conditions precedent to the Initial Loan, the following additional conditions, among others:

(i)      the Final Order shall have been entered by the Bankruptcy Court in a form acceptable to the DIP Lender, in its sole and exclusive discretion, shall be in full force and effect, shall not have been vacated or reversed, shall not be subject to a stay and shall not have been modified or amended other than as acceptable to the DIP Lender in its sole and exclusive discretion; and the Debtors shall be in compliance with the Final Order;

(ii)     all "second day orders" approving on a final basis any first day orders intended to be entered on or prior to the date of entry of the Final Order shall have been entered

by the Bankruptcy Court, shall be in full force and effect, shall not have been vacated or reversed, and shall not be subject to a stay;

        (iii)    the Approved Budget shall demonstrate a need for the funds to be advanced under this Agreement for the next week following the last Loan, and the Borrower Agents shall have delivered at 3 Business Days prior to the applicable draw date (or such shorter period as the Agents may agree in its sole discretion) the Notice of Borrowing showing the proposed use of such funds within the next week in accordance with an Approved Budget that was approved by Agents prior to receipt of the applicable Notice of Borrowing within the last week;

        (iv)    no event shall have occurred or circumstance exists that has or could reasonably be expected to have a Material Adverse Change;

        (v)    such advance or financial accommodation shall not be prohibited by any law or regulation or any order of any court or Governmental Authority or agency; and

        (vi)    no Debtor shall have repudiated or made any anticipatory breach or repudiation of any of its obligations under any Loan Document.

        10.    <u>Milestones.</u> The Debtors shall comply with the following deadlines (each of which may be extended or waived with the prior written consent of the DIP Lender, which may be by e-mail, without further order of the Bankruptcy Court) (collectively, the "<u>Milestones</u>"):

        (i)    The Bankruptcy Court shall have entered this Interim Order by the date that is no later than five days after the Petition Date.

        (ii)    The Bankruptcy Court shall have entered the Final Order by the date that is no later than 35 days after the Petition Date.

        (iii)    The Debtors shall have filed a motion to sell all or substantially all of the Debtors' assets through a sale pursuant to section 363 of the Bankruptcy Code in form and substance reasonably acceptable to the DIP Lender (the "<u>Sale Motion</u>") no later than fifteen (15) days after the Petition Date.

(iv)    The Bankruptcy Court shall have entered an order approving the bidding procedures of the sale contemplated by the Sale Motion (the "Sale") by the date that is no later than 45 days after the Petition Date.

(v)    The Bankruptcy Court shall have entered an order approving the Sale by the date that is no later than 75 days after the Petition Date.

(vi)    The Sale shall be consummated by the date that is no later than 14 days after the Bankruptcy Court has entered its order approving the Sale.

(vii)    A chapter 11 plan shall be consummated by the date that is no later than 90 days after consummation of the Sale.

11.    Proceeds of Avoidance Actions. Subject to entry of the Final Order, the DIP Superpriority Claims shall have recourse to Avoidance Action Proceeds of all of the Debtors' claims and causes of action pursuant to sections 502(d), 544, 545, 547, 548, 549, 551, 553(b), 732(2), or 742(2) of the Bankruptcy Code (the "Avoidance Actions"), including all of the Debtors' claims and causes of actions pursuant to section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral or postpetition transfer of DIP Facility proceeds.

12.    Representations and Warranties. Prior to the funding of any of the Interim Advance, the Debtors shall be deemed to have made the representations and warranties set forth in the Prepetition Loan Documents, as applied to Article V of the DIP Credit Agreement.

13.    Prepayment. The Debtors may voluntarily, at any time, prepay any of the DIP Obligations and/or reduce the commitments under the DIP Facility at par plus accrued interest. Until the DIP Facility has been repaid in full and subject to the exception below and the Carve-Out, the following mandatory prepayments will be required: (a) Concurrently with the receipt by any Debtor or any of its Subsidiaries of any proceeds from any Casualty Event, the Borrowers shall prepay the Loans in an amount equal to one hundred percent (100%) of such Net Casualty Proceeds from such Casualty Event to be applied as set forth in Section 3.12; and (b) 100% of any Net Disposition Proceeds from any disposition of any Collateral (other than in the ordinary course of business); (c) 100% of any proceeds received (x) under any insurance policy on account of the

damage or destruction of any Collateral of any Loan Parties and (y) due to any taking or condemnation of any Collateral; (d) 100% of the Net Disposition Proceeds of the incurrence or issuance of any indebtedness or equity by any Debtor; provided that no Debtor shall incur or issue indebtedness or equity; (e) 100% of any proceeds received or any cash received by or paid to or for the account of any Debtor not in the ordinary course of business, including but not limited to tax refunds, pension plan reversions, indemnity payments and any purchase price adjustments and (f) 100% of the Net Disposition Proceeds from the consummation of any sale pursuant to a Sale Motion. Notwithstanding the foregoing, any Employee Retention Credit ("ERC") monies or refunds received by the DIP Borrower  may be used by the Debtors to fund working capital. Absent consent of the Parties, any ERC monies or refunds received by the DIP Borrower will not be used to prepay any of the DIP Obligations and/or reduce the commitments under the DIP Facility.

14.    <u>Reporting and Information</u>.  Following the Closing Date, the Debtors shall be subject to the reporting and information covenants set forth in the Prepetition Loan Documents, modified in a customary manner to reflect the nature and tenor of the DIP Facility. Without limiting the generality of the foregoing, the Debtors shall deliver to the DIP Lender (i) Variance Reports (as defined below); (ii) copies of any pleadings or motions to be filed by or on behalf of any Debtor in the Cases at least three (3) days prior to such filing (or, if not practicable, as soon as reasonably practicable), (iii) all notices required to be given to all parties specified in any Financing Order; and (iv) such other information (including access to the Debtors' books, records, personnel and advisors during normal business hours) as the DIP Lender may reasonably request. All such reporting shall be in form and with sufficient detail as is acceptable to the DIP Lender in its sole discretion.

15.    <u>Budget Maintenance</u>. The Debtors shall prepare for the DIP Lender's review and approval a thirteen-week (13-week) detailed rolling cash projection similar in form to the 13-week cash projection provided as part of the Initial Approved Budget which shall be thereafter updated each week (each, a "<u>Proposed Budget</u>"). Upon the Debtors' receipt of the DIP Lender's approval

(in its sole discretion and exclusive) of a Proposed Budget, such budget shall become an "Approved Budget" and shall replace the then-operative Approved Budget for all purposes. The Initial Approved Budget shall be the Approved Budget until such time as a new Proposed Budget is approved, following which such Proposed Budget shall constitute the Approved Budget until a subsequent Proposed Budget is approved. The Debtors shall operate in accordance with the Approved Budget and all disbursements shall be consistent with the provisions of the Approved Budget (subject to the Permitted Variance (as defined below)). The Debtors may submit additional Proposed Budgets to the DIP Lender, but until the DIP Lender approves such Proposed Budget, it shall not become an Approved Budget and the Debtors shall continue to comply with the then-operative Approved Budget.

16.    Budget Compliance.

(i)    Beginning on the second business day following the first calendar week during which Petition Date occurs (the "Initial Reporting Date"), and continuing on the second business day of each week thereafter (collectively with the Initial Reporting Date, each a "Reporting Date"), the Debtors shall deliver to the DIP Lender, in a form consistent with the form of the Approved Budget, a variance report describing in reasonable detail, by line item, (i) the actual disbursements of the Debtors and actual receipts during the applicable Testing Period (as defined below); and (ii) any variance (whether positive or negative, expressed as a dollar variance and as a percentage) between the actual receipts or disbursements, as applicable, during such Testing Period against the estimated receipts or disbursements, as applicable, for the applicable Testing Period, as set forth in the applicable Approved Budget (a "Variance Report"). For the avoidance of doubt, the Debtors shall deliver to the DIP Lender weekly Variance Reports following the Petition Date;

(ii)    As used herein, "Testing Period" shall mean the four week period ending on the Sunday immediately preceding the applicable Reporting Date. The last day of each Testing

Period shall be a "Testing Date"). As of any applicable Testing Date, cash disbursements may vary from the Approved Budget by no more than 10.0% on an aggregate basis for all disbursement line items taken together in the aggregate (the "Permitted Variance");

(iii)    The Debtors shall be deemed to be in compliance with the Approved Budget for all purposes under the DIP Documents and the applicable Financing Orders unless, as of any Testing Date, the Debtors' actual cash receipts or disbursements vary from the Approved Budget by more than the applicable Permitted Variance as measured on any Testing Date (the "Variance Covenant").

17.    Affirmative Covenants. The Debtors shall (i) perform the affirmative covenants set forth in the DIP Documents, (ii) meet the case Milestones set forth in the DIP Documents; and (iii) on a weekly basis, deposit into a segregated account, funds in an amount equal to the  fees and expenses of persons or firms retained by (i) the Debtors pursuant to Sections 327, 328, or 363 of the Bankruptcy Code or (ii) any committee appointed in the cases ((i) and (ii) together, the "Estate Professionals")  incurred during the previous week up to the amount of such fees and expenses set forth in the Approved Budget and only to the extent there is an adequate reserve of cash for operations as determined by the Debtors.

18.    Negative Covenants. Following the Closing Date, the Debtors shall be subject to the negative covenants  as set forth in the DIP Documents.

19.    Events of Default. "Events of Default" under the DIP Facility shall include the occurrence of any of the following without the advance written consent of the DIP Lender in its sole discretion:

(i)    the failure or refusal of the Debtors to make any payment of the Obligations when due;

(ii)    the failure of any of the Debtors to properly observe or perform any obligation, agreement, covenant, or other provision contained in this Agreement or in any other Loan Document;

(iii)    the occurrence of any default or event of default under any of the other Loan Documents;

(iv)    any representation or warranty contained herein or in any of the other Loan Documents is false or misleading in any material respect when made or deemed made;

(v)    the failure to agree upon suitable Milestones (acceptable to Agents in its sole discretion) or to obtain entry of the Final Order within forty-five (45) days after the Petition Date;

(vi)    this Interim Order (or Final Order, if applicable) (A) at any time ceases to be in full force and effect or (B) shall be vacated, reversed, stayed, amended, supplemented or modified without the prior written consent of the Agents;

(vii)    except with the prior written consent of the Agents, the entry of an order in any of the Cases impairing or modifying any of the liens, rights, remedies, privileges, benefits or protections granted under the Interim Order (or Final Order, if applicable);

(viii)    the filing by any of the Debtors (or supporting another party in the filing of) a motion seeking entry of an order approving any key employee incentive plan, employee retention plan, or comparable plan, in each case without the prior written consent of the Agents;

(ix)    the bringing of a motion, taking of any action or the filing of any plan of reorganization other than in connection with a proposed refinancing and repayment in full in cash of the Obligations and the Prepetition Obligations on the date of the order granting such motion or the effective date of such plan of reorganization: (A) to obtain financing under Section 364(c) or (d) of the Bankruptcy Code; or (B) to grant any Lien upon or affecting any Collateral unless permitted under the Interim Order (or Final Order, as applicable);

(x)    (A) the consensual use of prepetition Cash Collateral is terminated or modified, or (B) the entry of an order in any of the Cases terminating or modifying the use of Cash Collateral other than as provided in the DIP Credit Agreement and the Interim Order (or Final Order, as applicable), in each case, without the prior written consent of the Agents;

(xi)     the entry of an order in the Cases confirming a plan or plans of reorganization or liquidation that does not contain a provision for repayment in full in cash of the Prepetition Loan on or before the effective date of such plan or plans;

(xii)    the appointment or election of a Chapter 11 trustee, a responsible officer or an examiner (other than a fee examiner) under section 1104 of the Bankruptcy Code with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of any Chapter 11 Debtor;

(xiii)   the dismissal of any of the Cases or conversion of any of the Cases to a Chapter 7 case;

(xiv)    the entry of any order in any of the Cases (A) charging any of the Collateral, whether under Section 506(c) of the Bankruptcy Code or otherwise or (B) charging any of the Prepetition Collateral, whether under Section 506(c) of the Bankruptcy Code or otherwise;

(xv)     the entry of an order by this Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (A) to allow any creditor to execute upon or enforce a Lien on any Collateral, (B) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local regulatory agency or authority, or (C) the approval of any settlement or other stipulation with any creditor of a Debtor, other than the Agents, or otherwise providing for with respect to such Prepetition claim payments as adequate protection or otherwise to such creditor with respect to such Prepetition claim;

(xvi)    the commencement of a suit or action against the DIP Lender that asserts or seeks (A) any legal or equitable remedy that would have the effect of challenging, avoiding or subordinating any or all of the Obligations, Prepetition Obligations, Liens granted herein or any Prepetition Liens, or (B) would otherwise result in a Material Adverse Change;

(xvii)   the marshalling of any Collateral other than at the request of the Agents;

(xviii)  except for the Carve-Out, and except as expressly permitted hereunder, the entry of an order in any of the Cases granting any claim against any Debtor entitled to superpriority administrative expense status in any of the Cases pursuant to section 364(c)(2) of the Bankruptcy

Code that is *pari passu* with or senior to the claims of the Agents (without the prior written consent of Agents);

(xix)    the entry of an order in any of the Cases (A) avoiding, disallowing, offsetting, recharacterizing, subordinating, disgorging or requiring repayment of any payments made to the Secured Parties on account of the Obligations, the Prepetition Obligations, the Orders, this Agreement, the other Loan Documents, or (B) reversing, recharacterizing or otherwise modifying all or any portion of the Roll-Up Loans;

(xx)    any Lien with respect to any material portion of the Collateral intended to be secured thereby ceases to be, or is not, valid or perfected.

(xxi)    any money judgment in excess of $1,000,000 (net of insurance coverage as to which the insurer has been notified of such judgment and has accepted coverage in writing) is rendered against any Loan Party that is not stayed pursuant to 11 U.S.C. 362;

(xxii)    a loss, theft, damage or destruction occurs with respect to any Collateral if the amount not covered by insurance exceeds $1,000,000;

(xxiii)    a Loan Party or any of its senior officers is criminally indicted or convicted for (i) a felony committed in the conduct of such Loan Party's business, or (ii) violating any state or federal law (including the Controlled Substances Act, Money Laundering Control Act of 1986 and Illegal Exportation of War Materials Act, each as amended) that could lead to forfeiture of any material property or any Collateral;

(xxiv)    Collateral Agent shall cease to have a valid, perfected and first priority Lien on any of the Collateral, except as otherwise expressly permitted herein or consented to in writing by Collateral Agent;

(xxv)    any provision of any Loan Document, at any time after its execution and delivery and for any reason, ceases to be in full force and effect; or any Loan Party or any other Person contests in writing in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document;

(xxvi)   the occurrence of a Change of Control;

(xxvii)  the occurrence of a Material Adverse Change after the Closing Date; or

(xxviii) the occurrence of any Event of Default set forth in this Interim Order; or

(xxix)   the (A) filing by any Debtor of (1) any chapter 11 plan other than the Plan of Reorganization, or any disclosure statement attendant to a chapter 11 plan other than the Plan of Reorganization, or (2) any direct or indirect amendment, or other document or instrument related to, the Plan of Reorganization (or any disclosure statement attendant thereto) that is materially inconsistent with the Plan of Reorganization to the extent such amendment, document or instrument relates to or impacts the Obligations, the Loan Documents or the DIP Lender and to which the Required Lenders (as defined in the DIP Credit Agreement) do not consent in writing, (B) the entry of an order approving a disclosure statement attendant to a chapter 11 plan other than the Plan of Reorganization, or (C) the entry of an order confirming a plan other than the Plan of Reorganization.

20.     <u>Rights and Remedies Upon Default.</u>

(i)     Any automatic stay otherwise applicable to the DIP Lender is hereby modified so that after the occurrence and during the continuation of any Event of Default (subject to any applicable grace periods under the DIP Documentation), and delivery by the DIP Lender of written notice of the occurrence of a default and of its intent to exercise remedies (a "<u>Remedies Notice</u>") as set forth in the DIP Documentation, in each case given to the Debtor and its counsel, counsel to any Committee, and the U.S. Trustee, the DIP Lender shall be entitled to exercise its rights and remedies in accordance with the DIP Documentation without further order of the Bankruptcy Court beginning five (5) business days following delivery of the Remedies Notice (the "<u>Remedies Notice Period</u>") unless otherwise provided by order of the Bankruptcy Court. During the Remedies Notice Period, the Debtor, the Committee, and/or the U.S. Trustee shall be entitled to seek an emergency hearing before the Bankruptcy Court (a "<u>Remedies Notice Hearing</u>"). If an Event of Default under the DIP Documentation is determined to have occurred and be continuing,

either by the Bankruptcy Court at a Remedies Notice Hearing or as a result of the expiration of the Remedies Notice Period without a timely response requesting a Remedies Notice Hearing having been filed, the automatic stay provisions of section 362 of the Bankruptcy Code will not be re-imposed or continue with respect to the DIP Lender without its written consent. If no response to the Remedies Notice or other responsive pleading is filed with the Bankruptcy Court during the Remedies Notice Period requesting an expedited hearing on such Remedies Notice, or if a Remedies Notice Hearing is not commenced within five (5) business days following delivery of the Remedies Notice, then the automatic stay provisions of section 362 of the Bankruptcy Code shall be deemed vacated and DIP Lender may exercise all rights and remedies provided for in the DIP Documentation, without further order from the Bankruptcy Court; provided, however, to the extent a Remedies Notice Hearing is occurring, then the Remedies Notice Period shall be extended pending a determination by the Bankruptcy Court.  Notwithstanding the occurrence of an Event of Default under the DIP Documentation or termination of the commitments under the DIP Credit Facility or anything herein to the contrary, all of the rights, remedies, benefits, and protections provided to the DIP Lender under the DIP Documentation shall survive after the Maturity Date. Upon the expiration of the Remedies Notice Period, the DIP Obligations shall be immediately due and payable and the DIP Lender shall have all other rights and remedies provided in the DIP Documentation. The Bankruptcy Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this paragraph and relating to the application, reimposition, or continuance of the automatic stay with respect to the DIP Lender. For the avoidance of doubt, the Remedies Notice Period shall expire no later than the earliest date of cure or waiver of the applicable Event of Default or payment of the DIP Obligations in full in cash (or by credit bid by the DIP Lender).

(ii) Upon the occurrence and during the continuance of any Event of Default, and without further application to the Bankruptcy Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to take any of the following actions, at the same or different times:

i.  issue the Remedies Notice (which may be by email) to the Debtors and their counsel, counsel for any Committee, and the U.S. Trustee (the "Remedies Notice Parties") declaring the occurrence of the Termination Date (as defined below);

ii.  issue a Carve-Out Notice (as defined below);

iii.  declare all DIP Obligations to be immediately due and payable without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Debtors;

iv.  declare the suspension or termination of the DIP Facility as to any further liability or obligation of the DIP Lender thereunder, but without affecting the DIP Liens or DIP Obligations (the "Termination Notice"); and

v.  charge the default rate of interest under the DIP Facility.

21.  Maturity/Termination Date. The DIP Facility and the Debtors' right to use Cash Collateral (as applicable) shall automatically terminate without further notice or court proceedings on the earliest to occur of any of (i) through (vii) below (each a "Termination Date"), unless extended, with the prior written consent (which may be by e-mail) of the DIP Lender.

(i)  120 days after the Petition Date (the "Scheduled Maturity Date");

(ii)  the effective date of a plan of reorganization or liquidation for the Debtors confirmed in the Cases;

(iii)  the date of termination of the commitments under the DIP Facility and/or acceleration of any outstanding borrowings under the DIP Facility, in each case, by the DIP Lender following the occurrence of an Event of Default and upon the delivery of a Termination Notice to the Remedies Notice Parties, in each case, subject to the Debtors' right to use Cash Collateral during the Remedies Notice Period as set forth above, and pending the outcome of the Stay Relief Hearing;

(iv)  the first business day on which this Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto;

(v)    the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code unless otherwise consented to in writing (which may be e-mail) by the DIP Lender;

(vi)    the dismissal of any of the Cases, unless otherwise consented to in writing (which may be e-mail) by the DIP Lender; and

(vii)    the repayment in full in cash of all obligations and termination of all commitments under the DIP Facility.

22.    <u>Repayment of DIP Obligations</u>. The DIP Obligations shall be due and payable, and shall be paid, as and when provided in the DIP Documents and as provided herein, without defense, offset, or counterclaim. Without limiting the generality of the foregoing, in no event shall the Debtors be authorized to offset or recoup any amounts owed, or allegedly owed, by any DIP Lender to the Debtors or any of their respective subsidiaries or affiliates against any of the DIP Obligations without the prior written consent of the DIP Lender, if any, that would be adversely affected by any such offset or recoupment, and no such consent shall be implied from any action, inaction or acquiescence by the DIP Lender.

23.    <u>Carve Out.</u>

(i)    Notwithstanding anything to the contrary in the DIP Documents, or the Financing Orders, the DIP Facility and the Adequate Protection shall be subject and subordinate to the Carve-Out. The Carve-Out shall include (a) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the Carve-Out Notice), (b) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the Carve-Out Notice), and (c) to the extent allowed by the Bankruptcy Court at any time, unpaid fees and expenses ("<u>Allowed Professional Fees</u>") of estate professionals incurred through the date of delivery of a Carve-Out Notice (defined below) up to the amounts for such professional included in the Approved Budget (which includes up to $200,000.00 for any committee and its professionals) through the date of the Carve-Out trigger

notice and (d) to the extent allowed by the Bankruptcy Court at any time, up to $50,000 of fees and expenses incurred by the Estate Professionals after the first business day following delivery of a Carve-Out Notice (excluding, for the avoidance of doubt, any success fee, transaction fee, deferred fee or other similar fee set forth in any professional's engagement letter, the amounts set forth in this clause (d) being the "Post Carve-Out Notice Cap").

(ii)      "Carve-Out Notice" means a written notice (which may be by email) by the DIP Lender to the Debtors, Debtors' counsel, the U.S. Trustee, and counsel to any Committee stating that the Post Carve-Out Notice Cap has been invoked, which notice may be delivered only following the occurrence and during the continuation of an Event of Default.

(iii)     Delivery of a Carve-Out Notice shall constitute a demand to the Debtors to utilize all cash on hand (including the proceeds of DIP Facility) to fund a reserve in an amount equal to the Carve-Out, which shall be earmarked and held in trust to pay unpaid fees and expenses incurred by Estate Professionals, to the extent allowed by the Bankruptcy Court at any time, prior to any and all other claims in the Cases (the "Carve-Out Reserve").

(iv)     All funds in the Carve-Out Reserve shall be used first to pay the obligations set forth in clauses (i)(a)-(d) in the above definition of "Carve-Out" until paid in full, and second, to pay the DIP Lender until paid in full. Notwithstanding anything to the contrary in the DIP Documents or the Financing Orders, the failure of the Carve-Out Reserve to satisfy in full the fees of Estate Professionals shall not affect the priority of the Carve-Out. The DIP Lender shall not be responsible for the payment or reimbursement of any fees or disbursements of any Estate Professionals or any fees or expenses of the U.S. Trustee or Clerk of the Court incurred in connection with these Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Final Order or otherwise shall be construed to obligate the DIP Lender, in any way, to pay compensation to, or to reimburse expenses of, any Estate Professionals or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

24.     Roll-Up Loans.  Subject to the terms and conditions set forth in the DIP Credit Agreement, the Challenge Period (as defined below) and this Interim Order, effective immediately

upon entry thereof and the disbursement of any installment of the Initial Loan or any subsequent Loan, the Prepetition Loan will be automatically deemed (on a cashless dollar- for-dollar basis) to constitute Loans under the DIP Credit Agreement, with $4 to be "rolled up" for each $1 in new money advanced ("Roll-Up Loans"). Upon any of the foregoing Roll-Up Loans, the Roll-Up Loans shall cease to be indebtedness under the Prepetition Credit Agreement and shall be deemed DIP Obligations and DIP Facility in all respects, including for purposes of having the benefit of section 364(e) of the Bankruptcy Code.

25.     Credit Bidding. Subject to entry of the Interim Order and the Challenge Period (as defined below), the Prepetition Lenders and DIP Lender, respectively, shall have the right to credit bid pursuant to section 363(k) of the Bankruptcy Code and/or other applicable law the DIP Facility and Prepetition Loan, in whole or in part in their sole and absolute discretion, in connection with an anticipated stalking horse bid for the sale or disposition of assets by the Debtors in the Cases and shall not be prohibited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code.

26.     Section 506(c) Claims. Subject to entry of the Final Order, except to the extent of the Carve-Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from any DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender; and the Debtors shall irrevocably waive and shall be prohibited from asserting any claim described in this paragraph, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender upon the DIP Collateral.

27.     No Marshaling/Applications of Proceeds. Subject to entry of a Final Order, the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, and proceeds shall be received and applied

pursuant to this Interim Order and the DIP Documents notwithstanding any other agreement or provision to the contrary.

28.    Section 552(b). Subject to the Final Order, the DIP Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, the "equities of the case" exception under sections 552(b)(i) and (ii) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, products, rents, issues or profits of any of their collateral, and no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the collateral under section 552(b) of the Bankruptcy Code. Furthermore, subject to entry of the Final Order, the Debtors and their estates shall be deemed to have irrevocably waived and have agreed not to assert any claim or right under sections 552 or 726 of the Bankruptcy Code to avoid the imposition of the liens of the DIP Lender on any property acquired by any of the Debtors or any of their estates or to seek to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by, the DIP Lender upon the DIP Collateral or the Prepetition Collateral (as defined in the Prepetition Credit Agreement), as applicable.

29.    Payments Free and Clear. All payments or proceeds remitted to the DIP Lender by or on behalf of the Debtors pursuant to the DIP Documents, the provisions of this Interim Order, or any subsequent order of this Court, shall be received free and clear of any claim, charge, assessment, or other liability, including any such claim or charge arising out of or based on, directly or indirectly, section 506(c) (subject to entry of the Final Order) or the "equities of the case" exception of section 552(b) of the Bankruptcy Code (subject to entry of the Final Order).

30.    Acknowledgments and Stipulations.  Subject to entry of the Interim Order, each of the Debtors' Stipulations shall be binding upon the Debtors and their bankruptcy estates (the "Estates"), and subject to the Challenge Period, any successors to the Debtors (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for all purposes.

31.     <u>Challenge Period</u>. Upon entry of this Interim Order, and subject to the Challenge Period (defined below), the stipulations, admissions, waivers, and releases contained in this Interim Order, including the Debtors' Stipulations, shall be binding upon the Debtors, their estates, and any of their respective successors in all circumstances and for all purposes and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (defined below) as of the Petition Date. The stipulations, admissions, releases, and waivers contained in this Interim Order, including the Debtors' Stipulations, shall be binding upon all other parties in interest, including any Committee, chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors, and any other person acting on behalf of the Debtors' estates, unless and to the extent that a party in interest with proper standing granted by order of the Court (or other court of competent jurisdiction) has timely and properly filed an adversary proceeding or contested matter under the Bankruptcy Rules (i) before seventy-five (75) calendar days after entry of the Interim Order, (the "<u>Challenge Period</u>" and, the date of expiration of the Challenge Period, the "<u>Challenge Period Termination Date</u>"); (ii) seeking to avoid, object to, or otherwise challenge the findings or Debtors' Stipulations regarding: (a) the validity, enforceability, extent, priority, or perfection of the mortgages, security interests, and liens of the Prepetition Lenders; or (b) the validity, enforceability, allowability, priority, secured status, or amount of the Prepetition Obligations (any such claim, a "<u>Challenge</u>"), and (iii) in which the Court enters a final order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter. Upon the expiration of the Challenge Period Termination Date without the filing of a Challenge (or if any such Challenge is filed and overruled): (a) any and all such Challenges by any party (including any Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in these Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever barred; (b) the Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in the Debtors' Cases and any Successor Cases; (c) the Prepetition Liens

shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected secured claims, not subject to recharacterization, subordination, or avoidance; and (d) all of the Debtors' stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, and all other waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the Prepetition Secured Parties' claims, liens, and interests contained in this Interim Order shall be of full force and effect and forever binding upon the Debtors, the Debtors' estates, and all creditors, interest holders, and other parties in interest in these Cases and any Successor Cases. If a chapter 7 trustee or a chapter 11 trustee is appointed or elected during the Challenge Period, then the Challenge Period Termination Date with respect to such trustee only, shall be the later of (i) the last day of the Challenge Period and (ii) the date that is twenty (20) calendar days after the date on which such trustee is appointed or elected.  If any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules and remains pending and the Cases are converted to chapter 7, the chapter 7 trustee may continue to prosecute such adversary proceeding or contested matter on behalf of the Debtors' estates. Furthermore, if any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules, the stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, shall nonetheless remain binding and preclusive on any Committee and any other person or entity except to the extent that such stipulations and admissions were expressly challenged in such adversary proceeding or contested matter prior to the Challenge Period Termination Date. Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including, without limitation, any Committee appointed in the Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation any challenges (including a Challenge) with respect to the Prepetition Loan Documents, the Prepetition Liens, and the Prepetition Obligations, and a separate order of the Court conferring such standing on any Committee or other party-in-interest shall be a prerequisite for the prosecution of a Challenge by such Committee or such other party-in-interest.

32. <u>Adequate Protection of the Bank</u>.  In order to provide adequate protection to the Bank in light of its pre-petition liens, the Debtors shall establish a separate reserve account at the Bank in the amount of [$          ] and the Bank shall be granted adequate protection liens, the scope and amount of which shall be [          ].

33. <u>No Priming or Pari Passu Liens.</u>  No order shall be entered authorizing or approving any liens or encumbrances on the DIP Collateral or the Prepetition Collateral, as applicable, senior to or *pari passu* with the liens of the Prepetition Lenders other than the priming liens of the DIP Lender.

34. <u>Payment of Expenses.</u> Debtors shall pay or reimburse all costs and expenses incurred by any Secured Party arising out of or in connection with the DIP Credit Agreement and the DIP Facility, including but not limited to the expenses delineated in Section 14.2 of the DIP Credit Agreement.

35. <u>Professional Fees.</u>  On a weekly basis, the Debtor shall deposit into a segregated account, funds in an amount equal to the Estate Professionals' fees and expenses incurred during the previous week up to the amount of such fees and expenses set forth in the Approved Budget and only to the extent there is an adequate reserve of cash for operations as determined by the Debtors. However, nothing in this Interim Order or otherwise shall be construed to obligate the DIP Lender in any way, to pay compensation to, or to reimburse expenses of, any professionals or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement. Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any Estate Professionals or shall affect the right of the DIP Lender to object to the allowance and payment of such fees and expenses.

36. <u>Modification of Automatic Stay</u>. The automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to the extent necessary to implement the provisions of this Interim Order and the DIP Documents, thereby permitting the DIP Lender, as and to the extent provided herein, to receive proceeds of the DIP Collateral for application to the DIP Obligations, to file or record any UCC-1 financing statements, mortgages, deeds of trust, assignments, pledges,

security deeds, or other instruments and documents evidencing or validating the perfection of any DIP Liens, and to enforce any DIP Liens; and as and to the extent provided herein, to receive adequate protection.

37.    <u>Effect of Appeal</u>. Consistent with section 364(e) of the Bankruptcy Code, if any or all of the provisions of this Interim Order are hereafter modified or reversed, such modification or reversal on appeal shall not affect the validity of any debt so incurred, or any liens or priorities granted by the Debtors to the DIP Lender, prior to the effective date of such modification  or reversal, whether or not any such entity knew of the appeal, unless the authorization and  incurring of such debt, or the granting of such lien or priority, were stayed pending appeal.

38.    <u>Limits on Lender Liability</u>. Subject to the Challenge Period, nothing in this Interim Order or in any of the DIP Documents or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from any activities by the Debtors in the operation of their business or in connection with the restructuring efforts and the administration of these Cases. The DIP Lender shall not be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors as a result of or in connection with this Interim Order or the DIP Documents. Subject to the Challenge Period, nothing in this Interim Order or the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

39.    <u>Release, Waivers or Limitation on any Claim or Cause of Action.</u>

(i)    Each of the Debtors and the Debtors' estates, on their own behalf and on behalf of each of their predecessors, successors, and assigns, hereby does, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge (i) the DIP Lender and its affiliates, former, current, and future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys,

affiliates, assigns, and predecessors in interest, each in its capacity as such (collectively, "Related Parties"), and (ii) the Prepetition Lenders and their Related Parties, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations, the DIP Liens, the DIP Documents, the Prepetition Obligations, the Prepetition Liens, or the Prepetition Loan Documents, as applicable, including, without limitation: (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Lender and the Prepetition Lenders (the "Releases").

(ii)     The  Releases do not bind any Committee or other party in interest until the expiration of the period described in the paragraph above titled "Challenge Period."

(iii)     Except as otherwise provided for in the DIP Credit Agreement or by applicable law, the Debtors waive all presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the DIP Lender on which the Debtors may in any way be liable, and hereby ratifies and confirms whatever the DIP Lender may do in this regard.  The Debtors waive their right to a jury trial. The Debtors also waive their right to demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release,

compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by the DIP Lender on which the Debtors may in any way be liable.

(iv)     Furthermore, the Debtors waive any suretyship defenses available to them under the California Uniform Commercial Code or any other applicable law, including, without limitation, the benefit of California Civil Code Section 2815 permitting revocation as to future transactions and the benefit of California Civil Code Sections 1432, 2809, 2810, 2819, 2839, 2845, 2847, 2848, 2849, 2850, and 2899 and 3433; and (b) any right to require the DIP Lender to:  (1) proceed against any one of the Debtors or any other person; (2) proceed against or exhaust any security; or (3) pursue any other remedy.  The DIP Lender may exercise or not exercise any right or remedy it has against any of the Debtors or any security it holds (including the right to foreclose by judicial or non-judicial sale) without affecting any of the Debtors' liability. Notwithstanding any other provision of the DIP Credit Agreement or other related document, each one of the Debtors irrevocably waive all rights that it may have at law or in equity (including, without limitation, any law subrogating the Debtors to the rights of the DIP Lender under the DIP Credit Agreement) to seek contribution, indemnification or any other form of reimbursement from any other one of the Debtors, or any other Person now or hereafter primarily or secondarily liable for any of the Obligations, for any payment made by the Debtors with respect to the Obligations in connection with the DIP Credit Agreement or otherwise and all rights that it might have to benefit from, or to participate in, any security for the Obligations as a result of any payment made by the Debtors with respect to the Obligations in connection with the DIP Credit Agreement or otherwise.

(v)     Each Guarantor (as defined in the DIP Credit Agreement) unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of nonperformance, default, acceleration, protest or dishonor and any other notice with respect to any of the Guaranteed Obligations and the DIP Credit Facility and any requirement that Secured Parties protect, secure, perfect or insure any Lien on any property subject thereto or exhaust any right or take any action against any Debtor or any other Person or

any Collateral. In addition, the Guarantors waive all rights of revocation, all defenses, any duty to disclose, all rights of subrogation or contribution, and additional waivers as set forth in Exhibit C to the DIP Credit Agreement. They also acknowledge that Agents may, without notice to or demand upon each Guarantor and without affecting the liability of each Guarantor under this Facility Guaranty, foreclose under any mortgage by nonjudicial sale, and each Guarantor hereby waives any defense to the recovery by Agents against each Guarantor of any deficiency after such nonjudicial sale and any defense or benefits that may be afforded by applicable law.

40.     <u>Indemnification</u>. The Debtors shall agree to indemnify and hold harmless the DIP Lender (solely in its capacity as DIP Lender) and each of its respective affiliates and each of their respective officers, directors, employees, agents, advisors, attorneys and representatives (each, an "<u>Indemnified Party</u>") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable and documented fees and out-of-pocket expenses of counsel), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), arising out of or in connection with or by reason of the DIP Facility, or any of transactions contemplated hereby, except to the extent arising from an Indemnified Party's fraud, gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any of the Debtors, any of their respective directors, security holders or creditors, an Indemnified Party or any other person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

41.     <u>Reservation of Rights.</u> The adequate protection provisions contained herein shall be without prejudice to the rights of the Prepetition Lenders to seek any other, further or additional adequate protection. Nothing in the DIP Documents or the Financing Orders shall be deemed to waive, modify or otherwise impair the rights of the Prepetition Lenders, and the Prepetition Lenders shall expressly reserve all of their rights and remedies under the Prepetition Loan

Documents and applicable law. Without limiting the foregoing, nothing in the DIP Documents or the Financing Orders shall have the effect of, or shall be construed as having the effect of amending or waiving any covenant, term or provision of the Prepetition Loan Documents, or any rights or remedies of the Prepetition Lenders thereunder, including (without limitation) any right to require strict compliance with such covenant, term or provision despite any consent or agreement contained in the DIP Documents or the Financing Orders.

42.     <u>Proofs of Claim</u>. The DIP Lender, and Prepetition Lenders, will not be required to file proofs of claim in any of the Cases or Successor Cases for any claim on account of DIP Obligations or Prepetition Obligations.

43.     <u>Rights Preserved</u>. Except as provided in this Interim Order and the DIP Documents, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the DIP Lender's right to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of the DIP Lender under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Lender. Entry of this Interim Order is without prejudice to any and all rights of any party in interest with respect to the terms and approval of the Final Order and any other position which any party in interest deems appropriate to raise in the Cases.

44.     <u>No Waiver by Failure to Seek Relief</u>. The failure of the DIP Lender to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Lender.

45. <u>Amendments and Waivers</u>. The Debtors and the DIP Lender are hereby authorized to enter into, in accordance with the terms of the applicable DIP Documents and without further order of the Court, any amendments to, modifications of, or waivers with respect to any of such DIP Documents (and the payment of any fees, expenses, or other amounts payable in connection therewith) on the following conditions: (a) the amendment, modification, or waiver must not constitute a material change to the terms of such DIP Document; and (b) copies of the amendment, modification, or waiver must be filed and served upon counsel for any Committee and the United States Trustee, who shall have five (5) business days to file an objection to any such amendment. Any amendment, modification, or waiver that constitutes a material change, to be effective, must be approved by the Court. For purposes hereof, a "material change" shall mean a change to a DIP Document that operates to shorten the term of the DIP Facility or the maturity of the DIP Obligations, to increase the aggregate amount of the DIP Facility, to increase the rate of interest other than as currently provided in or contemplated by such DIP Documents, to add specific Events of Default, or to enlarge the nature and extent of remedies available to the DIP Collateral Agent following the occurrence of an Event of Default. Without limiting the generality of the foregoing, no amendment of a DIP Document that postpones or extends any date or deadline therein or herein (including the expiration of the term of a DIP Facility), nor any waiver of an Event of Default, shall constitute a "material change" and any such amendment may be effectuated by the Debtors and the DIP Lender without the need for further approval of the Court.

46. <u>Financial Institutions and Debtors' Accounts</u>. Notwithstanding anything to the contrary in this or any order of this Court the Debtors are authorized to enter into, and cause the financial institutions servicing the Debtors' deposit accounts to enter into, such deposit account control agreements and other collateral agreements with the DIP Lender and such financial institutions as the DIP Lender may reasonably require, or alternatively, the DIP Lender shall be entitled to enjoy the benefit of all control agreements to which the Debtors are a party, as set forth above, without the need to enter into any such new agreements.

47.     <u>Discharge.</u> The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash and all commitments have been terminated in writing, on or before the effective date of such confirmed plan of reorganization or the DIP Lender has otherwise agreed in writing.

48.     <u>Survival of this Interim Order.</u>  The provisions of this Interim Order, including the claims, liens, security interests, and other protections granted to the DIP Lender, and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Cases; (b) converting any of the Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Cases or Successor Cases. The terms and provisions concerning the indemnification of the DIP Lender shall continue in the Cases or any Successor Cases, following dismissal of the Cases or any Successor Cases, and following termination of the DIP Documents or the indefeasible repayment of the DIP Obligations.

49.     <u>Binding Effect; Successors and Assigns</u>. The provisions of this Interim Order shall be binding upon all parties in interest in these Cases, including the Debtors, the DIP Lender,  and their respective successors and assigns (including any chapter 11 or chapter 7 trustee hereafter appointed for the estate of the Debtors, any examiner appointed pursuant to section 1104 of the Bankruptcy Code, any Committee, or any other fiduciary appointed as a legal representative of the Debtors or with respect to any property of the estate of the Debtors), and shall inure to the benefit of the Debtors, the DIP Lender, and their respective successors and assigns. In no event shall any DIP Lender have any obligation to make available the DIP Facility to, or permit the use of the DIP Collateral by, any chapter 7 trustee, chapter 11 trustee, or similar responsible person appointed or elected for the estate of the Debtors.

50.     <u>Joint and Several</u>. The Debtors are jointly and severally liable for the DIP Obligations and all other obligations to the DIP Lender hereunder.

51.     <u>No Third Party Rights</u>. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

52.     <u>Objections Overruled</u>. Any and all objections to the relief requested in the Motion, to the extent that such objections are to entry of this Interim Order and that have not otherwise been withdrawn, waived, or resolved by consent at or before the Interim Hearing, and all reservations of rights included therein, are hereby OVERRULED and DENIED.

53.     <u>Service of Interim Order</u>. Promptly after the entry of this Interim Order, the Debtors shall serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court.

54.     <u>Final Hearing.</u> The final hearing (the "<u>Final Hearing</u>") on the Motion shall be held on_____, 2024, at__:__ _.m., prevailing Eastern Time.  Any objections or responses to entry of a final order on the Motion shall be filed on or before __:__ _.m., prevailing Eastern Time, on _____, 2024.  In the event no objections to entry of a final order on the Motion are timely received, the Court may enter such final order without need for the final hearing.

55.     <u>Objection Deadline</u>.  Any objections to entry of the Final Order shall be filed with the Court on or before _____, 2024 at _____ p.m. (Prevailing Eastern Time) and concurrently served upon and actually received by: (a) the Debtors, 1201 W. 5th Street, Suite T-400, Los Angeles, CA 90017; (b) proposed counsel to the Debtors, Raines Feldman Littrell LLP, Attn: Thomas J. Francella Jr., tfrancella@raineslaw.com and Shulman Bastian Friedman & Bui LLP, 100 Spectrum Center Drive; Suite 600 Irvine, CA 92618, Attn: Alan Friedman, afriedman@shulmanbastian.com, Melissa Davis Lowe, mlowe@shulmanbastian.com, and Max Casal, mcasal@shulmanbastian.com; (c) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Jonathan Lipshie, jon.lipshie@usdoj.gov); (c) counsel to the DIP Lender, Elkins Kalt Weintraub Reuben Gartside LLP, 10345 W Olympic Boulevard, Los Angeles,

CA 90064, Attention: Michael I. Gottfried, Esq. mgottfried@elkinskalt.com, Lauren N Gans, lgans@elkinskalt.com (d) local counsel to the DIP Lender _____(Attn: _____); and (e) counsel to any Committee appointed in these Cases. If an objecting party fails to appear at the Final Hearing and assert the basis for such objection before the Court, such objection shall be deemed to have been waived and abandoned by such objecting party.

56.    <u>Effectiveness; Enforceability</u>. This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be valid, take full effect, and be enforceable immediately upon entry hereof; there shall be no stay of execution or effectiveness of this Interim Order; and any stay of the effectiveness of this Interim Order that might otherwise apply is hereby waived for cause shown.

57.    <u>Authorization to Take Necessary Actions.</u> The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

58.    <u>Jurisdiction.</u> This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

59.    <u>Inconsistencies.</u> To the extent that any provision in the other DIP Documents are inconsistent with any of the provisions of this Interim Order, the provisions of this Interim Order shall govern and control.

60.    <u>Headings</u>. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

**Exhibit 1**
**Credit Agreement**

EXECUTION COPY

**SENIOR SECURED SUPER-PRIORITY PRIMING DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT**

**dated as of July 17, 2024**

**among**

**One Table Restaurant Operations, LLC**
**Tender Greens OpCo, LLC**
**Tocaya Holdings LLC**

as Borrowers,

**One Table Restaurant Brands, LLC**,

as Parent,

Certain Subsidiaries and Affiliates thereof, as Guarantors,

The Lenders Party Hereto,

**BREAKWATER CREDIT OPPORTUNITIES FUND II LP,** and

**BREAKWATER MANAGEMENT LP**

ARTICLE I - DEFINITIONS .................................................................................................................. 2

    Section 1.1    Definitions ......................................................................................................... 2

    Section 1.2    UCC Terms ..................................................................................................... 21

    Section 1.3    Accounting Terms and Determinations ......................................................... 21

    Section 1.4    Interpretative Provisions ............................................................................... 21

    Section 1.5    Rates ............................................................................................................. 21

ARTICLE II - LOANS ......................................................................................................................... 22

    Section 2.1    Term Loans .................................................................................................... 22

    Section 2.2    Roll-Up Loans ............................................................................................... 22

    Section 2.3    Notice of Borrowing ..................................................................................... 22

    Section 2.4    Disbursement of Funds ................................................................................. 23

    Section 2.5    Evidence of Debt .......................................................................................... 24

    Section 2.6    *Pro Rata* Borrowings .................................................................................. 24

    Section 2.7    Purposes of Loans ......................................................................................... 24

    Section 2.8    Interest .......................................................................................................... 24

    Section 2.9    Interest Periods ............................................................................................. 24

    Section 2.10    Benchmark Replacement Illegality, etc ........................................................ 25

    Section 2.11    Compensation ............................................................................................... 25

    Section 2.12    Confirming Changes ..................................................................................... 27

    Section 2.13    [Reserved] ..................................................................................................... 27

    Section 2.14    [Reserved] ..................................................................................................... 27

    Section 2.15    Defaulting Lenders ....................................................................................... 27

    Section 2.16    Inability to Determine Rates ......................................................................... 28

ARTICLE III - GENERAL LOAN PROVISIONS; FEES AND EXPENSES ................................... 29

    Section 3.1    [Reserved] ..................................................................................................... 29

    Section 3.2    Fees and Expenses ........................................................................................ 29

    Section 3.3    Manner of Payment ...................................................................................... 29

Section 3.4 Termination of Agreement or Facility.................................................................... 29

Section 3.5 [Reserved]................................................................................................................ 29

Section 3.6 Changes in Capital Adequacy Regulations............................................................ 29

Section 3.7 Lender Statements; Survival of Indemnity ........................................................... 29

Section 3.8 Maximum Interest; Controlling Limitation .......................................................... 30

Section 3.9 Benchmark Replacement Procedures .................................................................... 30

Section 3.10 Mandatory Prepayments ........................................................................................ 31

Section 3.11 Application to Term Loans ..................................................................................... 31

Section 3.12 Application of Collateral Proceeds and Payments................................................ 31

Section 3.13 Payment of Obligations; Method and Place of Payment ...................................... 31

Section 3.14 Net Payments ......................................................................................................... 32

Section 3.15 Computations of Interest and Fees........................................................................ 32

ARTICLE IV - CONDITIONS PRECEDENT .......................................................................................... 32

Section 4.1 Conditions Precedent.............................................................................................. 32

Section 4.2 Conditions to Subsequent Advances ..................................................................... 32

ARTICLE V - REPRESENTATIONS AND WARRANTIES .................................................................... 34

Section 5.1 Representations and Warranties.............................................................................. 34

Section 5.2 Survival of Representations.................................................................................... 37

ARTICLE VI - SECURITY INTEREST AND COLLATERAL COVENANTS..................................... 37

Section 6.1 Security Interest ...................................................................................................... 37

Section 6.2 Collection of Accounts and Proceeds of Collateral ............................................. 38

Section 6.3 Verification of Accounts ........................................................................................ 38

Section 6.4 Ownership; Defense of Title ................................................................................. 38

Section 6.5 Locations; Organizational Information; Inventory ............................................... 38

Section 6.6 Records Relating to Collateral............................................................................... 38

Section 6.7 Inspection; Field Exams ........................................................................................ 38

Section 6.8 Maintenance ........................................................................................................... 38

Section 6.9 Appraisals................................................................................................................ 38

Section 6.10 Preservation of Collateral Rights ......................................................................... 38

Section 6.11 Perfection and Protection of Lender's Security Interest ...................................... 38

Section 6.12 Power of Attorney .................................................................................................. 38

ARTICLE VII - AFFIRMATIVE COVENANTS..................................................................................... 40

Section 7.1 Preservation of Existence and Similar Matters..................................................... 40

Section 7.2 Compliance with Applicable Law ......................................................................... 40

Section 7.3 Conduct of Business ............................................................................................... 41

Section 7.4      Payment of Taxes and Claims ................................................................. 41

Section 7.5      Accounting Methods and Financial Records ...................................... 41

Section 7.6      Hazardous Waste and Substances; Environmental Requirements .................... 41

Section 7.7      Accuracy of Information ................................................................ 41

Section 7.8      Revisions or Updates to Schedules ...................................................... 41

Section 7.9      ERISA ...................................................................................... 41

Section 7.10     Insurance ................................................................................. 41

Section 7.11     Payroll Taxes ............................................................................ 42

Section 7.12     Notice of Certain Matters ................................................................ 42

Section 7.13     Deposit Accounts; Treasury Management .................................................... 42

Section 7.14     [Reserved] ................................................................................ 42

Section 7.15     Bankruptcy Milestones .................................................................... 42

Section 7.16     Variance Reports and Budgets ............................................................. 43

Section 7.17     Additional Chapter 11 Covenants .......................................................... 44

Section 7.18     Board Observation Rights .................................................................. 44

Section 7.19     Weekly Deposits ........................................................................... 44

ARTICLE VIII - FINANCIAL AND COLLATERAL REPORTING ................................................... 44

Section 8.1      Reporting and Information ................................................................. 45

Section 8.2      Financial Statements ..................................................................... 45

Section 8.3      Collateral Information and Reports ....................................................... 45

ARTICLE IX - NEGATIVE COVENANTS ................................................................... 46

Section 9.1      Financial Covenants ...................................................................... 46

Section 9.2      Restricted Payments ...................................................................... 46

Section 9.3      Debt ..................................................................................... 46

Section 9.4      Liens .................................................................................... 46

Section 9.5      Loans .................................................................................... 46

Section 9.6      Merger, Division, Consolidation, Sale of Assets, Acquisitions .......................... 46

Section 9.7      Transactions with Affiliates ............................................................. 46

Section 9.8      New Subsidiaries of Tattooed Chef and Other Loan Parties ............................... 47

Section 9.9      Benefit Plans ............................................................................ 47

Section 9.10     Sales and Leasebacks ..................................................................... 47

Section 9.11     Organizational Documents ................................................................. 47

Section 9.12     Investments .............................................................................. 47

Section 9.13     Amendments ............................................................................... 47

Section 9.14     No Restrictions on Subsidiary Distributions ............................................. 47

Section 9.15    Collateral Locations .................................................................... 47

Section 9.16    Patriot Act .................................................................................. 47

Section 9.17    Sanctions .................................................................................... 47

Section 9.18    Use of Proceeds .......................................................................... 48

Section 9.19    Milestones ................................................................................... 48

Section 9.20    Chapter 11 Cases ........................................................................ 48

Section 9.21    Holding Company Status ............................................................ 49

Section 9.22    Negative Covenants .................................................................... 49

ARTICLE X - DEFAULT AND REMEDIES ........................................................ 49

Section 10.1    Events of Default ........................................................................ 49

Section 10.2    Remedies ..................................................................................... 51

Section 10.3    ..................................................................................................... 52

Section 10.4    Maturity/Termination Date ......................................................... 53

Section 10.5    Application of Proceeds .............................................................. 53

Section 10.6    Miscellaneous Provisions Concerning Remedies ...................... 53

Section 10.7    Trademark License ...................................................................... 53

ARTICLE XI - MULTIPLE BORROWERS; BORROWER AGENT ...................... 53

Section 11.1    Borrower Agent ........................................................................... 53

Section 11.2    Nature and Extent of Liability ................................................... 54

Section 11.3    One Obligations .......................................................................... 55

ARTICLE XII - GUARANTY .............................................................................. 55

Section 12.1    The Guaranty ............................................................................... 55

Section 12.2    Obligations Unconditional .......................................................... 56

Section 12.3    Reinstatement .............................................................................. 57

Section 12.4    Guarantied Obligations Due ....................................................... 57

Section 12.5    Waivers ....................................................................................... 57

Section 12.6    Acknowledgment of Benefits ..................................................... 58

Section 12.7    Rights of Contribution and Subrogation .................................... 58

Section 12.8    Guarantee of Payment; Continuing Guarantee; Assignments ... 58

ARTICLE XIII - AGENTS ................................................................................... 59

Section 13.1    Appointment ................................................................................ 59

Section 13.2    Delegation of Duties ................................................................... 59

Section 13.3    Exculpatory Provisions ............................................................... 59

Section 13.4    Reliance by Agents ..................................................................... 60

Section 13.5    Notice of Default ........................................................................ 60

Section 13.6     Non-Reliance on Agents and Other Lenders ................................................... 60

Section 13.7     Indemnification ................................................................................................. 61

Section 13.8     Agent in Its Individual Capacity ....................................................................... 61

Section 13.9     Successor Agents ............................................................................................... 61

Section 13.10    Agents Generally ............................................................................................... 62

Section 13.11    Restrictions on Actions by Lenders; Sharing of Payments............................... 62

Section 13.12    Agency for Perfection........................................................................................ 62

Section 13.13    Authorization to File Proof of Claim ................................................................ 63

Section 13.14    Credit Bids ........................................................................................................ 63

Section 13.15    Binding Effect ................................................................................................... 63

ARTICLE XIV - MISCELLANEOUS .......................................................................................... 63

Section 14.1     Notices .............................................................................................................. 63

Section 14.2     Expenses ........................................................................................................... 65

Section 14.3     Setoff................................................................................................................. 65

Section 14.4     Venue; Service of Process ................................................................................. 66

Section 14.5     Assignment; Participation ................................................................................. 66

Section 14.6     Amendments and Waivers ................................................................................. 66

Section 14.7     Performance of Loan Parties' Duties................................................................. 67

Section 14.8     Indemnification ................................................................................................. 67

Section 14.9     All Powers Coupled with Interest...................................................................... 67

Section 14.10    Severability of Provisions ................................................................................. 67

Section 14.11    GOVERNING LAW .......................................................................................... 67

Section 14.12    Jury Waiver; California Jury Trial Waiver ....................................................... 68

Section 14.13    Counterparts; Integration; Electronic Execution of Assignments...................... 69

Section 14.14    Time is of the Essence ....................................................................................... 70

Section 14.15    Waiver of Consumer Rights; Advice of Counsel ............................................... 70

Section 14.16    Payments Set Aside ........................................................................................... 70

Section 14.17    Waiver of Consequential Damages; Etc ............................................................ 70

Section 14.18    Protective Advances by Lender ......................................................................... 70

Section 14.19    Subordination of Intercompany Indebtedness ................................................... 70

Section 14.20    Patriot Act Notice.............................................................................................. 72

Section 14.21    Press Releases and Related Matters.................................................................. 72

Section 14.22    Conflict with Orders .......................................................................................... 72

Section 14.22    Amendments and Waivers ................................................................................. 72

## EXHIBITS AND SCHEDULES

| | |
|---|---|
| EXHIBIT A | Commitments |
| EXHIBIT B | Notice of Borrowing |
| EXHIBIT C | Suretyship Provisions and Waivers |
| | |
| Schedule 5.1(a) | Organization; Power; Qualification |
| Schedule 5.1(c) | Subsidiaries, Parents and Affiliates; Capitalization |
| Schedule 5.1(i) | Debt and Guarantees |
| Schedule 5.1(j) | Litigation |
| Schedule 5.1(m) | ERISA |
| Schedule 5.1(p) | Locations of Inventory and Equipment |
| Schedule 5.1(q) | Place of Business |
| Schedule 5.1(r) | Corporate and Fictitious Names; Trade Names |
| Schedule 5.1(s) | Intellectual Property |
| Schedule 5.1(w) | Deposit Accounts |
| Schedule 9.3 | Permitted Indebtedness |
| Schedule 9.4 | Permitted Liens |

**AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT**

This AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT (this "Agreement"), dated as of July 17, 2024, is executed by and among ONE TABLE RESTAURANT OPERATIONS, LLC, a Delaware limited liability company ("One Table"), TENDER GREENS OPCO, LLC, a Delaware limited liability company ("New TG"), TOCAYA HOLDINGS LLC, a Nevada limited liability company ("Tocaya", together with One Table and New TG, collectively, the "Borrowers"), ONE TABLE RESTAURANT BRANDS, LLC, a Delaware limited liability company (the "Parent"), the Subsidiaries of Parent signatory hereto as guarantors or hereafter designated as Guarantors pursuant to Section 6.11 (if any), Breakwater Credit Opportunities Fund II LP and the other lenders from time to time party hereto (each a "Lender" and, collectively, the "Lenders"), BREAKWATER MANAGEMENT LP ("Breakwater"), as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "Administrative Agent"), and Breakwater, as collateral agent for the Secured Parties (in such capacity, together with its successors and assigns in such capacity, the "Collateral Agent", and together with the Administrative Agent, collectively, the "Agents" and each an "Agent").

RECITALS

WHEREAS, the Borrowers, Parent, the Guarantors parties hereto, the Lenders party hereto, and the Agents are parties to an Amended and Restated Loan and Security Agreement, dated as of July 23, 2021 (as amended from time to time, the "Prepetition Credit Agreement");

WHEREAS, on July 17, 2024 (the "Petition Date"), the Parent, the Borrowers and certain direct and indirect Subsidiaries of Parent and Borrowers (each, a "Chapter 11 Debtor" and collectively, the "Chapter 11 Debtors") filed voluntary petitions with the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") initiating their respective jointly administered cases under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") (jointly administered under Case No. _____) (collectively, the "Chapter 11 Cases"), and each Chapter 11 Debtor has continued and is continuing in the possession of its assets and management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrowers have asked the Lenders to provide the Borrowers with a senior secured superpriority priming term loan debtor-in-possession credit facility (the "DIP Facility"), consisting of (a) $3,000,000 of "new money" term loans that will be made available to the Borrowers pursuant to the terms and subject to the conditions set forth in this Agreement and the Orders; and (b) Prepetition Loans in the amount of $12,000,000 will be deemed "rolled up" as loans hereunder on a dollar-for-dollar basis pursuant to the terms and subject to the conditions set forth in this Agreement and the Orders;

WHEREAS, the Guarantors have agreed to guarantee the obligations of the Borrowers hereunder;

WHEREAS, the Borrowers and the Guarantors (other than the Parent) have agreed to secure, and have secured, their respective Obligations by granting to the Lenders, subject to the Carve-Out, a senior secured super-priority priming Lien on substantially all of their respective assets, subject to the terms and conditions set forth in the Orders;

WHEREAS, the Lenders are willing to make the DIP Facility available to the Borrowers, subject to the terms and conditions set forth in this Agreement and the Orders; and

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

5407174.6                                         1

## ARTICLE I - DEFINITIONS

Section 1.1      Definitions.  When used in this Agreement, the capitalized terms set forth below shall have the definitions assigned to such terms below:

"ABR" means, for any day, a rate per annum equal to the highest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Rate in effect on such day plus 0.50%, (c) Adjusted Term SOFR for a one-month tenor in effect on such day plus 1.00% per annum and (d) 2.00% per annum.  Any change in the ABR due to a change in the Prime Rate, the Federal Funds Rate or Adjusted Term SOFR shall be effective from and including the effective date of such  change in the Prime Rate, the Federal Funds Rate or Adjusted Term SOFR, respectively.

"ABR Loan" means each Loan bearing interest at ABR, as provided in Section 2.8(a).

"ABR Term SOFR Determination Day" has the meaning specified in the definition of "Term SOFR".

"Account Debtor" means a Person who is obligated on an account.

"Acquisition" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of a Person, or of all or substantially all of any business or division of a Person, (b) the acquisition of in excess of 50% of the Equity Interests of any Person, or otherwise causing any Person to become a Subsidiary, or (c) a merger or consolidation or any other combination with another Person (other than a Person that is already a Subsidiary).

"Adequate Protection Liens" has the meaning assigned to such term in the Orders.

"Adequate Protection Claims" has the meaning assigned to such term in the Orders.

"Adjusted Term SOFR" means, for purposes of any calculation, the rate per annum equal to (a) Term SOFR for such calculation plus (b) the Term SOFR Adjustment; provided that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"Administrative Agent" has the meaning assigned to the term in the preamble to the Agreement.

"Advance" means a Loan or, in the case of the Initial Loan, a Tranche made under this Agreement.

"Affiliate" means, with respect to a specified Person, (a) any other Person which, directly or indirectly, controls or is controlled by or is under common control with such Person, and (b) any officer or director of such Person.  A Person shall be deemed to be "controlled by" any other Person if such Person possesses, directly or indirectly, power to vote 10% or more of the securities (on a fully diluted basis) having ordinary voting power for the election of directors or managers or power to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"Agents" has the meaning set forth in the preamble to this Agreement.

"Agents' Office" means the office of Agent set forth in Section 14.1 or such other office as Agents may designate from time to time.

"Agreement" has the meaning ascribed for such term in the preamble paragraph of this Agreement.

"Anti-Corruption Laws" means: (a) the U.S. Foreign Corrupt Practices Act of 1977, as amended; (b) the U.K. Bribery Act 2010, as amended; and (c) any other anti-bribery or anti-corruption laws, regulations or ordinances in any jurisdiction in which a Loan Party or any of its Subsidiaries is located or doing business.

"Anti-Money Laundering Laws" means applicable laws or regulations in any jurisdiction in which any Loan Party or any of its Subsidiaries is located or doing business that relates to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"Applicable Law" means, as to any Person, any law (statutory or common), treaty, rule or regulation of a Governmental Authority or determination of a court or binding arbitrator, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Applicable Margin" means (a) 9.60% per annum in the case of SOFR Loans and (b) 8.60% per annum in the case of ABR Loans.

"Approved Budget" has the meaning specified in Section 7.16(a).

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.10(d).

"Avoidance Action Proceeds" has the meaning specified in Section 6.1(b).

"Bankruptcy Code" has the meaning specified in the recitals to this Agreement.

"Bankruptcy Court" has the meaning specified in the recitals to this Agreement.

"Benchmark" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.10(a).

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower Agent giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the relevant Governmental Authority or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities at such time and (b) the related Benchmark Replacement Adjustment; provided that, if such Benchmark Replacement as so determined would be less than the Floor, such Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Credit Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for

calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower Agent giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the relevant Governmental Authority or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"Benchmark Replacement Date" means the earliest to occur of the following events with respect to the then-current Benchmark:

(a)     in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof); or

(b)     in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which all Available Tenors of such Benchmark (or the published component used in the calculation thereof) has been or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) have been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, if such Benchmark is a term rate, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)     a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof);

(b)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component),which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all

Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof); or

(c)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such Benchmark (or such component thereof) or,  if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, if such Benchmark is a term rate, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current  Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Start Date" means, in the case of a Benchmark Transition Event, the earlier of (a) the applicable Benchmark Replacement Date and (b) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication.

"Benchmark Unavailability Period" means the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.10 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.10.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation, in form and substance satisfactory to Lender.

"Beneficial Ownership Regulation" means 31 C.F.R. §1010.230.

"Benefit Plan" means a defined benefit plan as defined in Section 3(35) of ERISA (other than a Multiemployer Plan) in respect of which a Person or any Related Company is, or within the immediately preceding six years was, an "employer" as defined in Section 3(5) of ERISA, including such plans as may be established after the date hereof.

"Borrower" and "Borrowers" have the meaning ascribed for such terms in the preamble paragraph of this Agreement.

"Borrower Agent" has the meaning ascribed to such terms in Section 11.1(a).

"Borrowing" means and includes the incurrence of one Type of Term Loan (or in the case of the Initial Loan, a Tranche thereof) on a given date (or resulting from conversions on a given date after the Closing Date) having, in the case of SOFR Loans, the same Interest Period (provided that (i) all Tranches of the Initial Loan shall be considered part of a single Borrowing and (ii) ABR Loans incurred pursuant to Section 2.10(d) shall be considered part of any related Borrowing of SOFR Loans).

"Breakwater" has the meaning set forth in the preamble to this Agreement.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which commercial banks in Los Angeles, California, are authorized or required by law to remain closed, or is a day when Lender is otherwise closed.

"Capital Expenditures" means, with respect to any Person, all expenditures made and liabilities incurred for the acquisition of assets that are required to be capitalized in accordance with GAAP.

"Capitalized Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Capitalized Lease Obligation" means Debt represented by obligations under a Capitalized Lease, and the amount of such Debt shall be the capitalized amount of such obligations determined in accordance with GAAP.

"Carve-Out" has the meaning assigned to such term in the Orders.

"Carve-Out Notice" has the meaning ascribed to such term in the Interim DIP Orders.

"Cash Collateral" means all cash and cash equivalents of the Borrowers, whenever or wherever acquired, and the proceeds of all collateral pledged to the Lenders, constitute cash collateral, as contemplated by section 363 of the Bankruptcy Code.

"Capital Stock" means any and all shares, interests, participations, units or other equivalents (however designated) of capital stock of a corporation, membership interests in a limited liability company, partnership interests of a limited partnership, any and all equivalent ownership interests in a Person and any and all warrants, rights or options to purchase any of the foregoing.

"Casualty Event" has the meaning assigned to such term in the Prepetition Credit Agreement.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive  (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a)      any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act (but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan)) other than the Permitted Holders, is or becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act), directly or indirectly, of more than a majority (on a fully diluted basis) of (i) the issued and outstanding Voting Stock of the Parent or (ii) the aggregate economic value of all authorized Capital Stock of the Parent;

(b)    One Table (i) ceases to own 100% of the issued and outstanding Capital Stock of the Borrowers (other than One Table), free and clear of all Liens other than Liens in favor of the Collateral Agent or (ii) ceases to have the power to elect a majority of the Governing Body of any Borrower;

(c)    the Parent (i) ceases to own 100% of the issued and outstanding Capital Stock of One Table, free and clear of all Liens other than Liens in favor of the Collateral Agent or (ii) ceases to have the  power to elect a majority of the Governing Body of One Table;

(d)    any Borrower ceases to own 100% of the issued and outstanding Capital Stock of each of its Subsidiaries, free and clear of all Liens other than Liens in favor of the Collateral Agent;

(e)    the acquisition of direct or indirect Control (pursuant to clause (b) of the definition thereof) of the Parent, by any Person or group (as defined in clause (a) above) other than the Permitted Holders; or

(f)    any Loan Party other than the Borrowers shall cease to own 100% of the issued and outstanding Capital Stock of any of their respective Subsidiaries.

"Chapter 11 Cases" has the meaning specified in the recitals to this Agreement.

"Chapter 11 Debtors" has the meaning specified in the recitals to this Agreement.

"Closing Date" means the date on which all such conditions precedent set forth in Section 4.1 have been satisfied or waived in writing by Lender.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means:

(a)    all assets and properties of each of the Loan Parties and their estates, of any kind or  nature whatsoever, whether tangible or intangible, real, personal or mixed, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of, any of the Loan Parties (including under any trade names, styles or derivations thereof), whether before or after the Petition Date, and wherever located, including, without limitation, all of the Loan Parties' rights, title and interests in all Prepetition Collateral to the extent such assets or properties are assets or property, as applicable, of the Chapter 11 Debtors under applicable law;

(b)    all money, cash and cash equivalents, all funds in any deposit accounts, securities accounts, commodities accounts or other accounts (together with and all money, cash and cash equivalents, instruments and other property deposited therein or credited thereto from time to time), all accounts receivable and other receivables (including those generated by intercompany transactions), all rights to payment, contracts and contract rights, all instruments, documents and chattel paper, all securities (whether or not marketable), all goods, furniture, machinery, plants, equipment, vehicles, inventory and fixtures, all real property interests, all interests in leaseholds, purchase options, all Mortgaged Property, all franchise rights, all patents, tradenames, trademarks, copyrights, licenses and all other intellectual property, all general intangibles, tax or other refunds, or insurance proceeds, all equity interests or capital stock (including 100% of all equity interests in Foreign Subsidiaries), limited liability company interests, partnership interests and financial assets, all investment property, all supporting obligations, all letters of credit and letter of credit rights, all commercial tort claims, all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records), and all rents, products, offspring, profits, and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, each of the foregoing, including any and all proceeds of any

insurance (including any business interruption and property insurance),  indemnity, warranty or guaranty payable to any Loan Party from time to time with respect to any of the foregoing.

Without limiting the foregoing, Collateral shall include the following: any proceeds of or property recovered, whether by judgment, settlement, or otherwise, on account of all avoidance actions brought pursuant to chapter 5 of the Bankruptcy Code or section 724(a) of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state law or foreign law equivalents.

"Collateral Agent" has the meaning ascribed to such term in the preamble set forth in this Agreement.

"Collateral Sale" has the meaning ascribed to such term in Section 13.14.

"Commitment" means, with respect to each Lender, such Lender's Term Loan Commitment.

"Conforming Changes" means, with respect to either the use or administration of Adjusted Term SOFR or the use, administration, adoption or implementation of any Benchmark  Replacement, any technical, administrative or operational changes (including changes to the definition of "ABR," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.11 and other technical, administrative or operational matters) that the Administrative Agent decides (in consultation with the Borrower Agent) may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent (in consultation with the Borrower Agent) determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Contingent Liability" means any obligation of a Person arising from a guaranty, indemnity or other assurance of payment or performance of any Debt, lease, dividend or other obligation ("primary obligations") of another obligor ("primary obligor") in any manner, whether directly or indirectly, including any obligation of such Person under any (a) guaranty, endorsement, co-making or sale with recourse of an obligation of a primary obligor; (b) obligation to make take-or-pay or similar payments regardless of nonperformance by any other party to an agreement; and (c) arrangement (i) to purchase any primary obligation or security therefor, (ii) to supply funds for the purchase or payment of any primary obligation, (iii) to maintain or assure working capital, equity capital, net worth or solvency of the primary obligor, (iv) to purchase property or services for the purpose of assuring the ability of the primary obligor to perform a primary obligation, or (v) otherwise to assure or hold harmless the holder of any primary obligation against loss in respect thereof.  The amount of any Contingent Liabilities shall be deemed to be the stated or determinable amount of the primary obligation (or, if less, the maximum amount for which such Person may be liable under the instrument evidencing the Contingent Liability) or, if not stated or  determinable, the maximum reasonably anticipated liability with respect thereto.

"Contract Rate" means  the interest note for ABR Loans or SOFR loans, as provided in Section 2.8(a) or 2.8(b), respectively.

"Control" means either (a) the power to vote, or the beneficial ownership of, 10% or more of the

voting Capital Stock of such Person or (b) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  The terms "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means a control agreement, in form and substance reasonably satisfactory to Collateral Agent, executed and delivered by the applicable Credit Party, Collateral Agent, and the applicable securities intermediary or depository, which agreement is sufficient to give Collateral Agent "control" (within the meaning of the UCC) over each of such Credit Party's securities accounts, deposit accounts or investment property, as the case may be.

"Debt" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)    all obligations of such Person under any swap or hedging contract;

(d)    all obligations of such Person to pay the deferred purchase price of property or services, including earn-outs (other than trade accounts payable arising in the ordinary course of business not past due for more than 90 days);

(e)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)    all purchase money indebtedness and Capitalized Leases;

(g)    all liabilities in respect of a Sale and Leaseback Transaction;

(h)    all Disqualified Equity Interests, valued, as of the date of determination, at the greater of (i) the maximum aggregate amount that would be payable upon maturity, redemption, repayment or repurchase thereof (or of Disqualified Equity Interests or of Debt into which such Disqualified Equity Interests are convertible or exchangeable) and the (ii) the maximum liquidation preference of such Disqualified Equity Interests; and

(i)    all Contingent Liabilities of such Person in respect of any of the foregoing.

For all purposes hereof, the Debt of any Person shall include the Debt of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Debt is expressly made non-recourse to such Person.

"Default" means any of the events specified in Section 10.1 that, with the passage of time or giving of notice or both, would constitute an Event of Default.

"Default Rate" means the applicable Contract Rate plus 3.00% per annum.

"Defaulting Lender" means subject to Section 2.14(b), any Lender that, as determined by the Administrative Agent, (a) has failed to (i) fund any portion of the Term Loans required to be funded by it hereunder for three (3) or more Business Days unless such Lender notifies the Administrative Agent and the Borrower Agent in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder, (b) has notified the Borrower Agent or the Administrative Agent in writing that it does not intend to comply with its funding obligations or has made a public statement to that effect with respect to its funding obligations hereunder or under other agreements in which it commits to extend credit (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) or more Business Days after written request by the Administrative Agent or the Borrower Agent, to confirm in writing in a manner satisfactory to the Administrative Agent that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a bankruptcy or insolvency proceeding, (ii) had a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such capacity, (iii) taken any action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment or (iv) become the subject of a Bail-in Action; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through above shall be conclusive and binding absent manifest error.

"DIP Collateral" has the meaning ascribed to such term in Section 6.1(b).

"DIP Facility" has the meaning ascribed to it in the recitals to this Agreement.

"DIP Liens" has the meaning ascribed to such term in Section 6.1(b).

"DIP Remedies Notice Period" has the meaning ascribed to such term in Section 10.3.

"DIP Superpriority Claims" has the meaning ascribed to such term in Section 6.1(b).

"Disqualified Equity Interest" means any Equity Interest that, by its terms (or by the terms of any security of other Equity Interest into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is six months after the Scheduled Maturity Date, (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interest referred to in clause (a)

above, in each case at any time prior to six months after the Scheduled Maturity Date, (c) contains any repurchase obligation that may come into effect prior to payment in full of all Obligations, (d) requires cash dividend payments prior to six months after the Scheduled Maturity Date, (e) provides the holders of such Equity Interest thereof with any rights to receive any cash upon the occurrence of a change of control prior to six months after the date on which the Obligations have been irrevocably paid in full, unless the rights to receive such cash are contingent upon the Obligations being irrevocably paid in full, or (f) is prohibited by the terms of this Agreement.

.

"<u>Division</u>" means an action or series of actions taken under Applicable Law pursuant to which a limited liability company divides itself into two or more limited liability companies and allocates its assets among the resulting limited liability companies.

"<u>Dollar</u>" and "<u>$</u>" means freely transferable United States dollars.

"<u>Domestic Subsidiary</u>" means a Subsidiary incorporated or organized under the laws of the United States of America, any state thereof or the District of Columbia.

"<u>Environmental Laws</u>" means all federal, state, local and foreign laws now or hereafter in effect relating to pollution or protection of the environment, including laws relating to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals or industrial, toxic or hazardous substances or wastes or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, removal, transport or handling of pollutants, contaminants, chemicals or industrial, toxic or hazardous substances or wastes, and any and all regulations, notices or demand letters issued, entered, promulgated or approved thereunder.

"<u>Environmental Liability</u>" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"<u>Equity Interest</u>" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as in effect from time to time, and any successor statute, and any rule or regulation issued thereunder.

"<u>ERISA Affiliate</u>" means any trade or business (whether or not incorporated) under common control with a Loan Party or any of its Subsidiaries within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"<u>Estate Professionals</u>" means the persons or firms retained by (i) the Chapter 11 Debtors pursuant to Sections 327, 328, or 363 of the Bankruptcy Code or (ii) any committee appointed in the Chapter 11 Cases

"Event of Default" means any of the events specified in Section 10.1.

"Facility Guaranty" has the meaning ascribed to such term in Section 12.1.

"Federal Funds Rate" means, for any day, a fluctuating interest rate per annum equal to: (a) the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as published for such day (or, if such day is not a Business Day, for the next succeeding Business Day) by the Federal Reserve Bank of New York; or (b) if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"Federal Reserve Bank of New York's Website" means the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"Final DIP Order" means the final order entered by the Bankruptcy Court in the Chapter 11 Cases approving (i) the Loan Parties' entry into the Loan Documents, (ii) the incurrence by the Loan Parties of the Obligations and the Loans hereunder, (iii) the granting of the super-priority claims and liens against the Loan Parties and their assets in favor of the Lender, (iv) the Chapter 11 Debtors' use of Cash Collateral, (v) the granting of adequate protection to the Lender, and (vi) in exchange for the Lender agreeing to provide the DIP Facility, releases of Secured Parties, and their affiliates and others, in each case, on a final basis, in form and substance acceptable to Agent.

"First Day Orders" means all material orders entered by the Bankruptcy Court pursuant to motions filed on or about the Petition Date by the Chapter 11 Debtors.

"Floor" means two percent (2%) per annum.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"GAAP" means generally accepted accounting principles and practices consistently applied.

"Governing Body" has the meaning set forth in Section 7.18.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, and any agency, department or Person exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any corporation or other Person owned or controlled (through stock or capital ownership or otherwise) by any of the foregoing, whether domestic or foreign.

"Guaranteed Obligations" has the meaning ascribed to such term in Section 12.1(a).

"Guarantors" means (a) the Parent, (b) each Person that is a Domestic Subsidiary on the Closing Date, (c) each Person that is a Foreign Subsidiary on the Closing Date; provided, that the inclusion of any Foreign Subsidiary which may be reasonably likely to result in material adverse tax consequences to the Parent and its Subsidiaries, taken as a whole, shall not be considered a Guarantor hereunder.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"<u>Holder</u>" has the meaning ascribed to such term in <u>Section 14.19.</u>

"<u>Indemnified Party</u>" has the meaning ascribed to such term in <u>Section 14.8.</u>

"<u>Initial Approved Budget</u>" has the meaning assigned to such term in Section 4.1(e).

"<u>Initial Reporting Date</u>" means the Petition Date.

"<u>Intellectual Property</u>" means, as to any Person, all of such Person's then owned and existing and future acquired or arising patents, patent rights, copyrights, works which are the subject of copyrights, trademarks, service marks, trade names, trade styles, patent, trademark and service mark applications, and all licenses and rights related to any of the foregoing, and all rights to sue for past, present and future infringements of any of the foregoing.

"<u>Intercompany Indebtedness</u>" means Debt owing to (or from) a Loan Party from (or to) another Loan Party.

"<u>Interim DIP Order</u>" means the interim order entered by the Bankruptcy Court in the Chapter 11 Cases approving (i) the Loan Parties' entry into the Loan Documents, (ii) the incurrence by the Loan Parties of the Obligations and the Loans hereunder, (iii) the granting of the super-priority claims and liens against the Loan Parties and their assets in favor of the Lender, (iv) the Chapter 11 Debtors' use of Cash Collateral, and (v) the granting of adequate protection to the Lender, in each case, on an interim basis, in form and substance acceptable to Lender, and (vi) in exchange for the Lender agreeing to provide the DIP Facility, releases of Secured Parties, and their affiliates and others.

"<u>Initial Loan</u>" has the meaning ascribed to such term in Section 2.3.

"<u>Interest Period</u>" means a period commencing on the first calendar day of each month and end on the last calendar day of such month.

"<u>Investment</u>" means, with respect to any Person, any investment in another Person, whether by acquisition of any Debt or Equity Interest, by making any loan or advance, by becoming obligated with respect to a Contingent Liability in respect of obligations of such other Person (other than travel and similar advances to employees in the ordinary course of business and consistent with historical practices) or by making an Acquisition.

"<u>Lender</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Lien</u>" means, with respect to any Person, any security interest, chattel mortgage, charge, mortgage, deed to secure Debt, deed of trust, lien, pledge, Capitalized Lease, conditional sale or other title retention agreement, or other security interest or encumbrance of any kind in respect of any property of such Person or upon the income or profits therefrom.

"<u>Loan Documents</u>" means, collectively, this Agreement, each agreement or document now or hereafter executed and delivered by any Person to evidence, guarantee or secure the Obligations or Guaranteed Obligations, and each other instrument, agreement and document now or hereafter executed and delivered in connection with this Agreement or the Loans.

"<u>Loan Parties</u>" means, collectively, Parent, each Borrower and each Guarantor, all of whom are also the Chapter 11 Debtors..

"Loans" means all Advances made to Borrowers in connection with this Agreement, including, without limitation, the Term Loans and Roll-Up Loans.

"Maker" has the meaning ascribed to such term in Section 14.19.

"Material Adverse Change" means any act, omission, event or undertaking which would, singly or in the aggregate, have a materially adverse effect upon (a) the business, assets, properties, liabilities, condition (financial or otherwise), results of operations or business prospects of any Loan Party or any of its Subsidiaries, (b) the ability of any Loan Party to perform any obligations under this Agreement or any other Loan Document to which it is a party, or (c) the legality, validity, binding effect, enforceability or admissibility into evidence of any Loan Document or the ability of Lender to enforce any rights or remedies under or in connection with any Loan Document, in each case of the foregoing clauses (a) through (c), other than the commencement of a proceeding under chapter 11 of the Bankruptcy Code and the commencement of the Chapter 11 Cases, events that directly or indirectly customarily and reasonably result from the commencement of the Chapter 11 Cases (in each case, other than matters affecting the Loan Parties that are not subject to the automatic stay) and the consummation of the transactions contemplated by the First Day Orders or the Plan of Reorganization.

"Material Contract" means, as to any Person, (i) each contract or agreement to which such Person or any of its Subsidiaries is a party involving aggregate annual consideration payable to such Person or such Subsidiary of $375,000 or more, and (ii) all other contracts or agreements, the loss of which could reasonably be expected to result in a Material Adverse Effect. Each Material Agreement is set forth on Schedule 5.1(y).

"Maximum Rate" means the maximum nonusurious interest rate, if any, that at any time, or from time to time, may be contracted for, taken, reserved, charged, or received on the Loans under the laws which are presently in effect of the United States and the State of California applicable to Lender and such Debt or, to the extent permitted by law, under Applicable Law of the United States and the State of California which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than Applicable Laws now allows.

"Milestones" has the meaning ascribed to such term in Section 7.15.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which a Loan Party or a Related Company is required to contribute or has contributed within the immediately preceding 6 years.

"Net Casualty Proceeds" means, with respect to any Casualty Event, the amount of any insurance proceeds or condemnation awards received by any Loan Party or any of its Subsidiaries in connection with such Casualty Event (net of all reasonable collection expenses incurred in connection therewith (including, without limitation, any legal or other professional fees)), but excluding any proceeds or awards required to be paid to a creditor (other than the Lenders) which holds a first priority Lien permitted by Section 9.4 on the property which is the subject of such Casualty Event, and less any Taxes payable by such Person on account of such insurance proceeds or condemnation award, actually paid, assessed or estimated by such Person (in good faith) to be payable within the next 12 months in cash in connection with such Casualty Event.

"Net Disposition Proceeds" means, with respect to any disposition of assets by any Loan Party, the excess of: (a) the gross cash proceeds received by such Person from such Disposition, over (b) the sum of: (i) all reasonable legal, investment banking, underwriting, brokerage and accounting and other professional fees, sales commissions and disbursements and all other reasonable fees, expenses and charges, in each

case actually incurred in connection with such disposition which have not been paid and are not payable to Affiliates of such Person, and (ii) all Taxes payable by such Person on account of proceeds from such disposition, actually paid, assessed or estimated by such Person (in good faith) to be payable in cash within the next 12 months in connection with such proceeds.

"Notice of Borrowing" has the meaning ascribed to such term in Section 2.3(a).

"Obligations" means (a) the due and punctual payment by the Borrowers of (i) the principal of and interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (ii) all other monetary obligations of the Borrowers under this Agreement and each of the other Loan Documents (including obligations to pay fees, expense reimbursement and indemnification obligations), whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding, (b) the due and punctual performance of all other obligations of the Borrowers under or pursuant to the Agreement and each of the other Loan Documents and (c) the due and punctual payment and performance of all the obligations of each other Loan Party under or pursuant to this Agreement and each of the other Loan Documents (including monetary obligations incurred during the pendency of any bankruptcy, insolvency,  receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding, and the Guaranteed Obligations.

"Observer" has the meaning set forth in Section 7.18.

"Official Committee" shall mean any official committee of unsecured creditors appointed in any of the Chapter 11 Cases.

"Orders" shall mean the Interim DIP Order and/or the Final DIP Order, in each case as the context requires.

"Operating Lease" means any lease (other than a lease constituting a Capitalized Lease) of real or personal property determined in accordance with GAAP.

"Parent" has the meaning ascribed to such term in the preamble to this Agreement.

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001).

"PBGC" means the Pension Benefit Guaranty Corporation or any successor agency.

"Periodic Term SOFR Determination Day" has the meaning specified in the definition of "Term SOFR".

"Permitted Debt" means (a) the Obligations, (b) Debt constituting purchase money indebtedness or Capitalized Lease Obligations in aggregate amount outstanding not to exceed $_____, (c) the Subordinated Debt, and (d) Debt existing on the Closing Date and described on Schedule 9.3 attached hereto and made a part hereof.

"Permitted Holders" means T.Y.P. Restaurant Group, Inc., Big Table Brands Management, LLC, and New Tocaya Holdings, LLC.

"Permitted Investments" means Investments of Loan Parties in (a) negotiable certificates of deposit issued by any commercial bank having capital and surplus in excess of $100,000,000, and (b) any direct obligation of the United States of America or any agency or instrumentality thereof which has a remaining maturity at the time of repurchase of not more than one year and repurchase agreements relating to the same.

"Permitted Liens" has the meaning ascribed to it in Section  6.1(b), all as described in Schedule 9.4 attached hereto and made a part hereof.

"Permitted Variance" has the meaning assigned to such term in Section 7.16.

"Plan of Reorganization" means a plan of reorganization under the Chapter 11 Cases (including all related schedules, supplements, exhibits and orders, as applicable), which shall be in form and substance satisfactory to the Required Lenders.

"Person" means any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust or other enterprise or any Governmental Authority.

"Petition Date" has the meaning assigned to such term in the recitals hereto.

"Prepetition Collateral" shall mean the "Collateral" as defined in the Prepetition Credit Agreement.

"Prepetition Credit Agreement" has the meaning assigned to such term in the recitals hereto.

"Prepetition Lenders" means the Lenders under the Prepetition Loan Documents.

"Prepetition Liens" shall mean the liens and security interests granted by the Loan Parties to secure the Prepetition Obligations, if any, pursuant to Section 364(c)(3) of the Bankruptcy Code.

"Prepetition Loan Documents" shall mean the "Loan Documents" under and as defined in the Prepetition Credit Agreement.

"Prepetition Loans" shall mean the "Loans" under and as defined in the Prepetition Credit Agreement.

"Prepetition Obligations" shall mean all "Obligations" as such term is defined in the Prepetition Credit Agreement, excluding therefrom any Obligations as defined herein.

"Prime Rate" means a variable per annum rate, as of any date of determination, equal to the rate as of such date published in *The Wall Street Journal* as being the "Prime Rate" (or, if more than one rate is published as the Prime Rate, then the highest of such rates).  The Prime Rate will change as of the date of publication in *The Wall Street Journal* of a Prime Rate that is different from that published on the preceding Business Day.  In the event that *The Wall Street Journal* shall, for any reason, fail or cease to publish the Prime Rate, the Agents shall choose a reasonably comparable index or source to use as the basis for the Prime Rate.

"Proposed Budget" has the meaning ascribed to such term in Section 7.16(a).

"Pro Rata Share" means with respect to any Commitment of any Lender at any time, a percentage,

the numerator of which shall be such Lender's Commitment (or if such Commitments have been terminated or expired or the Loans have been declared to be due and payable, such Lender's Term Loan), and the denominator of which shall be the sum of such Commitments of all Lenders (or if such Commitments have been terminated or expired or the Loans have been declared to be due and payable, all Term Loans of all Lenders).

"Properly Contested" means, with respect to any obligation of any Loan Party, (a) the obligation is subject to a bona fide dispute regarding amount or such Loan Party's liability to pay; (b) the obligation is being properly contested in good faith by appropriate proceedings promptly instituted and diligently pursued; (c) appropriate reserves have been established in accordance with GAAP; (d) non-payment could not reasonably be expected to have a Material Adverse Change, nor could reasonably be expected to result in forfeiture or sale of any assets of such Loan Party; and (e) no Lien is imposed on assets of such Loan Party, unless bonded and stayed to the satisfaction of Lender.

"Protective Advance" has the meaning ascribed to such term in Section 14.18.

"Related Company" means, as to any Person, any (a) corporation which is a member of the same controlled group of corporations (within the meaning of Section 414(b) of the Code) as such Person, (b) partnership or other trade or business (whether or not incorporated) under common control (within the meaning of Section 414(c) of the Code) with such Person, or (c) member of the same affiliated service group (within the meaning of Section 414(m) of the Code) as such Person or any corporation described in clause (a) above or any partnership, trade or business described in clause (b) above.

"Remedies Notice" has the meaning ascribed to such term in Section 10.3.

"Remedies Notice Hearing" has the meaning ascribed to such term in Section 10.3.

"Remedies Notice Period" has the meaning ascribed to such term in Section 10.3.

"Reporting Date" has the meaning ascribed to such term in Section 8.1(a).

"Reporting Parties" means Parent and its consolidated Subsidiaries.

"Required Lenders" means, at any date, the Lenders having or holding a majority of the sum of the outstanding principal amount of the Term Loans; provided that the outstanding principal amount of the Terms Loans held, or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Reserve" means, as of any date of determination, an amount from time to time established by Lender in its sole and absolute discretion as a reserve in reduction of the Borrowing Base in respect of contingencies or other potential factors (such as, without limitation, rebates, sales taxes, property taxes, installation and delivery expenses, and warranties) which could adversely affect or otherwise reduce the anticipated amount of timely collections in payment of Eligible Accounts or the value (whether at cost, market or orderly liquidation value) of Eligible Inventory, which could affect the enforceability, perfection or priority of Lender's Lien on the Collateral or which does or would with notice or passage of time or both, constitute an Event of Default. The "Reserve", if any from time to time, does not represent cash funds.

"Restricted Payments" means, with respect to any Person, (a) the retirement, redemption, purchase, or other acquisition for value of any Equity Interests issued by such Person, (b) the declaration or payment of any dividend or distribution on or with respect to any Equity Interests (excluding distributions made solely in shares of stock of the same class) or any other payment by such Person in respect of Equity

Interests, (c) any redemption, prepayment (whether mandatory or optional), defeasance, repurchase or any other payment in respect of any Debt which ranks junior to the payment, or as to the distribution of assets upon any liquidation, dissolution or winding up of such Person to the Obligations, whether as a matter of contract or law, (d) the payment by any Person of the principal amount of or interest on any Debt (other than trade payables incurred in the ordinary course of business) owing to an Affiliate of such Person, or (e) the payment of any management fees or similar fees to any Person, including, without limitation, any holders of its Equity Interests or any Affiliate thereof.

"Roll-Up" means the "roll-up" of Prepetition Loans into Roll-Up Loans pursuant to the Orders and Section 2.2.

"Roll-Up Loans" has the meaning ascribed to such term in Section 2.2.

"Sale" has the meaning ascribed to such term in the Section 7.15.

"Sale Motion" has the meaning ascribed to such term in the Section 7.15.

"Sale and Leaseback Transaction" means, with respect to any Person, any arrangement, directly or indirectly, whereby such Person shall sell or transfer any property used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease from such Person, such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

"Sanction" or "Sanctions" means individually and collectively, respectively, any and all economic or financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes and anti- terrorism laws, including but not limited to those imposed, administered or enforced from time to time by: (a) the United States of America, including those administered by the OFAC, the U.S. State Department, the U.S. Department of Commerce, or through any existing or future Executive Order, (b) the United Nations Security Council, (c) the European Union, (d) the United Kingdom, or (e) any other Governmental Authorities with jurisdiction over any Loan Party or any of its Subsidiaries.

"Sanctioned Person" means any Person that is a target of Sanctions, including without limitation, a Person that is: (a) listed on OFAC's Specially Designated Nationals and Blocked Persons List; (b) listed on OFAC's Consolidated Non-Specially Designated Nationals List; (c) a legal entity that is deemed by OFAC to be a Sanctions target based on the ownership of such legal entity by Sanctioned Peron(s); or (d) a Person that is a Sanctions target pursuant to any territorial or country-based Sanctions program.

"Secured Parties" means, collectively, (a) the Lenders, (b) the Agents, (c) the beneficiaries of each indemnification obligation undertaken by any Loan Party under the Loan Documents and (d) any successors, endorsees, transferees and assigns of each of the foregoing.

"Scheduled Maturity Date" means the date which is 120 days after the Petition Date.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"SOFR Borrowing" means, as to any Borrowing, the SOFR Loans comprising such Borrowing.

"SOFR Loan" means a Loan that bears interest at a rate based on Adjusted Term SOFR, other than pursuant to clause (c) of the definition of "ABR".

"Solvent" means, when used in connection with any Person, that such Person has assets of a fair value which exceeds the total liabilities of such Person and which exceeds the amount required to pay its Debts (including contingent, subordinated, unmatured and unliquidated liabilities) as they become absolute and matured, and that such Person is able to, and anticipates that it will be able to, meet its Debts as they mature and has adequate capital to conduct the business in which it is or proposes to be engaged, and when used in connection with any Loan Party, that all of the foregoing requirements are true after given effect to the transactions contemplated hereby, and that such Loan Party will not be rendered insolvent by the execution and delivery of the Loan Documents or by completion of the transactions contemplated hereunder or thereunder.

"Subordinated Debt" means Debt owing by a Loan Party to a third Person that has been (a) approved in writing by Lender at its sole option and (b) subordinated to the payment of the Obligations pursuant to a written subordination agreement executed by Lender and the holder of such Debt containing terms acceptable to Lender in its sole and absolute discretion.

"Subsidiary" means, with respect to any Person, a corporation, partnership, limited liability company, or other legal entity in which that Person directly or indirectly owns or controls the shares of Equity Interests having ordinary voting power to elect a majority of the board of directors (or appoint a majority of other comparable managers) of such corporation, partnership, limited liability company, or other legal entity.

"Taxes" means all income, stamp or other taxes, duties, levies, imposts, charges, assessments, fees, deductions or withholdings, now or hereafter imposed, enacted, levied, collected, withheld or assessed by any Governmental Authority, and all interest, penalties, additions to tax or similar liabilities with respect thereto.

"Term Lender" means each Lender that holds a Term Loan Commitment or a Term Loan.

"Term Loan" has the meaning set forth in Section 2.1(a).

"Term Loan Commitment" means, with respect to each Lender and with respect to the Term Loan being funded on the Closing Date, (a) in the case of each Lender that is a Lender on the date hereof, the amount set forth opposite such Lender's name on Exhibit A as such Lender's "Term Loan Commitment" and (b) in the case of any Lender that becomes a Lender after the date hereof, the amount specified as such Lender's "Term Loan Commitment" in an applicable executed assignment and acceptance pursuant to which such Lender assumed a portion of the Total Term Loan Commitment, in each case as the same may be changed from time to time pursuant to the terms hereof.

"Term SOFR" means,

(a)    for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference

Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)      for any calculation with respect to an ABR Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "ABR Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any ABR Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such ABR SOFR Determination Day.

"Term SOFR Adjustment" means a percentage equal to 0.10% per annum.

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.

"Termination Date" has the meaning ascribed to such term in Section 10.4.

"Termination Event" means (a) a "Reportable Event" as defined in Section 4043 of ERISA, but excluding any such event as to which the PBGC has by regulation waived the requirement of Section 4043(a) of ERISA that it be notified within 30 days of the occurrence of such event; provided, however, that a failure to meet the minimum funding standard of Section 412 of the Code and of Section 302 of ERISA shall be a Reportable Event regardless of the issuance of any such waiver of the notice requirement in accordance with either Section 4043(a) of ERISA or Section 412(d) of the Code, (b) the filing of a notice of intent to terminate a Benefit Plan or the treatment of a Benefit Plan amendment as a termination under Section 4041 of ERISA, or (c) the institution of proceedings to terminate a Benefit Plan by the PBGC under Section 4042 of ERISA or the appointment of a trustee to administer any Benefit Plan.

"Termination Date" has the meaning ascribed to such term in Section 10.4.

"Termination Notice" has the meaning ascribed to such term in Section 10.3(d).

"Testing Date" shall be the last day of each Testing Period.

"Testing Period" shall mean the four week period ending on each Sunday, during the term of this Agreement, immediately preceding the applicable Reporting Date.

"Total Credit Exposure" means, as of any date of determination (a) with respect to each Lender, (i) prior to the termination of the Commitments, the sum of such Lender's Total Commitment plus such Lender's Term Loans or (ii) upon the termination of the Commitments, the sum of such Lender's Term Loans and (b) with respect to all Lenders, (i) prior to the termination of the Commitments, the sum of all of the Lenders' Total Commitments plus all Term Loans and (ii) upon the termination of the Commitments, the sum of all Lenders' Term Loans.

"<u>Total Term Loan Commitment</u>" means the sum of the Term Loan Commitments.  On the Closing Date, the Total Term Loan Commitment shall be as set forth on Exhibit A.

"<u>Tranche</u>" means a portion of the Initial Loan.

"<u>Type</u>" means, as to any Loan, its nature as an ABR Loan or SOFR Loan.

"<u>UCC</u>" means the Uniform Commercial Code as in effect from time to time in the State of California, including without limitation, any amendments thereto which are effective after the date hereof or, when the laws of any other jurisdiction govern the perfection or enforcement of any Lien, the Uniform Commercial Code of such jurisdiction.

"<u>Unadjusted Benchmark Replacement</u>" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"<u>Unfunded Vested Liabilities</u>" means the amount (if any) by which (i) the actuarial present value of accumulated benefits under a Benefit Plan which are vested exceeds (ii) such Benefit Plan's net assets available for benefits (all as determined in connection with the filing of Loan Parties' most recent Annual Report on Form 5500) but only to the extent such excess would, if such Benefit Plan were to terminate as of such date, represent a liability of a Loan Party or any ERISA Affiliate to the PBGC under Title IV of ERISA.  In each case the foregoing determination shall be made as of the most recent date prior to the filing of said Annual Report as of which such actuarial present value of accumulated Benefit Plan benefits is determined.

"<u>Updated Budget</u>" has the meaning ascribed to such term in the Orders.

"<u>U.S. Government Securities Business Day</u>" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"<u>Variance Reports</u>" has the meaning ascribed to such term in Section 8.1(a).

Section 1.2    <u>UCC Terms</u>.  Terms defined in the UCC (such as, but not limited to, accounts, chattel paper, commercial tort claims, contract rights, deposit account, documents, electronic chattel paper, equipment, financial assets, fixtures, general intangibles, goods, instruments, investment property, inventory, proceeds, security, security certificates and tangible chattel paper), as and when used (without being capitalized) in this Agreement or the Loan Documents, shall have the meanings given to such terms in the UCC.

Section 1.3    <u>Accounting Terms and Determinations</u>. Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all determinations with respect to accounting matters hereunder shall be made, and all financial statements and certificates and reports as to financial matters required to be furnished to Agents hereunder shall be prepared, in accordance with GAAP, applied on a basis consistent with the prior financial statements of Reporting Parties under the Prepetition Loan Documents.

Section 1.4        <u>Interpretative Provisions</u>.

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    Section, Schedule and Exhibit references are to this Agreement unless otherwise

specified.

(c)        The term "including" is not limiting and means "including without limitation."

(d)        In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including."

(e)        Unless otherwise expressly provided herein, (i) references to agreements (including this Agreement and the other Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, supplements and other modifications thereto, but only to the extent such amendments, restatements, supplements and other modifications are not prohibited by the terms of any Loan Document, (ii) references to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing or interpreting such statute or regulation, and (iii) references to any Person shall be deemed to include such Person's successors and permitted assigns.

(f)        This Agreement and the other Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters.  All such limitations, tests and measurements are cumulative and each shall be performed in accordance with its terms.

Section 1.5      Rates.  The Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to ABR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) or will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, ABR, the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Confirming Changes.  The Administrative Agent and its affiliates or other related entities may engage in transactions that affect the calculation of ABR, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain ABR, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR, or any other Benchmark, or any component definition thereof or rates referred to in the definition thereof, in each case pursuant to the terms of this Agreement and shall have no liability to the Borrowers, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity) for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

## ARTICLE II - LOANS

Section 2.1      Term Loans.  Subject to and upon the terms and conditions herein set forth, each Lender having a Commitment severally agrees to make a loan or loans (each such loan is referred to individually as a "***Term Loan***" and collectively as the "***Term Loans***") to the Borrowers.   The Term Loans (i) shall not exceed, for any such Lender, the Term Loan Commitment of such Lender, (ii) shall not exceed, in the aggregate, the Total Term Loan Commitment, (iii) shall be made on the Closing Date, and (iv) may be repaid or prepaid in accordance with the provisions hereof, but once repaid or prepaid may not be

reborrowed. The amount of the Initial Loan shall be equal to $1,700,000.

Section 2.2    Roll-Up Loans.

(a)    Subject to the terms and conditions set forth in this Agreement and the Interim DIP Order, effective immediately upon entry thereof and the disbursement of any Tranche of the Initial Loan or any subsequent Loan, without any further action by any party to this Agreement or the other Loan Documents, the Bankruptcy Court or any other Person, Prepetition Loans may be "rolled up" as follows:

(1)    In connection with each Tranche of the Initial Loan or any subsequent Loan under Section 2.1, Prepetition Loans shall be automatically deemed (on a cashless basis) to constitute Loans under this Agreement ("Roll-Up Loans"), which Roll-Up Loans shall be due and payable in accordance with the terms and conditions set forth in this Agreement;

(2)    The total amount of Roll-Up Loans shall be no greater than $12,000,000, which equals four (4) times the Total Term Loan Commitment.  The amount of each Roll-Up Loan shall be calculated as $12,000,000 multiplied by a fraction, (A) the numerator of which is the amount of the applicable Tranche of the Initial Loan or a subsequent Loan, and (B) the denominator of which is the amount of the Total Term Loan Commitment.

(3)    Upon the occurrence of any of the foregoing Roll-Up Loans, the outstanding principal balance of the Prepetition Loans shall be automatically and irrevocably deemed reduced by the amount of Lenders' Roll-Up Loans as advanced under this Agreement.  Roll-Up Loans repaid or prepaid may not be reborrowed.

Section 2.3    Notice of Borrowing.

(a)    The Borrower Agent shall give the Administrative Agent prior written notice prior to 11:00 a.m. (Pacific time) at least three Business Days' prior to the Closing Date for Term Loans.  Such notice in the form of Exhibit B (a "Notice of Borrowing"), except as otherwise expressly provided in Section 2.10, shall be irrevocable and shall specify (A) the date of the Borrowing (which for the initial Loan under this Agreement ("Initial Loan") shall be the proposed Closing Date), (B)  the aggregate principal amount of the Term Loans (or in the case of the Initial Loan and each Tranche thereof under this Agreement, the principal amount of the Tranche) to be made, (C) wiring instructions.  F or any Borrowing, if such notice does not include the Type of such Borrowing, it shall be deemed to be a SOFR Loan.  The Administrative Agent shall promptly give each Lender written notice of each proposed Borrowing of Term Loans, of such Lender's proportionate share thereof and of the other matters covered by the related Notice of Borrowing.

(b)    For any Advance made following the Initial Loan:

(i)    the Loan Parties shall have complied with Sections 4.1 and 4.2; and

(ii)    any such advance will be made by Agents no more frequently than once every calendar week.

(c)    For each Tranche of the Initial Loan:

(i)    the Loan Parties shall have complied with Section 4.1;

(ii)    any such Tranche will be made by Agents no more frequently than once

every calendar week; and

(iii)    the Notice of Borrowing shall provide the amount of the Initial Loan and the proposed Tranche to be advanced..

Section 2.4      Disbursement of Funds.

(a)    No later than 12:00 noon (Pacific time), in the case of each Borrowing for which all conditions to the making of such Loan set forth in this Agreement have been met, each Lender will make available its *pro rata* portion, if any, of such Borrowing requested to be made on such date in the manner provided below.

(b)    Each Lender shall make available all amounts it is to fund to the Borrowers, under any Borrowing, in immediately available funds to the Administrative Agent, and upon receipt of all requested funds, the Administrative Agent will make available to the Borrowers, by depositing in an account designated by the Borrower Agent to the Administrative Agent in writing, the aggregate of the amounts so made available in Dollars.

(c)    Unless the Administrative Agent shall have been notified by any Lender prior to the date of any Borrowing that such Lender does not intend to make available to the Administrative Agent its portion of the Borrowing or Borrowings to be made on such date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date of Borrowing, and the Administrative Agent, in reliance upon such assumption, may (in its sole discretion and without any obligation to do so) make available to the Borrowers a corresponding amount.  If such corresponding amount is not in fact made available to the Administrative Agent by such Lender and the Administrative Agent has made available the same to the Borrowers, the Administrative Agent shall be entitled to recover such corresponding amount from such Lender.  If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the Borrowers and the Borrowers shall promptly pay such corresponding amount to the Administrative Agent.  The Administrative Agent shall also be entitled to recover from such Lender or the Borrowers, as the case may be, interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to  the Borrowers, to the date such corresponding amount is recovered by the Administrative Agent, at a rate per annum equal to (i) if paid by such Lender, the Federal Funds Rate or (ii) if paid by the Borrowers, the then-applicable rate of interest, calculated in accordance with Section 2.8, applicable to ABR Loans.  If the Borrowers and such Lender shall pay interest to the Administrative Agent for the same (or a portion of the same) period, the Administrative Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period.

(d)    Nothing in this Section 2.4 shall be deemed to relieve any Lender from its obligation to fulfill its commitments hereunder or to prejudice any rights that the Borrowers may have against any Lender as a result of any default by such Lender hereunder (it being understood, however,  that no Lender shall be responsible for the failure of any other Lender to fulfill its commitments hereunder).

(e)    The sums of all Tranches shall not exceed the amount of the Initial Loan.

Section 2.5      Evidence of Debt.

(a)    At the request of Agents, the Loans shall be further evidenced by one or more promissory notes.

(b)    Agents shall maintain accounts in which it will record (i) the amount of each

Tranche of the Initial Loan, (ii) the amount of each Loan extended hereunder, (iii) the amount of any principal or interest due and payable or to become due and payable from Borrowers to Agents hereunder, and (iv) the amount of any payment received by Agents hereunder from Borrowers.

(c)     The entries in the accounts maintained pursuant to <u>Section 2.5(b)</u> shall be prima facie evidence of the existence and amounts of the Obligations therein recorded; <u>provided</u>, <u>however</u>, that the failure of Agents to maintain such accounts or any error therein shall not in any manner affect the obligation of Borrowers to repay the Obligations in accordance with their terms.

Section 2.6     <u>*Pro Rata* Borrowings</u>.  Each Borrowing of Term Loans under this Agreement shall be granted by the Lenders on the basis of their then-applicable Pro Rata Share of the Term Loan Commitments. It is understood that no Lender shall be responsible for any default by any other Lender in its obligation to make Loans hereunder and that each Lender shall be obligated to make the Loans provided to be made by it hereunder, regardless of the failure of any other Lender to fulfill its commitments hereunder.

Section 2.7     <u>Purposes of Loans</u>.  The Term Loans shall be provided by the Lenders to One Table as follows for the following purposes:

(a)     Post-petition working capital and maintenance capital expenditure purposes of the Chapter 11 Debtors;

(b)     Current interest, fees, and expenses under the DIP Facility;

(c)     Payment of adequate protection expenses for the Prepetition Lenders;

(d)     The allowed administrative costs and expenses of the Chapter 11 Cases, including professional fees and expenses;

(e)     Payment of prepetition claims authorized by the Bankruptcy Court;

(f)     Any forecasted cash outlays included in any Approved Budget; or

(g)     As otherwise agreed; in each case, solely in accordance with the Approved Budget and the applicable Order incorporating the terms hereof.

Section 2.8     <u>Interest</u>.

(a)     The unpaid principal amount of each ABR Loan shall bear interest from the date of the Borrowing thereof at a rate per annum that shall at all times be the Applicable Margin <u>plus</u> the ABR in effect from time to time.

(b)     The unpaid principal amount of each SOFR Loan shall bear interest from the date of the Borrowing thereof at a rate per annum that shall at all times be the Applicable Margin in effect from time to time <u>plus</u> the Adjusted Term SOFR for the Interest Period therefor.

(c)     Borrowers shall pay interest on the unpaid principal amount of the outstanding Obligations at a rate per annum equal to the lesser of (i) the Maximum Rate and (ii) the Contract Rate applicable to such Obligations, and such interest shall be, payable monthly in arrears on the first day of each calendar month and on the Scheduled Maturity Date; provided that such accrued interest shall be added to the principal of the Loans on the applicable payment date.

(d)     From and after the occurrence and during the continuance of any Event of Default, at the election of the Required Lenders or the Administrative Agent (or automatically while any Event of Default under Section 10.1(a) or Section 10.1(h) exists), the Borrowers shall pay interest on the principal amount of all Loans and all other due and unpaid Obligations, to the extent permitted by Applicable Law, at the rate described in Section 2.8(a) or Section 2.8(b), as applicable, plus the Default Rate, at the election of the Administrative Agent in its sole discretion.  All such interest shall be payable on demand of the Required Lenders and in cash.  Notwithstanding anything to the contrary herein, from and after the occurrence and during the continuance of any Event of Default, at the sole discretion of the Required Lenders, any Loans hereunder will be deemed to be ABR Loans (and shall bear interest accordingly) for purposes of the definition of "Applicable Margin".

(e)     Interest on each Loan shall accrue from and including the date of any Borrowing to but excluding the date of any repayment thereof.

Section 2.9   Interest Periods.  All SOFR Loans shall be made with an Interest Period of one (1) month.  In addition, the following provisions shall apply to Borrowings of SOFR Loans:

(a)     the initial Interest Period for any Borrowing of SOFR Loans shall commence on the date of such Borrowing (including the date of any conversion from a  Borrowing of ABR Loans) and each Interest Period occurring thereafter in respect of such Borrowing shall commence on the day on which the immediately preceding Interest Period expires; and

(b)     the first Interest Period for the Borrowing of SOFR Loan on the Closing Date shall commence on the Closing Date and end on the last calendar day of the month in which the Closing Date occurs.

Section 2.10     Benchmark Replacement, Illegality, etc.

(a)     Benchmark Replacement.  Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event, the Administrative Agent and the Borrower Agent may amend this Agreement to replace the then-current Benchmark with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all affected Lenders and the Borrowers so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders.   No replacement of a Benchmark with a Benchmark Replacement pursuant to this Section 2.10(a) will occur prior to the applicable Benchmark Transition Start Date.

(b)     Benchmark Replacement Conforming Changes.   In connection with the use, administration, or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c)     Notices; Standards for Decisions and Determinations. The  Administrative Agent will promptly notify the Borrower Agent and the Lenders of (i)  the implementation of any Benchmark Replacement, and (ii) the effectiveness of any Benchmark Replacement Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.    The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a

Benchmark pursuant to <u>Section 2.10(d)</u> and (v) the commencement any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, the Lender (or group of Lenders) pursuant to this Section 2.10, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be   conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this <u>Section 2.10.</u>

(d)     <u>Unavailability of Tenor of Benchmark</u>.  Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)     <u>Benchmark Unavailability Period</u>. Upon the Borrower Agent's receipt of notice of the commencement of a Benchmark Unavailability Period, (i) the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans and (ii) any outstanding affected SOFR Loans will be deemed to have been converted to ABR Loans at the end of the applicable Interest Period.  During a Benchmark Unavailability Period, or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of ABR based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will  not be used in any determination of ABR.

(f)     <u>Illegality</u>.  If, after the later of the date hereof and that date such entity becomes a Lender hereunder, the adoption of any Applicable Law regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by a Lender or its parent with any request or directive made or adopted after such date regarding capital adequacy (whether or not having the force of law) of any such authority, association, central bank or comparable agency, has the effect of reducing the rate of return on such Lender's or its parent's capital or assets as a consequence of such Lender's commitments or obligations hereunder to a level below that which such Lender or its parent could have achieved but for such adoption, effectiveness, change or compliance (taking into consideration such Lender's or its parent's policies with respect to capital adequacy), then within 5 days after written demand by such Lender (with a copy to the Borrower Agent), the Borrowers shall pay to such Lender such additional amount or amounts as will compensate such Lender or its parent for such reduction, it being understood and agreed, however, that a Lender shall not be entitled to such compensation as a result of such Lender's compliance with, or pursuant to any request or directive to comply with, any such Applicable Law as in effect on the date hereof. Each Lender (on its own behalf), upon determining in good faith that any additional amounts will be payable pursuant to this <u>Section 2.10(f)</u> , will, as promptly

as practicable upon ascertaining knowledge thereof, give written notice thereof to the Borrower Agent, which notice shall set forth in reasonable detail the basis of the calculation of such additional amounts. The failure to give any such notice, with respect to a particular event, within the time frame specified in <u>Section 2.13</u>, shall not release or diminish any of the Borrowers' obligations to pay additional amounts pursuant to this <u>Section 2.10(f)</u> for amounts accrued or incurred after the date of such notice with respect to such event.

(g)    Notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a change in Applicable Law, regardless of the date enacted, adopted or issued.

Section 2.11    <u>Compensation</u>.  If (a) any payment of principal of a SOFR Loan is made by the Borrowers to or for the account of a Lender other than on the last day of the Interest Period for  such SOFR Loan as a result of a payment or conversion pursuant to this Agreement, as a result of acceleration of the maturity of the Loans pursuant to Article X or for any other reason, (b) any Borrowing of SOFR Loans is not made as a result of a withdrawn Notice of Borrowing (except with respect to a revocation as provided in Section 2.10) or (c) any prepayment of principal of a SOFR Loan is not made as a result of a withdrawn notice of prepayment pursuant to this Agreement the Borrowers shall, after receipt of a written request by such Lender (which request shall set forth in reasonable detail the basis for requesting such amount), pay to the Administrative Agent for the account of such Lender any amounts required to compensate such Lender for any additional losses, costs or expenses that such Lender may reasonably incur as a result of such payment, failure to convert, failure to continue, failure to prepay, reduction or failure to reduce, including any loss, cost or expense (excluding loss of anticipated profits) actually incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Lender to fund or maintain such SOFR Loan.

Section 2.12    <u>Conforming Changes</u>.  In connection with the use or administration of Term SOFR, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document. The Administrative Agent will promptly notify the Borrowers and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

Section 2.13    [Reserved]

Section 2.14    [Reserved]

Section 2.15    <u>Defaulting Lenders</u>.

(a)    <u>Adjustments</u>.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by Applicable Law:

(i)    <u>Waivers and Amendments</u>.  That Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 10.01.

(ii)    <u>Reallocation of Payments</u>.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether

voluntary or mandatory, at maturity, pursuant to Section 3.05 or Article X or otherwise, and including any amounts made available to the Administrative Agent by that Defaulting Lender pursuant to Section 10.08), shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; second, as the Borrower Agent may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Borrower Agent, to be held in a non-interest bearing deposit account and released in order to satisfy such Defaulting Lender's potential future funding with respect to Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrowers as a result of any judgment of a court of competent jurisdiction obtained by the Borrowers against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and sixth, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

(b)      Defaulting Lender Cure.  If the Borrower Agent and the Administrative Agent agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be  a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders in accordance with their Pro Rata Share, whereupon that Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from a Defaulting Lender to a Lender that is not a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

Section 2.16      Inability to Determine Rates. Subject to Section 2.10, if, on or prior to the first day of any Interest Period for any SOFR Loan:

(a)      The Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Adjusted Term SOFR" cannot be determined pursuant to the definition thereof, or

(b)      the Required Lenders determine that for any reason in connection with any request for a SOFR Loan or a conversion thereto or a continuation thereof that Adjusted Term SOFR for any requested Interest Period with respect to a proposed SOFR Loan does not adequately and fairly reflect the cost to such Lenders of making and maintaining such Loan, and the Required Lenders have provided notice of such determination to the Administrative Agent, then, in each case, the Administrative Agent will promptly so notify the Borrower and each Lender.

Upon notice thereof by the Administrative Agent to the Borrower, any obligation of the Lenders to make SOFR Loans, and any right of the Borrower to continue SOFR Loans or to convert ABR Loans to SOFR Loans, shall be suspended (to the extent of the affected SOFR Loans or affected Interest Periods) until the Administrative Agent (with respect to clause (b), at the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, (i) the Borrower may revoke any pending

request for a borrowing of, conversion to or continuation of SOFR Loans (to the extent of the affected SOFR Loans or affected Interest Periods) or, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans in the amount specified therein and (ii) any outstanding affected SOFR Loans will be deemed to have been converted into ABR Loans at the end of the applicable Interest Period. Upon any such conversion, the Borrower shall also pay accrued interest on the amount so converted, together with any additional amounts required pursuant to Section 2.11. Subject to Section 2.10, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Adjusted Term SOFR" cannot be determined pursuant to the definition thereof on any given day, the interest rate on ABR Loans shall be determined by the Administrative Agent without reference to clause (c) of the definition of "ABR" until the Administrative Agent revokes such determination.

## ARTICLE III - GENERAL LOAN PROVISIONS; FEES AND EXPENSES

Section 3.1    [Reserved]

Section 3.2    Fees and Expenses.

(a)    In consideration for Lenders' agreement to make the Loans in accordance with the terms of this Agreement, Borrowers shall pay to Agents an administrative fee in the amount of three percent (3.00%) of the Total Term Loan Commitment Limit, such fee will be fully earned and paid on the Closing Date.

(b)    Expenses.  Borrowers shall pay Agents the expenses as set forth in Sections 4.1(j) and 14.2.

Section 3.3    Manner of Payment.  Each payment by Borrowers on account of the Obligations payable to Agents by Borrowers pursuant to this Agreement or the other Loan Documents shall be made not later than 1:00 p.m. (Los Angeles, California, time) on the applicable due date (or if such day is not a Business Day, the next succeeding Business Day), provided that interest shall continue to accrue until such payment is made.  All payments shall be made to Agents at Agents' Office, in Dollars, in immediately available funds and shall be made without any setoff, counterclaim or deduction whatsoever.

Section 3.4    Termination of Agreement or the DIP Facility.  On the Scheduled Maturity Date, Borrowers shall pay to Administrative Agent (i) the outstanding principal of, and accrued and unpaid interest on, the Loans on such date, (ii) all fees accrued and unpaid, (iii) any amounts payable to Agents pursuant to the other provisions of this Agreement or any other Loan Document, and (iv) any and all other Obligations then outstanding.

Section 3.5    [Reserved]

Section 3.6    Changes in Capital Adequacy Regulations.  If any Secured Party reasonably determines that the amount of capital required or expected to be maintained by any Lender or any corporation controlling such Lender is increased as a result of a Change in Law, then, within 15 days of demand for payment by Lender to Borrowers, Borrowers shall pay Agents, for the benefit of the applicable Lender, the amount necessary to compensate for any shortfall in the rate  of return on the portion of such increased capital which Lender determines is attributable to this Agreement and any facility hereunder.

Section 3.7    Agents Statements; Survival of Indemnity.  Agents shall deliver a written statement to Borrower Agent as to the amount due, if any, under Section 3.6.  Such written statement shall set forth in

reasonable detail the calculations upon which Agents determined such amount and shall be final, conclusive and binding on Borrowers in the absence of manifest error.  Unless otherwise provided herein, the amount specified in the written statement of Agents shall be payable on demand after receipt by Borrower Agent of such written statement.  The obligations of Borrowers under <u>Section 3.6</u> shall survive payment of the Obligations and termination of this Agreement.

Section 3.8    <u>Maximum Interest; Controlling Limitation.</u>

(a)    Each of Secured Parties and Loan Parties acknowledges, agrees, and declares that it is its intention to expressly comply with all Applicable Laws in respect of limitations on the amount or rate of interest that can legally be contracted for, charged or received under or in connection with the Loan Documents.  Notwithstanding anything to the contrary contained in any Loan Document (even if any such provision expressly declares that it controls all other provisions of the Loan Documents), in no contingency or event whatsoever shall the amount of interest (including the aggregate of all charges, fees, benefits, or other compensation which constitutes interest under any Applicable Law) under the Loan Documents paid by any Loan Party, received by Secured Parties or agreed to be paid by Loan Parties, or requested or demanded to be paid by Secured Parties exceed the Maximum Rate, and all provisions of the Loan Documents in respect of the contracting for, charging, or receiving compensation for the use, forbearance, or detention of money shall be limited as provided by this Section.  To the extent permitted by Applicable Law, all interest paid, or agreed to be paid, by any Loan Party, or taken, reserved, or received by Secured Parties shall be amortized, prorated, spread, and allocated in respect of the Obligations throughout the full term of this Agreement.  Notwithstanding any provision contained in any of the Loan Documents, or in any other related documents executed pursuant hereto, Secured Parties shall never be entitled to charge, receive, take, reserve, collect, or apply as interest any amount which, together with all other interest under the Loan Documents would result in a rate of interest under the Loan Documents in excess of the Maximum Rate and, in the event Secured Parties ever charges, receives, takes, reserves, collects, or applies any amount in respect of any Loan Party that otherwise would, together with all other interest under the Loan Documents, be in excess of the Maximum Rate, such amount shall automatically be deemed to be applied in reduction of the unpaid principal balance of the Obligations other than interest and, if the principal balance thereof is paid in full, any remaining excess shall forthwith be refunded to such Loan Party.  Subject to the foregoing, each Loan Party hereby agrees that the actual effective rate of interest from time to time existing under the Loan Documents, including all amounts agreed to by Loan Parties pursuant to and in accordance with the Loan Documents which may be deemed to be interest under any Applicable Law, shall be deemed to be a rate which is agreed to and stipulated by Loan Parties and Secured Parties in accordance with Applicable Law.

(b)    To the maximum extent permitted under any Applicable Law, each Loan Party and Secured Parties shall (i) characterize any non-principal payment as a standby fee, commitment fee, prepayment charge, delinquency charge, expense, or reimbursement for a third-party expense rather than as interest and (ii) exclude prepayments, acceleration, and the effect thereof.

(c)    Subject to <u>Section 3.8(a)</u>, after any period during which the limitations prescribed by <u>Section 3.8(a)</u>, have limited the applicable rate of interest on the Obligations to the Maximum Rate when, absent such limitations, such applicable rate would have exceeded the Maximum Rate, then, thereafter, the rate of interest applicable to the Obligations shall instead be deemed to be, and shall remain at, the Maximum Rate (notwithstanding any other provision of this Agreement other than <u>Section 3.8(a)</u>), until such time as the amount of interest paid hereunder equals the amount of interest that would have been lawfully contracted, charged or received in the absence of the limitation prescribed by <u>Section 3.8(a)</u>.

Section 3.9    <u>Voluntary Prepayments.</u>

(a)     Subject to the terms and conditions set forth in this Section 3.9, the Borrowers shall have the right to prepay the Term Loans, in whole or in part, at any time from time to time, without premium, fee or penalty of any kind or nature.

(b)     When making a voluntary prepayment, the Borrower Agent shall give the Administrative Agent written notice of (i) its intent to make such prepayment, (ii) the amount of such prepayment, subject to the Carve-Out, and (iii) in the case of SOFR Loans, the specific Borrowing(s) pursuant to which such prepayment will be made, no later than (A) in the case of SOFR Loans, 11:00 a.m. (Pacific time) three (3) Business Days prior to, and (B) in the case of ABR Loans, 11:00 a.m. (Pacific time) one Business Day prior to, the date of such prepayment, and such prepayment shall promptly be transmitted by the Administrative Agent to each of the relevant Lenders, as the case may be.

Section 3.10   Mandatory Prepayments. (a) Concurrently with the receipt by any Loan Party or any of its Subsidiaries of any proceeds from any Casualty Event, subject to the Carve-Out, the Borrowers shall prepay the Loans in an amount equal to one hundred percent (100%) of such Net Casualty Proceeds from such Casualty Event to be applied as set forth in Section 3.12; and (b) 100% of any Net Disposition Proceeds from any disposition of any Collateral (other than in the ordinary course of business); (c) 100% of any proceeds received (x) under any insurance policy on account of the damage or destruction of any Collateral of any Loan Parties and (y) due to any taking or condemnation of any Collateral; (d) 100% of the Net Disposition Proceeds of the incurrence or issuance of any indebtedness or equity by any Loan Party; provided that no Loan Party shall incur or issue indebtedness or equity; (e) 100% of any proceeds received or any cash received by or paid to or for the account of any Loan Party not in the ordinary course of business, including but not limited to tax refunds, pension plan reversions, indemnity payments and any purchase price adjustments and (f) 100% of the Net Disposition Proceeds from the consummation of any sale pursuant to a Sale Motion.

Section 3.11  Application to Term Loans. Amounts to be applied in connection with prepayments made pursuant to Section 3.9 or Section 3.10 shall be applied to the prepayment of the outstanding Obligations in accordance with Section 3.12. With respect to each such prepayment, the Borrowers may designate the Types of Loans that are to be prepaid and the specific Borrowing(s) pursuant to which made; provided, that the Borrowers pays any amounts, if any, required to be paid pursuant to Section 2.11 with respect to prepayments of SOFR Loans made on any date other than the last day of the applicable Interest Period. In the absence of a designation by the Borrowers as described in the preceding sentence, the Administrative Agent shall, subject to the above, make such designation in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.11. Each such prepayment shall be accompanied by all accrued interest on the Loans so prepaid, through the date of such prepayment.

Section 3.12   Application of Collateral Proceeds and Payments. Notwithstanding anything to the contrary in any other provision of any Loan Document, (x) all payments (including, without limitation, prepayments) in respect of the Obligations after acceleration, (y) all proceeds of Collateral and other payments received by any Agent pursuant to the exercise of remedies against the Collateral and (z) all payments received pursuant to Sections 3.9 or 3.10, shall be applied as Administrative Agent determines in its sole discretion; provided, however, that proceeds of funds derived from Employee Retention Credits of the Loan Parties shall not be used to pay the Obligations.

Section 3.13   Payment of Obligations; Method and Place of Payment.

(a)     The obligations of the Borrowers hereunder and under each other Credit Document are not subject to counterclaim, set-off, rights of rescission, or any other defense. Subject to Section 3.14, and except as otherwise specifically provided herein, all payments under this Agreement shall be made by the Borrowers, without set-off, rights of rescission, counterclaim or

deduction of any kind, to the Administrative Agent for the ratable account of the Secured Parties entitled thereto not later than 11:00 a.m. (Pacific time) on the date when due and shall be made in immediately available funds in Dollars to the Administrative Agent.  The Administrative Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal or interest or fees ratably to the Secured Parties entitled thereto.

      (b)      For purposes of computing interest or fees, any payments under this Agreement that are made later than 11:00 a.m. (Pacific time), may be deemed to have been made on the next succeeding Business Day.  Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest may continue to accrue during such extension at the applicable rate in effect immediately prior to such extension.

Section 3.14  Net Payments.  Subject to the following sentence, all payments made by or on behalf of the Borrowers under this Agreement or any other Loan Document shall be made free and clear of, and without deduction or withholding for or on account of, any current or future Taxes other than as required by Applicable Laws.

Section 3.15  Computations of Interest and Fees.

      (a)      All interest and fees shall be computed on the basis of the actual number of days (including the first day but excluding the last day) occurring during the period for which such interest or fee is payable over a year comprised of (a) 365 (or 366 as appropriate) days in the case of ABR Loans and (b) 360 days in all other cases.  Payments due on a day that is not a Business Day shall be made on the next succeeding Business Day and such extension of time shall be included in computing interest and fees in connection with that payment.

      (b)      Fees shall be calculated on the basis of a 360-day year for the actual days elapsed.

## ARTICLE IV - CONDITIONS PRECEDENT

Section 4.1  Conditions Precedent.  Secured Parties shall not be obligated to make the Initial Loan (or any Tranche thereof), or any other advance hereunder or permit Borrowers to use the Cash Collateral until (i) it shall have received the following documents and items, each duly executed and delivered in form and substance satisfactory to Secured Parties, in its sole and absolute discretion, and (ii) the following requirements have been fulfilled to the satisfaction of Secured Parties, in its sole and absolute discretion:

      (a)      Execution of this Agreement, the promissory notes evidencing the loans and all other Loan Documents required by Agents, including a Notice of Borrowing;

      (b)      the Bankruptcy Court shall have entered the Interim DIP Order, in a form acceptable to the Agent, in its sole and exclusive discretion, no later than five (5) Business Days after the Petition Date, which Interim DIP Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Agents; and the Loan Parties shall be in compliance with the Interim DIP Order;

      (c)      a certificate executed by a duly authorized officer of each Loan Party certifying (i) the names and signatures of the officers of such Person authorized to execute Loan  Documents, (ii) the

resolutions duly adopted by the Board of Directors (or equivalent governing body) of such Person authorizing the execution of this Agreement and the other Loan Documents, as appropriate, (iii) the correctness and completeness of the copy of the Operating Agreement (or equivalent governing document) of such Person attached thereto and (iv) the correctness and completeness of the copy of the certificate of incorporation (or equivalent governing document) of such Person attached thereto;

(d)      approval of the transaction contemplated hereby by the credit committee of each Lender.

(e)      no later than two (2) days prior to the Petition Date, the Agents shall have received a cash forecast for the period from the Petition Date through the Scheduled Maturity Date setting forth projected cash flows and disbursements similar in form to the initial DIP budget provided and acceptable to the Agents (the "Initial Approved Budget");

(f)      the Borrowers shall have provided the Agents with a copy of the "first day" motions, including the cash management motion, and proposed orders to be filed with the Bankruptcy Court in connection with the commencement of the Chapter 11 Cases;

(g)      orders approving all "first day" motions, either on an interim or final basis as the case may be, other than the Interim Order shall have been entered (including without limitation a cash management order);

(h)      other than as set forth herein, the Borrowers shall not have executed, entered into or otherwise committed to any plan or restructuring support agreement or any other agreement or understanding concerning the terms of a Chapter 11 plan or other exit strategy without the consent of the Agents;

(i)      Notwithstanding anything to the contrary contained herein, funding of the Initial Loan shall be subject to entry of the Interim DIP Order, which shall not have been vacated, reversed or stayed, appealed (and for which the appeal period has expired or has been waived), or modified or amended without the prior written consent of the Agents in their sole discretion;

(j)       [Reserved];

(k)      the Loan Parties shall be in compliance with the terms of the Interim Order or the Final Order, as applicable;

(l)      the Loan Parties shall have provided a certificate confirming that all of the representations and warranties of the Chapter 11 Debtors in this Agreement, as applicable, remain true and correct, unless otherwise agreed by the Agents;

(m)      there shall be no defaults or Events of Default under the Loan Documents, as applicable, or any defaults or Events of Default shall have been waived by the Agents;

(n)      The Loan Parties have complied with their obligations under Section 7.19; and

(o)      such other documents, certificates, opinions, and information that Agents may require.

Section 4.2   Conditions to Subsequent Advances.  The obligation of Lender to make any Loan subsequent to the Initial Loan is subject to the following conditions precedent in addition to all of the conditions set forth

in Section 4.1:

(a)        the Final DIP Order shall have been entered by the Bankruptcy Court, in a form acceptable to the Agent, in its sole and exclusive discretion, shall be in full force and effect, shall not have been vacated or reversed, shall not be subject to a stay and shall not have been modified or amended other than as acceptable to the Agent in its sole and exclusive discretion; and the Loan Parties shall be in compliance with the Final DIP Order;

(b)        all "second day orders" approving on a final basis any first day orders intended to be entered on or prior to the date of entry of the Final Order shall have been entered by the Bankruptcy Court, shall be in full force and effect, shall not have been vacated or reversed, shall not be subject to a stay;

(c)        the Approved Budget shall demonstrate a need for the funds to be advanced under this Agreement for the next week following the last Loan, and the Borrower Agent shall have delivered at 3 Business Days prior to the applicable draw date (or such shorter period as the Agents may agree in its sole discretion) the Notice of Borrowing showing the proposed use of such funds within the next week in accordance with an Approved Budget that was approved by Agent prior to receipt of the applicable Notice of Borrowing within the last week;

(d)        <u>Adverse Change</u>.  No event shall have occurred or circumstance exists that has or could reasonably be expected to have a Material Adverse Change.

(e)        <u>Legal Restriction</u>.  Such advance or financial accommodation shall not be prohibited by any law or regulation or any order of any court or Governmental Authority or agency.

(f)        <u>No Repudiation</u>.  No Loan Party shall have repudiated or made any anticipatory breach or repudiation of any of its obligations under any Loan Document.

## ARTICLE V - REPRESENTATIONS AND WARRANTIES

Section 5.1    <u>Representations and Warranties</u>.  As of the Closing Date and the date of each subsequent advance or Loan, each Loan Party represents and warrants to Agents as follows:

(a)        <u>Organization; Power; Qualification</u>.  Each Loan Party is a debtor in the Chapter 11 Cases. Each Loan Party is the type of entity identified on **Schedule 5.1(a)**, duly organized, validly existing and in good standing under the laws of state identified on **Schedule 5.1(a)** and is qualified to do business in each state in which the nature of its properties or its activities requires such qualification, except to the extent the failure to be so qualified could not reasonably be expected to have a Material Adverse Change. The jurisdictions in which each  Loan Party is qualified to do business as a foreign entity are listed on **Schedule 5.1(a)**.  Each Loan Party's federal employer identification number and its organizational number with the Secretary of State of the state of its organization (if issued) are as set forth on **Schedule 5.1(a)**.

(b)        <u>Authorization; Enforceability</u>.  Each Loan Party has the power and authority to, and is duly authorized to, execute and deliver the Loan Documents to be executed by such Loan Party. Each of the Loan Documents to which a Loan Party is a party, constitutes the legal, valid and binding obligations of such Loan Party subject to the entry by the Bankruptcy Court of the Interim DIP Order and, when applicable, the Final DIP Order.

(c)        <u>Subsidiaries, Parents and Affiliates; Ownership</u>.  Except as shown on **Schedule 5.1(c)**, no Loan Party has any Subsidiaries.  The outstanding Equity Interests of each Loan Party have been

duly and validly issued and are fully paid and nonassessable (to the extent applicable), and the number and owners of such Equity Interests are set forth on **Schedule 5.1(c)**. The information included in the Beneficial Ownership Certification most recently provided to Lender is true and complete in all respects.

(d)    Conflicts.    Neither the execution and delivery of the Loan Documents, nor consummation of any of the transactions therein contemplated nor compliance with the terms and provisions thereof, will contravene any provision of Applicable Law or any judgment, decree, license, order or permit applicable to any Loan Party or will conflict with, or will result in any breach of, any agreement to which such Loan Party is a party or by which such Loan Party may be bound or subject, or violate any provision of the organizational documents of such Loan Party or violate the Interim DIP Order upon entry thereof or, when applicable, the Final DIP Order upon entry thereof.

(e)    Consents and Governmental Approvals.    No governmental approval nor any consent or approval of any third Person (other than those which have been obtained prior to the date hereof and subject to the entry by the Bankruptcy Court of the Interim Order and, when applicable, the Final Order) is required in connection with the execution, delivery and performance by any Loan Party of the Loan Documents to which such Loan Party is a party.  Each Loan Party is in compliance with all applicable governmental approvals and permits.

(f)    Loans.    No Loan Party has made any loans or advances to any Affiliate or other Person except to the extent expressly permitted by the terms of this Agreement.

(g)    Business.    Loan Parties are engaged principally in the restaurant business.

(h)    Title; Liens.    Except for Permitted Liens, all of the properties and assets of Loan Parties are free and clear of all Liens, and each Loan Party has good and marketable or valid leasehold title to such properties and assets.  Each Lien granted, or intended to be granted, to Lender pursuant to the Loan Documents is a valid, enforceable, perfected, first priority Lien and security interest.

(i)    Debt and Contingent Liabilities.    As of the Closing Date, set forth on **Schedule 5.1(i)** is a complete and correct listing of all of Loan Parties' (i) Debt and (ii) Contingent Liabilities.

(j)    Suits, Actions, Etc.    Except as disclosed on **Schedule 5.1(j)**, no litigation, arbitration, governmental investigation, proceeding or inquiry is pending or, to the knowledge of any Loan Party, threatened against such Loan Party or that could materially affect any of the Collateral.  No such litigation, arbitration, governmental investigation, proceeding or inquiry could reasonably be expected to result in a Material Adverse Change.

(k)    Tax Returns and Payments.    All tax returns required to be filed by any Loan Party in any jurisdiction have been filed and all taxes (including property taxes) have been paid prior to the date on which they become delinquent or penalties attach unless such taxes are being Properly Contested.

(l)    [Reserved]

(m)    ERISA.    No Loan Party nor any Related Company maintains or contributes to any Benefit Plan or Multiemployer Plan other than those listed on **Schedule 5.1(m)**.  Further, (i) no Reportable Event (as defined in ERISA) has occurred and is continuing with respect to any Benefit Plan, and (ii) the PBGC has not instituted proceedings to terminate any Benefit Plan. Each Loan Party and each Related Company has satisfied the minimum funding standards under ERISA with respect to its Benefit Plans and is in compliance in all material respects with the presently applicable provisions of ERISA and the Code, and has not incurred any liability to the PBGC or a Benefit Plan under Title IV of ERISA other than a liability to the PBGC for premiums under Section 4007 of ERISA.

(n)     Defaults.  No Default or Event of Default has occurred and is continuing.

(o)     [Reserved]

(p)     Locations of Inventory and Equipment.  Set forth on **Schedule 5.1(p)** are (i) the location and address where all inventory and equipment of each Loan Party is located, except for inventory that is in transit to such location, and (ii) if the facility is leased or is a third party warehouse, processor location, the name of the landlord or such third party warehouseman or processor.

(q)     Place of Business.  The place of business of each Loan Party (or if such Loan Party has more than one place of business, its chief executive office) is at the address or addresses set forth on **Schedule 5.1(q)** and the books and records relating to the accounts of such Loan Party are located at the address or addresses set forth on **Schedule 5.1(q)**.

(r)     Corporate and Fictitious Names; Trade Names.  Except as disclosed on **Schedule 5.1(r)**, no Loan Party has, during the preceding five years, (i) been known as or used any other corporate, fictitious or trade names, (ii) been the surviving corporation of a merger or consolidation, or (iii) acquired all or substantially all of the assets of any Person.

(s)     Intellectual Property.  **Schedule 5.1(s)** lists all Intellectual Property owned by any Loan Party. Each Loan Party owns or possesses all Intellectual Property required to conduct its business as now and presently planned to be conducted without, to its knowledge, any material conflict with the rights of others.

(t)     Payroll Taxes.  Each Loan Party has made all payroll tax deposits for all of its employees on or before the date when due.

(u)     [Reserved].

(v)     Permits and Licenses.  Each Loan Party has obtained and maintains all permits and licenses necessary for such Loan Party to conduct its business.   To the extent such permits and licenses must be held by individuals, all employees of each Loan Party required to obtain and maintain permits and licenses necessary for them to conduct such Loan Party's business have been obtained and are maintained and current.

(w)     Deposit Accounts.  Except as may be designated to Agents by a Loan Party in writing after the Closing Date and approved by Agents in writing, each deposit account of a Loan Party is listed in **Schedule 5.1(w)**.

(x)     Compliance with Laws.  Each Loan Party and its Subsidiaries each is in compliance, in all material respects, with Applicable Law.

(y)     [Reserved]

(z)     Non-Regulated Entities.  No Loan Party is an "Investment Company" within the meaning of the Investment Company Act of 1940.  No Loan Party is subject to regulation under the Federal Power Act, any state public utilities code or law, or any other federal or state statute  or regulation limiting its ability to incur Debt.

(aa)   Investment Banking or Finder's Fees.  No Loan Party has agreed to pay or is otherwise obligated to pay or reimburse any Person with respect to any investment banking or similar or related fee, underwriter's fee, finder's fee or broker's fee in connection with this Agreement.

(bb)    <u>Sanctions, Anti-Corruption and Anti-Money Laundering Laws</u>.  No Loan Party is: (a) a Sanctioned Person; (b) controlled by or acting on behalf of a Sanctioned Person; (c) under investigation for an alleged breach of Sanction(s) by a Governmental Authority that enforces Sanctions.  Each Loan Party: (a) is in compliance with all Anti-Corruption Laws and Anti-Money Laundering Laws; (b) is not, and has not been, under administrative, civil or criminal investigation; and (c) has not received notice from or made a voluntary disclosure to any governmental entity regarding a possible violation of any Anti-Corruption Laws or Anti-Money Laundering Laws.  The provisions in this Section shall prevail and control over any contrary provisions in this Agreement or in any related documents.

(cc)    <u>Surety Obligations</u>.  No Loan Party is obligated as surety or indemnitor under any bond or other contract that assures payment or performance of any obligation of any Person, except as permitted hereunder.

(dd)    <u>[Reserved]</u>.

(ee)    <u>Full Disclosure</u>.  None of the representations or warranties made by any Loan Party in the Loan Documents and none of the statements contained in any Schedule or any report, statement or certificate furnished to Agents by or on behalf of any Loan Party in connection with the Loan Documents contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered. There is no fact or circumstance that any Loan Party has failed to disclose to Agents in writing that could reasonably be expected to have a Material Adverse Change.

(ff)    <u>Holding Company</u>.  Parent has not engaged in any business, and has not owned and does not own any assets other than those as permitted by this Agreement.

(gg)    <u>Orders</u>.  The Interim DIP Order is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Secured Parties, amended or modified and no appeal of such Interim DIP Order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.  After entry of the Final DIP Order, the Final DIP Order is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Agents, amended or modified and no appeal of such Final DIP Order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.

(hh)    <u>Bankruptcy Matters</u>.  The Chapter 11 Cases were validly commenced on the Petition Date, and (x) proper notice under the circumstances of the motion seeking approval of the Loan Documents and entry of the Orders was given, and (y) the hearing for the approval of the Interim DIP Order has been held by the Bankruptcy Court.

Section 5.2    <u>Survival of Representations</u>. All representations and warranties by each Loan Party herein shall be deemed to have been made on the date hereof and the date of each subsequent advance or Loan.

## **ARTICLE VI - SECURITY INTEREST AND COLLATERAL COVENANTS**

Section 6.1    <u>Security Interest</u>.

(a)    To secure the payment and performance of the Obligations and the Guaranteed Obligations, as applicable, each Loan Party hereby mortgages, pledges and assigns to Collateral Agent for itself, and as agent for its Affiliates and all other Secured Parties, all of the Collateral and grants to Collateral Agent. for

itself, and as agent for the Lenders and its Affiliates, a security interest and Lien in and upon all of the Collateral. Each Loan Party shall, at Collateral Agent's request, at any time and from time to time, authenticate, execute and deliver to Collateral Agent such financing statements, documents and other agreements and instruments (and pay the cost of filing or recording the same in all public offices deemed necessary or desirable by Collateral Agent) and do such other acts and things or cause third parties to do such other acts and things as Collateral Agent may deem necessary or desirable, in its sole and absolute discretion, in order to establish and maintain a valid, attached and perfected security interest in the Collateral in favor of Collateral Agent (free and clear of all other Liens except for Permitted Liens and the Lien created under this Section ) to secure payment of the Obligations and the Guaranteed Obligations, as applicable, and in order to facilitate the collection of the Collateral.

      (b)     Subject to the Carve-Out, all Obligations shall be:

      (i)     entitled to superpriority claim status under section 364(c)(1) of the Bankruptcy Code with priority over all administrative expense claims and unsecured claims existing as of the Petition Date or arising thereafter under the Bankruptcy Code, including, without limitation, the prepetition claims and adequate protection claims of the Prepetition Lenders, subject only to the Carve-Out (the "DIP Superpriority Claims"). The DIP Superpriority Claims may be repaid from any cash of the Chapter 11 Debtors, including without limitation, Cash Collateral and, following entry of the Final DIP Order, the proceeds of avoidance actions and property received or recovered thereby (the "Avoidance Action Proceeds");

      (ii)     secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by valid, enforceable, first priority, fully perfected security interests in and liens on all of the Chapter 11 Debtors' rights in property of the Chapter 11 Debtors' estates as of the Petition Date that, as of the Petition Date, were unencumbered (and do not become perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) (including, following entry of the Final DIP Order, Avoidance Action Proceeds), subject only to the Carve-Out;

      (iii)     secured, pursuant to section 364(c)(3) of the Bankruptcy Code, by valid, enforceable, fully perfected junior security interests in and liens on all of the Chapter 11 Debtors' rights in property of the Chapter 11 Debtors' estates as of the Petition Date that, as of the Petition Date, were subject to valid, perfected and non-avoidable liens and unavoidable liens in existence immediately prior to the Petition Date, if any, or valid liens in existence as of the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (the "Permitted Liens"), which security interests and liens shall be junior and subordinate only to such Permitted Liens and the Carve-Out;

      (iv)     secured, pursuant to section 364(d)(1) of the Bankruptcy Code, by valid, enforceable, priming first priority, fully perfected security interests in and liens upon all of the Debtors' rights in property of the Debtors' estates as of the Petition Date, and all of the Debtors' rights in property acquired post-petition (and proceeds thereof), whether now existing or hereafter acquired or arising, that secure the Prepetition Loans (such lien, together with the liens described in clauses (i) through (iii) above, the "DIP Liens" and the collateral described in clauses (i) through (iv) above, collectively, the "DIP Collateral"), which liens shall be subject to

the Carve-Out. The DIP Collateral shall also include any and all rents, issues, products, offspring, proceeds and profits generated by any item of DIP Collateral;

(v)     The DIP Liens shall be effective immediately upon the entry of the DIP Interim Order and shall not at any time be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of any Chapter 11 Debtor and their estates under section 551 of the Bankruptcy Code, (ii) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of any Chapter 11 Debtor, or (iii) any intercompany or affiliate liens of any Chapter 11 Debtor;
.

(vi)     The DIP Collateral will be free and clear of other liens, claims and encumbrances, except valid, perfected, enforceable and unavoidable liens, rights of recoupment enforceable in bankruptcy, and rights of setoff permissible under section 553 of the Bankruptcy Code, in each case except as otherwise agreed by the applicable creditor or lienholder, as applicable, in existence as of the Petition Date and permitted pursuant to the Prepetition Loan Documents, if any.

(iv)     The DIP Liens will automatically attach to the DIP Collateral and become valid and perfected immediately upon entry of the Interim DIP Order without the requirement of any further action by the DIP Lenders; provided that if the DIP Lenders determines to file any financing statements, notice of liens or similar instruments, the Chapter 11 Debtors will cooperate and assist in any such filings and the automatic stay shall be modified to allow such filing.

Section 6.2     Collection of Accounts and Proceeds of Collateral.  Upon the occurrence of an Event of Default which remains outstanding, all monies, checks, notes, drafts, and other payments relating to or constituting proceeds of accounts or of any other Collateral which is received by any Loan Party, shall be held in trust and immediately delivered to the Collateral Agent or immediately deposited as directed by the Collateral Agent.

Section 6.3     Verification of Accounts.  Collateral Agent shall have the right at any time at Loan Party's expense and in its own name, any Loan Party's name, or an assumed name to verify the validity, amount or any other matter relating to any accounts.

Section 6.4     Ownership; Defense of Title.

(a)     Each Loan Party shall defend its title in and to the Collateral and shall defend the security interest of Collateral Agent in the Collateral against the claims and demands of all Persons, other than Persons holding Permitted Liens.

(b)     Each Loan Party shall (i) protect and preserve all properties material to its business, including Intellectual Property, and maintain all tangible property in good and workable condition in all material respects, with reasonable allowance for wear and tear, and (ii) from time to time make or cause to be made all needed and appropriate repairs, renewals, replacements, and additions to such properties necessary for the conduct of its business.

Section 6.5     Locations; Organizational Information; Inventory.  No Loan Party shall change the location of its place of business (or, if it has more than one place of business, its chief executive office) or the place where it keeps its books and records relating to the Collateral or change its name, identity,

corporate structure or jurisdiction of organization without giving Collateral Agent at least 30 days' prior written notice thereof.  All inventory, other than inventory in transit to any such location, shall at all times be kept by Loan Parties at one or more of the locations set forth in Schedule 5.1(p).  Loan Parties shall use their best efforts to ensure that all inventory that is produced in the United States will be produced in compliance with the Fair Labor Standards Act, as amended.

Section 6.6        Records Relating to Collateral.

        (a)        Each Loan Party shall at all times keep and maintain (i) complete and accurate records of inventory on a basis consistent with past practices of such Loan Party, itemizing and describing the kind, type and quantity of inventory and such Loan Party's cost therefor and a current price list for such inventory, (ii) complete and accurate records of all other Collateral, (iii) a list of all customers of such Loan Party with names, addresses and phone numbers, (iv) a list of all distributors for each product line included in such Loan Party's inventory, (v) a current customer open order report against current inventory, and (vi) a current list of all salesmen and employees of such Loan Party.  Databases containing the foregoing shall at all times be accessible and available to Agents, subject to the terms of Section 6.7.

        (b)        Each Loan Party will conduct a physical count of all inventory, wherever located, at least annually and make adjustments to its books and records to reflect the findings of such count and such adjustments shall be immediately reported to Lender.

Section 6.7        Inspection; Field Exams.  Collateral Agent (by any of its officers, employees, or agents) shall have the right at any time or times (with reasonable prior notice to Loan Parties unless an Event of Default exists) to (a) visit the properties of any Loan Party, inspect the Collateral and the other assets of such  Loan Party and inspect and make extracts from the books and records of such Loan Party, all during customary business hours, (b) discuss such Loan Party's business, financial condition, results of operations and business prospects with such Loan Party's (i) principal officers, (ii) independent accountants and other professionals providing services to such Loan Party, and (iii) any other Person (except that any such discussion with any third parties shall be conducted only in accordance with Collateral Agent standard operating procedures relating to the maintenance of confidentiality of confidential information of such Loan Party), (c) conduct field examinations and otherwise verify the amount, quantity, value, and condition of, or any other matter relating to, any of the Collateral and in this connection review, audit and make extracts from all records and files related to any of the Collateral.  Each Loan Party will deliver to Lender upon request any instrument necessary to authorize an independent accountant or other professional to have discussions of the type outlined above with Collateral Agent or for Collateral Agent to obtain records from any service bureau maintaining records on behalf of such Loan Party.

Section 6.8        Maintenance.  Each Loan Party shall maintain all equipment of such Loan Party in good and working order and condition, reasonable wear and tear excepted.

Section 6.9        Appraisals.  Borrowers shall pay all costs and expenses relating to any appraisals  conducted in contemplation of this Agreement and for all other appraisals conducted at such other times  as Collateral Agent requested.

Section 6.10        Preservation of Collateral Rights.  To the extent allowed by law, neither Collateral Agent and Secured Party nor any of their officers, directors, employees or agents shall be liable or responsible in any way for the safekeeping of any Collateral or for any act or failure to act with respect to the Collateral, or for any loss or damage thereto or any diminution in the value thereof, or for any act by any other Person. In the case of any instruments and chattel paper included within the Collateral, no Secured Party shall have any duty or obligation to preserve rights against prior parties.  The Obligations shall not be affected by any failure of Collateral Agent and Secured Party to  take any steps to perfect its security interests or to collect or realize upon the Collateral, nor shall loss of  or damage to the Collateral release any Loan Party from any

of the Obligations.

Section 6.11    <u>Perfection and Protection of Lender's Security Interest</u>.  Each Loan Party shall perform, at its expense, all actions requested by Collateral Agent at any time to perfect, maintain, protect and enforce Lender's security interest in the Collateral.  Without limiting the foregoing, unless Collateral Agent agrees otherwise in writing, each Loan Party shall deliver to Collateral Agent the originals of all instruments, documents and chattel paper, duly endorsed or assigned to Lender without restriction, and all certificates of title covering any portion of the Collateral for which certificates of title have been issued, together with executed applications for corrected certificates of title and other such documentation as may be requested by Collateral Agent.  If at any time any Collateral is located on any leased premises not owned by a Loan Party, then such Loan Party shall obtain written landlord lien waivers or subordinations with respect to such premises, in form and substance satisfactory to Collateral Agent.  If any Collateral is at any time in the possession or control of any warehouseman, bailee, processor or any other Person other than a Loan Party, then Loan Parties shall notify Collateral Agent thereof and shall, at the request of Collateral Agent, notify such Person (in form and substance satisfactory to Collateral Agent) of Collateral Agent's security interest in such Collateral and instruct such Person to hold all such Collateral for Collateral Agent's account subject to Collateral Agent's instructions and obtain a satisfactory agreement with such Person regarding the Collateral.  Upon Collateral Agent's request, Borrowers shall record Collateral Agent's security interest on any certificate of title for any Collateral that is a motor vehicle. Notwithstanding any to the contrary herein, pursuant to the Orders, no filing or other action will be necessary to perfect or protect such Liens and security interests.

Section 6.12    <u>Power of Attorney</u>.  Each Loan Party hereby irrevocably appoints Collateral Agent as such Loan Party's agent and attorney-in-fact to take any action necessary to preserve and protect the Collateral and Collateral Agent's interests under the Loan Documents or to sign and file any document necessary to perfect Collateral Agent's security interest in the Collateral.  Without limiting the foregoing:

(i)    Collateral Agent shall have the right at any time to take any of the following action, in its own name or in the name of each Loan Party, whether or not an Event of Default is in existence: (a) make written or verbal requests for verification of the validity, amount or any other matter relating to any Collateral from any Person, (b) endorse such Loan Party's name on checks, instruments or other evidences of payment on Collateral, (c) sign and file, in such Loan Party's name or in Collateral Agent's name as secured party, any proof of claim or other document in any bankruptcy proceedings of any Account Debtor or obligor on Collateral, (d) access, copy or utilize any information recorded or contained in any computer or data processing equipment or system maintained by such Loan Party in respect of the Collateral and (e) open mail addressed to such Loan Party and take possession of checks or other proceeds of Collateral for application in accordance with this Agreement.

(ii)    Collateral Agent shall have the right at any time to take any of the following action, in its own name or in the name of each Loan Party, at any time when any Event of Default is in existence: (a) notify any or all Persons which Collateral Agent believes may be Account Debtors or obligors on Collateral to make payment directly to Collateral Agent, for the account of such Loan Party, (b) redirect the deposit and disposition of collections and proceeds of Collateral; <u>provided</u> that such proceeds shall be applied to the Obligations as provided by this Agreement, (c) settle, adjust, compromise or discharge accounts or extend time of payment upon such terms as Collateral Agent may determine, (d) notify post office authorities, in the name of such Loan Party or in the name of Collateral Agent, as secured party, to change the address for delivery of such Loan Party's mail to an address designated by Collateral Agent, (e) sign such Loan Party's name on any invoice, bill of lading, warehouse receipt or other document of title relating to any Collateral, and (f) clear inventory through customs in such Loan Party's name, in Collateral Agent's name as secured party or in the name of Collateral Agent's designee, and to sign and deliver to customs officials powers of attorney in such Loan Party's name for such purpose.

The powers granted under this Section 6.12 are coupled with an interest and are IRREVOCABLE until all Obligations have been paid in full and all commitments of Lenders under this Agreement have been terminated.  Costs and expenses incurred by Secured Parties in connection with any of such actions by Secured Parties, including attorneys' fees and out-of-pocket expenses, shall be reimbursed to Collateral Agent on demand.

## ARTICLE VII - AFFIRMATIVE COVENANTS

So long as this Agreement shall be in effect or any of the Obligations shall be outstanding, each Loan Party covenants and agrees as follows:

Section 7.1    Preservation of Existence and Similar Matters.  Each Loan Party shall preserve and maintain its existence and legal form, and qualify and remain qualified as a foreign entity qualified to do business in each jurisdiction in which the character of its properties or the nature of its business requires such qualification, except to the extent the failure to be so qualified could not reasonably be expected to have a Material Adverse Change.

Section 7.2    Compliance with Applicable Law.  Each Loan Party shall comply in all material respects with all Applicable Laws.

Section 7.3    Conduct of Business.  Each Loan Party shall engage only in substantially the same businesses conducted by such Loan Party on the date hereof.

Section 7.4    Payment of Taxes and Claims.  Each Loan Party shall pay or discharge when due (a) all federal, state, municipal and other material taxes, assessments and governmental charges imposed upon it or its properties and (b) all lawful claims which, if unpaid, might become a Lien on any properties of such Loan Party, except that this Section shall not require the payment or discharge of any such tax, assessment, charge, levy or claim that is being contested in good faith by appropriate proceedings and for which adequate reserves have been established on the appropriate books of such Loan Party in accordance with GAAP.

Section 7.5    Accounting Methods and Financial Records. Each Loan Party shall maintain a system of accounting, and keep such books, records and accounts (which shall be true and complete), as may be required or as may be necessary to permit the preparation of financial statements in accordance with GAAP consistently applied.

Section 7.6    Hazardous Waste and Substances; Environmental Requirements. Each Loan Party shall comply with all occupational health and safety laws and Environmental Laws in all material respects.

Section 7.7    Accuracy of Information.  All written information, reports, statements and other papers and data furnished to Lender shall be, at the time the same is so furnished, complete and correct in all material respects.

Section 7.8    Revisions or Updates to Schedules.  Should any of the information or disclosures provided on any of the Schedules attached hereto become outdated or incorrect in any material respect, each Loan Party shall provide promptly to Agents such revisions or updates to such Schedule(s) as may be necessary or appropriate to update or correct and update such Schedule(s).  Notwithstanding the foregoing, the delivery to Agents of a revised or updated schedule shall not constitute a waiver of, or consent to, any Default or Event of Default arising as a result of any erroneous or incorrect information provided in any Schedule previously delivered to Agents.

Section 7.9    ERISA. Each Loan Party shall provide to Agents, as soon as possible and in any event within

30 days after the date that (a) any Termination Event with respect to a Benefit Plan has occurred or will occur, (b) the aggregate present value of the Unfunded Vested Liabilities under all Benefit Plans has increased to an amount in excess of $0, or (c) such Loan Party is in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan required by reason of its complete or partial withdrawal (as described in Section 4203 or 4205 of ERISA) from such Multiemployer Plan, a certificate of the president or the chief financial officer of such Loan Party setting forth the details of such of the events described in clauses (a) through (c) as applicable and the action which is proposed to be taken with respect thereto and, simultaneously with the filing thereof, copies of any notice or filing which may be required by the PBGC or other agency of the United States government with respect to such of the events described in clauses (a) through (c) as applicable.

Section 7.10    Insurance.  Each Loan Party shall keep or cause to be kept adequately insured by financially sound and reputable insurers all of its property usually insured by Persons engaged in the same or similar businesses.  Without limiting the foregoing, each Loan Party shall insure the Collateral of such Loan Party against loss or damage by fire, theft, burglary, pilferage, loss in transit, business interruption, and such other hazards as usual and customary in such Loan Party's industry or as Agents may specify in amounts and under policies by insurers acceptable to Agents, and all premiums thereon shall be paid by such Loan Party and copies of the policies delivered to Agents.  If any Loan Party fails to do so, Agents may procure such insurance and charge the cost to Borrowers' account.  Each policy of insurance covering the Collateral shall provide that at least 30 days prior written notice of cancellation or notice of lapse must be given to Agents by the insurer (or at least 10 days if the reason for cancellation is for non- payment of premium). All insurance policies required under this Section shall name Agents as an additional named insured and as a lender loss payee, as applicable.  Any proceeds of insurance referred to in this Section which are paid to Agents shall be, at the option of Lender in its sole and absolute discretion, either (i) applied to rebuild, restore or replace the damaged or destroyed property, or (ii) applied to the payment or prepayment of the Obligations.

Section 7.11    Payroll Taxes.  Each Loan Party shall at all times make all payroll tax deposits (with such deposits being paid to a payroll company, to the applicable taxing authority or to a segregated account) for all of its employees on or before the date when due.

Section 7.12    Notice of Certain Matters.  Each Loan Party shall provide to Agents prompt notice of (a) the commencement, to the extent such Loan Party is aware of the same, of all actions and proceedings in any court against any Loan Party or any of the Collateral, (b) any amendment of any of the organizational documents of such Loan Party, including but not limited to certificate of incorporation or bylaws, (c) any change in the business, financial condition, results of operations or business prospects of such Loan Party and any change in the executive officers of such Loan Party, (d) any (i) Default or Event of Default, or (ii) event that would constitute a default or event of default by any Loan Party under any Material Agreement (other than this Agreement) to which such Loan Party is a party, and (e) the initiation of any litigation, arbitration, governmental investigation or other action or proceeding.

Section 7.13    Deposit Accounts; Treasury Management.  Each Loan Party shall cause Agents to at all times have control (as defined by Section 9-104 of the UCC) with respect to each deposit account of such Loan Party other than any deposit account solely maintained for paying payroll and related withholding taxes.

Section 7.14    Adequate Protection.  Subject in all cases to the Carve-Out, the Prepetition Lenders shall receive adequate protection for the Loan Parties' use of the collateral securing the Prepetition Loans, including, but not limited to:

i.    payment of all interest accruing under the Prepetition Loan Documents as and when due pursuant

to the Prepetition Loan Documents, to be paid in kind; _provided that_ the Prepetition Lenders reserve their rights to assert default interest pursuant to the Prepetition Loan Documents in connection with the confirmation of a plan of liquidation or reorganization for the Loan Parties;

ii.     replacement liens and security interests in DIP Collateral and superpriority administrative expense claims under sections 503 and 507 of the Bankruptcy Code, in each case (and as applicable) junior only to the Liens granted under this Agreement, Permitted Liens, the Obligations, and the Carve-Out, to the extent of any diminution in the value of the Prepetition Lender's interest in any Cash Collateral or other Prepetition Collateral arising as a result of (A) the use, sale, or lease of Cash Collateral or other collateral, (B) the granting of priming liens to secure the DIP Facility, or (C) the imposition of the automatic stay;

iii.    reimbursement by the Loan Parties of reasonable and documented fees, costs, and out-of-pocket expenses incurred or accrued by the Prepetition Lenders (to include all unpaid prepetition reasonable and documented fees, costs, and out-of-pocket expenses) in connection with any and all aspects of the Chapter 11 Cases; and

iv.     delivery of reporting and information as provided for herein.

The foregoing adequate protection liens will automatically attach to the Collateral and become valid and perfected immediately upon entry of the Interim Order without the requirement of any further action by the Lenders; _provided,_ that if the Lenders determines to file any financing statements, notice of liens or similar instruments, the Loan Parties will cooperate and assist in any such filings and the automatic stay shall be modified to allow such filing.

Section 7.15    Bankruptcy Milestones.  Subject to Bankruptcy Court availability, each of the Loan Parties will agree to comply with the following deadlines (each of which may be extended or waived with the prior written consent of the Agent, which may be by e-mail, without further order of the Bankruptcy Court) (collectively, the "Milestones"):

i.      The Bankruptcy Court shall have entered the Interim Order by the date that is no later than five (5) days after the Petition Date.

ii.     The Bankruptcy Court shall have entered the Final Order by the date that is no later than thirty-five (35) days after the Petition Date.

iii.    The Loan Parties shall have filed a motion to sell all or substantially all of the Loan Parties' assets through a sale pursuant to section 363 of the Bankruptcy Code in form and substance reasonably acceptable to the Agent (the "Sale Motion") no later than fifteen (15) days after the Petition Date.

iv.     The Bankruptcy Court shall have entered an order approving the bidding procedures of the sale contemplated by the Sale Motion (the "Sale") by the date that is no later than forty-five (45) days after the Petition Date.

v.      The Bankruptcy Court shall have entered an order approving the Sale by the date that is no later than seventy-five (75) days after the Petition Date.

vi.     The Sale shall be consummated by the date that is no later than fourteen (14) days after the Bankruptcy Court has entered its order approving the Sale.

vii.    A  chapter 11 plan  shall  be consummated by the date that is no later than ninety (90) days after

consummation of the Sale.

The extension of any Milestone is subject to the consent of the Agents at their sole discretion.

Section 7.16   Variance Reports and Budgets.

(a)      Following the Petition Date, the Loan Parties shall prepare for the Agents' review and approval a thirteen-week (13-week) detailed rolling cash projection similar in form to the 13-week cash projection provided as part of the Initial Approved Budget which shall be thereafter updated each week (each, a "Proposed Budget"). Upon the Loan Parties' receipt of the Agents' approval (in their reasonable discretion) of a Proposed Budget, such budget shall become an "Approved Budget" and shall replace the then-operative Approved Budget for all purposes.  The Initial Approved Budget shall be the Approved Budget until such time as a new Proposed Budget is approved, following which such Proposed Budget shall constitute the Approved Budget until a subsequent Proposed Budget is approved.  The Loan Parties shall operate in accordance with the Approved Budget and all disbursements shall be consistent with the provisions of the Approved Budget (subject to the Permitted Variance).  The Loan Parties may submit additional Proposed Budgets to Agents, but until the Agents approve such Proposed Budget, it shall not become an Approved Budget and the Loan Parties shall continue to comply with the then-operative Approved Budget.

(b)      As of any applicable Testing Date, the Loan Parties' cash disbursements may vary from the Approved Budget by no more than 10.0% on an aggregate basis for all disbursement line items taken together in the aggregate (the "Permitted Variance"). The Loan Parties shall be deemed to be in compliance with the Approved Budget for all purposes under the Orders unless, as of any Testing Date, the Loan Parties' actual cash receipts or disbursements vary from the Approved Budget by more than the applicable Permitted Variance as measured on any Testing Date.

Section 7.17   Additional Chapter 11 Covenants.

(a)      Debtors-In-Possession Obligations.  Comply in a timely manner with their obligations and responsibilities as debtors-in-possession under the Bankruptcy Code, the Orders, and any other order of the Bankruptcy Court.

(b)      Material Developments.  Promptly provide the Agents with updates of any material developments in connection with the Loan Parties' efforts under the Chapter 11 Cases.

(c)      Pleadings; Materials.  The Loan Parties shall deliver to Agents (i) as soon as practicable prior to the filing with the Bankruptcy Court or delivering to any Official Committee organized in the Chapter 11 Cases, or to the U.S. Trustee, as the case may be, (A) drafts of the Interim DIP Order, Final DIP Order, and all other proposed orders and pleadings related to this Agreement or any Milestone and (B) any other material pleading or filing (but excluding retention applications, fee applications and other declarations in support thereof or related thereto) and (ii) promptly (subject to any confidentiality obligations therein), copies of all (A) formal process or offering or marketing materials provided generally to participants in any sale process (B) written proposals, term sheets, commitment letters, and any other similar materials received in connection with any sale process, as applicable, and (C) all bidding materials on a redacted basis, including, but not limited to, marketing materials, including all binding bids received in connection with any sale process.

Section 7.18   Board Observation Rights. The Administrative Agent hereby appoint Eric Beckman, Joe Kaczorowski, and Aamir Amdani as observers (collectively, "Observer") to the governing body of the Parent and each other Loan Party (each, a "Governing Body"), which Observer shall be entitled to attend

(or at the option of such Observer, monitor by telephone), all meetings of the Governing Body and each committee or subcommittee of the Governing Body (other than any portions of any meetings that relate to this Agreement or which involve the exchange of privileged attorney-client information or work product) but shall not be entitled to vote, and which Observer shall receive all reports, meeting materials, notices, written consents (including written consents in lieu of a meeting), and other materials (in each case other than any portions of such reports or materials that contain confidential information relating to this Agreement or attorney-client privileged information or work product) as and when provided to the members of the Governing Body. The Loan Parties shall reimburse Administrative Agent for the reasonable travel expenses incurred by any such observer appointed by Administrative Agent in connection with attendance at or participation in meetings in person or by telephone. Each Loan Party that has a Governing Body agrees to hold at least one meeting of its Governing Body, either in person or via teleconference, in each fiscal quarter.

Section 7.19    Weekly Deposit. On a weekly basis, deposit into a segregated deposit account at a federally-insured bank, funds in an amount equal to the Estate Professionals' fees and expenses incurred during the previous week up to the amount of such fees and expenses set forth in the Approved Budget and only to the extent there is an adequate reserve of cash for operations as reasonably determined by the Borrowers. In connection therewith, Agent may request a fully-executed Control Agreement with respect to that segregated deposit account. Notwithstanding anything to the contrary contained in the Loan Documents or the Orders, the Lenders and the Agents shall not be responsible for the payment or reimbursement of any fees or disbursements of any Estate Professionals or any fees or expenses of the U.S. Trustee or Clerk of the Bankruptcy Court incurred in connection with these Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in the Loan Documents or the Orders or otherwise shall be construed to obligate the Agents or the Lenders, in any way, to pay compensation to, or to reimburse expenses of, any Estate Professionals or to guarantee that the Loan Parties have sufficient funds to pay such compensation or reimbursement.


## ARTICLE VIII - FINANCIAL AND COLLATERAL REPORTING

So long as this Agreement shall be in effect or any of the Obligations shall be outstanding, each Loan Party covenants and agrees as follows:

Section 8.1    Reporting. Following the Closing Date, the Loan Parties shall be subject to reporting and information covenants set forth in this Agreement, including but limited to the following;

(a)    Beginning on the second (2nd) the Business Day following first calendar week during which Petition Date occurs (the "Initial Reporting Date"), and continuing on the second (2nd) Business Day of each week thereafter during the term of this Agreement (collectively with the Initial Reporting Date, each a "Reporting Date"), the Loan Parties shall deliver to Agents, in a form consistent with the form of the Approved Budget, a variance report describing in reasonable detail, by line item, (i) the actual disbursements of the Loan Parties and actual receipts during the applicable Testing Period; and (ii) any variance (whether positive or negative, expressed as a dollar variance and as a percentage) between the actual receipts or disbursements, as applicable, during such Testing Period against the estimated receipts or disbursements, as applicable, for the applicable Testing Period, as set forth in the applicable Approved Budget (a "Variance Report").

(b)    the Loan Parties shall deliver to the Agents copies of any pleadings or motions to be filed by or on behalf of any Loan Parties in the Chapter 11 Cases at least three (3) days prior to such

filing (or, if not practicable, as soon as reasonably practicable);

(c)     the Loan Parties shall deliver to the Agents all notices required to be given to all parties specified in the Interim DIP Order or the Final DIP Order; and

(d)     the Loan Parties shall deliver to the Agents such other information (including access to the Loan Parties' books, records, personnel and advisors during normal business hours) as the Agents may reasonably request.

All reporting in this Section 8.1 shall be in form and with sufficient detail as is acceptable to the Agents in their sole discretion.

Section 8.2     Financial Statements.  The Loan Parties shall deliver financial statements as follows: as soon as available and in any event no later than ten (10) days after the end of each fiscal month, (i) (x) unaudited consolidated and consolidating balance sheets of the Parent and its Subsidiaries as of the end of such month, and (y) unaudited consolidated and consolidating statements of income and cash flow of the Parent and its Subsidiaries as of the end of such month and for the portion of the fiscal year then ended, in each case, including in comparative form (both in Dollar and percentage terms) a comparison to the figures for the corresponding month in the preceding fiscal year of the Parent, and year-to-date portion of the immediately preceding fiscal year of the Parent.

Section 8.3     Collateral Information and Reports.

(a)     Schedules of Accounts Payable.  Within two (2) Business days after each calendar week, Borrowers shall furnish to Lender a schedule of accounts payable of each Borrower as of the last Business Day of such week setting forth (i) a detailed aged trial balance of all of such  Borrower's then existing accounts payable, specifying the name of and the balance due to each creditor and (ii) a reconciliation to the schedule of accounts payable to such Borrower's general ledger as of such week end.

(b)     Schedule of Inventory.  Within 15 days after the end of each month, Borrowers shall furnish to Agents (A) a Schedule of Inventory, based upon each Borrower's perpetual inventory, as of the last Business Day of such month, itemizing and describing the kind, type, quantity and location of all inventory of such Borrower and the cost thereof with a summary of inventory by category, (B) a detailed statement of all inventory that is not located on the premises described on **Schedule 5.1(p)**, and (C) an inventory turnover report, in form and substance acceptable to Agents.

(c)     Notice Regarding Material Agreements.  Promptly, and in any event within five (5) Business Days (i) after any Material Agreement of any Loan Party is terminated or amended  in any material respect, (ii) any new Material Agreement is entered into, or (iii) any material default occurs under any Material Agreement, written notice of the same.

(d)     Certification.  Each of the schedules and certificates delivered to Agents by Borrowers pursuant to this Article VIII shall be in a form acceptable to Agents and shall be signed and certified by the president, chief financial officer or treasurer of Borrower Agent to be true, correct and complete as of the date indicated thereon.  In the event that any of such schedules or certificates are delivered electronically or without signature, such schedules and/or certificates shall, by virtue of their delivery, be deemed to have been signed and certified by the president of Borrower Agent to be true, correct and complete as of the date indicated thereon.

(e)     Other Information.  Agents may, in their sole and absolute discretion, from time to time require Loan Parties to deliver the schedules and certificates described in this Article VIII  more  or less

often and on different schedules than specified in such Section.  Each Loan Party shall also furnish to Agents such other additional information as Agents may from time to time request.

## ARTICLE IX - NEGATIVE COVENANTS

So long as this Agreement shall be in effect or any of the Obligations shall be outstanding, each Loan Party covenants and agrees as follows:

Section 9.1     <u>Financial Covenants</u>.  Comply with the covenants set forth in the Interim DIP Order.

Section 9.2     <u>Restricted Payments.</u>  No Loan Party shall, directly or indirectly, declare or make any Restricted Payment.

Section 9.3     <u>Debt</u>.  No Loan Party shall, directly or indirectly, create, assume, or otherwise become or remain obligated in respect of, or permit or suffer to exist or to be created, assumed or incurred or to be outstanding, any Debt other than Permitted Debt.

Section 9.4     <u>Liens</u>.  Neither Parent nor any of its Subsidiaries, shall, directly or indirectly, create, assume or permit or suffer to exist or to be created or assumed any Lien on any of the property or assets of such Loan Party, real, personal or mixed, tangible or intangible, other than Permitted Liens

Section 9.5     <u>Loans</u>.  No Loan Party shall make any loans or advances to or for the benefit of any Person (other than Subsidiaries that are Loan Parties), including, without limitation, officer, director, manager, shareholder, member, or partner of any Loan Party except advances for routine expense allowances in the ordinary course of business and consistent with past practice.  No Loan Party shall  make any payment on any obligation owing to or by any officer, director, manager, shareholder, member, partner or Affiliate of any Loan Party, except for payments of salary in the ordinary course consistent with past practice and Restricted Payments permitted pursuant to <u>Section 9.2</u>.

Section 9.6     <u>Merger, Division, Consolidation, Sale of Assets, Acquisitions</u>.  No Loan Party shall, directly or indirectly, (a) merge or consolidate with any other Person or agree or enter into a Division, (b) sell, lease or transfer or otherwise dispose of any assets to any Person (other than sales of inventory in the ordinary course of business), including an effective transfer of assets pursuant to a Division, or (c) enter into a binding commitment for, or consummate, an Acquisition.

Section 9.7     <u>Transactions with Affiliates</u>.  No Loan Party shall, directly or indirectly, enter into or consummate any transaction with any Affiliate on a basis less favorable to such Loan Party than would be the case if such transaction had been effected with a Person not an Affiliate, unless expressly permitted by <u>Section 9.2</u>; provided that in no event shall any Loan Party enter into any lease with any Affiliate.

Section 9.8     New Subsidiaries of Parent and Other Loan Parties.  None of the Loan Parties or any of their Subsidiaries will form any new Subsidiaries.

Section 9.9     <u>Benefit Plans</u>.  No Loan Party shall, directly or indirectly, permit, or take any action which would cause, the Unfunded Vested Liabilities under all Benefit Plans of Loan Parties to exceed $0.

Section 9.10     <u>Sales and Leasebacks</u>.  No Loan Party shall, directly or indirectly, enter into any Sale and Leaseback Transaction.

Section 9.11     <u>Organizational Documents</u>.  No Loan Party shall amend, restate, or modify its articles or certificate of incorporation, organization, formation or limited partnership (or similar charter document), or

its bylaws, operating agreement or limited partnership agreement (or similar governing document), in any manner which would be contrary to the terms and conditions of this Agreement or the other Loan Documents or in any manner adverse to Lender.

Section 9.12    Investments. No Loan Party shall, directly or indirectly, make or acquire any Investment, except for Permitted Investments.

Section 9.13    Amendments. No Loan Party shall amend or modify, or permit any amendment or modification to, whether orally, in writing, or otherwise, to any agreement evidencing or relating to Subordinated Debt.

Section 9.14  No Restrictions on Subsidiary Distributions. No Loan Party will permit, directly or indirectly, to create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Person to pay dividends or make any other distribution on any of such Person's Equity Interests owned by such Loan Party.

Section 9.15    Collateral Locations. Except for inventory in transit to a Loan Party in the ordinary course of business, no Loan Party will maintain any Collateral at any location other than those locations listed on Schedule 5.1(p) unless it gives Lender at least 30 days' prior written notice thereof and delivers or causes to be delivered to Lender all documents that Lender reasonably requests in connection therewith, including without limitation, in the case of any leased location, an access and waiver agreement, signed by the owner of such location, in form and substance satisfactory to Lender.

Section 9.16    Patriot Act. No Loan Party shall (a) be or become subject at any time to any law, regulation, or list of any government agency (including, without limitation, the U.S. Office of Foreign Asset Control list) that prohibits or limits Lenders from making any advance or extension of credit to such Loan  Party or from otherwise conducting business with such Loan Party or (b) fail to provide documentary and other evidence of such Loan Party's or its corporate officers' identities as may be requested by Agents at any time to enable Agents to verify such Loan Party's identity or to comply with any Applicable Law, including, without limitation, Section 326 of the Patriot Act.

Section 9.17    Sanctions. No Loan Party shall: (a) use any of the Loan proceeds for the purpose of: (i) providing financing to or otherwise making funds directly or indirectly available to any Sanctioned Person; or (ii) providing financing to or otherwise funding any transaction which would be prohibited by Sanctions or would otherwise cause any Secured Party or such Loan Party, or any entity affiliated with Secured Party or such Loan Party, to be in breach of any Sanction; or (b) fund any repayment of the Loans with proceeds derived from any transaction that would be prohibited by Sanctions or would otherwise cause any Secured Party or such Loan Party, or any Person affiliated with any Secured Party or such Loan Party, to be in breach of any Sanction. Loan Parties shall notify Agents in writing not more than one Business Day after becoming aware of any breach of this Section.

Section 9.18    Use of Proceeds.

(a)    The proceeds of the Loans shall not be used for any purpose other than provided in Section 2.7.

(b)    No Loan Party shall use any part of proceeds of the Loans to purchase or carry,  or to reduce or retire or refinance any credit incurred to purchase or carry, any margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System)  or for any other purpose which would violate Regulation U or Regulation T or X of such Board of Governors or for any other purpose prohibited by law or by the terms and conditions of this Agreement.

Section 9.19    <u>Milestones</u>.  The Loan Parties will not and will not permit any of its Subsidiaries to, directly or indirectly, fail to comply with any of the Milestones except with the prior written consent of the Agents.

Section 9.20    <u>Chapter 11 Cases</u>.  The Loan Parties will not and will not permit any of their Subsidiaries to:

        (a)    except for the Carve-Out, incur, create, assume, suffer to exist or permit, or file any motion seeking, any other superiority claim which is pari passu with, or senior to, the Obligations (except as may be set forth in the Orders or the Loan Documents);

        (b)    except for the Carve-Out, incur, create, assume, suffer to exist or permit or file any motion seeking, any lien which is pari passu with the liens granted hereunder (except as may be set forth in the Orders or the Loan Documents);

        (c)    make or permit to be made any amendment, modification, supplement or change to the Orders, as applicable, without the prior written consent of the Agents;

        (d)    make payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code;

        (e)    commence any adversary proceeding, contested matter or other action (or otherwise support any party) asserting any claims or defenses or otherwise against (or asserting any surcharge under section 506(c) of the Bankruptcy Code or otherwise against) the Agents, in connection with, arising out of or related to the Loan Documents, the transactions contemplated hereby or thereby, the Prepetition Loan Documents, the other documents or agreements executed or delivered in connection therewith or the transactions contemplated thereby;

        (f)    seek, consent to, or permit to exist, without the prior written consent of the Agents, any order granting authority to take any action that is prohibited by the terms of this Agreement, the other Loan Documents or the Orders or refrain from taking any action that is required to be taken by the terms of the any Loan Document or the Orders; or

        (g)    file any motion or application with the Bankruptcy Court with regard to actions taken outside the ordinary course of business of the Loan Parties without consulting with the Agents and providing the Agents two (2) Business Days' (or as soon thereafter as is practicable) prior written notice and the opportunity to review and comment on each such motion.

Section 9.21    <u>Business of the Parent</u>.  The Parent shall not engage in any business other than (i) ownership of the Capital Stock in the Borrowers; provided, that the Parent shall own no assets other than such Capital Stock, its books and records, deposit accounts of the Parent existing prior to the Closing Date, any replacement deposit accounts or additional deposit accounts entered into in the ordinary course of the Parent's business, all cash deposits held therein, and cash paid to the Parent in accordance with the terms hereof, and the Parent shall not grant a Lien on any of its assets other than Liens created pursuant to the Loan Documents and ordinary course Liens incurred under customary deposit account agreements entered into by the Parent with respect to deposit accounts existing prior to the Closing Date (and any replacement deposit accounts entered into in the ordinary course of the Parent's business); (ii) performance of its obligations under and in connection with the Loan Documents; (iii) issuance of Capital Stock; (iv) as otherwise required by law; (v) holding any cash received in accordance with the terms of this Agreement; (vi) its participation in tax, accounting and other administrative matters as a member of the consolidated group of the Parent and its Subsidiaries, including compliance with Applicable Laws and legal, tax and accounting matters related thereto and activities relating to its officers, directors, employees, managers,

partners, consultants and independent contractors; (vii) preparing reports to Governmental Authorities and to the holders of its Capital Stock; (viii) holding manager and equityholder meetings, preparing organizational records and other organizational activities required to maintain its separate organizational structure or to comply with Applicable Laws; (ix) any activities reasonably related to the activities set forth in clause (i) through (viii) above.

Section 9.22  <u>Negative Covenants</u>.  Following the Closing Date, the Loan Parties shall not (i) make any payments of any kind on account of the Prepetition Debt (except as expressly provided for in the Approved Budget or pursuant to orders entered by the Bankruptcy Court upon pleadings in form and substance reasonably satisfactory to the Agents) or (ii) assert any right of subrogation or contribution against any Loan Party until all borrowings under this Agreement are paid in full and the Commitments hereunder are terminated.

## ARTICLE X - DEFAULT AND REMEDIES

Section 10.1    <u>Events of Default</u>.  The occurrence of any one or more of the following events arising after the Petition Date  shall constitute an Event of Default:

(a)    the failure or refusal of any Loan Party to make any payment of the Obligations when due;

(b)    the failure of any Loan Party to properly observe or perform any obligation, agreement, covenant, or other provision contained in this Agreement or in any other Loan Document;

(c)    the occurrence of any default or event of default under any of the other Loan Documents;

(d)    any representation or warranty contained herein or in any of the other Loan Documents is false or misleading in any material respect when made or deemed made;

(e)    the failure to agree upon suitable Milestones (acceptable to Agents in its sole discretion) or to obtain entry of the Final DIP Order within forty-five (45) days after the Petition Date;

(f)    the Interim DIP Order (or Final DIP Order, if applicable) (A) at any time ceases to be in full force and effect or (B) shall be vacated, reversed, stayed, amended, supplemented or modified without the prior written consent of the Agents;

(g)    except with the prior written consent of the Agents, the entry of an order in any of Chapter 11 Cases impairing or modifying any of the liens, rights, remedies, privileges, benefits or protections granted under the Interim DIP Order (or Final DIP Order, if applicable);

(h)    the filing by any Loan Party (or supporting another party in the filing of) a motion seeking entry of an order approving any key employee incentive plan, employee retention plan, or comparable plan, in each case without the prior written consent of the Agents;

(i)    the bringing of a motion, taking of any action or the filing of any plan of reorganization other than in connection with a proposed refinancing and repayment in full in cash of the Obligations and the Prepetition Obligations on the date of the order granting such motion  or the effective date of such plan of reorganization: (A) to obtain financing under Section 364(c) or (d) of the Bankruptcy Code; or (B) to grant any Lien upon or affecting any Collateral unless permitted under the Interim Order (or Final Order, as applicable);

(j)      (A) the consensual use of prepetition Cash Collateral is terminated or modified, or (B) the entry of an order in any of the Chapter 11 Cases terminating or modifying the use of Cash Collateral other than as provided in this Agreement and the Interim Order (or Final Order, as applicable), in each case, without the prior written consent of the Agents;

(k)      the entry of an order in the Chapter 11 Cases confirming a plan or plans of reorganization or liquidation that does not contain a provision for repayment in full in cash of the Prepetition Loans on or before the effective date of such plan or plans;

(l)      the appointment or election of a Chapter 11 trustee, a responsible officer or an examiner (other than a fee examiner) under section 1104 of the Bankruptcy Code with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of any Chapter 11 Debtor;

(m)      the dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases to a Chapter 7 case;

(n)      the entry of any order in any of the Chapter 11 Cases (A) charging any of the Collateral , whether under Section 506(c) of the Bankruptcy Code or otherwise or (B) charging any of the Prepetition Collateral, whether under Section 506(c) of the Bankruptcy Code or otherwise;

(o)      the entry of an order by this Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral, (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local regulatory agency or authority, or (z) the approval of any settlement or other stipulation with any creditor of a Chapter 11 Debtor, other than the Agents, or otherwise providing for with respect to such Prepetition claim payments as adequate protection or otherwise to such creditor with respect to such Prepetition claim;

(p)      the commencement of a suit or action against any of the Secured Parties that asserts or seeks (A) any legal or equitable remedy that would have the effect of challenging, avoiding or subordinating any or all of the Obligations, Prepetition Obligations, Liens granted herein or any Prepetition Liens, or (B) would otherwise result in a Material Adverse Change;

(q)      the marshalling of any Collateral other than at the request of the Agents;

(r)      except for the Carve-Out, and except as expressly permitted hereunder, the entry of an order in any of the Chapter 11 Cases granting any claim against any Chapter 11 Debtor entitled to superpriority administrative expense status in any of the Chapter 11 Cases pursuant to section 364(c)(2) of the Bankruptcy Code that is pari passu with or senior to the claims of the Agents (without the prior written consent of Agents);

(s)      the entry of an order in any of the Chapter 11 Cases (A) avoiding, disallowing, offsetting, recharacterizing, subordinating, disgorging or requiring repayment of any payments made to the Secured Parties on account of the Obligations, the Prepetition Obligations, the Orders, this Agreement, the other Loan Documents, or (B) reversing, recharacterizing or otherwise modifying all or any portion of the Roll-Up Loans;

(t)      any Lien with respect to any material portion of the Collateral intended to be secured thereby ceases to be, or is not, valid or perfected.

(u)        any money judgment in excess of $1,000,000 (net of insurance coverage as to which the insurer has been notified of such judgment and has accepted coverage in writing) is rendered against any Loan Party that is not stayed pursuant to 11 U.S.C. 362;

(v)        a loss, theft, damage or destruction occurs with respect to any Collateral if the amount not covered by insurance exceeds $1,000,000;

(w)        a Loan Party or any of its senior officers is criminally indicted or convicted for (i) a felony committed in the conduct of such Loan Party's business, or (ii) violating any state or federal law (including the Controlled Substances Act, Money Laundering Control Act of 1986 and Illegal Exportation of War Materials Act, each as amended) that could lead to forfeiture of any material property or any Collateral;

(x)        Collateral Agent shall cease to have a valid, perfected and first priority Lien on any of the Collateral, except as otherwise expressly permitted herein or consented to in writing by Collateral Agent;

(y)        any provision of any Loan Document, at any time after its execution and delivery and for any reason, ceases to be in full force and effect; or any Loan Party or any other Person contests in writing in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document;

(z)        the occurrence of a Change of Control;

(aa)       the occurrence of a Material Adverse Change after the Closing Date; or

(bb)       the occurrence of any Event of Default set forth in the section entitled "Events of Default" in the Interim DIP Order; or

(cc)       the (A) filing by any Chapter 11 Debtor of (1) any chapter 11 plan other than the Plan of Reorganization, or any disclosure statement attendant to a chapter 11 plan other than the Plan of Reorganization, or (2) any direct or indirect amendment, or other document or instrument related to, the Plan of Reorganization (or any disclosure statement attendant thereto) that is materially inconsistent with the Plan of Reorganization to the extent such amendment, document or instrument relates to or impacts the Obligations, the Loan Documents or the Lenders and to which the Required Lenders do not consent in writing, (B) the entry of an order approving a disclosure statement attendant to a chapter 11 plan other than the Plan of Reorganization, or (C) the entry of an order confirming a plan other than the Plan of Reorganization;

Section 10.2  Remedies. Subject to the Orders and Section 10.3, if any Event of Default shall have occurred and be continuing, Agents, in their sole and absolute discretion, may (i) declare the principal of and accrued interest on the Loans at the time outstanding, and all other amounts owed to Secured Parties under this Agreement or any of the Loan Documents and all other Obligations, to be forthwith due and payable, whereupon the same shall immediately become due and payable without presentment, demand, protest, notice of protest and non-payment, notice of default, notice of acceleration or intention to accelerate, or other notice of any kind, all of which are expressly waived, anything in this Agreement or the Loan Documents to the contrary notwithstanding; (ii) suspend, terminate or limit any commitment of Lenders to make any further Loans, advances or

other extensions of credit hereunder; (iii) declare the ability of the Chapter 11 Debtors to use Cash Collateral to be terminated, reduced or restricted, (iv) issue a Carve-Out Notice, (v) charge the default rate of interest pursuant to the terms of this Agreement, (vi) enter upon any premises where Collateral is located; (vii) give notice of sole control or any other instruction under any deposit or securities control agreement and take any action with respect to such Collateral; and (viii) exercise any or all rights and remedies available under the Loan Documents, at law and/or in equity including, without limitation, the rights and remedies of a secured party under the UCC (whether or not the UCC is applicable).  Each Loan Party agrees that, to the extent notice of sale shall be required by law, at least ten (10) days' notice to Loan Parties of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notice, but notice given in any other reasonable manner or at any other reasonable time shall also constitute reasonable notification.

Section 10.3  Automatic Stay.  Upon the occurrence and during the continuance of any Event of Default, and without further application to the Bankruptcy Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit Agent to take any of the following actions, at the same or different times: (a) issue a written notice (the "Remedies Notice") (which may be by email) to the Loan Parties and their counsel, counsel for the Official Committee, and the U.S. Trustee (the "Remedies Notice Parties") declaring the occurrence of the Termination Date (as defined below); (b) issue a Carve-Out Notice; (c) declare all Obligations to be immediately due and payable without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Loan Parties; (d) declare the suspension or termination of the DIP Facility as to any further liability or obligation of the Lenders thereunder, but without affecting the Liens granted hereunder to Agent or the Obligations (the "Termination Notice"); and (e) charge the default rate of interest under this Agreement. Any automatic stay otherwise applicable to the Agents or the Lenders is hereby modified so that after the occurrence and during the continuation of any Event of Default (subject to any applicable grace periods under the Loan Documents), and delivery by Agent of written notice of the occurrence of a default and of its intent to exercise remedies (a "Remedies Notice") as set forth in the Loan Documents, in each case given to the Loan Parties their counsel, counsel to any Official Committee, and the U.S. Trustee, the Agent shall be entitled to exercise its rights and remedies in accordance with the Loan Documents without further order of the Bankruptcy Court beginning five (5) business days following delivery of the Remedies Notice (the "Remedies Notice Period") unless otherwise provided by order of the Bankruptcy Court. During the Remedies Notice Period, the Loan Parties, the Official Committee, and/or the U.S. Trustee shall be entitled to an emergency hearing before the Bankruptcy Court (a "Remedies Notice Hearing"). If an Event of Default under the Loan Documents is determined to have occurred and be continuing, either by the Bankruptcy Court at a Remedies Notice Hearing or as a result of the expiration of the Remedies Notice Period without a timely response requesting a Remedies Notice Hearing having been filed, the automatic stay provisions of section 362 of the Bankruptcy Code will not be re-imposed or continue with respect to Agent or Lender without the Agent's written consent. If no response to the Remedies Notice or other responsive pleading is filed with the Bankruptcy Court during the Remedies Notice Period requesting an expedited hearing on such Remedies Notice, or if a Remedies Notice Hearing is not commenced within five (5) business days following delivery of the Remedies Notice, the automatic stay provisions of section 362 of the Bankruptcy Code shall be deemed vacated and Agent and Lender may exercise all rights and remedies provided for in the Loan Documents, without further order from the Bankruptcy Court; provided, however, to the extent a Remedies Notice Hearing is occurring, then the Remedies Notice Period shall be extended pending a determination by the Bankruptcy Court. Notwithstanding the occurrence of an Event of Default under the Loan Documents or termination of the commitments under the DIP Credit Facility or anything herein to the contrary, all of the rights, remedies, benefits, and protections provided to the Agent or Lender under the DIP Documentation shall survive after the Termination Date. Upon the expiration of the Remedies Notice Period, the Obligations

shall be immediately due and payable and the Agent and Lender shall have all other rights and remedies provided in the Loan Documentation. The Bankruptcy Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of Section 10.3 and relating to the application, reimposition, or continuance of the automatic stay with respect to the Agents or the Lenders. For the avoidance of doubt, the Remedies Notice Period shall expire no later than the earliest date of cure or waiver of the applicable Event of Default or payment of the Obligations in full in cash (or by credit bid by the Agent or the Lenders).

Section 10.4  Maturity/Termination Date:  The DIP Facility and the Loan Parties' right to use Cash Collateral (as applicable) shall automatically terminate without further notice or court proceedings on the earliest to occur of the following (the "Termination Date"): (i) the Scheduled Maturity Date; (ii) the effective date of a plan of reorganization or liquidation for the Chapter 11 Debtors confirmed in the Chapter 11 Cases; (iii) reserved; (iv) the date of termination of the commitments under the DIP Facility and/or acceleration of any outstanding borrowings under the DIP Facility, in each case, by Agents following the occurrence of an Event of Default and upon the delivery of a Termination Notice to the Remedies Notice Parties, in each case, subject to the Chapter 11 Debtors' right to use Cash Collateral during the Remedies Notice Period as set forth above; (v) the first business day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and becomes effective prior thereto; (vi) the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code unless otherwise consented to in writing (which may be e-mail) by the Agent; (vii) the dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing (which may be e-mail) by the Agent; and (viii) the repayment in full in cash of all obligations and termination of all commitments under the DIP Facility, unless extended, with the prior written consent (which may be by e-mail) of the Agent.

Section 10.5    Application of Proceeds.  All proceeds from each sale of, or other realization upon, all or any part of the Collateral following an Event of Default shall be applied to the payment of the Obligations (with Loan Parties remaining liable for any deficiency) in any order which Agents may elect, with the balance (if any) paid to Loan Parties or to whomsoever is entitled thereto under Applicable Law.

Section 10.6    Miscellaneous Provisions Concerning Remedies.

(a)    Rights Cumulative.  The rights and remedies of Secured Parties under the Loan Documents shall be cumulative and not exclusive of any rights or remedies which each would otherwise have.  In exercising such rights and remedies, Secured Parties may be selective and no failure or delay by Secured Parties in exercising any right shall operate as a waiver of such right nor shall any single or partial exercise of any power or right preclude its other or further exercise or the exercise of any other power or right.  Without limiting the foregoing, the Agents may credit bid up to the full amount of all of the Obligations in the event of a sale of the Debtors' businesses.

(b)    Waiver of Marshaling.  Each Loan Party hereby waives any right to require any marshaling of assets and any similar right.

Section 10.7  Trademark License.  All trademarks, patents, copyrights, service marks and licenses owned by any Loan Party and all trademarks, patents, copyrights, service marks and software licensed by any Loan Party, are listed on Schedule 5.1(s).  Each Loan Party hereby grants to Collateral Agent the nonexclusive right and license to use all of the trademarks, patents, copyrights, service marks and licenses described on Schedule 5.1(s) and any other trademarks, patents, copyrights, service marks and licenses now or hereafter used by such Loan Party, following the occurrence and during the continuance of an Event of

Default, for the purposes set forth in <u>Section 10.2</u> and for the purpose of enabling Collateral Agent to realize on the Collateral and to permit any purchaser of any portion of the Collateral through a foreclosure sale or any other exercise of Collateral Agent's rights and remedies under the Loan Documents to use, sell or otherwise dispose of the Collateral bearing any such trademarks, patents, copyrights, service marks and licenses. Such right and license is granted free of charge, without the requirement that any monetary payment whatsoever be made to any Loan Party or any other Person by Collateral Agent.

## ARTICLE XI - MULTIPLE BORROWERS; BORROWER AGENT

At any time that more than one Person is identified as a Borrower hereunder:

Section 11.1    <u>Borrower Agent</u>.

(a)    <u>Appointment</u>.  Parent is hereby appointed by each of the other Borrowers as each such other Borrower's contractual representative (herein referred to as "<u>Borrower Agent</u>") under this Agreement and the other Loan Documents, and each of such other Borrowers irrevocably authorizes Borrower Agent to act as the contractual representative of such Borrower as provided by this Agreement and the other Loan Documents. Borrower Agent agrees to act as such contractual representative as provided herein.  No Secured Party, or any respective officers, directors, agents or employees of any Secured Party, shall not be liable to Borrower Agent or any Borrower for any action taken or omitted to be taken by Borrower Agent or Borrowers pursuant to this Agreement.

(b)    <u>Notices</u>.  Any notice required by Agents or any other Secured Party to Borrowers or any Borrower pursuant to this Agreement or the other Loan Documents may be directed to and in the name of Borrower Agent.  Any notice provided to Borrower Agent hereunder shall constitute notice to each Borrower.  Any notice required by a Borrower to Agents or any other Secured Party pursuant to this Agreement or the other Loan Documents may be sent by and on behalf of such Borrower by Borrower Agent.  Any such notice provided by Borrower Agent shall constitute notice by each such Borrower.

(c)    <u>Loan Documents</u>.  Each Borrower agrees that any action taken by Borrower Agent or Borrowers in accordance with the terms of this Agreement or the other Loan Documents, and the exercise by Borrower Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all Borrowers with the same effect as if taken by such Borrower.

Section 11.2    <u>Nature and Extent of Liability</u>.

(a)    Each Borrower agrees that it is jointly and severally liable for, and absolutely, irrevocably and unconditionally guarantees to Agents the prompt payment and performance of, all Obligations. Each Borrower agrees that its guaranty obligations hereunder constitute a continuing guaranty of payment and not of collection, that such obligations shall not be discharged until all Obligations arising under the Loan Documents are paid in full and each commitment to lend hereunder terminates, and that such obligations are absolute and unconditional, irrespective of (a) the genuineness, validity, regularity, enforceability, subordination or any future modification of, or change in, any Obligations or Loan Document, or any other document, instrument or agreement to which any Loan Party is or may become a party or be bound; (b) the absence of any action to enforce this Agreement (including this Section) or any other Loan Document, or any waiver, consent or indulgence of any kind by Lender with respect thereto; (c) the existence, value or condition of, or failure to perfect a Lien or to preserve rights against, any security or guaranty for any Obligations or any action, or the absence of any action, by Lender in respect thereof (including the release of any security or guaranty); (d) the insolvency of any Loan Party; (e) any election by any Secured Party in an insolvency proceeding for the application of Section 1111(b)(2) of the

Bankruptcy Code; (f) any borrowing or grant of a Lien by any other Borrower, as debtor-in-possession under Section 364 of the Bankruptcy Code or otherwise; (g) the disallowance of any claims of any Secured Party against any Loan Party for the repayment of any Obligations under Section 502 of the Bankruptcy Code or otherwise; or (h) any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, except payment in full of the Obligations. Each Borrower acknowledges and agrees that its Collateral secures and cross-collateralizes each Loan made hereunder. Each Borrower further acknowledged and agrees to the matters set forth on Exhibit A.

(b)     Each Borrower expressly waives all rights that it may have now or in the future under any statute, at common law, in equity or otherwise, to compel any Secured Party to marshal assets or to proceed against any Loan Party, other Person or security for the payment or performance of any Obligations before, or as a condition to, proceeding against such Borrower. Each Borrower waives all defenses available to a surety, guarantor or accommodation co-obligor other than full payment of all Obligations and waives, to the maximum extent permitted by law, any right to revoke any guaranty of any Obligations as long as it is a Borrower. It is agreed among each Borrower and any Secured Party that the provisions of this Section are of the essence of the transaction contemplated by the Loan Documents and that, but for such provisions, Lenders would decline to make Loans. Each Borrower acknowledges that its guaranty pursuant to this Section is necessary to the conduct and promotion of its business, and can be expected to benefit such business.

(c)     Each Borrower has requested that Secured Parties make this credit facility available to Borrowers on a combined basis, in order to finance Borrowers' business most efficiently and economically. Borrowers' business is a mutual and collective enterprise, and the successful operation of each Borrower is dependent upon the successful performance of the integrated group. Borrowers believe that consolidation of their credit facility will enhance the borrowing power of each Borrower and ease administration of the facility, all to their mutual advantage. Borrowers acknowledge that Secured Parties willingness to extend credit and to administer the Collateral on a combined basis hereunder is done solely as an accommodation to Borrowers and at Borrowers' request.

(d)     Each Borrower hereby subordinates any claims, including any rights at law or in equity to payment, subrogation, reimbursement, exoneration, contribution, indemnification or set off, that it may have at any time against any other Loan Party, howsoever arising, to the full payment of all Obligations.

Section 11.3   One Obligation. The Loans and other Obligations constitute one general obligation of Borrowers and are secured by the lien held by Collateral Agent on all Collateral; provided, however, that Secured Parties shall be deemed to be a creditor of, and the holder of a separate claim against, each Borrower to the extent of any Obligations jointly or severally owed by such Borrower.

## ARTICLE XII - GUARANTY

Section 12.1     The Guaranty.

(a)     Each Guarantor hereby jointly and severally guarantees to Agents as primary obligor and not as surety, the prompt payment of the Obligations in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration, or otherwise) strictly in accordance with the terms thereof (the undertaking by each Guarantor under this Article XII being, as amended from time to time, the "Facility Guaranty"). Guarantors hereby further agree that if any of the Obligations are not paid in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration, or otherwise), Guarantors will, jointly and severally, promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Obligations, the same will

be promptly paid in full when due (whether at extended maturity, as a mandatory prepayment, by acceleration, or otherwise) in accordance with the terms of such extension or renewal (such Obligations being the "Guaranteed Obligations"), and agrees to pay any and all expenses (including, without limitation, the fees and expenses of counsel) incurred by Agents in enforcing any rights under this Facility Guaranty or any other Loan Document. Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by any other Loan Party or other guarantor to Lender under or in respect of the Loan Documents but for the fact that they are unenforceable or not allowable due to the existence of any insolvency proceeding involving such other Loan Party or other guarantor.

(b)    Each Guarantor and Agents, hereby confirm that it is the intention of such Persons that this Facility Guaranty and the obligations of each Guarantor hereunder not constitute a fraudulent transfer or conveyance for purposes of the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act, or any similar law to the extent applicable to this Facility Guaranty and the Guaranteed Obligations of each Guarantor hereunder. To effectuate the foregoing intention, each Guarantor and Agents hereby irrevocably agree that such Guaranteed Obligations and other liabilities shall be limited to the maximum amount as will, after giving effect to such maximum amount and all other contingent and fixed liabilities of each Guarantor that are relevant under the laws referred to in the first sentence hereof, and after giving effect to any collections from, any rights to receive contributions from, or payments made by or on behalf of, any other Loan Party or other guarantor in respect of the Obligations under any Loan Document, result in the Guaranteed Obligations and all other liabilities of each Guarantor under this Facility Guaranty not constituting a fraudulent transfer or conveyance.

Section 12.2    Obligations Unconditional. Each Guarantor guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any Applicable Law now or hereafter in effect affecting any of such terms or the rights of Lender with respect thereto. The obligations of each Guarantor under or in respect of this Facility Guaranty are independent of the Guaranteed Obligations or any other Obligations of any other Loan Party or other guarantor under or in respect of the Loan Documents, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce this Facility Guaranty, irrespective of whether any action is brought against any Borrower or any other Loan Party or other guarantor or whether any Borrower or any other Loan Party or other guarantor is joined in any such action or actions. The liability of each Guarantor under this Facility Guaranty shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any or all of the following:

(a)    any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(b)    any change in the time, manner or place of payment of, or in any other term of, including any increase in the amount of, all or any of the Guaranteed Obligations or any other Obligations of any other Loan Party or other guarantor under or in respect of the Loan Documents, or any other amendment or waiver of or any consent to departure from any Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or other guarantor or otherwise;

(c)    any taking, exchange, release or non-perfection of any Collateral or any other collateral, or any taking, release or amendment or waiver of, or consent to departure from, any other guaranty, for all or any of the Guaranteed Obligations;

(d)    any manner of application of Collateral or any other collateral, or proceeds thereof,

to all or any of the Guaranteed Obligations, or any manner of sale or other disposition of any Collateral or any other collateral for all or any of the Guaranteed Obligations or any other Obligations of any Loan Party or other guarantor under the Loan Documents or any other assets of any Loan Party or other guarantor; the failure of Agents or any Lender, or any other Person to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of such Collateral, property or security;

(e)        the fact that any Collateral, security, or Lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations shall not be  properly perfected or created, or shall prove to be unenforceable or subordinate to any other Lien, it being recognized and agreed by each Guarantor that such Guarantor is not entering into this Facility Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any such Collateral;

(f)        any change, restructuring or termination of the entity structure or existence of  any Loan Party or any of its Subsidiaries;

(g)        any failure of Agents or any Lender to disclose to any Loan Party or other guarantor any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party or other guarantor now or hereafter known to Agents or any Lender (each Guarantor waiving any duty on the part of Agents or any Lender to disclose such information);

(h)        the failure of any other Person to execute or deliver any Loan Document or any supplement thereto or any other guaranty or agreement or the release or reduction of liability of any Guarantor or other guarantor with respect to the Guaranteed Obligations; or

(i)        any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by Agents or any Lender that might otherwise constitute a defense available to, or a discharge of, any Loan Party or other guarantor, other than payment in full of the Guaranteed Obligations.

Section 12.3   <u>Reinstatement</u>. The obligations of each Guarantor under this Facility Guaranty shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Person in respect of the Obligations or Guaranteed Obligations is rescinded or must be otherwise restored by Agents or any Lender, whether as a result of the any insolvency proceeding under the Bankruptcy Code or otherwise,  and each Guarantor agrees that it will indemnify Secured Parties on demand for all reasonable costs and expenses (including the fees and expenses of counsel) incurred by Secured Parties in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under the Bankruptcy Code or any similar laws.

Section 12.4   <u>Guarantied Obligations Due</u>. Each Guarantor hereby further agrees that, as between each Guarantor on the one hand, and Secured Parties, on the other hand, (i) the Guaranteed Obligations of each Guarantor may be declared to be forthwith due and payable as provided in <u>Article X</u> (and shall be deemed to have become automatically due and payable in the circumstances provided in <u>Section 10.2</u> for purposes of <u>Section 12.1</u>, notwithstanding any stay, injunction or other prohibition preventing such declaration in respect of the Obligations of any of the Loan Parties guarantied hereunder (or preventing such Guaranteed Obligations from becoming automatically due and payable) as against any other Person) and (ii) in the event of any declaration of acceleration of such Guaranteed Obligations (or such  Guaranteed Obligations being deemed to have become automatically due and payable) as provided in <u>Section 10.2</u>, such

Guaranteed Obligations (whether or not due and payable by any other Person) shall forthwith become due and payable by each Guarantor for all purposes of this Facility Guaranty.

Section 12.5    Waivers.  Each Guarantor hereby unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of nonperformance, default, acceleration, protest or dishonor and any other notice with respect to any of the Guaranteed Obligations and this Facility Guaranty and any requirement that Secured Parties protect, secure, perfect or insure any Lien on any property subject thereto or exhaust any right or take any action against any Loan Party or any other Person or any Collateral.  In addition, and without limiting the foregoing:

(a)    Waiver of Right of Revocation.  Each Guarantor hereby unconditionally and irrevocably waives any right to revoke this Facility Guaranty and acknowledges that this Facility Guaranty is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

(b)    Waiver of Defenses.  Each Guarantor hereby unconditionally and irrevocably waives (i) any defense arising by reason of any claim or defense based upon an election of remedies by Secured Parties that in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution or indemnification rights of each Guarantor or other rights of each Guarantor to proceed against any other Loan Party or other guarantor, any other guarantor or any other Person or any Collateral and (ii) any defense based on any right of set-off or counterclaim against or in respect of the Guaranteed Obligations of each Guarantor hereunder.  Each Guarantor further agrees that this Agreement shall not be discharged, impaired or affected by any defense that such Guarantor may or might have as to such Guarantor's respective undertakings, liabilities and obligations hereunder, each and every such defense being hereby waived by each of the undersigned Guarantors.

(c)    Foreclosure.  Each Guarantor acknowledges that Agents may, without notice to or demand upon each Guarantor and without affecting the liability of each Guarantor under this Facility Guaranty, foreclose under any mortgage by nonjudicial sale, and each Guarantor hereby waives any defense to the recovery by Agents against each Guarantor of any deficiency after such nonjudicial sale and any defense or benefits that may be afforded by applicable law.

(d)    Waiver of Duty to Disclose.  Each Guarantor hereby unconditionally and irrevocably waives any duty on the part of Lender to disclose to each Guarantor any matter, fact or thing relating to the business, financial condition, operations, or performance of any other Loan Party or any of its Subsidiaries now or hereafter known by Lender.

(e)    Additional Waivers.  Each Guarantor agrees that such Guarantor shall have no right of recourse to security for the Obligations, except through the exercise of rights of subrogation or contribution pursuant to Section 12.7. Each Guarantor further acknowledged and agrees to the matters set forth on Exhibit C.

Section 12.6    Acknowledgment of Benefits.  Each Guarantor acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements contemplated by the Loan Documents and that the waivers set forth in Section 12.2 and this Section 12.5 are knowingly made in contemplation of such benefits.

Section 12.7    Rights of Contribution and Subrogation.  Each Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against any Borrower, any other Loan Party or other guarantor that arise from the existence, payment, performance or enforcement of each Guarantor's Guaranteed Obligations under or in respect of this Facility Guaranty or any other Loan Document, including, without limitation, any right of subrogation, reimbursement, exoneration,

contribution or indemnification and any right to participate in any claim or remedy of Agents against any Borrower, any other Loan Party or other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any Borrower or any other Loan Party or other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations and all other amounts payable under this Facility Guaranty shall have been paid in full in cash and all commitments to extend financing under this Agreement shall have expired or been terminated. If any amount shall be paid to each Guarantor in violation of the immediately preceding sentence at any time prior to such time, such amount shall be received and held in trust for the benefit of Agents, shall be segregated from other property and funds of such Guarantor and shall forthwith be paid or delivered to Agents in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Facility Guaranty, whether matured or unmatured, in accordance with the terms of the Loan Documents, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Facility Guaranty thereafter arising.

Section 12.8    <u>Guarantee of Payment; Continuing Guarantee; Assignments</u>. This Facility Guaranty is a guaranty of payment and not of collection, is a continuing guarantee, and shall (a) remain in full force and effect until the payment in full in cash of the Guaranteed Obligations, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by Agents and its successors, transferees and assigns. Without limiting the generality of clause (c) of the immediately preceding sentence, Lender may assign or otherwise transfer all or any portion of their rights and obligations under this Secured Party (including, without limitation, all or any portion any Loans or commitment to extend financial accommodations hereunder) to any other Person who is an assignee under the Loan Documents, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to Lender herein or otherwise. No Guarantor shall have the right to assign its rights hereunder or any interest herein without the prior written consent of Agents.

## ARTICLE XIII – AGENTS

Section 13.1    <u>Appointment</u>. Each Lender (and, if applicable, each other Secured Party) hereby appoints Breakwater as its Collateral Agent under and for purposes of each Loan Document, and hereby authorizes the Collateral Agent to act on behalf of such Lender (or if applicable, each other Secured Party) under each Loan Document and, in the absence of other written instructions from the Lenders pursuant to the terms of the Loan Documents received from time to time by the Collateral Agent, to exercise such powers hereunder and thereunder as are specifically delegated to or required of the Collateral Agent by the terms hereof and thereof, together with such powers as may be incidental thereto. Each Lender (and, if applicable, each other Secured Party) hereby appoints Breakwater as its Administrative Agent under and for purposes of each Loan Document and hereby authorizes the Administrative Agent to act on behalf of such Lender (or, if applicable, each other Secured Party) under each Loan Document and, in the absence of other written instructions from the Lenders pursuant to the terms of the Loan Documents received from time to time by the Administrative Agent, to exercise such powers hereunder and thereunder as are specifically delegated to or required of the Administrative Agent by the terms hereof and thereof, together with such powers as may be incidental thereto. Each Lender (and, if applicable, each other Secured Party) hereby irrevocably designates and appoints each of the Collateral Agent and the Administrative Agent as the agent of such Lender. Notwithstanding any provision to the contrary elsewhere in this Agreement, no Agent shall have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender or other Secured Party, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against any Agent.

Section 13.2   <u>Delegation of Duties</u>.  Each Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  No Agent shall be responsible for the negligence or misconduct of any agents or attorneys in-fact selected by it with reasonable care.

Section 13.3   <u>Exculpatory Provisions</u>.  Neither any Agent nor any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be (a) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (b) responsible in any manner to any of the Lenders or any other Secured Party for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party or other Person to perform its obligations hereunder or thereunder.  None of  the Agents shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or Applicable Law, including  for the avoidance of doubt any action that may be in violation of the automatic stay under any bankruptcy or insolvency law or other similar law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any bankruptcy or insolvency law or other similar law.  The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other  Loan Document, or to inspect the properties, books or records of any Loan Party.

Section 13.4   <u>Reliance by Agents</u>.  Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, electronic mail, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Credit Parties), independent accountants and other experts selected by such Agent.  The Agents may deem and treat the payee of any note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent. Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all or other requisite Lenders) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Agents shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if  so specified by this Agreement, all Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans and all other Secured Parties.

Section 13.5   <u>Notice of Default</u>.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder, except with respect to any Default or Event of Default in the payment of principal, interest and fees required to be paid to the Administrative Agent for the account of the Lenders unless the Administrative Agent has received notice from a Lender or a Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  The Collateral Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Collateral Agent has received notice from a Lender or the Borrower Agent referring to this Agreement, describing such Default or Event of

Default and stating that such notice is a "notice of default". In the event that an Agent receives such a notice, such Agent shall give notice thereof to the other Agents and the Lenders. Each Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement); provided, that unless and until each Agent shall have received such directions, the Agents may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as such Agent shall deem advisable in the best interests of the Secured Parties.

Section 13.6    Non-Reliance on Agents and Other Lenders.  Each Lender (and, if applicable, each other Secured Party) expressly acknowledges that neither the Agents nor any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Loan Party or any Affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender or any other Secured Party.  Each Lender (and, if applicable, each other Secured Party) represents to the Agents that it has, independently and without reliance upon any Agent or any other Lender or any other Secured Party, and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, operations, property, financial and other condition and creditworthiness of the Credit Parties and their Affiliates and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender (and, if applicable, each other Secured Party) also represents that it will, independently and without reliance upon any Agent or any other Lender or any other Secured Party, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by any Agent hereunder, the Agents shall not have any duty or responsibility to provide any Lender or any other Secured Party with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any Affiliate of a Loan Party that may come into the possession of such Agent or any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates.

Section 13.7    Indemnification.  The Lenders agree to indemnify each Agent in its capacity as such (to the extent not reimbursed by the Loan Parties and without limiting the obligation of the Loan Parties to do so), ratably according to their respective Total Term Loan Commitments in effect on the date on which indemnification is sought under this Section 14.7 (or, if indemnification is sought after the date upon which the Total Term Loan Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such respective outstanding principal balances of the Loans immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing; provided, that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent's gross negligence or willful misconduct.  The agreements in this Section 14.7 shall survive the payment of the Loans and all other amounts payable hereunder.

Section 13.8    Agent in Its Individual Capacity.  Each Agent and its Affiliates may make loans to, accept

deposits from and generally engage in any kind of business with any Loan Party as though such Agent were not an Agent.  With respect to its Loans made or renewed by it, each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender", "Lenders", "Secured Party" and "Secured Parties" shall include each Agent in its individual capacity.

Section 13.9    <u>Successor Agents</u>.  The Administrative Agent or the Collateral Agent may  resign as Administrative Agent or Collateral Agent, as applicable, upon twenty (20) days' notice to the Lenders, such other Agents and the Borrower Agent; <u>provided</u>, that such notice is not required in connection with a pre-arranged resignation and simultaneous appointment of another Lender as such Agent that occurs during the first two fiscal quarters following the Closing Date.  If an Agent shall resign as such Agent in its applicable capacity under this Agreement and the other Loan Documents,  then the Required Lenders shall appoint from among the Lenders a successor agent, which successor  agent shall (unless an Event of Default shall have occurred and be continuing), except with respect to the appointment of an Initial Lender, be subject to approval by the Borrowers (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights (other  than any rights to indemnity payments owed to the retiring Agent), powers and duties of such Agent in its applicable capacity, and the term "Administrative Agent" or "Collateral Agent", as the case may be, shall mean such successor agent effective upon such appointment and approval, and the former Agent's rights (other than any rights to indemnity payments owed to the retiring Agent), powers and duties as Agent in its applicable capacity shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement or any holders of the Loans.  If no applicable successor agent has accepted appointment as such Agent in its applicable capacity by the date that is twenty (20) days following such retiring Agent's notice of resignation, such retiring Agent's resignation shall nevertheless thereupon become effective (except that in the case of any Collateral held by any Agent for the benefit of the Secured Parties under any of the Loan Documents, the Agent will continue to hold such collateral security until such time as a successor Agent is appointed)  and the Lenders shall assume and perform all of the duties of such Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above.  After any retiring Agent's resignation as the Administrative Agent or the Collateral Agent, as applicable, the provisions of this Article XIV shall inure to its benefit as to any actions taken or omitted to be taken by it while it was an Agent under this Agreement and the other Loan Documents.

Section 13.10    <u>Agents Generally</u>.  Except as expressly set forth herein, no Agent shall have any duties or responsibilities hereunder in its capacity as such.

Section 13.11    <u>Restrictions on Actions by Lenders; Sharing of Payments</u>.

(a)    Each of the Lenders agrees that it shall not, without the express written consent  of the Collateral Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the written request of Collateral Agent, set off against the Obligations, any amounts owing by such Lender to any Loan Party or any of their respective Subsidiaries or any deposit accounts of any Loan Party or any of their respective Subsidiaries now or hereafter maintained with such Lender.  Each of the Lenders further agrees that it shall not, unless specifically requested to do so in writing by Collateral Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings to enforce any Loan Document against any Loan Party or to foreclose any Lien on, or otherwise enforce any security interest in, any of the Collateral.

(b)    Subject to Section 14.3, if, at any time or times any Lender shall receive (i) by payment, foreclosure, setoff, or otherwise, any proceeds of Collateral or any payments with respect to the Obligations, except for any such proceeds or payments received by such Lender from the Agents pursuant to the terms of this Agreement, or (ii) payments from the Agents in excess of such Lender's pro rata share

of all such distributions by Agents, such Lender promptly shall (A) turn the same over to the Administrative Agent, in kind, and with such endorsements as may be required to negotiate the same to the Administrative Agent, or in immediately available funds, as applicable, for the account of all of the Lenders and for application to the Obligations in accordance with the applicable provisions of this Agreement, or (B) purchase, without recourse or warranty, an undivided interest and participation in the Obligations owed to the other Lenders so that such excess payment received shall be applied ratably as among the Lenders in accordance with their pro rata shares; provided, that to the extent that such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment.

Section 13.12   Agency for Perfection.  Collateral Agent hereby appoints each other Secured Party as its agent (and each Secured Party hereby accepts such appointment) for the purpose of perfecting the Collateral Agent's Liens in assets which, in accordance with the UCC of any applicable state can be perfected only by possession or control. Should any Secured Party obtain possession or control of any such Collateral, such Secured Party shall notify Collateral Agent thereof, and, promptly upon Collateral Agent's request therefor shall deliver possession or control of such Collateral to Collateral Agent or in accordance with Collateral Agent's instructions.

Section 13.13   Authorization to File Proof of Claim.  In case of the pendency of any bankruptcy, insolvency or other similar proceeding with respect to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable or whether the Administrative Agent shall have made any demand therefor) shall be entitled: (i) to file and prove a claim in such proceeding for the full amount of the principal and interest owing and unpaid in respect of the Loans and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for reimbursement under this Agreement) allowed in such proceeding; and (ii) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any trustee, liquidator or another similar official in any such proceedings is hereby authorized by each Lender to make such payments to the Administrative Agent for the account of such Lender.  Nothing contained herein shall be deemed to authorize the Administrative Agent to consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the obligations of the Loan Party hereunder or the rights of any Lender, or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 13.14   Credit Bids. Subject to Section 10.3:

(a)     Each Loan Party and each Secured Party hereby irrevocably authorizes Administrative Agent, based upon the written instruction of the Required Lenders, to bid and purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted (i) by any Agent under the provisions of the Code, including pursuant to Sections 9-610 or 9-620 of the UCC (ii) under the provisions of the Bankruptcy Code, including Section 363, 365 and/or 1129 of the Bankruptcy Code or (iii) by any Agent (whether by judicial action or otherwise, including a foreclosure sale) in accordance with Applicable Laws (clauses (i), (ii) an (iii), a "Collateral Sale"); and in connection with any Collateral Sale based upon the written instruction of Required Lenders, the Administrative Agent may accept non-cash consideration, including debt and equity securities issued by such acquisition vehicle under the direction or control of the Administrative Agent and such Agent may offset all or any portion of the Obligations against the purchase price of such Collateral. Each Secured Party hereby agrees that, except as otherwise provided in any Loan Documents or with the written consent of the Administrative Agent and the Required Lenders, it will not take any enforcement action, accelerate obligations under any Loan

Documents, or exercise any right that it might otherwise have under Applicable Laws to credit bid at foreclosure sales, UCC sales or other similar dispositions of Collateral.

(b)     The Agent and Prepetition Lenders, subject to entry of the Interim DIP Order and the Challenge Period (as defined in the Interim DIP Order), shall have the right, in whole or in part in their sole and absolute discretion, under section 363(k) of the Bankruptcy Code and other applicable law, to credit bid up to the full amount of the Obligations and the Prepetition Loans, in connection with any sale of the Loan Parties' assets, whether or not under section 363 of the Bankruptcy Code, a chapter 11 plan, or otherwise, and no such rights shall be limited "for cause" or otherwise; the foregoing shall include an anticipated stalking horse bid for the sale or disposition of assets by the Chapter 11 Debtors in the Chapter 11 Cases and shall not prohibit the Agents or the Prepetition Lenders from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code.

(c)     The Agent shall have the absolute right to assign, sell, or otherwise dispose of such right to credit bid in connection with any acquisition entity or joint venture formed in connection with such bid. Notwithstanding the foregoing, nothing herein shall affect or impair the right of the Official Committee or the U.S. Trustee to seek to disqualify from the auction any bidder based upon conduct at or prior to the auction.

Section 13.15   Binding Effect.  Each Secured Party, by accepting the benefits of the Loan Documents, agrees that (i) any action taken by any Agent or the Required Lenders (or, if expressly required hereby, a greater proportion of the Lenders) in accordance with the provisions of the Loan Documents, (ii) any action taken by any Agent in reliance upon the instructions of Required Lenders (or, where so required, such greater proportion) and (iii) the exercise by any Agent or the Required Lenders (or, where so required, such greater proportion) of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Secured Parties.

## ARTICLE XIV - MISCELLANEOUS

Section 14.1    Notices.

(a)     Method of Communication.  All notices and the communications hereunder and thereunder shall be in writing or by telephone subsequently confirmed in writing.  Notices in writing shall be delivered personally or sent by overnight courier service, by certified or registered mail, postage pre-paid, or by facsimile transmission and shall be deemed received, in the case of personal delivery, when delivered, in the case of overnight courier service, on the next Business Day after delivery to such service, in the case of mailing, on the third day after mailing (or, if such day is a day on which deliveries of mail are not made, on the next succeeding day on which deliveries of mail are made) and, in the case of facsimile transmission, upon transmittal; provided that in the case of notices to Agents, Agents shall be charged with knowledge of the contents thereof only when such notice is actually received by Agents.  A telephonic notice to Agents as understood by Agents will be deemed to be the controlling and proper notice in the event of a discrepancy with or failure to receive a confirming written notice.  In addition to the foregoing, Agents may, in its sole and absolute discretion, provide notices and other communications hereunder by electronic communications.  Unless Agents otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication

shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(b)    <u>Addresses for Notices</u>.  Notices to any party shall be sent to it at the following addresses, or any other address of which all the other parties are notified in writing.

If to Loan Parties:

One Table Restaurant Brands, LLC, One Table Restaurant Operations, LLC or Tender Greens OpCo, LLC:
1201 W 5th St. T-400, Los Angeles, CA 90017
Attention: Harald Herrmann
Email: harald.herrmann@otrb.com

Tocaya Holdings LLC and its Subsidiaries:
Tocaya Holdings LLC
8720 W Sunset Blvd
West Hollywood, CA 90069
Attention: Harald Herrmann
Email: harald.herrmann@otrb.com

with a copy to (which copy shall not be deemed to constitute notice):

Shulman Bastian Friedman & Bui LLP
100 Spectrum Center Drive, Suite 600
Irvine, CA 92618
Attention: Alan J. Friedman
Email: afriedman@shulmanbastian.com

<u>Agent:</u>

Breakwater Management LP
c/o Breakwater Management
2121 Avenue of the Stars, Suite 800
Los Angeles, California 90067
Attention: Eric Beckman
Email: ebeckman@breakwatermgmt.com

with a copy to (which copy shall not be deemed to constitute notice):

Elkins Kalt Weintraub Reuben Gartside LLP
10345 W Olympic Boulevard
Los Angeles, CA 90064
Attention: Michael I. Gottfried, Esq.
Email: mgottfried@elkinskalt.com

Section 14.2 <u>Expenses</u>.  Borrowers shall pay or reimburse all costs and expenses incurred by any Secured Party arising out of or in connection with this Agreement and the Loans including, without limitation, (a) the fees and expenses of counsel in connection with the negotiation, preparation, execution, delivery, amendment, enforcement and termination of this Agreement and each of the other Loan Documents, (b) the out-of-pocket costs and expenses incurred in connection with the administration and interpretation of this Agreement and the other Loan Documents, (c) subject to <u>Section 6.9</u> and <u>Section 6.11</u>, the costs and expenses of field exams and appraisals, (d) the costs and expenses of lien searches, (e) all stamp, registration, recordation and similar taxes, fees or charges related to the Collateral and charges of filing financing statements and continuations and the costs and expenses of taking other actions to perfect, protect, and continue the security interest of Collateral Agent, (f) costs and expenses related to the preparation, execution and delivery of any waiver, amendment, supplement or consent by Secured Parties relating to this Agreement or any of the Loan Documents, (g) sums paid or obligations incurred in connection with the payment of any amount or taking any action required of any Loan Party under the Loan Documents that Loan Parties fail to pay or take, (h) costs of inspections and verifications of the Collateral, including, without limitation, $1,000 per diem per examiner plus out of pocket expenses for travel, lodging, and meals arising in connection with inspections and verifications of the Collateral and any Loan Party's operations and books and records by Agents' employees and agents, (i) costs and expenses of forwarding loan proceeds, collecting checks and other items of payment, and establishing and maintaining each account of the Loan Parties maintained with Agents or owned by Agents for the benefit of any Loan Party and each Collections Account or Lockbox, (j) [reserved] (k) costs and expenses of preserving and protecting the Collateral, (l) costs and expenses related to consulting with and obtaining opinions and appraisals from one or more Persons, including personal property appraisers, accountants and lawyers, concerning the value of any Collateral for the Obligations or related to the nature, scope or value of any right or remedy of Secured Parties hereunder or under any of the Loan Documents, including any review of factual matters in connection therewith, which expenses shall include the fees and disbursements of such Persons, and (m) costs and expenses paid or incurred to obtain payment of the Obligations, enforce the security interest of Collateral Agent, sell or otherwise realize upon the Collateral, and otherwise enforce the provisions of the Loan Documents, or to prosecute or defend any claim in any way arising out of, related to or connected with, this Agreement or any of the Loan Documents, which expenses shall include the fees and disbursements of counsel and of experts and other consultants retained by Collateral Agent.  Each Borrower hereby authorizes Collateral Agent to debit Borrowers' loan account by increasing the principal amount of the Loans, or deduct from such Borrower's accounts maintained with any Affiliate of Collateral Agent, the amount of any costs, fees and expenses owed by Borrowers when due. Borrowers' obligations under this Section 14.2 shall survive payment in full of the Obligations and the termination of this Agreement.

Section 14.3 <u>Setoff</u>.  In addition to any rights now or hereafter granted under Applicable Law, and not by way of limitation of any such rights, upon and after the occurrence of any Event of Default, Agent is hereby authorized by Loan Parties at any time or from time to time, without notice to any Loan Party or any other Person, any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, time or demand, including, but not limited to, Debt evidenced by certificates of deposit, whether matured or unmatured) and any other Debt at any time held or owing by Lenders or the Agents or any participant to or for the credit or the account of any Loan Party against and on account of the Obligations irrespective of whether or not (a) Lenders or Agents shall have made any demand under this Agreement or any of the Loan Documents, or (b) Lenders or Agents shall have declared any or all of the Obligations to be due and payable as permitted by <u>Section 10.2</u> and although such Obligations shall be contingent or unmatured.

Section 14.4 <u>Venue; Service of Process</u>. EACH LOAN PARTY HEREBY IRREVOCABLY SUBMITS ITSELF TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN LOS ANGELES COUNTY, CALIFORNIA, AND AGREES AND

CONSENTS THAT SERVICE OF PROCESS MAY BE MADE UPON IT IN ANY LEGAL PROCEEDING RELATING TO THIS AGREEMENT, ANY BORROWING HEREUNDER OR ANY OTHER RELATIONSHIP BETWEEN LENDER AND SUCH LOAN PARTY BY ANY MEANS ALLOWED UNDER STATE OR FEDERAL LAW.  ANY LEGAL PROCEEDING ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, ANY BORROWING HEREUNDER OR ANY OTHER RELATIONSHIP BETWEEN ANY SECURED PARTY AND SUCH LOAN PARTY MAY BE BROUGHT AND LITIGATED IN ANY ONE OF THE STATE OR FEDERAL COURTS LOCATED IN LOS ANGELES COUNTY, CALIFORNIA, HAVING JURISDICTION.  EACH LOAN PARTY AND EACH SECURED PARTY WAIVE AND AGREE NOT TO ASSERT, BY WAY OF MOTION, AS A DEFENSE OR OTHERWISE, THAT ANY SUCH PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM OR THAT THE VENUE THEREOF IS IMPROPER.  NOTHING HEREIN SHALL LIMIT THE RIGHT OF AGENT TO BRING PROCEEDINGS AGAINST ANY LOAN PARTY IN THE COURTS OF ANY OTHER JURISDICTION.  ANY JUDICIAL PROCEEDING BY ANY LOAN PARTY AGAINST ANY SECURED PARTY INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTION WITH ANY LOAN DOCUMENT SHALL BE BROUGHT ONLY IN A COURT IN LOS ANGELES, CALIFORNIA.  Each Loan Party expressly waives personal service of the summons and complaint or other process or papers issued therein and agrees that service of such summons and complaint or other process or papers may be made by registered or certified mail addressed to such Loan Party at its address referenced in <u>Section 11.1</u>, which service  shall be deemed to have been made on the date that receipt is deemed to have occurred for registered or certified mail as provided in <u>Section 11.1</u>.

Section 14.5      <u>Assignment; Participation</u>.  All the provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, except that no Loan Party may assign or transfer any of its rights under this Agreement or delegate any of its duties or obligations under this Agreement.  Lenders may assign to one or more Persons, or sell participations to one or more Persons in, all or a portion of its rights and obligations hereunder and under this Agreement and any promissory notes issued pursuant hereto and, in connection with any such assignment or sale of a participation, may assign its rights and obligations under the Loan Documents.  Each Loan Party agrees that Lenders may provide any information that Lenders may have about such Loan Party or about any matter relating to this Agreement to any of its Affiliates or their successors, or to any one or more purchasers or potential purchasers of any of its rights under this Agreement or any one or more participants or potential participants.

Section 14.6      <u>Amendments and Waivers</u>.  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Loan Party therefrom, shall be effective unless the same shall be in writing and signed by Agents, and the Required Lenders and Loan Parties and then any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 14.7      <u>Performance of Loan Parties' Duties</u>.  If any Loan Party shall fail to do any act or thing which it has covenanted to do under this Agreement or any of the Loan Documents, Agents may (but shall not be obligated to) do the same or cause it to be done either in the name of Agents or in the name and on behalf of such Loan Party, and each Loan Party hereby irrevocably authorizes Agents so to act.

Section 14.8      <u>Indemnification</u>.  Each Loan Party shall reimburse Secured Parties and its Affiliates and their respective officers, employees, directors, shareholders, agents and legal counsel (collectively, the "<u>Indemnified Parties</u>" and individually, an "<u>Indemnified Party</u>") for all reasonable costs and expenses, including legal fees and expenses, incurred and shall indemnify and hold the Indemnified Parties harmless from and against all losses (including, without limitation, any and all Environmental Liabilities) suffered by any Indemnified Party, in any way relating to (a) any Loans, Loan Documents, or the use thereof or

transactions relating thereto, (b) any action by Secured Parties or any Affiliate of Secured Parties taken or omitted in connection with any Loan Documents, (c) the existence or perfection of any Liens, or realization upon any Collateral, (d) exercise by Secured Parties or any Affiliate of Secured Parties of any rights or remedies under or in any way connected to this Agreement, any other Loan Documents or Applicable Law, or (e) failure by any Loan Party to perform or observe any terms of any Loan Document, in each case including all costs and expenses relating to any investigation, litigation, arbitration or other proceeding, whether or not the applicable Indemnified Party is a party thereto, <u>provided</u>; <u>however</u>, no Loan Party shall be required to indemnify and hold an Indemnified Party harmless for any losses resulting from an Indemnified Party's gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final non- appealable judgment. EACH LOAN PARTY AND EACH SECURED PARTY EXPRESSLY INTEND THAT THE FOREGOING INDEMNITY SHALL COVER, AND THAT EACH LOAN PARTY SHALL INDEMNIFY AND HOLD THE INDEMNIFIED PARTIES HARMLESS FROM AND AGAINST, COSTS, EXPENSES AND LOSSES SUFFERED AS A RESULT OF THE NEGLIGENCE OF ANY INDEMNIFIED PARTY. Borrowers' obligations under this Section shall survive payment in full of the Obligations and the termination of this Agreement.

Section 14.9    <u>All Powers Coupled with Interest</u>. All powers of attorney and other authorizations granted to each Secured Party and any Persons designated by each Secured Party pursuant to any provisions of this Agreement or any of the Loan Documents shall be deemed coupled with an interest and shall be irrevocable so long as any of the Obligations remain unpaid or unsatisfied or Lenders have any obligations to make the Loans hereunder.

Section 14.10    <u>Severability of Provisions</u>. Any provision of this Agreement or any other Loan Document which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remainder of such provision or the remaining provisions hereof or thereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 14.11    <u>GOVERNING LAW</u>. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, THE INTERPRETATION AND CONSTRUCTION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND OF ANY PROVISION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND OF ANY ISSUE RELATING TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA NOT INCLUDING CONFLICTS OF LAWS RULES AND (TO THE EXTENT APPLICABLE) CHAPTER 11 OF THE BANKRUPTCY CODE.

Section 14.12 <u>Jury Waiver; California Jury Trial Waiver</u>. EACH LOAN PARTY AND EACH SECURED PARTY HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN OR AMONG SUCH LOAN PARTY AND EACH SECURED PARTY AND EACH SECURED PARTY'S AFFILIATES ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR ANY RELATIONSHIP BETWEEN EACH SECURED PARTY AND SUCH LOAN PARTY OR BETWEEN SUCH LOAN PARTY AND ANY AFFILIATE OF EAH SECURED PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO PROVIDE THE FINANCING DESCRIBED HEREIN OR IN THE OTHER LOAN DOCUMENTS.

(a)    EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES TO THE MAXIMUM EXTENT NOT PROHIBITED BY APPLICABLE LAW, ANY RIGHT TO TRIAL

BY JURY OF ANY CLAIM, COUNTERCLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT, ANY OTHER LOAN DOCUMENTS, OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THEREWITH, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR THERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENTS OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE AND EACH PARTY HEREBY CONSENTS THAT ANY SUCH CLAIM, COUNTERCLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

(b)     IN THE EVENT THAT ANY SUCH ACTION IS COMMENCED OR MAINTAINED IN ANY COURT IN THE STATE OF CALIFORNIA, AND THE WAIVER OF JURY TRIAL SET FORTH IN THE SECTION ABOVE IS NOT ENFORCEABLE, AND EACH PARTY TO SUCH ACTION DOES NOT SUBSEQUENTLY WAIVE IN AN EFFECTIVE MANNER UNDER CALIFORNIA LAW ITS RIGHT TO A TRIAL BY JURY, THE PARTIES HERETO HEREBY ELECT TO PROCEED AS FOLLOWS:

(i)     WITH THE EXCEPTION OF THE ITEMS SPECIFIED IN CLAUSE BELOW, ANY CONTROVERSY, DISPUTE OR CLAIM (EACH, A "CONTROVERSY") BETWEEN THE PARTIES ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER DOCUMENT WILL BE RESOLVED BY A REFERENCE PROCEEDING IN ACCORDANCE WITH THE PROVISIONS OF SECTIONS 638, ET SEQ. OF THE CALIFORNIA CODE OF CIVIL PROCEDURE ("CCP"), OR THEIR SUCCESSOR SECTIONS, WHICH SHALL CONSTITUTE THE EXCLUSIVE REMEDY FOR THE RESOLUTION OF ANY CONTROVERSY, INCLUDING WHETHER THE CONTROVERSY IS SUBJECT TO THE REFERENCE PROCEEDING. EXCEPT AS OTHERWISE PROVIDED ABOVE, VENUE FOR THE REFERENCE PROCEEDING WILL BE IN ANY COURT IN WHICH VENUE IS APPROPRIATE UNDER APPLICABLE LAW (THE "COURT").

(ii)     THE MATTERS THAT SHALL NOT BE SUBJECT TO A REFERENCE ARE THE FOLLOWING: (A) NON-JUDICIAL FORECLOSURE OF ANY SECURITY INTERESTS IN REAL OR PERSONAL PROPERTY; (B) EXERCISE OF SELF HELP REMEDIES (INCLUDING SET-OFF); (C) APPOINTMENT OF A RECEIVER; AND (D) TEMPORARY, PROVISIONAL OR ANCILLARY REMEDIES (INCLUDING WRITS OF ATTACHMENT, WRITS OF POSSESSION, TEMPORARY RESTRAINING ORDERS OR PRELIMINARY INJUNCTIONS). THIS AGREEMENT DOES NOT LIMIT THE RIGHT OF ANY PARTY TO EXERCISE OR OPPOSE ANY OF THE RIGHTS AND REMEDIES DESCRIBED IN CLAUSES (A) AND (B) OR TO SEEK OR OPPOSE FROM A COURT OF COMPETENT JURISDICTION ANY OF THE ITEMS DESCRIBED IN CLAUSES (C) AND (D). THE EXERCISE OF, OR OPPOSITION TO, ANY OF THOSE ITEMS DOES NOT WAIVE THE RIGHT OF ANY PARTY TO A REFERENCE PURSUANT TO THIS AGREEMENT.

(iii)     THE REFEREE SHALL BE A RETIRED JUDGE OR JUSTICE SELECTED BY MUTUAL WRITTEN AGREEMENT OF THE PARTIES. IF THE PARTIES DO NOT AGREE WITHIN TEN (10) DAYS OF A WRITTEN REQUEST TO DO SO BY ANY PARTY, THEN, UPON REQUEST OF ANY PARTY, THE REFEREE SHALL BE SELECTED BY THE PRESIDING

JUDGE OF THE COURT (OR HIS OR HER REPRESENTATIVE).  A REQUEST FOR APPOINTMENT OF A REFEREE MAY BE HEARD ON AN EX PARTE OR EXPEDITED BASIS, AND THE PARTIES AGREE THAT IRREPARABLE HARM WOULD RESULT IF EX PARTE RELIEF IS NOT GRANTED.

(iv)    EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE REFEREE SHALL DETERMINE THE MANNER IN WHICH THE REFERENCE PROCEEDING IS CONDUCTED INCLUDING THE TIME AND PLACE OF HEARINGS, THE ORDER OF PRESENTATION OF EVIDENCE, AND ALL OTHER QUESTIONS THAT ARISE WITH RESPECT TO THE COURSE OF THE REFERENCE PROCEEDING.  ALL PROCEEDINGS AND HEARINGS CONDUCTED BEFORE THE REFEREE, EXCEPT FOR TRIAL, SHALL BE CONDUCTED WITHOUT A COURT REPORTER, EXCEPT THAT WHEN ANY PARTY SO REQUESTS, A COURT REPORTER WILL BE USED AT ANY HEARING CONDUCTED BEFORE THE REFEREE, AND THE REFEREE WILL BE PROVIDED A COURTESY COPY OF THE TRANSCRIPT.  THE PARTY MAKING SUCH A REQUEST SHALL HAVE THE OBLIGATION TO ARRANGE FOR THE COURT REPORTER.  SUBJECT TO THE REFEREE'S POWER TO AWARD COSTS TO THE PREVAILING PARTY, BORROWERS WILL PAY THE COST OF THE REFEREE AND ALL COURT REPORTERS.

(v)    THE REFEREE SHALL BE REQUIRED TO DETERMINE ALL ISSUES IN ACCORDANCE WITH EXISTING APPLICABLE CASE LAW AND STATUTORY LAW.  THE RULES OF EVIDENCE APPLICABLE TO PROCEEDINGS AT LAW IN THE COURT WILL BE APPLICABLE TO THE REFERENCE PROCEEDING.  THE REFEREE SHALL BE EMPOWERED TO ENTER EQUITABLE AS WELL AS LEGAL RELIEF, ENTER EQUITABLE ORDERS THAT WILL BE BINDING ON THE PARTIES AND RULE ON ANY MOTION THAT WOULD BE AUTHORIZED IN A COURT PROCEEDING.  THE REFEREE SHALL ISSUE A DECISION AT THE CLOSE OF THE REFERENCE PROCEEDING WHICH DISPOSES OF ALL CLAIMS OF THE PARTIES THAT ARE THE SUBJECT OF THE REFERENCE.  PURSUANT TO CCP SECTION 644, SUCH DECISION SHALL BE ENTERED BY THE COURT AS A JUDGMENT OR AN ORDER IN THE SAME MANNER AS IF THE ACTION HAD BEEN TRIED BY THE COURT AND ANY SUCH DECISION WILL BE FINAL, BINDING AND CONCLUSIVE.  THE PARTIES RESERVE THE RIGHT TO APPEAL FROM THE FINAL JUDGMENT OR ORDER OR FROM ANY APPEALABLE DECISION OR ORDER ENTERED BY THE REFEREE.  THE PARTIES RESERVE THE RIGHT TO FINDINGS OF FACT, CONCLUSIONS OF LAWS, A WRITTEN STATEMENT OF DECISION, AND THE RIGHT TO MOVE FOR A NEW TRIAL OR A DIFFERENT JUDGMENT, WHICH NEW TRIAL, IF GRANTED, IS ALSO TO BE A REFERENCE PROCEEDING UNDER THIS PROVISION.

Section 14.13   Counterparts; Integration; Electronic Execution of Assignments.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and shall be binding upon all parties, their successors and assigns, and all of which taken together shall constitute one and the same agreement.  A facsimile or digital copy of any signed Loan Document, including this Agreement, shall be deemed to be an original thereof.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  The words "execution," "signed," "signature," and words of like import shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 14.14   Time is of the Essence.  Time is of the essence of this Agreement and the other Loan

Documents.

Section 14.15  <u>Waiver of Consumer Rights; Advice of Counsel</u>.  EACH LOAN PARTY HEREBY WAIVES ITS RIGHTS UNDER THE DECEPTIVE TRADE PRACTICES.  CONSUMER PROTECTION ACT, SECTION 17.41 ET SEQ. BUSINESS & COMMERCE CODE, A LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS.  AFTER CONSULTATION WITH AN ATTORNEY OF ITS OWN SELECTION, SUCH LOAN PARTY VOLUNTARILY CONSENTS TO THIS WAIVER. EACH LOAN PARTY EXPRESSLY WARRANTS AND REPRESENTS THAT IT (A) IS NOT IN A SIGNIFICANTLY DISPARATE BARGAINING POSITION RELATIVE TO SECURED PARTY, (B) SUCH LOAN PARTY HAS BEEN ADVISED BY AGENT TO SEEK THE ADVICE OF AN ATTORNEY AND AN ACCOUNTANT IN CONNECTION WITH THIS LOAN, AND (C) SUCH LOAN PARTY HAS HAD THE OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY AND ACCOUNTANT OF SUCH LOAN PARTY'S CHOICE IN CONNECTION WITH THIS LOAN.

Section 14.16  <u>Payments Set Aside</u>.  To the extent that any payment by or on behalf of any Loan Party is made to Lender, or Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by any Secured Party in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under the Bankruptcy Code, any other debtor relief law of any applicable jurisdiction affecting the rights of creditors generally, or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred.

Section 14.17  <u>Waiver of Consequential Damages; Etc.</u>.  To the fullest extent permitted by Applicable Law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnified Party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnified Party shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnified Party through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnified Party as determined by a final and nonappealable judgment of a court of competent jurisdiction, **WHICH LIMITATION OF LIABILITY SHALL APPLY REGARDLESS OF WHETHER THE LIABILITY ARISES FROM THE SOLE, CONCURRENT, CONTRIBUTORY OR COMPARATIVE NEGLIGENCE OF THE INDEMNIFIED PARTY**.

Section 14.18  <u>Protective Advances by Lenders</u>.  At its option, but without being obligated to do so, Lender may, upon prior notice to any Loan Party, after the occurrence and during the continuance of an Event of Default, (i) pay and discharge past due taxes, assessments and governmental charges, at any time levied on or with respect to any of the Collateral of any Loan Party which such Loan Party has failed to pay and discharge in accordance with the requirements of this Agreement or any of the other Loan Documents, (ii) pay and discharge any claims of other creditors of any Loan Party which are secured by any Lien on any Collateral, other than a Permitted Lien, (iii) pay for the maintenance, repair, restoration and preservation of the Collateral to the extent any Loan Party fails to comply with its obligations in regard thereto under this Agreement and the other Loan Documents or Agents reasonably believe, in their sole discretion, payment of the same is necessary or appropriate to avoid a material loss or material diminution in value of the Collateral, (iv) obtain and pay the premiums on insurance for the Collateral which any Loan Party fails to

maintain in accordance with the requirements of this Agreement and the other Loan Documents, and/or (v) pay the costs and expense desirable to preserve, protect, prepare for sale or lease or dispose of the Collateral or any portion thereof, to enhance the likelihood or maximize the amount of repayment by Loan Parties of the Obligations or to pay or to pay any other amount chargeable to the Loan Parties pursuant to the terms of this Agreement and the other Loan Documents (any such advance made pursuant to this Section, a "Protective Advance"). Protective Advances are repayable on demand and shall be secured by the Collateral and bear interest at a rate per annum equal to the rate then applicable to Term Loans.

Section 14.19    Subordination of Intercompany Indebtedness. Each holder of Intercompany Indebtedness (each a "Holder") and each issuer of Intercompany Indebtedness (each a "Maker") agrees with Lender as follows:

(a)    Subordination. The payment of principal, interest, fees and other amounts with respect to Intercompany Indebtedness is expressly subordinated to the Obligations.

(b)    Payments. If an Event of Default has occurred and is continuing and Agents have commenced enforcing remedies with respect to the Collateral, no Maker may make, and no Holder may take, demand, receive or accept, any payment with respect to Intercompany Indebtedness.

(c)    Payments Held in Trust. In the event any payment of principal or interest or distribution of property of any Maker on or in respect of Intercompany Indebtedness shall be received by any Holder in violation of this Section, such payment or distribution shall be held in trust for Agents, and such Holder will forthwith turn over any such payments in the form received, properly endorsed or assigned, to Agents.

(d)    Enforcement. No Holder shall be entitled to demand payment of or accelerate any Intercompany Indebtedness or to exercise any remedies or take any actions against any Maker to enforce any of such Holder's rights with respect to Intercompany Indebtedness.

(e)    Collateral. No Holder will ask, demand, accept, or receive any collateral security from any Loan Party for the payment of Intercompany Indebtedness, and any collateral security for the payment of Intercompany Indebtedness that any Holder may now or hereafter have on any property of any Loan Party is expressly subordinated to the Liens of Collateral Agent.

(f)    Attorney in Fact. Each Holder irrevocably authorizes and directs Collateral Agent and any trustee in bankruptcy, receiver, custodian or assignee for the benefit of creditors of any Maker, whether in voluntary or involuntary liquidation, dissolution or reorganization, in its behalf to take such action as may be necessary or appropriate to effectuate the subordination provided for in this Section and irrevocably appoints, which appointment is coupled with an interest, upon the occurrence and during the continuation of any Event of Default, Collateral Agent, or any such trustee, receiver, custodian or assignee, its attorneys in fact for such purpose with full powers of substitution and revocation.

(g)    Proof and Vote of Claims. Each Holder irrevocably appoints, which appointment is irrevocable and coupled with an interest, Collateral Agent as such Holder's true and lawful attorney, with full power of substitution, in the name of such Holder, Collateral Agent, for the sole use and benefit of Collateral Agent, to the extent permitted by Applicable Law, to prove and vote all claims relating to Intercompany Indebtedness, and to receive and collect all distributions and payments to which such Holder would be otherwise entitled on any liquidation of any Maker or any of its property or in any proceeding affecting any Maker or its property under the Bankruptcy Code.

(h)    No Interference. Each Holder agrees (i) not to take any action as the holder of

Intercompany Indebtedness that will impede, interfere with or restrict or restrain the exercise by Collateral Agent of its rights and remedies under the Loan Documents and (ii) upon the commencement of any proceeding under the Bankruptcy Code or other insolvency proceeding, to take such actions as the holder of Intercompany Indebtedness as may be reasonably necessary or appropriate to effectuate the subordination provided hereby. In furtherance thereof, each Holder, in its capacity as a holder of Intercompany Indebtedness, agrees not to oppose any motion filed or supported by Secured Parties for relief from stay or for adequate protection in respect of the Obligations and not to oppose any motions supported by Secured Parties for any Loan Party's use of Cash Collateral or post- petition borrowing from Lenders.

Section 14.20    Patriot Act Notice.    IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each Person that opens an account, including any deposit account, treasury management account, loan, other extension of credit, or other financial services product. What this means for each Loan Party: When a Loan Party opens an account, if such Loan Party is an individual, Lenders will ask for such Loan Party's name, residential address, date of birth, and other information that will allow Lenders to identify such Loan Party, and if such Loan Party is not an individual, Lenders will ask for such Loan Party's name, employer identification number, business address, and other information that will allow Lenders to identify such Loan Party. Lenders may also ask, if a Loan Party is an individual, to see such Loan Party's driver's license or other identifying documents, and if such Loan Party is not an individual, to see such Loan Party's legal organizational documents or other identifying documents.

Section 14.21    Press Releases and Related Matters.    Each Loan Party consents to the publication by Lender of customary advertising material relating to the transactions contemplated by this Agreement and the other Loan Documents, including on the website of Secured Parties or their Affiliates, using such Loan Party's name, product photographs, logo or trademark, subject to Collateral Agent's prior notice to such Loan Party of such advertising material.

Section 14.22    Conflict with Orders.    To the extent that any specific provision of this Agreement or the Loan Documents is inconsistent with the Orders, the Orders shall control.

Section 14.23.    Amendments and Waivers.    Neither this Agreement nor any other Loan Document, nor any terms hereof or thereof, may be amended, supplemented or modified except in accordance with the provisions of this Section 14.23. The Required Lenders may or, with the consent of the Required Lenders or the Administrative Agent, as applicable, may, from time to time, (a) enter into with the relevant Loan Party or written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Secured Parties or the Loan Parties hereunder or thereunder or (b) waive, on such terms and conditions as the Required Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; provided, that no such waiver, amendment, supplement or modification shall directly:

(i)    (A) reduce or forgive any portion of any Loan or extend the final expiration date of any Commitment of a Lender or extend the final scheduled maturity date of any Loan or reduce the stated interest rate (it being understood that only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrowers to pay interest at the Default Rate or amend Section 2.8(d),(B) reduce or forgive any portion or extend the date for the payment, of any interest or fee payable hereunder (other than as a result of waiving the applicability of any post-default increase in interest rates and other than as a result of a waiver or amendment of any mandatory prepayment of Term Loans (which shall not constitute an extension, forgiveness or postponement of any date for payment of principal, interest or fees)), (C) amend

or modify any provisions of this Agreement that provides for the *pro rata* nature of disbursements by or payments to Lenders or (D) subordinate, or permit the subordination of, any of the Loans to any other Indebtedness, in each case without the written consent of each Lender directly and adversely affected thereby;

        (ii)      amend, modify or waive any provision of this Section 14.23 or reduce the percentages specified in the definitions of the term "Required Lenders" or consent to the assignment or transfer by any Loan Party of its rights and obligations under any Loan Document to which it is a party (except as permitted pursuant to Section 7.03), in each case without the written consent of each Lender directly and adversely affected thereby;

        (iii)      increase the aggregate amount of any Commitment of any Lender without the consent of such Lender;

        (iv)      amend, modify or waive any provision of Article XIV applicable to an Agent without the written consent of such Agent; or release all or substantially all of the Guarantors or Collateral under Loan Document (except as expressly permitted thereby), in each case without the prior written consent of each Lender; provided, further, that without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default or Event of Default at the time.

        [Remainder of Page Intentionally Left Blank; Signature Page Follows]

THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

**BORROWERS**:
 

**ONE TABLE RESTAURANT OPERATIONS, LLC,**
a Delaware limited liability company
By:  One Table Restaurant Brands, LLC
Its:  Sole Member


By: _____
Name: Harald Herrmann
Title: Chief Executive Officer


**TENDER GREENS OPCO, LLC,**
a Delaware limited liability company
By:  One Table Restaurant Brands, LLC
Its:  Sole Member

By: _____
Name: Harald Herrmann
Title: Chief Executive Officer


**TOCAYA HOLDINGS LLC,**
a Nevada limited liability company


By: _____
Name: Harald Herrmann
Title: Authorized Signatory

**PARENT**:

**ONE TABLE RESTAURANT BRANDS, LLC,**
a Delaware limited liability company

By: _____
Name: Harald Herrmann
Title: Chief Executive Officer

**GUARANTORS:**

**TOCAYA MANAGEMENT LLC,**
a Nevada limited liability company

By: _____
Name: Harald Herrmann
Title: Authorized Signatory

**TOCAYA ORGANICA, LLC,**
a California limited liability company

By: _____
Name: Harald Herrmann
Title: Authorized Signatory

**TOCAYA SANTA MONICA LLC,**
a California limited liability company

By: _____
Name: Harald Herrmann
Title: Authorized Signatory

**TOCAYA VENICE LLC,**
a California limited liability company

By: _____
Name: Harald Herrmann
Title: Authorized Signatory

**TOCAYA TOLUCA, LLC**,
a California limited liability company

By: _____
Name: Harald Herrmann
Title: Authorized Signatory

**BLT STEAK LA LLC**,
a California limited liability company

By: _____
Name: Harald Herrmann
Title: Authorized Signatory

**TOCAYA SOUTH BAY, LLC**,
a California limited liability company

By: _____
Name: Harald Herrmann
Title: Authorized Signatory

**ADMINISTRATIVE AGENT AND COLLATERAL AGENT:**

**BREAKWATER MANAGEMENT LP**

By: _____
Name: Eric Beckman
Title: Managing Partner

**LENDER:**

**BREAKWATER CREDIT OPPORTUNITIES FUND II LP**

By: _____
Name: Eric Beckman
Title: Authorized Signatory

.

**LENDER:**                                                        **H&W IRREVOCABLE TRUST**

By: _____
Name: Cheryl Moore
Title: Trustee

**LENDER:**                                                        **2014 MSM IRREVOCABLE  TRUST**

By: _____
Name: Cheryl Moore
Title: Trustee

**LENDER:**                                                        **SCHUYLER AND DINA JOYNER REVOCABLE TRUST DATED 11/12/2003**

By: _____
Name: Schuyler C. Joyner
Title: Trustee

.

**Exhibit A**

<u>Commitments</u>

| Lender | Term Loan Commitment |
|---|---|
| BREAKWATER CREDIT OPPORTUNITIES FUND II LP | $2,758,129.02 |
| H&W Irrevocable Trust | $33,973.62 |
| 2014 MSM Irrevocable Trust | $201,791.25 |
| Schuyler and Dina Joyner Revocable Trust Dated 11/12/2003 | $6,106.11 |
| **TOTAL TERM LOAN COMMITMENT** | $3,000,000 |

.

**Exhibit B**

Notice of Borrowing


BREAKWATER MANAGEMENT LP
    as Administrative Agent
2121 Avenue of the Stars Suite 1150
Los Angeles, California 90067

    Ladies and Gentlemen:

This Notice of Borrowing is delivered to you as of _____ , 2024 pursuant to Section 2.3 of the Loan and Security Agreement, dated as of July 17, 2024 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Loan Agreement"), among, *inter alia*, **ONE TABLE RESTAURANT OPERATIONS, LLC**, a Delaware limited liability company ("Borrower Agent"), **TENDER GREENS OPCO, LLC**, a Delaware limited liability company ("New TG"), **TOCAYA HOLDINGS LLC**, a Nevada limited liability company ("Tocaya", together with One Table and New TG, collectively, the "Borrowers"), **ONE TABLE RESTAURANT BRANDS, LLC**, a Delaware limited liability company (the "Borrower Agent"), the Subsidiaries of Parent or Borrowers signatory thereto as guarantors or thereafter designated as Guarantors under the Loan Agreement, Breakwater Credit Opportunities Fund II LP and the other lenders from time to time party thereto (each a "Lender" and, collectively, the "Lenders") and **BREAKWATER MANAGEMENT LP**, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "Administrative Agent") and as collateral agent for the Secured Parties (in such capacity, together with its successors and assigns in such capacity, the "Collateral Agent", and together with the Administrative Agent, collectively, the "Agents" and each an "Agent"). Unless otherwise defined herein or the context otherwise requires, capitalized terms used herein shall have the meanings provided in the Loan Agreement.

    (1)    The Borrower Agent hereby requests that on _____, 2024[1]:

[check one below]:

        _____(a) a Borrowing as a Tranche in the aggregate principal amount of _____Dollars ($_____) as a _____ Loan[2]; and hereby certifies that the amount of the Initial Loan is $1,700,000; or

        _____(b) .a Borrowing of a Loan in the aggregate principal amount of _____ Dollars ($_____) as a _____ Loan.

    (2)    The Borrower Agent hereby acknowledges that, pursuant to Section 4.1 of the Loan Agreement, the acceptance by the Borrowers for the benefit of the Loan Parties of the proceeds of the Borrowing requested hereby constitutes a representation and warranty by the Borrowers, on behalf of each Loan Party, that, on the date of such Borrowing (both immediately before and after giving effect thereto and to the application of the proceeds thereof) all the statements set forth in Section 4.1 of the Loan

---

[1] This Notice of Borrowing shall be delivered prior to 11:00 a.m. (Pacific time) at least three (3) Business Days' prior to the date of Borrowing, except for the first Tranche of the Initial Loan.

[2] Insert SOFR or ABR in (a) or (b)

Agreement are true and correct.

(3)     The Borrower Agent hereby acknowledges that, pursuant to Section 4.2 of the Loan Agreement, the acceptance by the Borrowers for the benefit of the Loan Parties of the proceeds of the Borrowing (other than the Initial Loan or any Tranche requested hereby) constitutes a representation and warranty by the Borrowers, on behalf of each Loan Party, that, on the date of such Borrowing (both immediately before and after giving effect thereto and to the application of the proceeds thereof) all the statements set forth in Sections 4.1 and 4.2 of the Loan Agreement are true and correct.

(4)     The Borrower Agent agrees that if, prior to the time of the Borrowing requested hereby, any matter certified to herein by it will not be true and correct in all respects at the date of such Borrowing as if then made, it will immediately so notify the Administrative Agent.  Except to the extent, if any, that prior to the time of the Borrowing requested hereby, the Administrative Agent shall receive written notice to the contrary from the Borrower Agent, each matter certified to herein shall be deemed to be certified as true and correct at the date of such Borrowing.

(5)     Please wire transfer the proceeds of the Borrowing to the following account and financial institution:

| | |
|---|---|
| Bank Name: | [_____] |
| Bank Address: | [_____] |
| Account Name: | [_____] |
| Account No.: | [_____] |
| ABA No.: | [_____] |
| Attention: | [_____] |

*[Remainder of page left intentionally blank.]*

The Borrower Agent has caused this Notice of Borrowing to be executed and delivered as of the date first written above.

**ONE TABLE RESTAURANT BRANDS, LLC**, a Delaware limited liability company, as Borrower Agent

By: _____

Name: _____

Title: _____

**EXHIBIT C**

**SURETYSHIP PROVISIONS AND WAIVERS**

1.      <u>Waivers and Consents</u>.  Each Loan Party acknowledges that the liens created or granted herein will or may secure obligations of Persons other than such Loan Party and, in full recognition of that fact, each Loan Party consents and agrees that Lenders or Agents may, at any time and from time to time, without notice  or demand, and without affecting the enforceability or security hereof:

(a)      with the consent of any other Loan Party, supplement, modify, amend, extend, renew, accelerate, or otherwise change the time for payment or the terms of the Obligations or any part thereof, including any increase or decrease of the rate(s) of interest thereon, in each case in accordance with the applicable Loan Documents;

(b)      with the consent of any other Loan Party, supplement, modify, amend or waive, or enter into or give any agreement, approval or consent with respect to, the Obligations or any part thereof or any of the Loan Documents or any additional security or guaranties, or any condition, covenant, default, remedy, right, representation or term thereof or thereunder;

(c)      accept new or additional instruments, documents or agreements in exchange for or relative to any of the Loan Documents or the Obligations or any part thereof;

(d)      accept partial payments on the Obligations;

(e)      receive and hold additional security or guaranties for the Obligations or any part thereof;

(f)      release, reconvey, terminate, waive, abandon, subordinate, exchange, substitute, transfer and enforce any security or guaranties, and apply any security and direct the order or manner of sale thereof as Lender in its sole and absolute discretion may determine;

(g)      release any guarantor or any other Person from any personal liability with respect to the Obligations or any part thereof;

(h)      settle, release on terms satisfactory to Lenders or Agents or by operation of applicable laws or otherwise liquidate or enforce any Obligations and any security or guaranty therefor in any manner, consent to the transfer of any security and bid and purchase at any sale; and

(i)      consent to the merger, change or any other restructuring or termination of the corporate existence of any Loan Party, and correspondingly restructure the Obligations, and any such merger, change, restructuring or termination shall not affect the liability of such Loan Party or the continuing existence of any lien hereunder, under any other Loan Document to which such Loan Party is a party or the enforceability hereof or thereof with respect to all or any part of the Obligations.

Upon the occurrence of and during the continuance of any Event of Default, Lenders or Agents may enforce this Agreement independently of any other remedy or security Lenders or Agents at any time may have or hold in connection with the Obligations, and it shall not be necessary for Lenders or Agents to marshal assets in favor of any Loan Party or any other Person or to proceed upon or against and/or exhaust any other security or remedy before proceeding to enforce this Agreement.  Each Loan Party expressly waives, upon the occurrence of and during the continuance of any Event of Default, any right to require Agents to marshal assets in favor of such Loan Party or any other Person or to proceed against any other Person or any collateral provided by any other Person, and agrees that Lenders or Agents

may proceed against any Person and/or collateral in such order as it shall determine in its sole and absolute discretion. Lenders or Agents may file a separate action or actions against each Loan Party, whether action is brought or prosecuted with respect to any other security or any other Person, or whether any other Person is joined in any such action or actions. Each Loan Party agrees that Lenders or Agents and the other Loan Party and any other Person may deal with each other in connection with the Obligations or otherwise, or alter any contracts or agreements now or hereafter existing between any of them, in any manner whatsoever, all without in any way altering or affecting the security of this Agreement. Lenders' or Agents' rights hereunder shall be reinstated and revived, and the enforceability of this Agreement shall continue, with respect to any amount at any time paid on account of the Obligations which thereafter shall be required to be restored or returned by Lenders or Agents upon the bankruptcy, insolvency or reorganization of any Loan Party or any other Person or otherwise, all as though such amount had not been paid. The liens created or granted herein and the enforceability of this Agreement at all times shall remain effective to secure the full amount of all the Obligations including, without limitation, the amount of all loans and interest thereon at the rates provided for in this Agreement and the note(s) thereunder, even though the Obligations, including any part thereof or any other security or guaranty therefor, may be or hereafter may become invalid or otherwise unenforceable as against any Loan Party or any other  Person and whether or not any Loan Party or any other Person shall have any personal liability with respect thereto. Each Loan Party expressly waives any and all defenses now or hereafter arising or asserted by reason of (a) any disability or other defense of any other Loan Party or any other Person with respect to the Obligations, (b) the unenforceability or invalidity of any other security or guaranty for the Obligations or the lack of perfection or continuing perfection or failure of priority of any other security  for the Obligations, (c) the cessation for any cause whatsoever of the liability of any other Loan Party or any other Person (other than by reason of the full payment and performance of all Obligations), (d) any failure of Lenders or Agents to marshal assets in favor of any Loan Party or any other Person, (e) except as otherwise provided in this Agreement, any failure of Lenders or Agents to give notice of sale or other disposition of collateral  to any Loan Party or any other Person or any defect in any notice that may be given in connection with any sale or disposition of collateral, (f) except as otherwise provided in this Agreement, any failure of Lenders or Agents to comply with applicable laws in connection with the sale or other disposition of any Collateral  of any other Loan Party or other security of any other Loan Party for any Obligation, including, without limitation, any failure of Lenders or Agents to conduct a commercially reasonable sale or other disposition of any Collateral of any other Loan Party or other security of any other Loan Party for any Obligation, (g) any act or omission of Lenders or Agents or others that directly or indirectly results in or aids the discharge or release of any other Loan Party or any other Person or the Obligations or any other security or guaranty therefor by operation of law or otherwise, other than through the gross negligence or willful misconduct of Lenders or Agents, (h) any law which provides that the obligation of a surety or guarantor must neither be larger in amount nor in other respects more burdensome than that of the principal or which reduces a surety's or  guarantor's obligation in proportion to the principal obligation, (i) any failure of Lenders or Agents to file or enforce  a claim in any bankruptcy or other proceeding with respect to any Person, (j) the election by Lenders or Agents, in any bankruptcy proceeding of any Person, of the application or non-application of Section 1111(b)(2) of the United States Bankruptcy Code, (k) any extension of credit or the grant of any lien under Section 364 of the United States Bankruptcy Code, (l) any use of Cash Collateral under Section 363 of the United  States Bankruptcy Code, (m) any agreement or stipulation with respect to the provision of adequate protection in any bankruptcy proceeding of any Person, (n) the avoidance of any lien in favor of Lenders or Agents for any reason (other than the avoidance of the lien granted pursuant to this Agreement), (o) any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, liquidation or dissolution proceeding commenced by or against any Person, including any discharge of, or bar or stay against collecting, all or any of the Obligations (or any interest thereon) in or as a result of any such proceeding, or (p) to the extent permitted, the benefits of any form of one-action rule.  Except as provided herein, each Loan Party expressly waives all setoffs and counterclaims and all presentments, demands for payment or performance, notices of nonpayment or

nonperformance, protests, notices of protest, notices of dishonor and all other notices or demands of any kind or nature whatsoever with respect to the Obligations, and all notices of acceptance of this Agreement or of the existence, creation or incurring of new or additional Obligations, except for those arising from or relating to the gross negligence or willful misconduct of Lenders or Agents.

2.      <u>Condition of Other Loan Parties</u>.  Each Loan Party represents and warrants to Lenders or Agents that such Loan Party has established adequate means of obtaining from the other Loan Parties, on a continuing basis, financial and other information pertaining to the business, operations and condition (financial and otherwise) of the other Loan Parties and their assets, and each Loan Party now is and hereafter will be completely familiar with the business, operations and condition (financial and otherwise) of the other Loan Parties and their assets.  Each Loan Party hereby expressly waives and relinquishes any duty on the part of Lenders or Agents to disclose to such Loan Party any matter, fact or thing related to the businesses, operations or condition (financial or otherwise) of the other Loan Parties and their assets, whether now known or hereafter known by Lender during the life of this Agreement. With respect to any of the Obligations, Lenders or Agents need not inquire into the powers of any Loan Party, or the officers or employees acting or purporting to act on its behalf, and all Obligations made or created in good faith reliance upon the professed exercise of such powers shall be secured hereby.

3.      <u>Waiver of Rights of Subrogation</u>.  Until no part of any commitment of Lenders to lend to Borrower remains outstanding and all of the Obligations have been paid and performed in full, notwithstanding anything to the contrary elsewhere contained herein or in any other Loan Document to which each Loan Party is a party, each Loan Party hereby waives with respect to the other Loan Parties, their successors and assigns (including any surety) and any other Person any and all rights at law or in equity, to subrogation, to reimbursement, to exoneration, to indemnity, to contribution, to setoff or to any other rights that could accrue to a surety against a principal, to a guarantor against a maker or obligor, to an accommodation party against the party accommodated, or to a holder or transferee against a maker and which any Loan Party may have or hereafter acquire against any other Loan Party in connection with or  as a result of such Loan Party's execution, delivery and/or performance of this Agreement or any other Loan Document to which each Loan Party is a party.  Until no part of any commitment of Lenders to lend to Borrowers remains outstanding and all of the Obligations have been paid and performed in full, each Loan Party agrees that it shall not have or assert any such rights against any other Loan Party or its successors and assigns or any other Person (including any surety) which is directly or indirectly a creditor of any other Loan Party or any surety for any other Loan Party, either directly or as an attempted setoff to any action commenced against any Loan Party by any other Loan Party (as a borrower or in any other capacity) or any other Person.  Each Loan Party hereby acknowledges and agrees that this waiver is intended to benefit Lenders or Agents and shall not limit or otherwise affect each Loan Party's liability hereunder, under any other Loan Document to which any Loan Party is a party, or the enforceability hereof or thereof.  Until no part of any commitment of Lenders to lend to Borrowers remains outstanding and all of the Obligations have been paid and performed in full, each Loan Party expressly waives any right to enforce any remedy that Lenders or Agents now has or hereafter may have against any other Person and waives the benefit of, or any right to participate in, any other security now or hereafter held by Lender.

4.      <u>Liens on Real Property</u>.  In the event that all or any part of the Obligations at any time are secured by any one or more deeds of trust or mortgages or other instruments creating or granting liens on any interests in real property, each Loan Party authorizes Lenders or Agents, upon the occurrence of and during the continuance of any Event of Default, at their sole option, without notice or demand and without affecting any obligations of any Loan Party hereunder and under the other Loan Documents, the enforceability of this Agreement, or the validity or enforceability of any liens of Lenders or Agents on any collateral, to foreclose any or all of such deeds of trust or mortgages or other instruments by judicial or nonjudicial sale.  Each Loan Party expressly waives all rights defenses that each Loan Party may have if the Obligations become secured by real property.  This means, among other things, that Lenders or

Agents may collect from any Loan Party without first foreclosing on any real or personal property pledged by any Loan Party, and that if Lenders or Agents foreclose on any real property collateral pledged by any Loan Party, the amount of the Obligations may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if that collateral is worth more than the sale price, and that Lenders or Agents may collect from any Loan Party even if Lenders or Agents, by foreclosing on the real property collateral, has destroyed any right any Loan Party may have to collect from any other Loan Party.  This is an unconditional and irrevocable waiver of any rights and defenses each Loan Party may have if the Obligations become secured by real property.  These rights and defenses include, but are not limited to, any rights or defenses based upon California Code of Civil Procedure §§ 580a, 580b, 580d or 726, or comparable provisions of the laws of any other jurisdiction, and all other suretyship defenses each Loan Party otherwise might or would have under California law or other applicable law.  Further, each of the Loan Parties waive all rights and defenses arising out of an election of remedies by Lenders or Agents, even though that election of remedies, such as nonjudicial foreclosure with respect to security for the Obligations, has destroyed any Loan Party's rights of subrogation and reimbursement against any other Loan Party by the operation of California Code of Civil Procedure § 580d or otherwise. Each Loan Party expressly waives any right to receive notice of any judicial or nonjudicial foreclosure or sale of any real property or interest therein subject to any such deeds of trust or mortgages or other instruments and each Loan Party's failure to receive any such notice shall not impair or affect each Loan Party's obligations hereunder and under the other Loan Documents or the enforceability of this  Agreement or any liens created or granted hereby.

5.    <u>Waiver of Discharge</u>.  Without limiting the generality of the foregoing, each Loan Party hereby waives discharge by waiving all defenses based on suretyship or impairment of collateral.

6.    <u>Understandings with Respect to Waivers and Consents</u>.  Each Loan Party warrants and agrees that each of the waivers and consents set forth herein is made after consultation with legal counsel and with full knowledge of its significance and consequences, with the understanding that events giving rise to any defense or right waived may diminish, destroy or otherwise adversely affect rights which any Loan Party otherwise may have against any other Loan Party, Lenders or Agents or others, or against collateral, and that, under the circumstances, the waivers and consents herein given are reasonable and not contrary to public policy or law.  If any of the waivers or consents herein are determined to be contrary to any applicable  law or public policy, such waivers and consents shall be effective to the maximum extent permitted by law.

SCHEDULE 5.1(a)

ORGANIZATION; POWER; QUALIFICATION

SCHEDULE 5.1(c)

<u>SUBSIDIARIES, PARENTS AND AFFILIATES; CAPITALIZATION</u>

SCHEDULE 5.1(i)

DEBT AND GUARANTEES

SCHEDULE 5.1(j)

<u>LITIGATION</u>

SCHEDULE 5.1(m)

<u>ERISA</u>

SCHEDULE 5.1(p)

<u>LOCATIONS OF INVENTORY AND EQUIPMENT</u>

SCHEDULE 5.1(q)

<u>PLACE OF BUSINESS</u>

SCHEDULE 5.1(r)

<u>CORPORATE AND FICTITIOUS NAMES; TRADE NAMES</u>

SCHEDULE 5.1(s)

<u>INTELLECTUAL PROPERTY</u>

SCHEDULE 5.1(w)

<u>DEPOSIT ACCOUNTS</u>

SCHEDULE 9.3

<u>PERMITTED INDEBTEDNESS</u>

SCHEDULE 9.4

<u>PERMITTED LIENS</u>

**Exhibit 2**

**Budget**

**Debtor-In-Possesion ("DIP") Budget**

One Table Restaurant Brands

Amounts in USD

| | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Week # | *Post* | *Post* | *Post* | *Post* | *Post* | *Post* |
| | 2024 | 2024 | 2024 | 2024 | 2024 | 2024 |
| | Week Ending | Week Ending | Week Ending | Week Ending | Week Ending | Week Ending |
| | **7/23/2024** | **7/30/2024** | **8/6/2024** | **8/13/2024** | **8/20/2024** | **8/27/2024** |
| | **Forecast** | **Forecast** | **Forecast** | **Forecast** | **Forecast** | **Forecast** |
| **Total Revenue** | **2,116,975** | **2,116,975** | **2,173,117** | **2,173,117** | **2,173,117** | **2,173,117** |
| **Operating Cash Flows:** | | | | | | |
| Company Store Net Sales | 1,924,379 | 1,924,379 | 1,966,226 | 1,966,226 | 1,966,226 | 1,966,226 |
| Sales Tax Collections | 117,698 | 117,698 | 113,432 | 113,432 | 113,432 | 113,432 |
| Employee Tips | 96,748 | 96,748 | 99,240 | 99,240 | 99,240 | 99,240 |
| Other Floats (Olo, Employee Deductions) | 25,000 | 37,500 | 25,000 | 37,500 | 25,000 | 37,500 |
| **Total Operating Receipts** | **2,163,824** | **2,176,324** | **2,203,898** | **2,216,398** | **2,203,898** | **2,216,398** |
| **Disbursements - Personnel and Benefits:** | | | | | | |
| Payroll (Wages, Taxes, Benefits and Tips) | - | 1,458,244 | - | 1,499,189 | - | 1,590,134 |
| **Total Personnel and Benefits** | **-** | **1,458,244** | **-** | **1,499,189** | **-** | **1,590,134** |
| **Disbursements - COGS and Operating Expense:** | | | | | | |
| Accounts Payable | 265,000 | 265,000 | 265,000 | 895,721 | 895,721 | 895,721 |
| Accounts Payable - Critical Payments | 1,210,000 | 1,210,000 | - | - | - | - |
| Occupancy | - | - | 1,200,000 | - | - | - |
| Insurance | 103,065 | 205,329 | 20,000 | - | 103,065 | 5,000 |
| Property Tax | - | - | - | - | 223,536 | - |
| Sales Tax Remittances | 317,844 | - | - | - | - | 520,319 |
| Olo Fee Payment | - | - | - | - | 125,000 | - |
| Maintenance Capex | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 |
| Amex Payment | - | - | 20,000 | 10,000 | 30,000 | - |
| **Total COGS and Operating Expense** | **1,903,409** | **1,687,829** | **1,512,500** | **913,221** | **1,384,823** | **1,428,540** |
| **Total Operating Disbursements** | **1,903,409** | **3,146,073** | **1,512,500** | **2,412,410** | **1,384,823** | **3,018,674** |
| **Cash Flows from (used in) Operations** | **260,415** | **(969,749)** | **691,398** | **(196,013)** | **819,075** | **(802,276)** |
| **Cumulative Cash from (Used in) Operations** | **260,415** | **(709,334)** | **(17,936)** | **(213,948)** | **605,127** | **(197,149)** |
| **Other Disbursements (Sources)** | | | | | | |
| Other Accounts Receivable | - | (50,000) | - | - | - | - |
| **Cash Flows from (source) Other Activities** | **-** | **(50,000)** | **-** | **-** | **-** | **-** |
| **Financing & Other Cash Flows:** | | | | | | |
| Cash Infusion (Employee Retention Credits, Etc.) | - | - | - | - | - | (375,800) |
| **Cash Flows from (source) Financing Activities** | **-** | **-** | **-** | **-** | **-** | **(375,800)** |
| **Bankruptcy-Related Disbursements** | | | | | | |
| Fees, DIP Loan [TBD]----> | 99,000 | - | - | - | - | - |
| Professional Fees, Restructuring | 107,275 | 107,275 | 226,000 | 190,000 | 101,220 | 101,220 |
| Utility Deposit | - | 125,000 | - | - | - | - |
| **Total Bankruptcy Related Disbursements** | **206,275** | **232,275** | **226,000** | **190,000** | **101,220** | **101,220** |
| **Net Cash Flow** | **54,140** | **(1,152,024)** | **465,398** | **(386,013)** | **717,855** | **(527,696)** |
| **Cumulative Net Cash Flow (Usage)** | **54,140** | **(1,097,884)** | **(632,486)** | **(1,018,498)** | **(300,643)** | **(828,339)** |
| **Cash Balance** | | | | | | |
| Beginning Balance | $557,444 | $2,311,584 | $1,159,561 | $1,624,958 | $1,238,946 | $1,956,801 |
| Cumulative Net Cash Source (Use) | 54,140 | (1,152,024) | 465,398 | (386,013) | 717,855 | (527,696) |
| DIP Funding (1) | 1,700,000 | - | - | - | - | - |
| **Ending Cash** | **$2,311,584** | **$1,159,561** | **$1,624,958** | **$1,238,946** | **$1,956,801** | **$1,429,105** |
| **Interim DIP Commitment** | | | | | | |
| Beginning Balance / Commitment | $0 | $1,700,000 | $1,700,000 | $1,700,000 | $1,700,000 | $1,700,000 |
| Draw / Commitment | 1,700,000 | | | | | |
| **Ending Balance Commitment:** | **$1,700,000** | **$1,700,000** | **$1,700,000** | **$1,700,000** | **$1,700,000** | **$1,700,000** |

(1) Note, DIP shall be drawn as needed.

**Debtor-In-Possesion ("DIP") Budget**
**Paid professional fees and expenses, summary**

| ($ in thousands) | 2 7/23 Post | 3 7/30 Post | 4 8/6 Post | 5 8/13 Post | 6 8/20 Post | 7 8/27 Post |
|---|---|---|---|---|---|---|
| **Company professionals** | | | | | | |
| Company lead counsel | $50 | $50 | $50 | $50 | $50 | $50 |
| Financial advisor | 57 | 57 | 31 | 30 | 31 | 31 |
| Investment banker | - | - | - | 25 | - | - |
| Claims agent | - | - | - | 65 | - | - |
| U.S. Trustee | - | - | - | - | - | - |
| Consumer Privacy (TBD) | - | - | - | - | - | - |
| Independent Board Member | - | - | - | - | - | - |
| Lease Negotiator | - | - | - | - | - | - |
| Total company professionals | $107 | $107 | $81 | $170 | $81 | $81 |
| **Lender professionals** | | | | | | |
| Lender lead counsel | - | - | 125 | - | - | - |
| Lender financial advisor | - | - | - | - | - | - |
| Total lender professionals | $0 | $0 | $125 | $0 | $0 | $0 |
| **Unsecured Creditors' Committee professionals** | | | | | | |
| Unsecured Creditors' Committee l | - | - | 15 | 15 | 15 | 15 |
| Unsecured Creditors' Committee f | - | - | 5 | 5 | 5 | 5 |
| Total Unsecured Creditors' Com | $0 | $0 | $20 | $20 | $20 | $20 |
| **GRAND TOTAL PROFESSIO** | **$107** | **$107** | **$226** | **$190** | **$101** | **$101** |

\* All company professionals' retai

1,896

*Month*          *May-24   May-24   Jun-24   Jun-24   Jun-24   Jun-24*