## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | Chapter 11 |
| | Case No. 24-11553 (KBO) |
| ONE TABLE RESTAURANT BRANDS, LLC, *et al.*,[1] | (Jointly Administered) |
| Debtors. | **Hearing Date:  TBD** |
| | **Objection Deadline:  TBD** |

**DEBTORS' MOTION FOR ENTRY OF ORDERS: (I) (A) APPROVING BIDDING PROCEDURES AND PROTECTIONS IN CONNECTION WITH A SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) AUTHORIZING THE DEBTORS TO DESIGNATE A STALKING HORSE BID; (C) SCHEDULING AN AUCTION AND SALE HEARING; (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (E) APPROVING PROCEDURES RELATED TO ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND LEASES;  (II) (A) AUTHORIZING SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS PURSUANT TO SUCCESSFUL BIDDER(S)' ASSET PURCHASE AGREEMENT(S), FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; AND (B) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND LEASES; AND (III) GRANTING <u>RELATED RELIEF</u>**

The above-captioned debtors and debtors-in-possession (collectively, the "<u>Debtors</u>") of the

above-captioned jointly administered chapter 11 cases (the "<u>Cases</u>"), by their undersigned counsel,

hereby move (the "<u>Motion</u>") this Court for entry of orders granting the relief described herein. In

support of the Motion, the Debtors rely upon the *Declaration of Harald Herrmann in Support of*

---

[1] The Debtors in these Cases, along with the last four (4) digits of their federal tax identification numbers, are: (1) One Table Restaurant Brands, LLC, a Delaware limited liability company (9853); (2) One Table Restaurant Operations, LLC, a Delaware limited liability company (7280), (3) Tender Greens OpCo, LLC, a Delaware limited liability company (7827); (4) Tocaya Holdings LLC, a Nevada limited liability company (8815); (5) Tocaya Organica, LLC, a California limited liability company (6720); (6) Tocaya Management, LLC, a Nevada limited liability company (6789); (7) BLT Steak LA LLC, a California limited liability company (4688); (8) Tocaya Venice LLC, a California limited liability company (0159); (9) Tocaya South Bay LLC, a California limited liability company (0401); (10) Tocaya Toluca LLC, a California limited liability company; and (11) Tocaya Santa Monica LLC, a California limited liability company (8134).  The Debtors' mailing address is: 1201 W. 5th Street, Suite T-400, Los Angeles, CA 90017.

*First Day Pleadings* (the "First Day Declaration") [D.I. 13] and the Declaration of Richard Klein filed concurrently herewith (the "Klein Declaration").

## INTRODUCTION AND SUMMARY

1.      The Debtors operate two restaurant brands – the "farm-to-fork" concept, Tender Greens, and the modern Mexican eatery, Tocaya.

2.      As set forth in greater detail in the First Day Declaration, the Debtors have faced significant business and macroeconomic challenges since combining in August 2021 (the "Combination").

3.      Due to the cumulative effect of such challenges, the Debtors diligently explored their out-of-court restructuring options by initiating a formal, prepetition marketing and sale process. While the Debtors' prepetition marketing and sale process resulted in two proposals for certain of their assets, neither proposal provided a solution for the Debtors' liabilities that would ensure viability of the remaining business.

4.      Faced with a declining cash position and the prospect of shutting their doors, the Debtors were unable to continue exploring out-of-court resolutions and commenced these Cases to preserve jobs and the going concern of their businesses while they engage in a substantial post-petition marketing and sale process.

5.      In furtherance of their efforts to market and sell the businesses as a going concern, in June 2024, the Debtors engaged Hilco Corporate Finance ("Hilco") as their proposed investment banker to market and sell substantially all of the Debtors' assets (the "Assets").

6.      Concurrent with the ongoing marketing of the Assets, the Debtors are negotiating a Stalking Horse Agreement (defined below) with their prepetition lender who is also providing postpetition financing, Breakwater Management LP (together with its affiliates, "Breakwater").

7.    The Debtors now file this Motion to run a robust marketing and sale process that will maximize value for the Debtors' creditors and other parties in interest.

## RELIEF REQUESTED

8.    First, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"):

a.    Authorizing and approving the bidding procedures relating to the sale of the Assets (the "Bidding Procedures") attached as **Exhibit 1** to the Bidding Procedures Order;

b.    Authorizing the Debtors to enter into one or more "stalking horse" agreements (each, a "Stalking Horse Agreement"), which may include bid protections, with potential bidders (each, a "Stalking Horse Bidder") for the purpose of establishing a minimum acceptable bid for the Assets (a "Stalking Horse Bid"), and approving the procedures related thereto (the "Stalking Horse Procedures");

c.    Scheduling the Auction and the Sale Hearing (defined below);

d.    Approving the form and manner of notice of the Auction and Sale Hearing (the "Sale Notice") attached as **Exhibit 2** to the Bidding Procedures Order;

e.    Approving the procedures (the "Assumption and Assignment Procedures") related to the assumption and assignment of executory contracts and unexpired leases (collectively, the "Contracts"), and the Assumption and Assignment Notice (defined below) attached as **Exhibit 3** to the Bidding Procedures Order; and

f.    Granting related relief.

9. Second, upon the Sale Hearing, the Debtors seek entry an order (the "Sale Order"):

    a. Authorizing the sale of the Assets free and clear of liens, claims, encumbrances, and interests, except as set forth in the Successful Bidder(s)' (defined below) asset purchase agreement(s);

    b. Authorizing the assumption and assignment of certain Contracts to be assumed and assigned in connection with the proposed sale of the Assets to the Successful Bidder (the "Assigned Contracts"); and

    c. Granted related relief.

## JURISDICTION AND VENUE

10. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (M), (N), and (O) and the Debtors confirm their consent pursuant to Rule 9013-l(f) of the Local Rules of Bankruptcy Procedure of the United States Bankruptcy Court District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

11. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

12. The statutory predicates for the relief requested herein are (i) sections 105, 363, 365 and 503 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), (ii) Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and (iii) Local Rules 2002-1 and 6004-1.

# BACKGROUND

## A.  The Chapter 11 Cases

13.     On July 17, 2024, the Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Petition Date").

14.     The Debtors are continuing in possession of their property, and operating and managing their businesses, as debtors in possession pursuant to Sections 1107 and 1108. No trustee or examiner has been appointed in these Cases.  On August 2, 2024, the U.S. Trustee appointed an official committee of unsecured creditors (the "Committee").

15.     A more detailed description of the Debtors' background, structure, operations and recent financial history is contained in the First Day Declaration.

## B.  Prepetition Sale Process

16.     As set forth in the First Day Declaration, the Debtors diligently explored out-of-court restructuring options prior to the commencement of these Cases.

17.     In late 2022, the Debtors engaged North Point Advisors ("North Point") and ran a formal sales process to market the businesses.

18.     North Point built a confidential information memorandum and data room which it shared with various prospective buyers.

19.     As part of the Debtors' prepetition sale process, North Point contacted over 36 potential buyers, 22 of which signed non-disclosure agreements.

20.     While the Debtors did receive two proposals for purchases of certain of their assets, neither proposal provided a solution for the Debtors' liabilities that would ensure the viability of the remaining business, and the Debtors did not have enough cash to continue operating while exploring out-of-court resolutions.

21.     Thus, the Debtors determined that the only way to preserve the going concern of their businesses, over one thousand jobs, and the value of their assets was to commence these Cases in order to run a robust postpetition marketing and sale process.

22.     On June 25, 2024, the Debtors engaged Hilco as their investment banker to market and sell the Assets both before and during the Cases.

23.     Leading up to the Petition Date, the Debtors worked with Hilco to prepare an active prepetition and postpetition marketing process to identify strategic and financial parties as potential bidders for the Assets or any portion thereof.

24.     Hilco has already contacted more than 500 parties and has actively engaged with at least 21 parties to date. Hilco expects that the Debtors' proposed sale process will identify more interested parties and drive additional interest in the Assets.

## C.     **Breakwater**

### **Prepetition Lender**

25.      As part of the Combination, on July 23, 2021, Debtors One Table Restaurant Operations, LLC, Tender Greens OpCo, LLC, and Tocaya Holdings LLC entered into a credit agreement (as amended from time to time, the "Prepetition Credit Agreement") for a $28 million senior secured term loan credit facility (together, subsequent loans under the Prepetition Credit Agreement, the "Prepetition Loans") with Debtor One Table Restaurant Brands, LLC ("OTRB") as parent, each of the subsidiaries of OTRB as guarantors, Breakwater as administrative agent and collateral agent, and the following five lenders: (1) Breakwater Credit Opportunities Fund II LP; (2) H&W Irrevocable Trust; (3) Randall Capital Group, LLC; (4) 2014 MSM Irrevocable Trust; and (5) Schuyler and Dina Joyner Revocable Trust Dated 11/12/2003 (collectively, the "Prepetition Lenders").

26.     Concurrently with the Prepetition Credit Agreement, the parties entered into a security agreement, guarantee agreement, and certain control agreements which granted Breakwater, for the benefit of the Prepetition Lenders, a first priority security interest in all of the assets of the Debtors.

27.     The Prepetition Loans have a variable interest rate based on the secured overnight financing rate plus a margin of 9.6%.  Currently, the interest rate is 15.9% and interest payments total roughly $4.5 million annually.

28.     As of the Petition Date, approximately $28.8 million remains outstanding under the Prepetition Loans, plus accrued and unpaid interest, fees and expenses.

**DIP Lender**

29.     In order to obtain the use of necessary funds to maintain their operations during the pendency of these Cases and the Debtors' postpetition marketing and sale process, the Debtors and Breakwater (in such capacity, the "DIP Lender") entered into that certain Senior Secured Super-Priority Priming Debtor-In-Possession Loan and Security Agreement (the "DIP Credit Agreement," and with related documents, the "DIP Documents").

30.     Among other things, the DIP Credit Agreement provides for: (1) the provision of up to $3,000,000.00 in debtor-in-possession financing from the DIP Lender; (2)  a roll-up of the Prepetition Loan on a 4:1 ratio; (3) certain releases of the DIP Lender, their affiliates and others; and (4) certain milestones (the "Milestones") that must be met by the Debtors in order to avoid a default under the DIP Credit Agreement, the most relevant of such Milestones to this Motion being:

        a.     The Debtors shall have filed a motion to sell all or substantially all of the Debtors' assets through a sale pursuant to section 363 of the Bankruptcy Code in form and substance reasonably acceptable to the DIP Lender by no later than fifteen (15) days after the Petition Date.

b.      The Court shall have entered an order approving the bidding procedures of the sale contemplated by the such motion by the date that is no later than 45 days after the Petition Date.

c.      The Bankruptcy Court shall have entered an order approving the sale by the date that is no later than 75 days after the Petition Date.

d.      The sale shall be consummated by the date that is no later than 14 days after the Court has entered its order approving the Sale.

31.      On July 19, 2024, the Court approved the DIP Credit Agreement on an interim basis, interim funding in the amount of $1,700,000, and an initial roll-up of $6,800,000.00 [D.I. 64].  The Court set a final hearing for August 13, 2024.

32.      Significantly, the DIP Credit Agreement provides that Breakwater (in its capacity as DIP Lender) may credit bid up to the full amount of all of the obligations owed by the Debtors under the Prepetition Loan and DIP Credit Agreement (the "Obligations") in the event of a sale of the Debtors' businesses.

33.      The Debtors and Breakwater are currently negotiating a  Stalking Horse Agreement which contemplates such credit bid, the assumption of certain executory contracts and unexpired leases, and the designation of an entity identified by Breakwater as the Stalking Horse Bidder for the Assets.

**D.      The Bidding Procedures**

34.      In order to ensure that the Debtors receive the maximum value for their Assets, the Debtors will market their Assets and conduct a fair and open Auction subject to the Bidding Procedures set forth as **Exhibit 1** to the Bidding Procedures Order.

35.      Concurrently with this Motion, the Debtors have filed a motion for order shortening the notice period of this Motion (the "Motion to Shorten") which requests that the Bidding

Procedures Hearing be held on shortened notice. As set forth in further detail in the Motion to

Shorten, it is imperative that the Bidding Procedures be approved as soon as practicable in order

to comply with the Milestones, to avoid default under the DIP Credit Agreement, and to preserve

the value of the Assets.

36.    Pursuant to and in accordance with Local Rule 6004-1(c), the material provisions

of the Bidding Procedures are as follows:[2]

| **Provisions Governing Qualification of Bidders and Qualified Bids** Local Rule 6004-1(c)(i)(A)-(B) | Each person or entity that desires to participate in the Auction process (each, a "<u>Prospective Bidder</u>") and seeks access to the Data Room must first deliver the following: A.    An executed confidentiality agreement in form and substance satisfactory to the Debtors (unless such party is already a party to an existing confidentiality agreement with the Debtors that is acceptable to the Debtors for this due diligence process, in which case such agreement shall govern); and B.    Sufficient information to allow the Debtors to determine that the interested party intends to access the Data Room for a bona fide purpose consistent with these Bidding Procedures and that such Prospective Bidder has the financial and managerial wherewithal to submit a Qualified Bid and to consummate the sale transaction(s) contemplated thereby. To qualify as a "<u>Qualified Bid</u>," a Bid must be in writing and determined by the Debtors to satisfy the following requirements: 1.    <u>Identification of Bidder</u>. A Qualified Bid must fully disclose the following: (a) the legal identity of each person or entity bidding for the applicable Assets and/or otherwise sponsoring, financing (including through the issuance of debt in connection with such Bid) or participating in (including through license or similar arrangement with respect to the Assets to be acquired in connection with such Bid) the Auction in connection with such Bid and the complete terms of any such participation; and (b) any past or present connections or agreements with the Debtors or their non- |
|---|---|

---

[2] The below is merely a summary of the terms of the Bidding Procedures. In the event of a conflict between the below summary and the language of the Bidding Procedures, the Bidding Procedures shall control. All capitalized terms used in this summary but not defined herein shall have the meanings ascribed to them in the Bidding Procedures.

Debtor affiliates, the DIP Lender, any other known Prospective Bidder or Qualified Bidder, or any officer or director of any of the foregoing (including any current or former officer or director of the Debtors or their non-Debtor affiliates).

2.      Purchased Assets. A Qualified Bid must identify the following:

    a. the Assets to be purchased (including any then-known executory contracts and unexpired leases) such Prospective Bidder wishes to bid on.

    b. the liabilities (including applicable Cure Costs if any, to be assumed by the Prospective Bidder in the Sale Transaction), including any debt to be assumed; and

    c. if a Bid is for less than the entire business, an allocation of the purchase price across the individual desired Assets.

3.      Form of Consideration.

    a. Credit Bidding. Pursuant to the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing and Use Cash Collateral; (II) Granting Priming and Other Liens and Super-priority Claims and Adequate Protection; (III) Modifying the Automatic Stay; and (IV) Scheduling a Final Granting Related Relief* [D.I. 64] (the "Interim DIP Order"), the Prepetition Lenders and DIP Lender, or their designees, shall have the unqualified right at any time to credit bid on a dollar-for-dollar basis up to the full amount of the Obligations in accordance with Section 363(k) of the Bankruptcy Code. The DIP Lender and Prepetition Lenders shall not be prohibited from making such any such credit bid "for cause" under Section 363(k) of the Bankruptcy Code. Moreover, any Bid submitted by the DIP Lender or Prepetition Lender shall be deemed to be a Qualified Bid, notwithstanding the requirements in these Bidding Procedures that a Bid must

satisfy to be a Qualified Bid. For the avoidance of doubt, the DIP Lender and Prepetition Lenders shall be considered Qualified Bidders and shall not be required to provide Good Faith Deposit.

b.     Form of Consideration and Allocation. A Qualified Bid must propose a purchase price payable in cash and specified assumed liabilities. Bids proposing a purchase price other than in cash shall not be Qualified Bids.

4.     Proposed Asset Purchase Agreement and Sale Order: A Qualified Bid must constitute a binding and irrevocable offer and be in the form of an asset purchase agreement reflecting the terms and conditions of the Bid (each, a "Proposed Asset Purchase Agreement"). A Proposed Asset Purchase Agreement shall: (a) be duly authorized and executed; (b) be based on, and marked against the applicable Stalking Horse Agreement (if any) or such other form purchase agreement provided by the Debtors to reflect the proposed Sale Transaction and to show any other proposed modifications to the form purchase agreement; (c) specify the proposed purchase price for the applicable Assets; and (d) identify any then-known Assigned Contracts proposed for or that may be proposed for assumption and assignment in connection with the proposed Sale Transaction.

5.     Financial Information. A Qualified Bid must include the following:

a.     a statement that the Prospective Bidder is financially capable of timely consummating the Sale Transaction contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement;

b.     sufficient evidence, as reasonably determined by the Debtors (in consultation with the Consultation Parties), to determine that the Prospective Bidder has, or can obtain, the financial wherewithal to timely consummate the Sale Transaction contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement.

c.    Adequate Assurance Information with respect to any Contracts included or that may be included in the Prospective Bidder's Bid.

6.    <u>Good Faith Deposit</u>. Each Qualified Bid must be accompanied by a good faith deposit (each, a "<u>Good Faith Deposit</u>") in the form of cash (or other form acceptable to the Debtors in their sole discretion after consultation with the Consultation Parties) in an amount equal to ten percent (10%) of the proposed purchase price for the Assets. All Good Faith Deposits shall be deposited into a trust account maintained on behalf of the Debtors (and to be designated by Debtors) and handled in accordance with these Bidding Procedures. To the extent a Qualified Bidder increases the purchase price before, during, or after the Auction, the Debtors reserve the right after consultation with the Consultation Parties to require that such Qualified Bidder adjust its Good Faith Deposit so that it equals ten percent (10%) of the increased purchase price. The Debtors reserve the right after consultation with the Consultation Parties to increase or decrease the Good Faith Deposit for one or more Qualified Bidders in their sole discretion, provided, the Debtors may not decrease or waive any Good Faith Deposit without consulting with the Consultation Parties.

7.    <u>Adequate Assurance</u>. A Qualified Bid must include evidence of the Prospective Bidder's (or any other relevant assignee's) ability to comply with Section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Prospective Bidder's (or any other relevant assignee's) ability to perform future obligations arising under any Assigned Contracts included in its Bid. The Debtors (in consultation with the Consultation Parties) may require the following Adequate Assurance Information in connection with demonstrating adequate assurance of future performance: information evidencing the Prospective Bidder's (or any other relevant assignee's) financial wherewithal and willingness to perform under any Assigned Contracts included in the Bid, which information may include: (i) a corporate organizational chart or similar disclosure identifying corporate ownership and control; (ii) financial statements; (iii) tax returns (iv) annual reports; and (v) summaries of the proposed assignee's experience in the industry, including the number of restaurants currently operating and all trade names used. All Adequate Assurance Information must be in a form that will permit its immediate dissemination to the applicable Counterparties.

8.      <u>Representations and Warranties</u>. A Qualified Bid must include the following representations and warranties:

a.      a statement that the Prospective Bidder has had an opportunity to conduct any and all due diligence regarding the Debtors' businesses and the Assets prior to submitting its Bid;

b.      a statement that the Prospective Bidder has relied solely upon its own independent review, investigation and/or inspection of any relevant documents and the Assets in making its Bid and did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtors' businesses or the Assets or the completeness of any information provided in connection therewith;

c.      a statement that all proof of financial ability to consummate the Sale Transaction in a timely manner and all information provided to support adequate assurance of future performance is true and correct; and

d.      a statement that the Prospective Bidder agrees to be bound by the terms of the Bidding Procedures.

9.      <u>Authorization</u>. A Qualified Bid must: (a) include evidence of authorization and approval from the Prospective Bidder's board of directors (or comparable governing body) with respect to the submission, execution and delivery of any bid for the Assets, participation in the Auction and closing of the Sale Transaction contemplated by the Prospective Bidder's proposed asset purchase agreement; or (b) if the Prospective Bidder is an entity formed for the purpose of effecting the proposed Sale Transaction, provide written evidence acceptable to the Debtors of authorization and the approval by the equity holder(s) of such Prospective Bidder.

10.      <u>Joint Bids</u>. The Debtors will be authorized to approve joint Bids in their discretion on a case-by-case basis.

11. <u>Other Requirements</u>. A Qualified Bid must:

a.  state that the Prospective Bidder agrees to serve as a backup bidder (a "<u>Backup Bidder</u>") if such bidder's Qualified Bid is selected at the Auction as the next highest or next best bid after the Successful Bid (as defined herein) for the Assets (each such bid, a "<u>Backup Bid</u>");

b.  state that the Bid, as may be modified before or during the Auction, represents a binding, irrevocable, good-faith and bona fide offer to purchase the Assets and is not subject to or conditioned on any due diligence, financing, or other contingency (other than the conditions to closing under the applicable agreement), and is irrevocable until twenty-eight (28) days after entry of the Sale Order (the "<u>Backup Bid Expiration Date</u>");

c.  expressly state and acknowledge that the Prospective Bidder shall not be entitled to a break-up fee, termination fee, expense reimbursement or other "bidding protection" in connection with the submission of a bid for the Assets or otherwise participating in the Auction or the Sale Transaction process, unless otherwise granted by the Debtors (in consultation with the Consultation Parties) and approved by an order of the Court;

d.  identify with particularity each and every condition to closing and all Contracts to be assumed and assigned;

e.  state that the Prospective Bidder is committed to closing the Sale Transaction contemplated in its Bid as soon as practicable and in any case no later than fourteen (14) days after entry of the Sale Order;

f.  specify (i) whether the Qualified Bidder intends to hire any of the Debtors'

employees and (ii) the proposed treatment of the Debtors' prepetition compensation, incentive, retention, bonus or other compensatory arrangements, plans, or agreements, including offer letters, employment agreements, consulting agreements, retiree benefits, and any other employment related agreements (collectively, the "Employee Obligations");

g.      expressly waive any claim or right to assert any substantial contribution administrative expense claim under Section 503(b) of the Bankruptcy Code or the payment of any broker fees or costs in connection with bidding for any of the Assets and/or otherwise participating in the Auction or the Sale Transaction process;

h.      include a covenant to cooperate with the Debtors (i) to provide pertinent factual information regarding the Prospective Bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and any other applicable regulatory requirements and (ii) to obtain Court approval of the Sale Transaction;

i.      state or otherwise estimate the types of transition services, if any, the Prospective Bidder would require of and/or provide to the Debtors, including an estimate of the time any such transition services would be required of and/or provided to the Debtors, if the Prospective Bidder's Bid were selected as the Successful Bid for the applicable Assets;

j.      certify that the Prospective Bidder did not collude with any other bidders and is not otherwise a partnership, joint venture or other entity in which more than one bidder (or any affiliates of a bidder) has a direct or indirect interest, unless consented to in

| | writing by the Debtors (in consultation with the Consultation Parties); |
|---|---|
| | k.  include a covenant to comply with the terms of these Bidding Procedures and the Bidding Procedures Order; and |
| | l.  include contact information for the specific person(s) the Debtors should contact in the event they have any questions about the Prospective Bidder's Bid. |
| **Provisions Providing Bid Protections to Stalking Horse or Initial Bidder**<br><br>Local Rule 6004-1(c)(i)(C) | In the event the Debtors enter into a Stalking Horse Agreement with a Stalking Horse Bidder, upon the consummation of a sale of all or any portion of the Assets to any party other than the Stalking Horse Bidder or as otherwise provided in the Sale Order, the Debtors shall pay to the Stalking Horse Bidder a "break-up" fee equal to (i) three percent (3%) of the Stalking Horse Bid plus (ii) reimbursement of all actual costs and expenses incurred by the Stalking Horse Bidder not to exceed one percent (1%) of the Stalking Horse Bid (collectively, the "<u>Break-up Fee</u>").  No bidder or any other party other than a Stalking Horse Bidder shall be entitled to any termination or "break-up" fee, expense reimbursement or any other bidding protections in connection with the submission of a bid for the Assets or for otherwise participating in the Auction or the Sale Transaction process, unless otherwise granted by the Debtors and approved by an order of the Court. |
| **Modification of Bidding and Auction Procedures**<br><br>Local Rule 6004-1(c)(i)(D) | The Debtors reserve the right to, in their business judgment, in a manner consistent with their fiduciary duties and applicable law, and in consultation with the Consultation Parties, modify these Bidding Procedures, including to, among other things: (a) extend or waive deadlines or other terms and conditions set forth herein; (b) adopt new rules and procedures for conducting the bidding and Auction process; or (c) otherwise modify these Bidding Procedures to further promote competitive bidding for and maximizing the of value of the Assets; provided that such extensions, waivers, new rules and procedures, accommodations and modifications (i) do not conflict with and are not inconsistent with the Bidding Procedures Order, these Bidding Procedures, the Bankruptcy Code, the Bankruptcy Rules, or any order of the Court; and (ii) are promptly communicated to each Qualified Bidder.<br><br>The Debtors may, in their sole discretion after consultation with the Consultation Parties, among other things: (i) amend or waive the conditions precedent to qualifying as a Qualified Bidder; (ii) extend the Bid Deadline as to any party or with respect to any Assets; (iii) with respect to any Bid that is not a Qualified Bid, the Debtors may provide (but shall not be obligated to provide) the Bidder with the opportunity to remedy any deficiencies prior to the |

| | |
|---|---|
| | Auction; and/or (iv) postpone or cancel the Auction and terminate the proposed sale(s) for any Assets. |
| **Closing with Alternative Backup Bidders**<br><br>Local Rule 6004-1(c)(i)(E) | Immediately prior to the conclusion of the Auction, the Debtors will, in consultation with the Consultation Parties, (a) determine, in a manner consistent with these Bidding Procedures, which Qualified Bid is the Backup Bid and (b) notify all Qualified Bidders at the Auction of the identity of the Backup Bidder and the amount of the purchase price and other material terms of the Backup Bid. Within two (2) business days after the Auction, the Backup Bidder shall submit to the Debtors execution versions of the documentation memorializing the terms of the Backup Bid(s).<br><br>A Backup Bid will remain binding on the applicable Backup Bidder until the Backup Bid Expiration Date. If the Sale Transaction with the applicable Successful Bidder is terminated prior to the Backup Bid Expiration Date, the Backup Bidder shall be deemed the new Successful Bidder and shall be obligated to consummate the Backup Bid as if it were the Successful Bid at the Auction; provided, that the Debtors may, in their business judgment and after providing notice to the Sale Notice Parties, elect not to pursue the Sale Transaction contemplated by the Backup Bid. |
| **Procedures Governing Auction**<br><br>Local Rule 6004-1(c)(ii) | The Auction shall be governed by the following procedures, subject to the Debtors' right to modify such procedures in their business judgment after consultation with the Consultation Parties:<br><br>    1.    <u>Baseline Bid</u>. Prior to the commencement of the Auction, the Debtors will determine, in their business judgment, the highest and/or best Qualified Bid (each such Qualified Bid, a "<u>Baseline Bid</u>"). Bidding at the Auction shall commence at the amount of the Baseline Bid.<br><br>    2.    <u>Sub-Auctions</u>. The Debtors reserve the right to host Sub-Auctions for certain packages of Assets at their discretion (each such package an "<u>Auction Package</u>").<br><br>    3.    <u>Minimum Overbid</u>.<br><br>        a.    Bidding at the Auction will begin with the Baseline Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid (a "<u>Subsequent Bid</u>") is submitted by a Qualified Bidder that (i) improves on such Qualified Bidder's immediately prior Qualified Bid and (ii) the Debtors determine, in consultation with the Consultation Parties, is (A) for the first round, a higher or otherwise better offer |

than the Baseline Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined herein).

b. At the Auction, Qualified Bidders may submit successive bids in increments of at least $100,000 greater than the prior bid (each, such Bid, a "Minimum Overbid"). The Debtors may, in their discretion and in consultation with the Consultation Parties, announce increases or reductions to Minimum Overbids at any time during the Auction.

c. In the event the Debtors designate a Stalking Horse Bid in accordance with the Stalking Horse Procedures, the initial overbid for the assets subject to the applicable Stalking Horse Agreement must be in an amount no less than the Stalking Horse Bid plus the Minimum Overbid plus the Break-up Fee.

d. Upon a Qualified Bidder's declaration of a Bid at the Auction, the Qualified Bidder must state on the record its commitment to pay within two (2) business days following the Auction, if such Bid were to be selected as the Successful Bid or as the Backup Bid, the incremental amount of the Qualified Bidder's Good Faith Deposit calculated based on the increased purchase price of such Bid (such Good Faith Deposit so increased, the "Incremental Deposit Amount") if applicable. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by any Bid subsequent to a Baseline Bid, the Debtors will in consultation with the Consultation Parties, at each round of bidding, consider and/or give effect to (a) any additional liabilities to be assumed by a Qualified Bidder under the Bid, including whether such liabilities are secured or unsecured, (b) any additional costs that may be imposed on the Debtors,

and (c) the provision of any wind-down expenses, treatment of the obligations owed to the Prepetition Lenders and DIP Lender, and any additional outstanding debt, as applicable.

4.    Leading Bid.

a.    After the first round of bidding and between each subsequent round of bidding, the Debtors (in consultation with the Consultation Parties) will announce the bid that they believe to be the highest or otherwise best offer (each such bid, a "Leading Bid") and describe the material terms thereof. Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the material terms of the Leading Bid, subject to the Debtors' authority to revise the Auction procedures to the extent permitted hereby.

b.    The Auction or any Sub-Auction will be conducted by open bidding in the presence of all other Qualified Bidders and each Qualified Bidder shall have the right to be present for all rounds of open bidding and to submit additional Bids and make modifications to its Proposed Asset Purchase Agreement at the Auction to improve its Bid. However, to remain eligible to participate in subsequent rounds of bidding, each Qualified Bidder except the bidder that submitted the Leading Bid in the immediately prior round must submit a qualifying Subsequent Bid with respect to such round of bidding. If a Qualified Bidder that did not submit the Leading Bid in the immediately prior round fails to submit a qualifying Subsequent Bid, then such Qualified Bidder shall be disqualified from continuing to participate in the Auction. The Debtors may, in their business judgment, engage in discussions and negotiate with any and all Qualified Bidders

|  | participating in the Auction or Sub-Auction outside the presence of other bidders before each round of bidding, including to improve or clarify the terms of bids made. |
|---|---|
| c. | The Debtors shall have the right to determine (in consultation with the Consultation Parties) which Bid is the highest or otherwise best Bid and, in accordance with the terms of these Bidding Procedures, reject, at any time, without liability, any bid that the Debtors deem to be inadequate or insufficient, not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, these Bidding Procedures, any order of the Court, or the best interests of the Debtors and their estates. |
| d. | The determination of which Qualified Bid(s) constitutes the Baseline Bid(s) and which Qualified Bid(s) constitutes the Successful Bid(s) shall take into account any factors the Debtors, in consultation with the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid(s) to the Debtors' estates, which may include, among other things: (a) the type and amount of Assets sought to be purchased in the Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Bidder's ability to close a transaction and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Baseline Bid; (e) the tax consequences of such Qualified Bid; (f) the assumption of obligations, including contracts and leases; (g) the cure amounts to be paid; and (h) the impact on employees, including the number of employees proposed to be transferred (to the extent such factor shall not negatively impact creditors); and employee-related obligations to be assumed. |

5.      Additional Auction Procedures.

a.      The Debtors (in consultation with the Consultation Parties) may announce at the Auction or a specific Sub-Auction additional procedural rules (e.g., among other things, the amount of time to make Subsequent Bids, the amount of the Minimum Overbid, or the requirement that parties submit "best and final" Bids) for conducting the Auction or specific Sub-Auction or otherwise modify the Bidding Procedures; provided, that such rules (i) are not materially inconsistent with the Bidding Procedures Order, the Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court; and (ii) are disclosed to each Qualified Bidder during the Auction or Sub-Auction.

b.      Any Bid for any Assets included in any Auction Package shall be subject to a determination by the Debtors, in their business judgment, in consultation with the Consultation Parties, and in accordance with the other provisions of these Bidding Procedures, that (i) a Bid for substantially all of the Debtors' Assets and/or (ii) a combination of Bids that groups the Assets together differently, is the highest or otherwise best offer for such Assets.

37.     The Debtors request that the Bidding Procedures Order establish the following dates and deadlines subject to extension and other modifications by the Debtors:

| EVENT | DATE |
|---|---|
| Service of Bidding Procedures Order and Sale Notice | Two (2) business days after entry of Bidding Procedures Order |
| Deadline for the Debtors to file and Serve the Assumption and Assignment Notice | Two (2) business days after entry of Bidding Procedures Order |

| | |
|---|---|
| Deadline for the Debtors to Publish Publication Notice | Five (5) business days after entry of the Bidding Procedures Order |
| Contract Objection Deadline (objections related to Cure Costs and assumption and assignment (except with respect to adequate assurance of future performance)) | September 12, 2024 at 4:00 p.m. (prevailing Eastern time) |
| Sale Objection Deadline | September 12, 2024 at 4:00 p.m. (prevailing Eastern time) |
| Bid Deadline | September 19, 2024 at 4:00 p.m. (prevailing Eastern time) |
| Deadline for the Debtors to Serve Adequate Assurance Information | September 20, 2024 |
| Auction | September 23, 2024 |
| Deadline to File Notice of Auction Results | September 24, 2024 at 12:00 p.m. (prevailing Eastern time) |
| Post-Auction Objection Deadline | September 25, 2024 at 4:00 p.m. (prevailing Eastern time) |
| Adequate Assurance Objection Deadline | September 25, 2024 at 4:00 p.m. (prevailing Eastern time) |
| Sale Hearing | September 27, 2024 |
| Deadline to Consummate Approved Sale Transactions | Fourteen (14) days after entry of the Sale Order |
| Backup Bid Expiration Date | Twenty-eight (28) days after entry of the Sale Order |

### E.    The Sale Notice

38.    The Sale Notice sets forth (i) a description of Assets available for sale pursuant to the Bidding Procedures; (ii) the date, time and location of the Auction and Sale Hearing; and (iii) the Sale Objection Deadline and Post-Auction Objection Deadline and the procedures for filing such objections.

39.    The Debtors will file the Sale Notice within two (2) business days after entry of the Bidding Procedures Order, cause it to be published on https://cases.stretto.com/onetable (the "Claims Agent Website"), and serve it on the following parties (collectively, the "Sale Notice Parties"): (a) counsel to Breakwater; (b) all persons and entities known by the Debtors to have asserted any lien, claim, interest or encumbrance in the Assets (for whom identifying information and addresses are available to the Debtors); (c) all parties (each, a "Counterparty") to any Contract

that may be assumed or rejected; (d) any governmental authority known to have a claim against the Debtors in these Cases; (e) the Office of the United States Trustee; (f) the Federal Trade Commission; (g) the Bureau of Consumer Protection; (h) all applicable federal, state and local taxing authorities, including the Internal Revenue Service; (i) the United States Attorney's Office for the District of Delaware; (j) the United States Attorney General's Office for the District of Delaware; (k) the Office of the Attorney General and the Secretary of State in each state in which the Debtors operate; (l) the California Department of Alcoholic Beverage Control; (m) the Arizona Department of Liquor Licenses and Control; (n) counsel for the Committee; (o) all of the parties entitled to notice pursuant to Bankruptcy Rule 2002; and (p) all other parties as directed by the Court.

40.     Moreover, within five (5) business days after entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors will cause the information contained in the Sale Notice to be published once in *The Wall Street Journal* (national edition), *Los Angeles Times*, or a similar regional or national publication (the "<u>Publication Notice</u>").

41.     The Debtors submit that the foregoing notices comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Bidding Procedures, the Auction, and the Sale Hearing to the Debtors' creditors and other parties in interest.

**F.    <u>Stalking Horse Procedures</u>**

42.     The Debtors request that the Court authorize the Debtors to enter into Stalking Horse Agreements in accordance with the below "<u>Stalking Horse Procedures</u>."

43.     If the Debtors enter into a Stalking Horse Agreement, they must, within seven (7) days prior to the hearing on this Motion, file a notice (the "<u>Stalking Horse Notice</u>") with the Court and serve the Stalking Horse Notice on: (i) counsel to the Committee; (ii) the Office of the United

States Trustee; (iii) counsel to Breakwater; and (iv) any other party that has requested notice pursuant to Bankruptcy Rule 2002.

44.     The Stalking Horse Notice must: (i) include a copy of the Stalking Horse Agreement; (ii) disclose whether the Stalking Horse Bidder is an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, as well as any common identity of incorporators, directors, officers, or controlling stockholders between the Stalking Horse Bidder and the Debtors; and (iii) advise that any objections to the Stalking Horse Notice may be made at the hearing on this Motion.

45.     Any objections to a Stalking Horse Notice must be filed at the hearing on this Motion.

46.     In the event the Debtors enter into a Stalking Horse Agreement with a Stalking Horse Bidder, upon the consummation of a sale of all or any portion of the Assets to any party other than the Stalking Horse Bidder or as otherwise provided in the Sale Order, the Debtors shall pay to the Stalking Horse Bidder a "break-up" fee equal to (i) three percent (3%) of the Stalking Horse Bid plus (ii) reimbursement of all actual costs and expenses incurred by the Stalking Horse Bidder not to exceed one percent (1%) of the Stalking Horse Bid (collectively, the "Break-up Fee").  No bidder or any other party other than a Stalking Horse Bidder shall be entitled to any termination or "break-up" fee, expense reimbursement or any other bidding protections in connection with the submission of a bid for the Assets or for otherwise participating in the Auction or the Sale Transaction process, unless otherwise granted by the Debtors and approved by an order of the Court.

### G.   Assumption and Assignment Procedures

47.   The Debtors request that the Court approve the following Assumption and Assignment Procedures:

a.   Assumption and Assignment Notice. Within two (2) days of entry of the Bidding Procedures Order, the Debtors shall serve a notice (the "Assumption and Assignment Notice") which will: (i) identify the Debtors' Contracts; (ii) provide the amounts, costs, or expenses that the Debtors believe must be paid or actions or obligations that must be performed or satisfied pursuant to the Bankruptcy Code to effectuate the assumption and assignment of such Contract (each a "Cure Cost" and, collectively, the "Cure Costs"); (iii) inform Counterparties of the requirement to file a Contract Objection (defined below) by the Contract Objection Deadline (defined below); and (iv) advise Counterparties of the procedures related to Adequate Assurance Objections (defined below).

b.   Service of the Assumption and Assignment Notice. The Debtors shall serve the Assumption and Assignment Notice by first class mail or hand delivery or e-mail on the Sale Notice Parties.

c.   Contract Objections. Any objection to any Cure Cost set forth on the Assumption and Assignment Notice or to the assumption and assignment of a Contract to a Successful Bidder by any Counterparty (except with respect to adequate assurance of future performance) (collectively, a "Contract Objection"), must: (a) be in writing; (b) state the basis for such objection with specificity; (c) if it contests any Cure Cost set forth in the Cure Notice, state with specificity what amounts, costs, or expenses the Contract

Counterparty believes must be paid or actions or obligations must be performed or satisfied pursuant to the Bankruptcy Code to effectuate the assumption by the Debtors and the assignment to a Successful Bidder (in all cases with appropriate documentation in support thereof); (d) comply with the Bankruptcy Rules and the Local Rules; (e) be filed with the Court on or before September 12, 2024 at 4:00 p.m. (prevailing Eastern time) (the "Contract Objection Deadline"), and (f) be served on or before the Contract Objection Deadline upon (collectively, the "Objection Notice Parties"): (1) Counsel for the Debtors: (a) Shulman Bastian Friedman & Bui LLP, 100 Spectrum Center Drive, Suite 600, Irvine, CA 92618, afriedman@shulmanbastian.com, mlowe@shulmanbastian.com, and mcasal@shulmanbastian.com; and (b) Raines Feldman Littrell LLP, tfrancella@raineslaw.com; (2) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Jonathan Lipshie, jon.lipshie@usdoj.gov; (3) counsel to the Committee; and (4) counsel for Breakwater: (a) Elkins Kalt Weintraub Reuben Gartside LLP, 10345 W Olympic Boulevard, Los Angeles, CA 90064, Attention: Michael I. Gottfried, Esq. mgottfried@elkinskalt.com, Lauren N. Gans, lgans@elkinskalt.com; and (b) Richard Riley, RRiley@whitefordlaw.com, and David Gaffey, DGaffey@whitefordlaw.com.

d.     <u>Adequate Assurance Information</u>. The Debtors shall serve the Adequate Assurance Information of all Qualified Bidders to applicable Counterparties by no later than September 20, 2024. Any Counterparty that receives any Adequate Assurance Information with respect to any Qualified Bidder shall review such information on a confidential basis, shall not disclose such

information to any party, and shall not use the Adequate Assurance Information for any purpose other than: (a) evaluating whether adequate assurance of future performance as required under the Bankruptcy Code has been provided; and (b) to support an objection to adequate assurance by such Counterparty.

e.      Adequate Assurance Objection Deadline. The deadline for a Counterparty to object to the assumption and assignment on the grounds of adequate assurance of future performance (each, an "Adequate Assurance Objection") shall be the Post-Auction Objection Deadline. An Adequate Assurance Objection must: (a) be in writing; (b) state the basis for such objection with specificity; (c) comply with the Bankruptcy Rules and the Local Rules; (d) be filed with the Court; and (e) be served on the Objection Notice Parties by no later than the Post-Auction Objection Deadline.

f.      Hearing. If a Contract Objection or Adequate Assurance Objection is timely filed and received and the applicable parties are unable to consensually resolve the dispute or the amount to be paid under section 365 of the Bankruptcy Code, if any, such objection will be determined at a hearing to be requested by the Debtors or a Successful Bidder.  At the Successful Bidder's discretion, the hearing regarding the Contract Objection or Adequate Assurance Objection may be set after the Sale Hearing.

g.      Effect of Failure to Object. If a Counterparty fails to file a Contract Objection or Adequate Assurance Objection by the relevant deadlines: (a) the Counterparty will be deemed to have consented to the assumption and assignment of the Contract; (b) the Counterparty will be forever barred and estopped from asserting any objection to the propriety or effectiveness of

the assumption and assignment of the Contract against the Debtors, a Successful Bidder, any assignee of the Contract, or the property of any of them; (c) the Cure Cost set forth on the Assumption and Assignment Notice for such Contract shall be controlling and the Counterparty will be deemed to have consented thereto, notwithstanding anything to the contrary in the Contract or otherwise; and (d) the Contract Counterparty will be forever barred and estopped from objecting to the Cure Cost or asserting any claims against the Debtors, any Successful Bidder, any assignee of the Contract, or the property of any of them.

h.     <u>Notice of Assigned Contracts</u>. As soon as reasonably practicable after the Sale Hearing, the Debtors will file a notice containing the list of Assigned Contracts to be assumed and assigned to any Successful Bidder(s).

**<u>BASIS FOR RELIEF REQUESTED</u>**

**A.**     **<u>The Bidding Procedures and Relief Sought in the Bidding Procedures Order are in the Best Interest of the Estate and Should Be Approved</u>**

48.     Section 363 of the Bankruptcy Code and Bankruptcy Rule 6004(f)(1) authorize debtors to sell property outside the ordinary course of business by private sale or by auction. Specifically, section 363(b) of the Bankruptcy Code provides that "[t]he [debtor in possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate," and Bankruptcy Rule 6004(f)(1) provides that "sales not in the ordinary course of business may be... by private auction." Moreover, Bankruptcy Code section 105(a) empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

49.     The procedures to be used in selling estate assets are subject to a debtor's business judgment, which is entitled to substantial deference so long as the debtor articulates an adequate business justification.  *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999).

50.     The Bidding Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of property of a debtor's estate: maximizing the value of sale proceeds received by the estate.  *See In re Edwards*, 228 B.R. 552, 361 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate"); *Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that a debtor had a fiduciary duty to maximize and protect the value of the estate's assets); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (recognizing that a main goal of any proposed sale of property of a debtor's estate is to maximize value).

51.     Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 536-37 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing the benefit of sale procedures that "encourage bidding and . . . maximize the value of the debtor's assets").

52.     Ultimately, any Successful Bid(s), after being subject to a "market check" in the form of the Auction, and accepted by the Debtors in the exercise of their reasonable business

judgment, will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practically available alternative. *See, e.g., In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's-length fair value transaction").

53.     The Debtors, with assistance of their advisors, have structured the Bidding Procedures to promote active bidding by interested parties and to confirm the highest or otherwise best offer reasonably available for the Assets through an orderly, uniform, and appropriately competitive process. Specifically, the Bidding Procedures encourage participation by financially capable bidders with demonstrated ability to consummate a timely transaction, provide such capable bidders with sufficient time to conduct necessary diligence and submit well-informed bids, and allow the Debtors to conduct the Auction in a fair and transparent manner that ensures the Debtors are maximizing the value of the Assets.

54.     Finally, the Bidding Procedures are consistent with procedures previously approved in this District. *See e.g.*, *In re MRRC Hold Co.*, No. 24011164 (CTG) (Bankr. D. Del. Jul. 10, 2024); *In re SIO2 Medical Products, Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Apr. 25, 2023); *In re Lucira Health, Inc.*, No. 23-10242 (MFW) (Bankr. D. Del. Mar. 27, 2023); *In re Performance Powersports Group Holdings, Inc.*, No. 23-10047 (LSS) (Bankr. D. Del. Feb. 27, 2023); *In re Alex & Ani, LLC*, No. 21-10918 (CTG) (Bankr. D. Del. Jul. 16, 2021); *In re Bluestem Brands, Inc.*, No. 20-10566 (MFW) (Bankr. D. Del. Jun. 3, 2020); *In re Bertucci's Holdings, Inc.*, Case No. 18-10894 (MFW) (Bankr. D. Del. May 7, 2018); *In re Saladworks*, Case No. 15-10327 (LSS) (Bankr. D. Del. Mar. 12, 2015).

*55.* Moreover, if the Debtors are authorized to enter into Stalking Horse Agreements with potential Stalking Horse Bidders, the Debtors will ensure that they obtain fair market value for the Assets by setting a minimum purchase price for interested parties to submit competing bids. The Debtors therefore submit that they should be authorized to enter into Stalking Horse Agreements in accordance with the Stalking Horse Procedures. Courts in this District have approved similar procedures providing for the designation of stalking horse bidders and sale timelines. *See*, *e.g.*, *In re Consolidated Infrastructure Group, Inc.*, No. 19-10165 (BLS) [D.I. 151] (Bankr. D. Del. Apr. 24, 2019) (authorizing designation of stalking horse bidders and provision of bid protections without further hearing with consent of United States Trustee and consultation parties)**;** *In re Hobbico, Inc.*, No. 18-10055 (KG) [D.I. 243] (Bankr. D. Del. Mar. 14, 2018) (same); *In re California Proton Treatment Center, LLC*, No. 1710477 (LSS) [D.I. 158] (Bankr. D. Del. Apr. 12, 2017) (same); *In re United Road Towing, Inc.*, No. 17-10249 (LSS) [D.I. 131] (Bankr. D. Del. Mar. 6, 2017) (same); *In re Constellation Enterprises LLC*, No. 16-11213 (CSS) [D.I. . 260] (Bankr. D. Del. Jun. 15, 2016) (same).

56. Accordingly, in the exercise of their business judgment, the Debtors submit that the Bidding Procedures should be approved because they are reasonable, appropriate, and will ensure the Debtors receive the highest possible price for the Assets.

**B.** **The Break-up Fee is Appropriate Under the Circumstances**

57. Approval of the Break-up Fee is governed by standards for determining the appropriateness of bid protections in the bankruptcy context. Courts have identified at least two instances in which bid protections may benefit the estate. First, a break-up fee may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which

bidding would have been limited." *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 537. Second, if the availability of a break-up fee was to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*; *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 206-08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse bidder to remain committed to a purchase).

58.     *In O'Brien*, the Third Circuit reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee:

a.     the presence of self-dealing or manipulation in negotiating the break-up fee;

b.     whether the fee hampers, rather than encourages, bidding;

c.     the reasonableness of the break-up fee relative to the purchase price;

d.     whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

e.     the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

f.     the correlation of the fee to a maximum value of the debtor's estate;

g.     the support of the principal secured creditors and creditors' committees of the break-up fee;

h.     the benefits of the safeguards to the debtor's estate; and

i.     the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See O'Brien*, 181 F.3d at 536.

59.      While none of the factors are dispositive, an application of the facts to several of such factors supports the approval of the Break-up Fee. In particular, the Debtors believe that the Break-up Fee is necessary to attract potential Stalking Horse Bidders and to establish an adequate floor price for the Assets. Without the Break-up Fee, the Debtors might lose the opportunity to obtain the highest or otherwise best offer for the Assets and would certainly lose the downside protection that will be afforded by the existence of a Stalking Horse Bidder.

60.      Moreover, the amount of the Break-up Fee is reasonable and consistent with the size of other break-up fees approved in cases in this District. *See In re Beavex Holding*, Case No. 19-10316 (Bankr. D. Del. Mar. 14, 2019) (approving break up fee and expense reimbursement that is 4.5% of the purchase price); *In re Activecare, Inc., et al.,* No. 18-11659 (Bankr. D. Del. Aug. 17, 2018) (approving break up fee that is 3% of the purchase price); *In re Vertullus Specialties, Inc.*, No. 16-11290 (Bankr. D. Del. June 28, 2016) (approving break up fee of 3% of the purchase price and unlimited expense reimbursement); *In re deCode Genetics,* No. 09-14063 (Bankr. D. Del. Dec. 11, 2009) (approving break up fee of 3% of the purchase price and an expense reimbursement of $500,000 for a total of 6.5% of the purchase price in the aggregate).

61.      In sum, the Break-up Fee is reasonable under the circumstances as a Stalking Horse Bid will enable the Debtors to maximize the value for their Assets while setting a minimum purchase price for the Assets that will be tested in the marketplace. As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable and at or above the market.

**C.**   **The Proposed Form and Manner of Notice of the Auction and Sale Hearing is Appropriate.**

62.   Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to provide notice of the proposed sale of the Assets, and such notice must include a disclosure of the time and place of any public sale, and the deadlines for filing any objections.

63.   As set forth herein, the Sale Notice provides: (i) a description of the Assets available for sale pursuant to terms set forth in the Bidding Procedures; (ii) the date, time, and place of the Auction and the Sale Hearing, and (iii) the deadlines and procedures for filing relevant objections. The Debtors will serve the Sale Notice within two (2) business days of entry of the Bidding Procedures Order upon the Sale Notice Parties, whom are inclusive of all interested parties or those otherwise entitled to notice of the sale of the Assets, and will publish the Sale Notice on the Claims Agent Website.

64.   Additionally, within five (5) days after entry of the Bidding Procedures Order, the Debtors will cause the Publication Notice to be published once in *The Wall Street Journal* (national edition), *Los Angeles Times*, or a similar regional or national publication in order to provide notice to any other potential interested parties.

65.   The Debtors submit that notice of this Motion and Bidding Procedures Hearing, coupled with service of the Sale Notice, the Assumption and Assignment Notice, and publication of the Publication Notice, constitutes good and adequate notice of the sale of the Assets and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.

66.   The Debtors further submit that the proposed notice procedures are designed to maximize the chance of obtaining the broadest possible participation in the Debtors' marketing

process, while minimizing costs to the estates. Accordingly, the Debtors respectfully request that the Court find that the proposed notice procedures set forth in this Motion are sufficient, and that no other or further notice of the relief requested herein is required.

**D.** **The Assumption and Assignment Procedures Are Appropriate and Should be Approved**

67. In accordance with the Bidding Procedures, the Debtors believe it is necessary to establish the Assumption and Assignment Procedures to provide certainty to the Debtors, any Successful Bidders, and Counterparties of their obligations and rights with respect to the Contracts.

68. The Debtors submit that the Assumption and Assignment Procedures provide for the orderly assumption and assignment of Assigned Contracts to a Successful Bidder. Further, the Assumption and Assignment Notice provides Counterparties with necessary information relating to the Cure Costs, the Adequate Assurance Information, and the procedures to object to assignment of their Contract on those bases.

69. As set forth above, the Debtors request that the Assumption and Assignment Procedures provide that any Counterparty that fails to object to the proposed assumption and assignment of their Contract be deemed to consent to assumption and assignment of such Contract pursuant to section 365 of the Bankruptcy Code. Such relief is necessary to ensure applicable Contracts may be orderly assumed and assigned and should be granted. *See, e.g., In re Boy Scouts of Am.*, 642 BR 504, 569 (Bankr. D. Del. 2022) ("The lack of objection of a [creditor] is also consensual for purposes of § 363 and, again, permissible under § 363(f)(2)."); *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (same); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

70.     The Debtors believe that the Assumption and Assignment Procedures are fair and reasonable, provide sufficient notice to parties to Contracts, and provide certainty to all parties in interest regarding their obligations and rights in respect thereof. Accordingly, the Debtors request that the Court approve the Assumption and Assignment Procedures set forth herein and in the Bidding Procedures Order.

**E.     The Sale Should Be Approved as an Exercise of Sound Business Judgment**

71.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts will approve a sale of the debtor's assets if such sale is based upon the sound business judgment of the debtor. *See In re Del. & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991); *In re Martin*, 91 F.3d at 395 (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513 (7th Cir. 1991)); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

72.     Courts consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was provided to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. *See Del. & Hudson Ry. Co.*, 124 B.R. at 176 (adopting *Lionel* factors to determine whether a sound business justification exists for the sale in this District); *Lionel Corp.*, 722 F.2d at 1071 (setting forth the "sound business purpose" test); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).

73.     Once a debtor demonstrates a valid business justification for its decision to sell property outside the ordinary course of business, it is presumed that "in making a business decision

the directors of the corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Resources*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1983)); *In re Filene's Basement, LLC*, No. 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate.") (citations omitted). "Courts are loathe to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence." *Integrated Resources*, 147 B.R. at 656.

### *A Sound Business Purpose Exists for the Sale of the Assets and the Sale is Proposed in Good Faith*

74. A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estates, creditors, or interest holders. *See e.g., In re Abbotts Dairies of Pa, Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1071.

75. The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See e.g. Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004); *Four B. Corp. v. Food Barn Stores (Food Barn Stores)*, 107 F.3d 558, 564-65 (1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate") (quoting *Cello Bag Co. Inc. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)). "'As long as [the sale] appears to enhance a debtor's estate, court approval of a

debtor's decision to [sell] should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code. . . '" *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Building Group, Ltd.)*, 331 B.R. 251, 255 (N.D. Tex. 2005) (quoting *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985).

76.     Here, a strong business justification exists here because a sale of the Assets is necessary to preserve the value of such assets for the Debtors' estates, creditors, and other parties in interest. As set forth herein and in the First Day Declaration, the Debtors explored out-of-court restructuring, refinancing, and sale options prior to the commencement of the Cases. While such efforts did generate interest in certain of the Assets, the Debtors faced a declining cash position and determined that these Cases were the only avenue to preserve the going concern of the Debtors' businesses, to keep over one thousand people employed, and to generate any value for the benefit of their creditors and estates. Consequently, the sale of the Assets is supported by good business reasons and is proposed by the Debtors in good faith.

### *Adequate and Reasonable Notice of the Sale Will be Provided*

77.     Adequate and reasonable notice of the sale of the Assets will be provided through the Sale Notice. As discussed herein, the Sale Notice will provide the Sale Notice Parties with all information relevant to the sale of the Assets, the Auction, the Sale Hearing, and the procedures related thereto.

78.     Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding Procedures Order after notice and a hearing before it is served on parties in interest.

### *The Sale Will Produce a Fair Price for the Assets*

79.     The Debtors and their advisors have engaged, and will continue to engage, in a robust marketing and sale process directed at generating significant interest in the Debtors' Assets to maximize the value to the Debtors' estates.

80.     Accordingly, the fairness and reasonableness of the consideration to be paid for the Assets will be demonstrated by adequate "market exposure" and an open and fair auction process – the best means for establishing whether a fair and reasonable price is being paid. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, *4 (Bankr. D. Del. 2001) (while a "Section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

81.     Specifically, the Bidding Procedures were designed to facilitate a robust and competitive bidding process and provide the Debtors' with significant flexibility to do so. The Debtors also constructed the Bidding Procedures to promote transparency, good faith and fairness throughout the entire sale process within the parameters of the Milestones. The Bidding Procedures provide an appropriate framework for the Debtors to review, analyze and compare one or more bids for the Assets and to engage with bidders on an arm's length basis to work to improve the quality of their bids for the benefit of all parties in interest.

82.     Hilco will continue to market the Debtor's assets and solicit other offers consistent with the Bidding Procedures, including, for example, by contacting presumably interested parties as well as previously solicited parties, by continuing to provide acceptable bidders with data room access and requested information, by considering a variety of alternative transaction structures,

and otherwise by assisting the Debtors with all efforts to maximize the value of the Assets. In this way, the Debtors will ensure that the Successful Bidder's purchase price will, conclusively, be fair value.

**F.      The Successful Bidder(s) Should be Entitled to the Protections of Section 363(m) of the Bankruptcy Code**

83.      Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor's estate notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale were stayed pending appeal.

84.      Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'" *In re Abbotts Dairies of Penn., Inc*., 788 F.2d 143, 147 (3d Cir.1986); *Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); *In re Stein & Day, Inc*., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

85.      The Debtors submit that any Successful Bidder will be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and the applicable asset purchase agreement(s) will be good-faith agreement(s) on arm's length terms entitled to the protections of section 363(m).

86.     Any Successful Bidder will be an entity making an arms-length, good faith bid following a competitive marketing process, and will be selected by the Debtors in accordance with the Bidding Procedures. Therefore, the Debtors intend to request at the Sale Hearing a finding that the Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

## G.     Breakwater or its Designee Should Be Authorized to Credit Bid Pursuant to Section 363(k) of the Bankruptcy Code

87.     A secured creditor is allowed to "credit bid" the amount of its claims in a sale of assets in which it has a security interest. Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) of the Bankruptcy Code allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the creditor's economic value. *See In re Submicron Sys. Corp.*, 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled . . . that creditors can bid the full face value of their secured claims under section 363(k)").

88.     In this District, absent cause for restriction on credit bidding, courts have consistently ruled in favor of reserving a secured creditor's right to credit bid its claim. *See In re Source Home Entm't, LLC*, No. 14-115533 (KG) (Bankr. D. Del. July 21, 2014) (order approving Bidding Procedures which authorized parties with secured claims to credit bid); *In re PTC Alliance Corp.*, No. 09-13395 (Bankr. D. Del. Nov. 6, 2009) (order authorizing, but not directing, the

administrative agent to credit bid); *In re Hayes Lemmerz Int'l, Inc.*, No. 09-11655 (Bankr. D. Del. Sept. 22, 2009) (order authorizing interested party to exercise its right under Bankruptcy Code section 363(k) to make a credit bid); *In re Foamex Int'l Inc.*, 09-10560, (Bankr. D. Del. May 27, 2009) (order authorizing the sale of substantially all of the debtor's assets in a $155 million credit bid over a $151.5 million all-cash bid); *see also Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 459-60 (3d Cir. 2006) (citations omitted).

89.     Here, Breakwater (in its capacities as Prepetition Lender and DIP Lender) has valid secured claims against the Debtors and is entitled to credit bid some or all of the claims secured by its collateral pursuant to section 363(k) of the Bankruptcy Code. Moreover, the DIP Credit Agreement (which was approved by the Court on an interim basis) provides that Breakwater (in its capacity as DIP Lender) may credit bid up to the full amount of the Obligations in the event of a sale of the Debtors' businesses.

90.     Accordingly, the Debtors submit that the Court should authorize Breakwater (or its designee) to submit a credit bid for the Assets.

**H.      The Sale of the Assets Free and Clear of Liens, Claims and Other Interests is Authorized by Section 363(f)**

91.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interests;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

92.     This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  This equitable power may be utilized to effectuate the provisions of section 363(f*). See, e.g., In re Trans World Airlines, Inc.*, 2001 WL 1820325 (highlighting bankruptcy courts' equitable authority to authorize sale of estate assets free and clear).

93.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens and interests. *See e.g. In re Dura Automotive Sys., Inc.*, 2007 WL 7728109 n.32 (Bankr. D. Del. Aug. 15, 2007); *Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (section 363(f) of the Bankruptcy Code is written in the disjunctive, thus a court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (because section 363(f) is written in the disjunctive, a court may approve a "free and clear" sale even if only one of the subsections is met); *In re Bygaph, Inc*., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

94.     The Debtors believe that one or more of the tests of section 363(f) of the Bankruptcy Code will be satisfied with respect to the sale of the Assets. As set forth herein, Breakwater, the Debtors' prepetition and postpetition senior lender, intends to submit a credit bid up to the full amount of the Obligations, and any overbid by a Successful Bidder would need to exceed that amount. Accordingly, the Debtors submit that either or both of section 363(f)(2) and (3) of the

Bankruptcy Code will be satisfied, and the Debtors request they be permitted to sell the Assets free and clear of all liens, claims, encumbrances and all other interests. The Debtors further request that any holder of a lien, claim, encumbrance or other interest related to the Assets that fails to object to the relief sought herein by the Sale Objection Deadline be deemed to consent to the transfer of the Assets free and clear.

95.     Moreover, the Debtors submit that it is appropriate to sell the Assets free and clear of successor liability relating to the Debtors' businesses.  Such a provision ensures that a Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to one or more of the Debtors.  Courts have consistently held that a buyer of a debtor's assets pursuant to a sale under section 363 of the Bankruptcy Code takes free from successor liability relating to the debtor's business. *See e.g. In re Trans World Airlines, Inc*., 322 F.3d 283, 288–89 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 585 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); *In re General Motors Corp.,* 407 B.R. 463, 505-06 (Bankr. S.D.N.Y. 2009) (holding that "the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that connection, will issue the requested findings and associated injunction."); *In re Chrysler LLC,* 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) *("in personam* claims, including any potential state successor or transferee liability claims against New Chrysler, as well as *in rem* interests, are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction."); *see also WBQ P'ship v. Commonwealth of Virginia Dep't of Medical Assistant Servs*., 189 B.R. 97, 103 (Bankr. E.D. Va. 1995) (approving sale of debtor's assets under section 363(f) and precluded governmental entity

from collecting depreciation recapture arising from such sale from the purchaser); *P.K.R. Convalescent Ctrs., Inc. v. Commonwealth of Virginia, Dep't of Medical Assistance Serv. (In re P.K.R. Convalescent Ctrs., Inc.)*, 189 B.R. 90, 94 (Bankr. E.D. Va. 1995) (same); *Am. Living Sys. v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 56 B.R. 186, 189-90 (Bankr. N.D. Ga. 1986) (sale pursuant to section 363(f) barred successor liability for product defect claims), *aff'd,* 805 F.2d 1515 (11th Cir. 1986); *Rubinstein v. Alaska Pac. Consortium (In re New England Fish Co.)*, 19 B.R. 323, 328 (Bankr. W.D. Wash. 1982) (sale pursuant to section 363(f) was free and clear of successor liability claims for employment discrimination and civil rights violations); *Folger Adam Security v. DeMatteis/MacGregor JV*, 209 F.3d 252, 258 (3d Cir. 2000) (citing *Leckie* for the proposition that the debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute").

96.     The purpose of an order purporting to authorize the transfer of assets free and clear of all liens, claims, encumbrances and all other interests would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct. Moreover, without such assurances, the Debtors would run the risk that potential bidders may not enter the Auction or, if they did, would do so with reduced bid amounts. To that end, a Successful Bidder should not be liable under any theory of successor liability relating to the Debtors' businesses, but should hold the purchased Assets free and clear.

## I.     The Assumption and Assignment of Contracts Should Be Approved

97.     Section 365(a) of the Bankruptcy Code provides that, subject to the court's approval, a trustee "may assume or reject any executory contracts or unexpired leases of the debtor." 11 U.S.C. § 365(a).

98.     Upon finding that a trustee has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code. The standard applied by the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113). Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. *See In re Decora Indus., Inc.*, 2002 WL 32332749, at *8 (D. Del. 2002); *Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp)*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"); *see also Phar Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract") (citation omitted).

99.     A debtor's decision to assume or reject an executory contract or expired lease will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *Se, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. Ry. Co.*, 318 U.S. 523 (1943) (applying Bankruptcy Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting a test of whether an executory contract was burdensome in favor of determining whether rejection is within the debtor's business judgment); *see also Sharon Steel*, 872 F.2d at 40

(describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code").

100.     Here, the Court should approve the decision to assume and assign the Assigned Contracts in connection with the sale of the Debtors' Assets as a sound exercise of the Debtors' business judgment. The Assigned Contracts are necessary to operate the businesses and, as such, they are essential to inducing the best offer for the Assets. Second, it is unlikely that any purchaser would want to acquire the Assets unless a significant number of the contracts and leases needed to manage the day-to-day operations were included in the transaction. Last, the Assigned Contracts will be assumed and assigned through the Assumption and Assignment Procedures approved by the Court pursuant to the Bidding Procedures Order and, thus, will such procedures will have been by key constituents in the Cases.

101.     Accordingly, the Debtors submit that the assumption and assignment of the Assigned Contracts by way of the Assumption and Assignment Procedures should be approved as a valid exercise of their business judgment.

### *Defaults Under the Assigned Contracts Will Be Cured Through the Sale Transactions*

102.     Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder. Section 365 of the Bankruptcy Code "attempts to strike a balance between two sometimes competing interests, the

right of the contracting nondebtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *In re Carlisle Homes, Inc.*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted).

103. The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied. Because the Assumption and Assignment Procedures (once approved) provide a clear process by which to resolve disputes over cure amounts or other defaults, the Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-debtor parties.

### *The Counterparties Will be Adequately Assured of Future Performance*

104. Similarly, the Debtors submit that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here. "The phrase 'adequate assurance of future performance' was adopted from Uniform Commercial Code Section 2-609" and is to be given a practical, pragmatic construction based upon the facts and circumstances of each case. *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982). Although no single solution will satisfy every case, the degree of assurance necessary falls considerably short of an absolute guaranty. *In re Decora Indus., Inc.*, No. 00-4459, 2002 WL 32332749, at *8 (D. Del. May 20, 2002) (citing In re Prime Motor Inns, Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994)). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605−06 (Bankr. S.D.N.Y. 1986).

105.     The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assigned Contracts to the Successful Bidder(s) will be satisfied. As required by the Bidding Procedures, all bidders must provide Adequate Assurance Information to the Debtors to participate in the Auction. The Debtors will evaluate such Adequate Assurance Information relating to the financial wherewithal of potential bidders before designating such party as a Qualified Bidder (e.g., financial credibility, willingness, and ability of the interested party to perform under the Assigned Contracts) and will demonstrate such financial wherewithal, willingness, and ability to perform under the Assigned Contracts assigned to the Successful Bidder to the relevant Counterparties. Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of any Successful Bidder(s) to provide adequate assurance of future performance and object to the assumption of the Assigned Contracts or proposed Cure Costs. The Court therefore should have a sufficient basis to authorize the Debtors to reject or assume and assign the Assigned Contracts.

**J.       Relief from the Fourteen Day Waiting Period Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

106.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Debtors request that the Sale Order be effective immediately by providing that the fourteen (14) day stay under Bankruptcy Rules 6004(h) and 6006(d) are waived.

107.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006.  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen (14) day stay period, Collier suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." *Collier on Bankruptcy* ¶ 6004.11 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id*.

108.    To maximize the value received for the assets and to satisfy the terms and Milestones of the DIP Credit Agreement, the Debtors seek to close the sale of the Assets on or before September 30, 2024. Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## <u>NOTICE</u>

109.    Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) Counsel to Breakwater; (b) all persons and entities known by the Debtors to have asserted any lien, claim, interest or encumbrance in the Assets (for whom identifying information and addresses are available to the Debtors); (c) Counterparties to any Contract that may be assumed or rejected; (d) any governmental authority known to have a claim against the Debtors in these Cases;  (e) the Office of the United States Trustee; (f) the Federal Trade Commission; (g) the Bureau of Consumer Protection;  (h) all applicable federal, state and local taxing authorities, including the Internal Revenue Service; (i) the United States Attorney's

Office for the District of Delaware; (j) United States Attorney General's Office for the District of Delaware; (k) the Office of the Attorney General and the Secretary of State in each state in which the Debtors operate; (l) the California Department of Alcoholic Beverage Control; (m) the Arizona Department of Liquor Licenses and Control; (n) counsel for the Committee; (o) all of the parties entitled to notice pursuant to Bankruptcy Rule 2002; and (p) all other parties as directed by the Court. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**<u>NO PRIOR REQUEST</u>**

110.    The Debtors have not previously sought the relief requested herein from this or any other Court.

WHEREFORE, the Debtors respectfully request entry of the Bidding Procedures Order, substantially in the form attached hereto as **<u>Exhibit A</u>**, the Sale Order upon the Sale Hearing, and grant such other and further relief as may be appropriate and proper.

Dated:  August 9, 2024
Wilmington, Delaware

**RAINES FELDMAN LITTRELL LLP**

*/s/ Thomas J. Francella, Jr.*
Thomas J. Francella Jr. (DE Bar No. 3855)
1200 North Broom Street
Wilmington, DE 19806-4204
Telephone: (302) 772-5805
Email: tfrancella@raineslaw.com

and

**SHULMAN BASTIAN FRIEDMAN & BUI LLP**
Alan J. Friedman (admitted *pro hac vice*)
Melissa Davis Lowe (admitted *pro hac vice*)
Max Casal (admitted *pro hac vice*)
100 Spectrum Center Drive; Suite 600
Irvine, CA 92618
Telephone:  (949) 340-3400
Facsimile:  (949) 340-3000
E-mail:
afriedman@shulmanbastian.com
mlowe@shulmanbastian.com
mcasal@shulmanbastian.com

*Proposed Counsel to the Debtors and Debtors in
Possession*