**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: | Chapter 11 |
| ONE TABLE RESTAURANT BRANDS, LLC, *et al.*,[1] | Case No.24-11553 (KBO) |
| Debtors. | (Jointly Administered) |
| | RE: Docket Nos. 14 & 64 |

**SECOND INTERIM ORDER (I) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION FINANCING AND USE CASH COLLATERAL;  (II) GRANTING
PRIMING AND OTHER LIENS AND SUPER-PRIORITY CLAIMS AND ADEQUATE
PROTECTION; (III) MODIFYING THE AUTOMATIC STAY; AND
AND (IV) GRANTING RELATED RELIEF**

Upon consideration of the Debtors' motion (the "Motion")[2] for Order (I) Authorizing

Debtors to Obtain Postpetition Financing and Use of Cash Collateral; (II) Granting Priming and

Other Liens and Super-Priority Claims and Adequate Protection; (III) Modifying the Automatic

Stay; and (IV) Granting Related Relief [Docket 14]; and after entry of the Interim Order (I)

Authorizing Debtors to Obtain Postpetition Financing and Use of Cash Collateral; (II) Granting

Priming and Other Liens and Super-Priority Claims and Adequate Protection; (III) Modifying the

Automatic Stay; and (IV) Granting Related Relief [Docket 64] ("Interim Order"); and it appearing

that approval of the additional interim relief set forth in this Second Interim Order on an interim

basis is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending

the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors,

their estates, and all parties-in-interest, and is essential for the continued operation of the Debtors'

businesses and the preservation of the value of the Debtors' assets; and it appearing that the

---

[1] The Debtors in these Chapter 11 cases, along with the last four (4) digits of their federal tax identification numbers are (1) One Table Restaurant Brands, LLC, a Delaware limited liability company (9853); (2)  One Table Restaurant Operations, LLC, a Delaware limited liability company (7280), (3) Tender Greens OpCo, LLC, a Delaware limited liability company (7827); (4) Tocaya Holdings LLC, a Nevada limited liability company (8815); (5) Tocaya Organica, LLC, a California limited liability company (6720); (6) Tocaya Management LLC, a Nevada limited liability company (6789); (7) BLT Steak LA LLC, a California limited liability company (4688); (8) Tocaya Venice LLC, a California limited liability company (0159); (9) Tocaya South Bay, LLC, a California limited liability company (0401); (10) Tocaya Toluca, LLC, a California limited liability company; and (11) Tocaya Santa Monica LLC, a California limited liability company (8134).  The Debtors' mailing address is:  1201 W. 5th Street, Suite T-400, Los Angeles, CA 90017.

2 Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the DIP Credit Agreement (a copy of which was attached to the Interim Order as Exhibit 1) or the Interim Order, as applicable.

Debtors' entry into the DIP Credit Agreement is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW**

A.    <u>Petition Date</u>.  On July 17, 2024 ("<u>Petition Date</u>"), the Debtors filed their respective voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Debtors are continuing in possession of their property, and operating and managing their businesses, as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.    <u>Jurisdiction.</u> This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334.  This matter constitutes a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Court has the authority to enter a final order in this matter. Venue is proper in this jurisdiction pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    <u>Service of Motion and Notice of Interim Hearing</u>. Proper and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

D.    <u>Findings Regarding Postpetition Financing and the Use of Cash Collateral</u>.

(i)    <u>Request for Postpetition Financing.</u>  The Debtors seek authority on a second interim basis to enter into the DIP Facility on the terms described herein and in the DIP Documents and for authority to use Cash Collateral to administer their Cases and fund their operations in accordance with the Approved Budget, subject to Permitted Variances (as defined herein) and unless otherwise expressly specified in the DIP Credit Agreement. At the Final Hearing, the Debtors will seek final approval of the proposed postpetition financing and use of Cash Collateral arrangements pursuant to the Final Order, which shall be in form and substance acceptable to the DIP Lender. Notice of the Final Hearing and Final Order will be provided in accordance with this Second Interim Order.

(ii)    <u>Immediate Need for Postpetition Financing.</u>  An immediate and ongoing need exists for the Debtors to obtain the proceeds of the DIP Facility and to continue the use of Cash Collateral in order to permit, among other things, the Debtors to meet their obligations arising during the Cases, including the administration of the Cases, so as to maximize the value of their businesses and assets as Debtors in possession under Chapter 11 of the Bankruptcy Code. The Debtors do not have sufficient available sources of working capital to operate their businesses without access to the DIP Facility, and their existing liquidity is deteriorating at a rate that requires immediate access to the proceeds of the DIP Facility and warrants expedited consideration of the Motion and entry of this Second Interim Order. The Debtors' ability to preserve and maintain their assets, make rent payments, to pay employees, and to otherwise fund operations and an orderly reorganization process, is essential to the Debtors' viability and preservation of the going-concern value of their business and the value of their assets. Without access to the DIP Facility, the Debtors' estates would suffer immediate and irreparable harm.

(iii)    <u>No Credit Available on More Favorable Terms.</u> The Debtors are unable to obtain financing on more favorable terms than the DIP Facility and are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or secured credit solely under section 364(c) of the Bankruptcy Code.

(iv)    <u>Approved Budget.</u> The Debtors have delivered to the DIP Lender the Approved Budget which is reasonably acceptable to the DIP Lender in accordance with the DIP Documents. The DIP Lender is relying upon the Approved Budget in entering into the DIP Documents

(v)    <u>Use of Proceeds of the DIP Facility and Cash Collateral.</u>  As a condition to the Debtors' entry into the DIP Documents and the extensions of credit under the DIP Facility, the DIP Lender and the Debtors have agreed that the proceeds of the DIP Facility shall be used, in each case in a manner consistent with the terms and conditions of this Second Interim Order and the DIP Documents and in accordance with the Approved Budget and subject to such variances as permitted in the DIP Credit Agreement (such variances, "<u>Permitted Variances,</u>") solely for the

purpose set forth in (a)-(g) below, (collectively the "Permitted Uses of the DIP Facility and Cash Collateral"):

    a.   post-petition working capital and maintenance capital expenditure purposes of the Debtors;

    b.   current interest, fees, and expenses under the DIP Facility;

    c.   payment of adequate protection expenses for the Prepetition Lenders;

    d.   the allowed administrative costs and expenses of the Cases, including professional fees and expenses;

    e.   payment of prepetition claims authorized by the Bankruptcy Court;

    f.   any forecasted cash outlays included in any Approved Budget; or

    g.   as otherwise agreed; in each case, solely in accordance with the Approved Budget and the applicable Financing Order incorporating the terms hereof.

E.    Section 506(c). Subject to the entry of the Final Order, (x) the DIP Lender's agreement that its liens and superpriority claims are subject to the Carve Out and (y) the Prepetition Lenders' consent to use of Cash Collateral and Prepetition Collateral under the Interim Order and this Second Interim Order and the Debtors' right to use Cash Collateral and Prepetition Collateral: (i) are in lieu of any section 506(c) claim, payment or priority for the costs or expenses of the administration of any of these Cases; and (ii) are granted as consideration for (among other things) the waiver of the exceptions provided in sections 552(b)(1) and (2) of the Bankruptcy Code, which exceptions are hereby waived.

F.    Good Faith of the DIP Lender.

(i)    Certain Conditions to DIP Facility. The DIP Lender's willingness to make the DIP Facility available is conditioned upon, among other things, (a) the Debtors obtaining Court approval to enter into the DIP Documents and to incur all of their obligations thereunder, and to confer upon the DIP Lender all rights, powers, and remedies thereunder, (b) the DIP Lender being granted, as security for the prompt payment of the obligations under the DIP Facility and all other DIP Obligations, perfected security interests in and liens upon the DIP Collateral, and that such

perfected security interests and liens have the priorities set forth herein and (c) the Interim and Final Orders including releases of the DIP Lender, and their affiliates and others.

(ii) <u>Fair and Reasonable Terms</u>. The terms and conditions of the DIP Facility and the use of Cash Collateral, if any, are fair and reasonable, are the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration, have been negotiated in good faith and at arm's length between the Debtors and the DIP Lender, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code.

G. <u>Debtors' Stipulations</u>. After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest pursuant to the Challenge Period described in the paragraph below titled "Challenge Period," the Debtors, on their own behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree as follows (collectively, the "<u>Debtors' Stipulations</u>"):

(i) Prior to the Petition Date, One Table Restaurant Operations, LLC ("<u>OTRO</u>"), Tender Greens OpCo, LLC ("<u>Tender Greens OpCo</u>") and Tocaya Holdings LLC ("<u>Tocaya Holdings</u>," and collectively with OTRO and Tender Greens OpCo, "<u>Borrowers</u>"), One Table Restaurant Brands, LLC ("<u>OTRB</u>"), and certain subsidiaries of OTRB (as guarantors) entered into a credit agreement dated as of July 23, 2021 (as amended from time to time, the "<u>Prepetition Credit Agreement</u>" and, with related documents, "<u>Prepetition Loan Documents</u>") with the Prepetition Lenders and Breakwater (in its capacity as administrative agent and collateral agent for the Prepetition Lenders) for a $28.8 million senior secured term loan credit facility (the "<u>Prepetition Loan</u>"). The Prepetition Loan has a variable interest rate based on the secured overnight financing rate plus a margin of 9.6%. Currently, the interest rate is 15.9% and interest payments total roughly $4.5 million annually. As of the Petition Date, approximately $28.8million remains outstanding (the "<u>Prepetition Debt</u>") under the Prepetition Loan, plus accrued and unpaid interest, fees and expenses. Concurrently with the Prepetition Credit Agreement, the parties

entered into a security agreement, guarantee agreement, and certain control agreements which granted Breakwater, for the benefit of the Prepetition Lenders, a first priority security interest in all of the assets of the Debtors.

(ii)     All Prepetition Loan Documents are valid, binding, and enforceable by the Prepetition Lenders against each of the relevant Debtors.

(iii)     As of the Petition Date, each of the Debtors was indebted and liable, without any objection, defense, counterclaim, recoupment, challenge, or offset of any kind, to the Prepetition Lenders pursuant to the Prepetition Loan Documents, in the principal amount of not less than $28,800,000, plus, in each case, all accrued or hereafter accruing and unpaid interest thereon and any additional amounts, charges, fees and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Loan Documents as to such Debtor) now or hereafter due under the Prepetition Loan Documents (all obligations of each Debtor arising under any Prepetition Loan Documents, including all loans, advances, debts, liabilities, principal, interest, fees, charges, expenses and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts owing to the Prepetition Lenders by such Debtor, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, shall be referred to herein collectively as the "Prepetition Obligations"), which Prepetition Obligations are legal, valid, and binding obligations of each relevant Debtor and no portion of which is subject to avoidance, disallowance, reduction, recharacterization, subordination, or other challenge pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(iv)     Pursuant to the Prepetition Loan Documents and to the extent set forth therein, as of the Petition Date, each Debtor granted to the Prepetition Lenders, to secure such Debtor's Prepetition Obligations, a valid, duly authorized, non-voidable, binding, perfected, first-priority security interest in the Prepetition Collateral (as defined in the Prepetition Credit Agreement).

6

(v)      The Debtors have a critical need to obtain postpetition financing under the DIP Facility and to use Cash Collateral, as applicable, to, among other things, pay the costs and expenses associated with administering these Cases, continue the orderly operation of the Debtors' businesses, maximize and preserve the Debtors' going concern value, make lease and other contractual payments, and satisfy other working capital and general corporate purposes, in each case, in accordance with the Approved Budget, and to provide adequate protection. The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without access to the DIP Facilities and the authorized use of Cash Collateral, as applicable.

(vi)      In light of the Debtors' facts and circumstances, the Debtors would be unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code, or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (a) a senior lien on unencumbered assets of their estates under section 364(c)(2) of the Bankruptcy Code, and (b) a junior lien on encumbered assets under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code from sources other than the DIP Lender on terms more favorable than the terms of the DIP Facility. The only viable source of secured credit available to the Debtors, other than the use of Cash Collateral, is the DIP Facility. The Debtors require both additional financing under the DIP Facility and the continued use of Cash Collateral, as applicable, under the terms of the DIP Documents and subject to the Final Order, to satisfy their postpetition liquidity needs. The DIP Lender has indicated a willingness to provide the Debtors with certain financing commitments, and the Prepetition Lenders authorize the use of Prepetition Collateral, including Cash Collateral, but solely on the terms and conditions set forth in the DIP Documents and subject to the Final Order.

(vii)      Accordingly, after considering all of their practical alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided

by the DIP Lender pursuant to the terms of the DIP Documents represents the best financing currently available to the Debtors.

(viii)    Good cause has been shown for immediate entry of this Second Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2. Entry of this Second Interim Order is in the best interest of the Debtors, their estates and creditors. The terms of the DIP Facility (including the Debtors' continued use of the Prepetition Collateral, including Cash Collateral) are in the best interest of the Debtors' estates under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration for the Prepetition Lenders' consent thereto.

(ix)    The Debtors, the DIP Lender and the Prepetition Lenders have negotiated the terms and conditions of the DIP Facility (including the Debtors' continued use of the Prepetition Collateral, including Cash Collateral) in good faith and at arm's length, and any credit extended and loans made to the Debtors pursuant to the DIP Documents and the Debtors' Stipulations shall be, and hereby are, deemed to have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code. Subject to the paragraph below titled "Challenge Period," the Prepetition Lenders are entitled to receive adequate protection as set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code for any diminution in the value of the Prepetition Collateral, including Cash Collateral, resulting from the automatic stay or the Debtors' use, sale or lease of the Prepetition Collateral, including Cash Collateral, during these Cases.

H.    Adequate Protection. The Prepetition Lenders and Bank of America, N.A., as "Bank" thereunder and as assignee of Bank of America Merchant Services, LLC (in such capacities, the "Card Processor") under certain agreements between the Debtors and the Card Processor regarding the Debtors' card processing system (collectively, the "Card Processing Agreement"), are entitled to adequate protection as and to the extent set forth herein pursuant to sections 362, 363 and 364 of the Bankruptcy Code. Based on the DIP Motion and on the record

presented to the Court, the terms of the payment of adequate protection expenses for the Prepetition Lenders and Card Processor are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Collateral, including cash collateral.

I.    <u>Finding of Good Cause</u>. Good cause has been shown for the entry of this Second Interim Order and authorization for: (a) the DIP Lender to provide the Debtors with the DIP Facility and (b) the Debtors to accept, incur, and undertake the DIP Obligations pursuant to the DIP Documents during the Interim Period as extended under this Second Interim Order. The Debtors' need for financing of the type afforded by the DIP Documents is critical. Entry of this Second Interim Order will preserve the value of the assets of the Debtors' estates and is in the best interests of the Debtors, their creditors and their estates. The terms of the DIP Facility are fair and reasonable, including the interest rates, fees and expenses owed thereunder, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

J.    <u>Finding of Good Faith</u>. Based upon the record presented at the Interim Hearing, the DIP Facility has been negotiated in good faith and at arm's length between the Debtors, on the one hand, and the DIP Lender, on the other. All of the DIP Obligations, including the DIP Facility made pursuant to the DIP Documents and all other liabilities and obligations of the Debtors under this Second Interim Order, owing to the DIP Lender shall be deemed to have been extended by the DIP Lender in "good faith," as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code. The DIP Lender and Card Processor shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Second Interim Order or any provision hereof is reversed, or modified, on appeal.

K.    <u>Immediate Entry</u>. The Debtors have requested immediate entry of this Second Interim Order pursuant to Bankruptcy Rule 4001(c)(2) and the Local Rules. Absent the immediate grant by the Court of the interim relief sought by the Motion, the Debtors' estates will be

immediately and irreparably harmed pending the Final Hearing. The consummation of the DIP Facility in accordance with the terms of this Second Interim Order and the other DIP Documents, is in the best interest of the Debtors' estates, and is consistent with the Debtors' exercise of their fiduciary duties. Under the circumstances, the notice given by the Debtors of the Motion and Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 4001(c) and the Local Rules. No further notice of the relief sought at the Interim Hearing is necessary or required.

L.    <u>Notice of Interim Hearing.</u> Notice of this Interim Hearing and the relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier, or hand delivery, to certain parties-in-interest, including, among others: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel for the DIP Lender and the Prepetition Lenders; (c) the holders of the 30 largest claims against the Debtors on a consolidated basis; (d) all known holders of liens upon the Debtors' assets; (e) the attorneys general in the states in which the Debtors conduct their business; (f) the Internal Revenue Service; and (g) all parties that have filed notices of appearance pursuant to Bankruptcy Rule 2002.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDICATED, AND DECREED as follows:**

1.    <u>Grant of Motion; Authorization of Interim Financing; Use of Proceeds</u>.

(a)    The Motion is hereby granted on an interim basis, as and to the extent provided herein, and the Court hereby authorizes and approves the Debtors' execution and delivery of the DIP Documents, and the Debtors' execution and delivery of all instruments, security agreements, assignments, pledges and other documents referred to therein or reasonably requested by the DIP Lender to give effect to the terms thereof and as will be drafted and executed as contemplated therein, in each case, in final form and substance consistent with the Interim Order and this Second Interim Order and otherwise reasonably acceptable to the DIP Lender and the Debtors.

(b)      The Debtors are hereby authorized to borrow under the DIP Documents and this Second Interim Order up to an additional $600,000 (the "Second Interim Advance") (or a total of $2,300,000), plus an additional roll-up based on the Second Interim Advance of $2,400,000 of the Prepetition Loan (or a total of $9,200,000 (the "Interim Roll Up Loan"), during the Interim Period, subject to any conditions and limitations on availability in the DIP Documents, plus all interest, fees, and other charges payable in connection with the DIP Facility as provided in the DIP Credit Agreement and the other DIP Documents; to incur any and all liabilities and obligations under the DIP Documents; to pay all principal, interest, fees, expenses, and other obligations provided for under the Approved Budget, subject to the Permitted Variance (defined below) and the other DIP Documents. The Prepetition Loan shall be automatically and irrevocably deemed reduced by the amount of the Interim Roll Up Loan.

(c)      The DIP Lender is not obligated to or responsible for monitoring the use of the proceeds of the DIP Facility and may rely upon the Debtors' representations that the amount of the DIP Facility requested at any time, and the use thereof, are in accordance with the requirements of the Interim Order and this Second Interim Order, the Approved Budget, the DIP Documents, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

(d)      The Debtors may obtain and use the DIP Facility proceeds during the Interim Period only as permitted under the DIP Documents. For the avoidance of doubt, no DIP Facility proceeds may be used to make any payment in settlement or satisfaction of any prepetition claim or administrative claim, unless such payment is (x) in compliance with the Approved Budget or (y) separately approved or authorized by the Court upon notice to the Lender.

2.       Committee's Reservation of Rights.  The Committee reserves all of its rights as to any roll-up on the Second Interim Advance and with respect to the other relief set forth herein, in the Interim Order, and in connection with final approval of the DIP Facility.

3.       Entry into, Execution, Delivery, and Performance of DIP Documents.  The Debtors are hereby authorized (a) to enter into the DIP Credit Agreement and the other DIP Documents, (b) to incur and perform the DIP Obligations arising from and after the date of this Second Interim

Order under the DIP Facility, (c) to repay amounts borrowed, together with interest, and to pay all fees, costs, and expenses contemplated therein, as well as any other outstanding DIP Obligations to the DIP Lender in accordance with and subject to the terms and conditions set forth in this Second Interim Order, the other DIP Documents, and such additional documents, instruments, and agreements as may reasonably be required by the DIP Lender to implement the terms or effectuate the purpose of and transactions contemplated by the DIP Documents, the terms of which are incorporated by reference. The DIP Documents may be executed and delivered on behalf of the Debtors by any officer, director, or agent of the Debtors, who by signing shall be deemed to represent himself or herself to be duly authorized and  empowered to execute such DIP Documents for and on behalf of the Debtors; the DIP Lender shall be authorized to rely upon any such person's execution and delivery of any of the DIP Documents as having done so with all requisite power and authority to do so; and the execution and delivery of any of the DIP Documents by any such person on behalf of the Debtors shall be conclusively presumed to have been duly authorized by all necessary corporate action of the Debtors. Upon execution and delivery thereof, each of the DIP Documents shall constitute valid and binding obligations of the Debtors, enforceable against the Debtors (and any successor in interest including any chapter 7 or chapter 11 trustee) in accordance with its terms for all purposes during their Cases, any subsequently converted case of the Debtors under chapter 7 of the Bankruptcy Code (a "Successor Case"), and after the dismissal of any of the Cases. No obligation, payment, or transfer under the DIP Documents, the  Interim Order or this Second Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law (including under sections 502(d), 544, 547, 548, 549, 550 or 553 of the Bankruptcy Code or under any applicable Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act, or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim.

4.      Use of DIP Facility and Cash Collateral. The Debtors are hereby authorized to use Cash Collateral solely in accordance with the Permitted Uses of the DIP Facility and Cash

Collateral as set forth in the Interim Order, the Second Interim Order and the DIP Documents and to the extent set forth in the Approved Budget.

5.      Restrictions on Use of DIP Facility and Cash Collateral.  Proceeds of the Loans shall not be used for any purpose other than provided in Section 2.8 of the DIP Credit Agreement. Additionally, no Debtor  shall use any part of proceeds of the Loans to purchase or carry, or to reduce or retire or refinance any credit incurred to purchase or carry, any margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System) or for any other purpose which would violate Regulation U or Regulation T or X of such Board of Governors or for any other purpose prohibited by law or by the terms and conditions of the DIP Credit Agreement. None of the Carve-Out, any Cash Collateral, the DIP Facility, the DIP Collateral, or the Prepetition Collateral may be used to investigate or challenge the amount, validity, perfection, priority or enforceability of, or assert any defense, counterclaim or offset to, the DIP Facility, or the DIP Documents or the Prepetition Debt or the Prepetition Loan Documents, or the security interests and liens securing any of the DIP Obligations or the Prepetition Debt, or to fund prosecution or assertion of any claims, or to otherwise litigate against the DIP Lender, provided that up to $25,000 shall be made available to the Committee[3] for investigation costs in respect of the stipulations contemplated herein or otherwise set forth in the Interim Order, this Second Interim Order or Final Order (collectively, the "Financing Orders").

6.      DIP Facility Interest Rate and Fees. The New Money Loans and the Roll-Up Loans shall accrue interest at the same interest rate as provided in the Pre-Petition Loan, with a default interest rate of an additional 3.00% per annum.  All interest is limited to the Maximum Rate.  The DIP Facility shall provide for an administrative fee of 3% percent of the DIP Facility Commitment, which shall be paid in cash to Breakwater as administrative agent on the date on which all such conditions precedent set forth in Article IV of the DIP Credit Agreement have been satisfied or waived in writing by the DIP Lender (the "Closing Date").

---

[3] On August 2, 2024, the Official Committee of Unsecured Creditors (the "Committee") was appointed in these Cases, pursuant to section 1102(a)(1) of the Bankruptcy Code [Docket 80].

7.        <u>Priority and Security of the DIP Liens</u>.

(i)        Subject to the Carve-Out (as defined below), all obligations of the Debtors under the DIP Facility (the "<u>DIP Obligations</u>") shall be:

i.    entitled to superpriority claim status under section 364(c)(1) of the Bankruptcy Code with priority over all administrative expense claims and unsecured claims existing as of the Petition Date or arising thereafter under the Bankruptcy Code, including, without limitation, the prepetition claims and adequate protection claims of the Prepetition Lenders, subject only to the Carve-Out (the "<u>DIP Superpriority Claims</u>"). The DIP Superpriority Claims may be repaid from any cash of the Debtors, including without limitation, Cash Collateral and, following entry of the Final Order, the proceeds of Avoidance Actions (as defined below) and property received or recovered thereby (the "<u>Avoidance Action Proceeds</u>");

ii.    secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by valid, enforceable, first priority, fully perfected security interests in and liens on all of the Debtors' rights in property of the Debtors' estates as of the Petition Date that, as of the Petition Date, were unencumbered (and do not become perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) (including, following entry of the Final Order, Avoidance Action Proceeds) (such liens, subject only to the Carve-Out);

iii.    secured, pursuant to section 364(c)(3) of the Bankruptcy Code, by valid, enforceable, fully perfected junior security interests in and liens on all of the Debtors' rights in property of the Debtors' estates as of the Petition Date that were subject to valid, perfected and non-avoidable liens and unavoidable liens in existence immediately prior to the Petition Date, if any, or valid liens in existence as of the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (the "<u>Permitted Prior Liens</u>"), which security interests and liens shall be junior and subordinate only to such Permitted Prior Liens and the Carve-Out;

iv.    secured, pursuant to section 364(d)(1) of the Bankruptcy Code, by valid, enforceable, priming first priority, fully perfected security interests in and liens upon all of the

Debtors' rights in property of the Debtors' estates as of the Petition Date, and all of the Debtors'

rights in property acquired post-petition (and proceeds thereof), whether now existing or hereafter

acquired or arising, that secure the Prepetition Debt (such lien, together with the liens described in

clauses (i) through (iii) above, the "DIP Liens" and the collateral described in clauses (i) through

(iv) above, collectively, the "DIP Collateral"), which liens shall be subject to the Carve-Out. The

DIP Collateral shall also include any and all rents, issues, products, offspring, proceeds and profits

generated by any item of DIP Collateral.  Notwithstanding the foregoing, for the avoidance of

doubt, DIP Collateral shall not include, and no liens granted pursuant to this Order shall attach to,

the Debtors' real property leases, but may include all proceeds from the sale or other disposition

of such leases.

(ii)    The DIP Liens were effective immediately upon the entry of the Interim

Order and shall not at any time be subject or subordinate to (i) any lien or security interest that is

avoided and preserved for the benefit of any Debtor and their estates under section 551 of the

Bankruptcy Code, (ii) any liens arising after the Petition Date including, without limitation, any

liens or security interests granted in favor of any federal, state, municipal or other governmental

unit, commission, board or court for any liability of any Debtor, or (iii) any intercompany or

affiliate liens of any Debtor.

(iii)    The DIP Collateral will be free and clear of other liens, claims and

encumbrances, except valid, perfected, enforceable and unavoidable liens, rights of recoupment

enforceable in bankruptcy, and rights of setoff permissible under section 553 of the Bankruptcy

Code, in each case except as otherwise agreed by the applicable creditor or lienholder, as

applicable, in existence as of the Petition Date and permitted pursuant to the Prepetition Loan

Documents, if any.

(iv)    The DIP Liens automatically attached to the DIP Collateral and became

valid and perfected immediately upon entry of the Interim Order without the requirement of any

further action by the DIP Lender; provided that if the DIP Lender determines to file any financing

statements, notice of liens or similar instruments, the Debtors will cooperate and assist in any such filings and the automatic stay shall be modified to allow such filing.

8.    <u>Adequate Protection for Card Processor</u>.  Notwithstanding anything herein to the contrary, Card Processor shall receive adequate protection for the Debtors' use of the Card Processor's collateral securing the claims under the Card Processing Agreement (the "<u>Card Processor Obligations</u>"), including, but not limited to:

(i)    To secure the Card Processor Obligations, Card Processor hereby is granted valid and automatically perfected replacement liens and security interests in and on the DIP Collateral and Cash Collateral (the "<u>Card Processor Adequate Protection Liens</u>") with the same priority as Card Processor had prior to the Petition Date, to the extent of any diminution during these Cases in the value of Card Processor's interest in the Debtors' interest in property from the Petition Date ("<u>Card Processor's Prepetition Collateral</u>"), which Card Processor Adequate Protection Liens automatically attached to the DIP Collateral and Cash Collateral and became valid and perfected immediately upon entry of the Interim Order without the requirement of any further action; provided, that if the Card Processor determines to file any financing statements, notice of liens or similar instruments, the Debtors will cooperate and assist in any such filings and the automatic stay shall be modified to allow such filing.

(ii)    Card Processor hereby is granted superpriority administrative expense claims under sections 503 and 507 of the Bankruptcy Code, *pari passu* with the DIP Superpriority Claims, with priority over all administrative expense claims and unsecured claims existing as of the Petition Date or arising thereafter under the Bankruptcy Code, to the extent of any diminution in the value of Card Processor's interest in the Debtors' interest in property from the Petition Date (minus any amount remaining in the Reserve Account funded pursuant to subparagraph iv below) arising as a result of the use, sale, depreciation, or disposition of Card Processor's Prepetition Collateral, or the imposition of the automatic stay with respect to Card Processor's Prepetition Collateral.

(iii)    Card Processor shall receive timely payment of all Merchant Fees (as defined in the Cash Management Motion) and other Card Processor Obligations as and when they become due.

(iv)    Every Monday, beginning July 22, 2024 and continuing each Monday thereafter, Debtors shall fund (or by notice to the Debtors, the Card Processor may fund by holding back funds from settlement or debiting the Bank Accounts (as defined in the Cash Management Motion)) another $3,000 per week into the Reserve Account (as defined in the Card Processing Agreement) until the earlier of: (A) such Reserve Account being funded in the amount of $55,000.00 for the period before the Final Hearing (with all rights reserved as to  whether such maximum amount will increase after the interim period) or (B) Debtors having sold substantially all of their assets and ceasing to process transactions under the Card Agreement. For the avoidance of doubt, the Reserve Account shall be subject only to the Card Processor Adequate Protection Liens; the DIP Liens and any other adequate protection liens shall not attach to any amounts contained in any Reserve Account or any amounts held by Card Processor in relation to the Card Processing Agreement (including card settlements), except that such liens may attach to the Debtors' rights under the Card Processing Agreement and to any amounts paid to the Debtors thereunder.

9.    <u>Adequate Protection for Prepetition Lender</u>. Subject in all cases to the Carve-Out (as defined below), the Prepetition Lenders shall receive adequate protection for the Debtors' use of the collateral securing the Prepetition Loan, including, but not limited to:

(i)    payment of all interest accruing under the Prepetition Loan Documents as and when due pursuant to the Prepetition Loan Documents, to be paid in kind; provided that the Prepetition Lenders reserve their rights to assert default interest pursuant to the Prepetition Loan Documents in connection with the confirmation of a plan of liquidation or reorganization for the Debtors;

(ii)    replacement liens and security interests in DIP Collateral and superpriority administrative expense claims under sections 503 and 507 of the Bankruptcy Code, in each case

(and as applicable) junior only to the DIP Liens, DIP Obligations, and the Carve-Out (as defined below), to the extent of any diminution in the value of the Prepetition Lenders' interest in any Cash Collateral or other Prepetition Collateral (as defined in the Prepetition Credit Agreement) arising as a result of (A) the use, sale, or lease of Cash Collateral or other collateral, (B) the granting of priming liens to secure the DIP Facility, or (C) the imposition of the automatic stay;

(iii)    reimbursement by the Debtors of the reasonable and documented fees, costs, and out-of-pocket expenses incurred or accrued by the Prepetition Lenders (to include all unpaid prepetition reasonable and documented fees, costs, and out-of-pocket expenses) in connection with any and all aspects of the Debtors' Cases; and

(iv)    delivery of reporting and information as provided for in the DIP Documents.

(v)    The foregoing adequate protection liens automatically attached to the DIP Collateral and became valid and perfected immediately upon entry of the Interim Order without the requirement of any further action by the Prepetition Lenders; provided, that if the Prepetition Lenders determine to file any financing statements, notice of liens or similar instruments, the Debtors will cooperate and assist in any such filings and the automatic stay shall be modified to allow such filing.

10.    DIP Conditions Precedent. The obligation of DIP Lender to make the Initial Loan (or any Tranche thereof) is subject to the satisfaction of the following conditions precedent, among others:

(i)    DIP Lender shall have received executed copies of the DIP Credit Agreement and the other DIP Documents;

(ii)    the Bankruptcy Court shall have entered the Interim Order, in a form acceptable to the DIP Lender, in its sole and exclusive discretion, no later than five (5) Business Days after the Petition Date, which Interim Order shall be in full force and effect, and the Debtors shall be in compliance with the Interim Order;

(iii)    Lender shall have received a certificate executed by a duly authorized officer of each Debtor certifying (a) the names and signatures of the officers of such Person

authorized to execute the DIP Documents, (b) the resolutions duly adopted by the Board of Directors (or equivalent governing body) of such Person authorizing the execution of the DIP Credit Agreement and the other Loan Documents, as appropriate, (c) the correctness and completeness of the copy of the Operating Agreement (or equivalent governing document) of such Person attached thereto and (d) the correctness and completeness of the copy of the certificate of incorporation (or equivalent governing document) of such Person attached thereto;

(iv)    approval of the transaction by the credit committee of each of the Prepetition Lenders;

(v)    no later than two (2) days prior to the Petition Date, the DIP Lender shall have received the Initial Approved Budget;

(vi)    the Borrowers shall have provided the DIP Lender with a copy of the "first day" motions, including the cash management motion, and proposed orders to be filed with the Bankruptcy Court in connection with the commencement of the Cases;

(vii)    orders approving all "first day" motions other than the Interim Order shall have been entered;

(viii)    other than as set forth in the DIP Credit Agreement, the Borrowers shall not have executed, entered into or otherwise committed to any plan or restructuring support agreement or any other agreement or understanding concerning the terms of a Chapter 11 plan or other exit strategy without the consent of the DIP Lender;

(ix)    the Debtors shall be in compliance with the terms of the Interim Order, this Second Interim Order or the Final Order, as applicable;

(x)    the Debtors shall have provided a certificate confirming that all of the representations and warranties of the Debtors in the DIP Credit Agreement, as applicable, remain true and correct, unless otherwise agreed by the DIP Lender; and

(xi)    there shall be no defaults or Events of Default under the DIP Documents, as applicable, or any defaults or Events of Default shall have been waived by the DIP Lender

11.     <u>DIP Conditions Precedent to All Subsequent Advances.</u> The obligation of DIP Lender to make subsequent advances is also subject to, in addition to the conditions precedent to the Initial Loan, the following additional conditions, among others:

(i)      the Final Order shall have been entered by the Bankruptcy Court in a form acceptable to the DIP Lender, in its sole and exclusive discretion, shall be in full force and effect, shall not have been vacated or reversed, shall not be subject to a stay and shall not have been modified or amended other than as acceptable to the DIP Lender in its sole and exclusive discretion; and the Debtors shall be in compliance with the Final Order;

(ii)     all "second day orders" approving on a final basis any first day orders intended to be entered on or prior to the date of entry of the Final Order shall have been entered by the Bankruptcy Court,  shall be in full force and effect, shall not have been vacated or reversed, and shall not be subject to a stay;

(iii)    the Approved Budget shall demonstrate a need for the funds to be advanced under  this Agreement for the next week following the last Loan, and the Borrower Agents shall have delivered at 3 Business Days prior to the applicable draw date (or such shorter period as the Agents may agree in its sole discretion) the Notice of Borrowing showing the proposed use of such funds within the next week in accordance with an Approved Budget that was approved by Agents prior to receipt of the applicable Notice of Borrowing within the last week;

(iv)     no event shall have occurred or circumstance exists that has or could reasonably be expected to have a Material Adverse Change;

(v)      such advance or financial accommodation shall not be prohibited by any law or regulation or any order of any court or Governmental Authority or agency; and

(vi)     no Debtor shall have repudiated or made any anticipatory breach or repudiation of any of its obligations under any Loan Document.

12.     <u>Milestones.</u> Failure to comply with the following deadlines (collectively, the "<u>Milestones</u>") (each of which may be extended or waived with the prior written consent of the

DIP Lender, which such consent may be by e-mail, without further order of the Bankruptcy Court) shall be an Event of Default:

       (i)     The Bankruptcy Court shall have entered the Final Order by the date that is no later than September 6, 2024. This Milestone was originally set for 35 days after the Petition Date and was extended by the DIP Lender in connection with the Committee's request to continue the Final Hearing (as defined below).

       (ii)    The Bankruptcy Court shall have entered an order approving the bidding procedures of the sale contemplated by the Sale Motion (the "Sale") by the date that is no later than 45 days after the Petition Date.

       (iii)   The Bankruptcy Court shall have entered an order approving the Sale by the date that is no later than 75 days after the Petition Date.

       (iv)   The Sale shall be consummated by the date that is no later than 14 days after the Bankruptcy Court has entered its order approving the Sale.

       (v)    A chapter 11 plan shall be consummated by the date that is no later than 90 days after consummation of the Sale.

13.    <u>Proceeds of Avoidance Actions</u>. Subject to entry of the Final Order, the DIP Superpriority Claims shall have recourse to Avoidance Action Proceeds of all of the Debtors' claims and causes of action pursuant to sections 502(d), 544, 545, 547, 548, 549, 551, 553(b), 732(2), or 742(2) of the Bankruptcy Code (the "<u>Avoidance Actions</u>"), including all of the Debtors' claims and causes of actions pursuant to section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral or postpetition transfer of DIP Facility proceeds.

14.    <u>Representations and Warranties.</u> Prior to the funding of any of the Interim Advance, the Debtors shall be deemed to have made the representations and warranties set forth in the Prepetition Loan Documents, as applied to Article V of the DIP Credit Agreement.

15.    <u>Prepayment.</u> The Debtors may voluntarily, at any time, prepay any of the DIP Obligations and/or reduce the commitments under the DIP Facility at par plus accrued interest. Until the DIP Facility has been repaid in full and subject to the exception below and the Carve-

Out, the following mandatory prepayments will be required: (a) Concurrently with the receipt by any Debtor or any of its Subsidiaries of any proceeds from any Casualty Event, the Borrowers shall prepay the Loans in an amount equal to one hundred percent (100%) of such Net Casualty Proceeds from such Casualty Event to be applied as set forth in Section 3.12; and (b) 100% of any Net Disposition Proceeds from any disposition of any Collateral (other than in the ordinary course of business); (c) 100% of any proceeds received (x) under any insurance policy on account of the damage or destruction of any Collateral of any Loan Parties and (y) due to any taking or condemnation of any Collateral; (d) 100% of the Net Disposition Proceeds of the incurrence or issuance of any indebtedness or equity by any Debtor; provided that no Debtor shall incur or issue indebtedness or equity; (e) 100% of any proceeds received or any cash received by or paid to or for the account of any Debtor not in the ordinary course of business, including but not limited to tax refunds, pension plan reversions, indemnity payments and any purchase price adjustments and (f) 100% of the Net Disposition Proceeds from the consummation of any sale pursuant to a Sale Motion. Notwithstanding the foregoing, any Employee Retention Credit ("ERC") monies or refunds received by the DIP Borrower  may be used by the Debtors to fund working capital. Absent consent of the Parties, any ERC monies or refunds received by the DIP Borrower will not be used to prepay any of the DIP Obligations and/or reduce the commitments under the DIP Facility. Notwithstanding anything to the contrary herein, except as may be subject to the terms of the Debtors' nonresidential real property leases and otherwise to the fullest extent provided by applicable law, any rights granted herein shall not interfere with any rights held by a landlord to insurance proceeds for damage to a landlord's property.

16.    <u>Reporting and Information</u>.  Following the Closing Date, the Debtors shall be subject to the reporting and information covenants set forth in the Prepetition Loan Documents, modified in a customary manner to reflect the nature and tenor of the DIP Facility. Without limiting the generality of the foregoing, the Debtors shall deliver to the DIP Lender (i) Variance Reports (as defined below); (ii) copies of any pleadings or motions to be filed by or on behalf of any Debtor in the Cases at least three (3) days prior to such filing (or, if not practicable, as soon as reasonably

practicable), (iii) all notices required to be given to all parties specified in any Financing Order; and (iv) such other information (including access to the Debtors' books, records, personnel and advisors during normal business hours) as the DIP Lender may reasonably request. All such reporting shall be in form and with sufficient detail as is acceptable to the DIP Lender in its sole discretion.

17.     <u>Budget Maintenance</u>. The Debtors shall prepare for the DIP Lender's review and approval a thirteen-week (13-week) detailed rolling cash projection similar in form to the 13-week cash projection provided as part of the Initial Approved Budget which shall be thereafter updated each week (each, a "<u>Proposed Budget</u>"). Upon the Debtors' receipt of the DIP Lender's approval (in its sole discretion and exclusive) of a Proposed Budget, such budget shall become an "<u>Approved Budget</u>" and shall replace the then-operative Approved Budget for all purposes. The Initial Approved Budget shall be the Approved Budget until such time as a new Proposed Budget is approved, following which such Proposed Budget shall constitute the Approved Budget until a subsequent Proposed Budget is approved. The Debtors shall operate in accordance with the Approved Budget and all disbursements shall be consistent with the provisions of the Approved Budget (subject to the Permitted Variance (as defined below)). The Debtors may submit additional Proposed Budgets to the DIP Lender, but until the DIP Lender approves such Proposed Budget, it shall not become an Approved Budget and the Debtors shall continue to comply with the then-operative Approved Budget.

18.     <u>Budget Compliance</u>.

(i)     Beginning on the second business day following the first calendar week during which Petition Date occurs (the "<u>Initial Reporting Date</u>"), and continuing on the second business day of each week thereafter (collectively with the Initial Reporting Date, each a "<u>Reporting Date</u>"), the Debtors shall deliver to the DIP Lender, in a form consistent with the form of the Approved Budget, a variance report describing in reasonable detail, by line item, (i) the actual disbursements of the Debtors and actual receipts during the applicable Testing Period (as defined below); and (ii) any variance (whether positive or negative, expressed as a dollar variance

and as a percentage) between the actual receipts or disbursements, as applicable, during such Testing Period against the estimated receipts or disbursements, as applicable, for the applicable Testing Period, as set forth in the applicable Approved Budget (a "Variance Report"). For the avoidance of doubt, the Debtors shall deliver to the DIP Lender weekly Variance Reports following the Petition Date;

(ii)    As used herein, "Testing Period" shall mean the four week period ending on the Sunday immediately preceding the applicable Reporting Date. The last day of each Testing Period shall be a "Testing Date"). As of any applicable Testing Date, cash disbursements may vary from the Approved Budget by no more than 10.0% on an aggregate basis for all disbursement line items taken together in the aggregate (the "Permitted Variance");

(iii)    The Debtors shall be deemed to be in compliance with the Approved Budget for all purposes under the DIP Documents and the applicable Financing Orders unless, as of any Testing Date, the Debtors' actual cash receipts or disbursements vary from the Approved Budget by more than the applicable Permitted Variance as measured on any Testing Date (the "Variance Covenant").

19.    Affirmative Covenants. The Debtors shall (i) perform the affirmative covenants set forth in the DIP Documents, (ii) meet the case Milestones set forth in the DIP Documents; and (iii) on a weekly basis, deposit into a segregated account, funds in an amount equal to the  fees and expenses of persons or firms retained by (i) the Debtors pursuant to Sections 327, 328, or 363 of the Bankruptcy Code or (ii) any committee appointed in the cases ((i) and (ii) together, the "Estate Professionals")  incurred during the previous week up to the amount of such fees and expenses set forth in the Approved Budget and only to the extent there is an adequate reserve of cash for operations as determined by the Debtors.

20.    Negative Covenants. Following the Closing Date, the Debtors shall be subject to the negative covenants  as set forth in the DIP Documents.

21.    <u>Events of Default</u>. "<u>Events of Default</u>" under the DIP Facility shall include the occurrence of any of the following without the advance written consent of the DIP Lender in its sole discretion:

(i)    the failure or refusal of the Debtors to make any payment of the Obligations when due;

(ii)    the failure of any of the Debtors to properly observe or perform any obligation, agreement, covenant, or other provision contained in this Agreement or in any other Loan Document;

(iii)    the occurrence of any default or event of default under any of the other Loan Documents;

(iv)    any representation or warranty contained herein or in any of the other Loan Documents is false or misleading in any material respect when made or deemed made;

(v)    the failure to agree upon suitable Milestones (acceptable to Agents in its sole discretion) or to obtain entry of the Final Order pursuant to the Milestone set forth in this Second Interim Order;

(vi)    this Second Interim Order (or Final Order, if applicable) (A) at any time ceases to be in full force and effect or (B) shall be vacated, reversed, stayed, amended, supplemented or modified without the prior written consent of the Agents;

(vii)    except with the prior written consent of the Agents, the entry of an order in any of the Cases impairing or modifying any of the liens, rights, remedies, privileges, benefits or protections granted under this Second Interim Order (or Final Order, if applicable);

(viii)    the filing by any of the Debtors (or supporting another party in the filing of) a motion seeking entry of an order approving any key employee incentive plan, employee retention plan, or comparable plan, in each case without the prior written consent of the Agents;

(ix)    the bringing of a motion, taking of any action or the filing of any plan of reorganization other than in connection with a proposed refinancing and repayment in full in cash of the Obligations and the Prepetition Obligations on the date of the order granting such motion

or the effective date of such plan of reorganization: (A) to obtain financing under Section 364(c) or (d) of the Bankruptcy Code; or (B) to grant any Lien upon or affecting any Collateral unless permitted under this Second Interim Order (or Final Order, as applicable);

(x)    (A) the consensual use of prepetition Cash Collateral is terminated or modified, or (B) the entry of an order in any of the Cases terminating or modifying the use of Cash Collateral other than as provided in the DIP Credit Agreement and this Second Interim Order (or Final Order, as applicable), in each case, without the prior written consent of the Agents;

(xi)    the entry of an order in the Cases confirming a plan or plans of reorganization or liquidation that does not contain a provision for repayment in full in cash of the Prepetition Loan on or before the effective date of such plan or plans;

(xii)    the appointment or election of a Chapter 11 trustee, a responsible officer or an examiner (other than a fee examiner) under section 1104 of the Bankruptcy Code with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of any Chapter 11 Debtor;

(xiii)    the dismissal of any of the Cases or conversion of any of the Cases to a Chapter 7 case;

(xiv)    the entry of any order in any of the Cases (A) charging any of the Collateral, whether under Section 506(c) of the Bankruptcy Code or otherwise or (B) charging any of the Prepetition Collateral, whether under Section 506(c) of the Bankruptcy Code or otherwise;

(xv)    the entry of an order by this Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (A) to allow any creditor to execute upon or enforce a Lien on any Collateral, (B) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local regulatory agency or authority, or (C) the approval of any settlement or other stipulation with any creditor of a Debtor, other than the Agents, or otherwise providing for with respect to such Prepetition claim payments as adequate protection or otherwise to such creditor with respect to such Prepetition claim;

(xvi)    the commencement of a suit or action against the DIP Lender that asserts or seeks (A) any legal or equitable remedy that would have the effect of challenging, avoiding or subordinating any or all of the Obligations, Prepetition Obligations, Liens granted herein or any Prepetition Liens, or (B) would otherwise result in a Material Adverse Change;

(xvii)    the marshalling of any Collateral other than at the request of the Agents;

(xviii)    except for the Carve-Out, and except as expressly permitted hereunder, the entry of an order in any of the Cases granting any claim against any Debtor entitled to superpriority administrative expense status in any of the Cases pursuant to section 364(c)(2) of the Bankruptcy Code that is *pari passu* with or senior to the claims of the Agents (without the prior written consent of Agents);

(xix)    the entry of an order in any of the Cases (A) avoiding, disallowing, offsetting, recharacterizing, subordinating, disgorging or requiring repayment of any payments made to the Secured Parties on account of the Obligations, the Prepetition Obligations, the Orders, this Agreement, the other Loan Documents, or (B) reversing, recharacterizing or otherwise modifying all or any portion of the Roll-Up Loans;

(xx)    any Lien with respect to any material portion of the Collateral intended to be secured thereby ceases to be, or is not, valid or perfected.

(xxi)    any money judgment in excess of $1,000,000 (net of insurance coverage as to which the insurer has been notified of such judgment and has accepted coverage in writing) is rendered against any Loan Party that is not stayed pursuant to 11 U.S.C. 362;

(xxii)    a loss, theft, damage or destruction occurs with respect to any Collateral if the amount not covered by insurance exceeds $1,000,000;

(xxiii)    a Loan Party or any of its senior officers is criminally indicted or convicted for (i) a felony committed in the conduct of such Loan Party's business, or (ii) violating any state or federal law (including the Controlled Substances Act, Money Laundering Control Act of 1986 and Illegal Exportation of War Materials Act, each as amended) that could lead to forfeiture of any material property or any Collateral;

(xxiv)   Collateral Agent shall cease to have a valid, perfected and first priority Lien on any of the Collateral, except as otherwise expressly permitted herein or consented to in writing by Collateral Agent;

(xxv)   any provision of any Loan Document, at any time after its execution and delivery and for any reason, ceases to be in full force and effect; or any Loan Party or any other Person contests in writing in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document;

(xxvi)   the occurrence of a Change of Control;

(xxvii)  the occurrence of a Material Adverse Change after the Closing Date; or

(xxviii) the occurrence of any Event of Default set forth in this Second Interim Order; or

(xxix)   the (A) filing by any Debtor of (1) any chapter 11 plan other than the Plan of Reorganization, or any disclosure statement attendant to a chapter 11 plan other than the Plan of Reorganization, or (2) any direct or indirect amendment, or other document or instrument related to, the Plan of Reorganization (or any disclosure statement attendant thereto) that is materially inconsistent with the Plan of Reorganization to the extent such amendment, document or instrument relates to or impacts the Obligations, the Loan Documents or the DIP Lender and to which the Required Lenders (as defined in the DIP Credit Agreement) do not consent in writing, (B) the entry of an order approving a disclosure statement attendant to a chapter 11 plan other than the Plan of Reorganization, or (C) the entry of an order confirming a plan other than the Plan of Reorganization.

22.    Rights and Remedies Upon Default.

(i)      Any automatic stay otherwise applicable to the DIP Lender is hereby modified so that after the occurrence and during the continuation of any Event of Default (subject to any applicable grace periods under the DIP Documentation), and delivery by the DIP Lender of written notice of the occurrence of a default and of its intent to exercise remedies (a "Remedies

Notice") as set forth in the DIP Documentation, in each case given to the Debtor and its counsel, counsel to any Committee, and the U.S. Trustee, the DIP Lender shall be entitled to exercise its rights and remedies in accordance with the DIP Documentation without further order of the Bankruptcy Court beginning five (5) business days following delivery of the Remedies Notice (the "Remedies Notice Period") unless otherwise provided by order of the Bankruptcy Court. During the Remedies Notice Period, the Debtor, the Committee, and/or the U.S. Trustee shall be entitled to seek an emergency hearing before the Bankruptcy Court (a "Remedies Notice Hearing"). If an Event of Default under the DIP Documentation is determined to have occurred and be continuing, either by the Bankruptcy Court at a Remedies Notice Hearing or as a result of the expiration of the Remedies Notice Period without a timely response requesting a Remedies Notice Hearing having been filed, the automatic stay provisions of section 362 of the Bankruptcy Code will not be re-imposed or continue with respect to the DIP Lender without its written consent. If no response to the Remedies Notice or other responsive pleading is filed with the Bankruptcy Court during the Remedies Notice Period requesting an expedited hearing on such Remedies Notice, then the automatic stay provisions of section 362 of the Bankruptcy Code shall be deemed vacated and DIP Lender may exercise all rights and remedies provided for in the DIP Documentation, without further order from the Bankruptcy Court; provided, however, to the extent a Remedies Notice Hearing is occurring, then the Remedies Notice Period shall be extended pending a determination by the Bankruptcy Court.  Notwithstanding the occurrence of an Event of Default under the DIP Documentation or termination of the commitments under the DIP Credit Facility or anything herein to the contrary, all of the rights, remedies, benefits, and protections provided to the DIP Lender under the DIP Documentation shall survive after the Maturity Date. Upon the expiration of the Remedies Notice Period, the DIP Obligations shall be immediately due and payable and the DIP Lender shall have all other rights and remedies provided in the DIP Documentation. The Bankruptcy Court (or the United States District Court for the District of Delaware as the case may be) shall retain jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this paragraph and relating to the application, reimposition, or continuance of the

automatic stay with respect to the DIP Lender. For the avoidance of doubt, the Remedies Notice Period shall expire no later than the earliest date of cure or waiver of the applicable Event of Default or payment of the DIP Obligations in full in cash (or by credit bid by the DIP Lender).

(ii) Upon the occurrence and during the continuance of any Event of Default, and without further application to the Bankruptcy Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to take any of the following actions, at the same or different times:

    i.   issue the Remedies Notice (which may be by email) to the Debtors and their counsel, counsel for any Committee, and the U.S. Trustee (the "Remedies Notice Parties") declaring the occurrence of the Termination Date (as defined below);

    ii.   issue a Carve-Out Notice (as defined below);

    iii.   declare all DIP Obligations to be immediately due and payable without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Debtors;

    iv.   declare the suspension or termination of the DIP Facility as to any further liability or obligation of the DIP Lender thereunder, but without affecting the DIP Liens or DIP Obligations (the "Termination Notice"); and

    v.   charge the default rate of interest under the DIP Facility.

Notwithstanding anything to the contrary contained herein, following the occurrence and continuation of an Event of Default, the DIP Lender may only enter upon the Debtors' leased real property pursuant to (i) an agreement between the DIP Lender and the applicable landlords, (ii) applicable non-bankruptcy law, or (iii) a further order of this Court obtained by motion of the DIP Lender and following notice to the landlord as shall be required by this Court.

23.    <u>Maturity/Termination Date</u>. The DIP Facility and the Debtors' right to use Cash Collateral (as applicable) shall automatically terminate without further notice or court proceedings

on the earliest to occur of any of (i) through (vii) below (each a "Termination Date"), unless extended, with the prior written consent (which may be by e-mail) of the DIP Lender.

(i)      120 days after the Petition Date (the "Scheduled Maturity Date");

(ii)     the effective date of a plan of reorganization or liquidation for the Debtors confirmed in the Cases;

(iii)    the date of termination of the commitments under the DIP Facility and/or acceleration of any outstanding borrowings under the DIP Facility, in each case, by the DIP Lender following the occurrence of an Event of Default and upon the delivery of a Termination Notice to the Remedies Notice Parties, in each case, subject to the Debtors' right to use Cash Collateral during the Remedies Notice Period as set forth above, and pending the outcome of the Stay Relief Hearing;

(iv)     the first business day on which this Second Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto;

(v)      the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code unless otherwise consented to in writing (which may be e-mail) by the DIP Lender;

(vi)     the dismissal of any of the Cases, unless otherwise consented to in writing (which may be e-mail) by the DIP Lender; and

(vii)    the repayment in full in cash of all obligations and termination of all commitments under the DIP Facility.

24.    Repayment of DIP Obligations. The DIP Obligations shall be due and payable, and shall be paid, as and when provided in the DIP Documents and as provided herein, without defense, offset, or counterclaim. Without limiting the generality of the foregoing, in no event shall the Debtors be authorized to offset or recoup any amounts owed, or allegedly owed, by any DIP Lender to the Debtors or any of their respective subsidiaries or affiliates against any of the DIP Obligations without the prior written consent of the DIP Lender, if any, that would be adversely

affected by any such offset or recoupment, and no such consent shall be implied from any action, inaction or acquiescence by the DIP Lender.

25.   <u>Carve Out.</u>

(i)   Notwithstanding anything to the contrary in the DIP Documents, or the Financing Orders, the DIP Facility and the Adequate Protection shall be subject and subordinate to the Carve-Out. The Carve-Out shall include (a) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the Carve-Out Notice), (b) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the Carve-Out Notice), and (c) to the extent allowed by the Bankruptcy Court at any time, unpaid fees and expenses ("<u>Allowed Professional Fees</u>") of estate professionals incurred through the date of delivery of a Carve-Out Notice (defined below) up to the amounts for such professional included in the Approved Budget (which includes up to $200,000.00 for any committee and its professionals) through the date of the Carve-Out trigger notice and (d) to the extent allowed by the Bankruptcy Court at any time, up to $50,000 of fees and expenses incurred by the Estate Professionals after the first business day following delivery of a Carve-Out Notice (excluding, for the avoidance of doubt, any success fee, transaction fee, deferred fee or other similar fee set forth in any professional's engagement letter, the amounts set forth in this clause (d) being the "<u>Post Carve-Out Notice Cap</u>").

(ii)   "<u>Carve-Out Notice</u>" means a written notice (which may be by email) by the DIP Lender to the Debtors, Debtors' counsel, the U.S. Trustee, and counsel to any Committee stating that the Post Carve-Out Notice Cap has been invoked, which notice may be delivered only following the occurrence and during the continuation of an Event of Default.

(iii)   Delivery of a Carve-Out Notice shall constitute a demand to the Debtors to utilize all cash on hand (including the proceeds of DIP Facility) to fund a reserve in an amount equal to the Carve-Out, which shall be earmarked and held in trust to pay unpaid fees and expenses

incurred by Estate Professionals, to the extent allowed by the Bankruptcy Court at any time, prior to any and all other claims in the Cases (the "Carve-Out Reserve").

(iv)    All funds in the Carve-Out Reserve shall be used first to pay the obligations set forth in clauses (i)(a)-(d) in the above definition of "Carve-Out" until paid in full, and second, to pay the DIP Lender until paid in full. Notwithstanding anything to the contrary in the DIP Documents or the Financing Orders, the failure of the Carve-Out Reserve to satisfy in full the fees of Estate Professionals shall not affect the priority of the Carve-Out. The DIP Lender shall not be responsible for the payment or reimbursement of any fees or disbursements of any Estate Professionals or any fees or expenses of the U.S. Trustee or Clerk of the Court incurred in connection with these Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Second Interim Order or otherwise shall be construed to obligate the DIP Lender, in any way, to pay compensation to, or to reimburse expenses of, any Estate Professionals or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

26.    Roll-Up Loans.  Subject to the terms and conditions set forth in the DIP Credit Agreement, the Challenge Period (as defined below),  the Interim  Order and this Second Interim Order, effective immediately upon entry thereof and the disbursement of any installment of the Initial Loan or any subsequent Loan, the Prepetition Loan will be automatically deemed (on a cashless dollar- for-dollar basis) to constitute Loans under the DIP Credit Agreement, with $4 to be "rolled up" for each $1 in new money advanced ("Roll-Up Loans"). Upon any of the foregoing Roll-Up Loans, the Roll-Up Loans shall cease to be indebtedness under the Prepetition Credit Agreement and shall be deemed DIP Obligations and DIP Facility in all respects, including for purposes of having the benefit of section 364(e) of the Bankruptcy Code.

27.    Credit Bidding. Subject to entry of the Final Order and the Challenge Period (as defined below), the Prepetition Lenders and DIP Lender, respectively, shall have the right to credit bid pursuant to section 363(k) of the Bankruptcy Code and/or other applicable law the DIP Facility and Prepetition Loan, in whole or in part in their sole and absolute discretion, in connection with an anticipated stalking horse bid for the sale or disposition of assets by the Debtors in the Cases and

shall not be prohibited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code. Notwithstanding the foregoing, nothing herein shall affect or impair the right of any Committee or the U.S. Trustee to seek to disqualify from the auction any bidder based upon conduct at or prior to the auction.

28.      Section 506(c) Claims. Subject to entry of the Final Order, except to the extent of the Carve-Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from any DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender; and the Debtors shall irrevocably waive and shall be prohibited from asserting any claim described in this paragraph, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender upon the DIP Collateral.

29.      No Marshaling/Applications of Proceeds. Subject to entry of a Final Order, the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, and proceeds shall be received and applied pursuant to this Second Interim Order and the DIP Documents notwithstanding any other agreement or provision to the contrary.

30.      Section 552(b). Subject to the Final Order, the DIP Lender and Card Processor shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, the "equities of the case" exception under sections 552(b)(i) and (ii) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, products, rents, issues or profits of any of their collateral, and no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the collateral under section 552(b) of the Bankruptcy Code. Furthermore, subject to entry of the Final Order, the

Debtors and their estates shall be deemed to have irrevocably waived and have agreed not to assert any claim or right under sections 552 or 726 of the Bankruptcy Code to avoid the imposition of the liens of the DIP Lender or Card Processor on any property acquired by any of the Debtors or any of their estates or to seek to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by, the DIP Lender upon the DIP Collateral or the Prepetition Collateral (as defined in the Prepetition Credit Agreement), as applicable.

31.     <u>Payments Free and Clear</u>. All payments or proceeds remitted to the DIP Lender or Card Processor by or on behalf of the Debtors pursuant to the DIP Documents, the provisions of this Second Interim Order, or any subsequent order of this Court, shall be received free and clear of any claim, charge, assessment, or other liability, including any such claim or charge arising out of or based on, directly or indirectly, section 506(c) (subject to entry of the Final Order) or the "equities of the case" exception of section 552(b) of the Bankruptcy Code (subject to entry of the Final Order).

32.     <u>Acknowledgments and Stipulations.</u>  Subject to entry of the Second Interim Order, each of the Debtors' Stipulations shall be binding upon the Debtors and their bankruptcy estates (the "<u>Estates</u>"), and subject to the Challenge Period, any successors to the Debtors (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for all purposes.

33.     <u>Challenge Period</u>. Subject to the Challenge Period (defined below), the stipulations, admissions, waivers, and releases contained in the Interim Order, including the Debtors' Stipulations, shall be binding upon the Debtors, their estates, and any of their respective successors in all circumstances and for all purposes and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (defined below) as of the Petition Date. The stipulations, admissions, releases, and waivers contained in this Second Interim Order, including the Debtors' Stipulations, shall be binding upon all other parties in interest, including any Committee, chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors, and any

other person acting on behalf of the Debtors' estates, unless and to the extent that a party in interest with proper standing granted by order of the Court (or other court of competent jurisdiction) has timely and properly filed an adversary proceeding or contested matter under the Bankruptcy Rules (i) before seventy-five (75) calendar days after entry of the Interim Order, (the "Challenge Period" and, the date of expiration of the Challenge Period, the "Challenge Period Termination Date"); (ii) seeking to avoid, object to, or otherwise challenge the findings or Debtors' Stipulations regarding: (a) the validity, enforceability, extent, priority, or perfection of the mortgages, security interests, and liens of the Prepetition Lenders; or (b) the validity, enforceability, allowability, priority, secured status, or amount of the Prepetition Obligations (any such claim, a "Challenge"), and (iii) in which the Court enters a final order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter.[4] Upon the expiration of the Challenge Period Termination Date without the filing of a Challenge (or if any such Challenge is filed and overruled): (a) any and all such Challenges by any party (including any Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in these Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever barred; (b) the Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in the Debtors' Cases and any Successor Cases; (c) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected secured claims, not subject to recharacterization, subordination, or avoidance; and (d) all of the Debtors' stipulations and admissions contained in this Second Interim Order, including the Debtors' Stipulations, and all other waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the Prepetition Secured Parties' claims, liens, and interests contained in the  Interim Order and this Second Interim Order shall be of full force and effect and forever binding upon the Debtors, the Debtors' estates,

---

[4] Pending entry of the Final Order, the parties reserve all rights with respect to the extent and definition of a "Challenge."

and all creditors, interest holders, and other parties in interest in these Cases and any Successor Cases. If a chapter 7 trustee or a chapter 11 trustee is appointed or elected during the Challenge Period, then the Challenge Period Termination Date with respect to such trustee only, shall be the later of (i) the last day of the Challenge Period and (ii) the date that is twenty (20) calendar days after the date on which such trustee is appointed or elected.  If any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules and remains pending and the Cases are converted to chapter 7, the chapter 7 trustee may continue to prosecute such adversary proceeding or contested matter on behalf of the Debtors' estates. Furthermore, if any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules, the stipulations and admissions contained in this Second Interim Order, including the Debtors' Stipulations, shall nonetheless remain binding and preclusive on any Committee and any other person or entity except to the extent that such stipulations and admissions were expressly challenged in such adversary proceeding or contested matter prior to the Challenge Period Termination Date. Nothing in this Second Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including, without limitation, any Committee appointed in the Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation any challenges (including a Challenge) with respect to the Prepetition Loan Documents, the Prepetition Liens, and the Prepetition Obligations, and a separate order of the Court conferring such standing on any Committee or other party-in-interest shall be a prerequisite for the prosecution of a Challenge by such Committee or such other party-in-interest.

34.     <u>Adequate Protection of the Bank</u>.  [Reserved]

35.     <u>No Priming or Pari Passu Liens.</u>  No order shall be entered authorizing or approving any liens or encumbrances on the DIP Collateral or the Prepetition Collateral, as applicable, senior to or *pari passu* with the liens of the Prepetition Lenders other than the priming liens of the DIP Lender.

36.     <u>Payment of Expenses.</u> Debtors shall pay or reimburse all costs and expenses incurred by any Secured Party arising out of or in connection with the DIP Credit Agreement and

the DIP Facility, including but not limited to the expenses delineated in Section 14.2 of the DIP Credit Agreement.

37.     <u>Professional Fees.</u>  On a weekly basis, the Debtor shall deposit into a segregated account, funds in an amount equal to the Estate Professionals' fees and expenses incurred during the previous week up to the amount of such fees and expenses set forth in the Approved Budget and only to the extent there is an adequate reserve of cash for operations as determined by the Debtors. However, nothing in this Second Interim Order or otherwise shall be construed to obligate the DIP Lender in any way, to pay compensation to, or to reimburse expenses of, any professionals or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement. Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any Estate Professionals or shall affect the right of the DIP Lender to object to the allowance and payment of such fees and expenses.

38.     <u>Modification of Automatic Stay</u>. The automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to the extent necessary to implement the provisions of this Second Interim Order and the DIP Documents, thereby permitting the DIP Lender, as and to the extent provided herein, to receive proceeds of the DIP Collateral for application to the DIP Obligations, to file or record any UCC-1 financing statements, mortgages, deeds of trust, assignments, pledges, security deeds, or other instruments and documents evidencing or validating the perfection of any DIP Liens, and to enforce any DIP Liens; and as and to the extent provided herein, to receive adequate protection; and permitting the Card Processor to act in accordance with this Second Interim Order.

39.     <u>Effect of Appeal</u>. Consistent with section 364(e) of the Bankruptcy Code, if any or all of the provisions of this Second Interim Order are hereafter modified or reversed, such modification or reversal on appeal shall not affect the validity of any debt so incurred, or any liens or priorities granted by the Debtors to the DIP Lender or Card Processor, prior to the effective date of such modification  or reversal, whether or not any such entity knew of the appeal, unless the

authorization and  incurring of such debt, or the granting of such lien or priority, were stayed pending appeal.

40.     <u>Limits on Lender Liability</u>. Subject to the Challenge Period, nothing in this Second Interim Order or in any of the DIP Documents or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from any activities by the Debtors in the operation of their business or in connection with the restructuring efforts and the administration of these Cases. The DIP Lender shall not be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors as a result of or in connection with this Second Interim Order or the DIP Documents. Subject to the Challenge Period, nothing in this Second Interim Order or the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

41.     <u>Release, Waivers or Limitation on any Claim or Cause of Action.</u>

(i)     Each of the Debtors and the Debtors' estates, on their own behalf and on behalf of each of their predecessors, successors, and assigns, hereby does, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge (i) the DIP Lender and its affiliates, former, current, and future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each in its capacity as such (collectively, "Related Parties"), and (ii) the Prepetition Lenders and their Related Parties, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent,

pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations, the DIP Liens, the DIP Documents, the Prepetition Obligations, the Prepetition Liens, or the Prepetition Loan Documents, as applicable, including, without limitation: (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Lender and the Prepetition Lenders (the "Releases").

(ii)     Notwithstanding anything herein to the contrary, the Releases do not bind any Committee or other party in interest until the expiration of the period described in the paragraph above titled "Challenge Period."

(iii)     Except as otherwise provided for in the DIP Credit Agreement or by applicable law, the Debtors waive all presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the DIP Lender on which the Debtors may in any way be liable, and hereby ratifies and confirms whatever the DIP Lender may do in this regard.  The Debtors waive their right to a jury trial. The Debtors also waive their right to demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by the DIP Lender on which the Debtors may in any way be liable.

(iv)     Furthermore, the Debtors waive any suretyship defenses available to them under the California Uniform Commercial Code or any other applicable law, including, without limitation, the benefit of California Civil Code Section 2815 permitting revocation as to future transactions and the benefit of California Civil Code Sections 1432, 2809, 2810, 2819, 2839,

2845, 2847, 2848, 2849, 2850, and 2899 and 3433; and (b) any right to require the DIP Lender to: (1) proceed against any one of the Debtors or any other person; (2) proceed against or exhaust any security; or (3) pursue any other remedy.  The DIP Lender may exercise or not exercise any right or remedy it has against any of the Debtors or any security it holds (including the right to foreclose by judicial or non-judicial sale) without affecting any of the Debtors' liability. Notwithstanding any other provision of the DIP Credit Agreement or other related document, each one of the Debtors irrevocably waive all rights that it may have at law or in equity (including, without limitation, any law subrogating the Debtors to the rights of the DIP Lender under the DIP Credit Agreement) to seek contribution, indemnification or any other form of reimbursement from any other one of the Debtors, or any other Person now or hereafter primarily or secondarily liable for any of the Obligations, for any payment made by the Debtors with respect to the Obligations in connection with the DIP Credit Agreement or otherwise and all rights that it might have to benefit from, or to participate in, any security for the Obligations as a result of any payment made by the Debtors with respect to the Obligations in connection with the DIP Credit Agreement or otherwise.

(v)     Each Guarantor (as defined in the DIP Credit Agreement) unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of nonperformance, default, acceleration, protest or dishonor and any other notice with respect to any of the Guaranteed Obligations and the DIP Credit Facility and any requirement that Secured Parties protect, secure, perfect or insure any Lien on any property subject thereto or exhaust any right or take any action against any Debtor or any other Person or any Collateral. In addition, the Guarantors waive all rights of revocation, all defenses, any duty to disclose, all rights of subrogation or contribution, and additional waivers as set forth in Exhibit C to the DIP Credit Agreement.  They also acknowledge that Agents may, without notice to or demand upon each Guarantor and without affecting the liability of each Guarantor under this Facility Guaranty, foreclose under any mortgage by nonjudicial sale, and each Guarantor hereby

waives any defense to the recovery by Agents against each Guarantor of any deficiency after such nonjudicial sale and any defense or benefits that may be afforded by applicable law.

42.    <u>Indemnification</u>. The Debtors shall agree to indemnify and hold harmless the DIP Lender (solely in its capacity as DIP Lender) and each of its respective affiliates and each of their respective officers, directors, employees, agents, advisors, attorneys and representatives (each, an "<u>Indemnified Party</u>") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable and documented fees and out-of-pocket expenses of counsel), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), arising out of or in connection with or by reason of the DIP Facility, or any of transactions contemplated hereby, except to the extent arising from an Indemnified Party's fraud, gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any of the Debtors, any of their respective directors, security holders or creditors, an Indemnified Party or any other person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

43.    <u>Reservation of Rights.</u> The adequate protection provisions contained herein shall be without prejudice to the rights of the Prepetition Lenders or Card Processor to seek any other, further or additional adequate protection. Nothing in the DIP Documents or the Financing Orders shall be deemed to waive, modify or otherwise impair the rights of the Prepetition Lenders or Card Processor, and the Prepetition Lenders and Card Processor shall expressly reserve all of their rights and remedies under the Prepetition Loan Documents and Card Processing Agreement and applicable law. Without limiting the foregoing, nothing in the DIP Documents or the Financing Orders shall have the effect of, or shall be construed as having the effect of amending or waiving any covenant, term or provision of the Prepetition Loan Documents or Card Processing Agreement, or any rights or remedies of the Prepetition Lenders or Card Processor thereunder,

including (without limitation) any right to require strict compliance with such covenant, term or provision despite any consent or agreement contained in the DIP Documents or the Financing Orders.

44.    <u>Proofs of Claim</u>. The DIP Lender, and Prepetition Lenders, will not be required to file proofs of claim in any of the Cases or Successor Cases for any claim on account of DIP Obligations or Prepetition Obligations.

45.    <u>Rights Preserved</u>. Except as provided in this Second Interim Order and the DIP Documents, the entry of this Second Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the DIP Lender's or Card Processor's right to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of the DIP Lender or Card Processor under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Lender or Card Processor. Entry of this Second Interim Order is without prejudice to any and all rights of any party in interest with respect to the terms and approval of the Final Order and any other position which any party in interest deems appropriate to raise in the Cases.

46.    <u>No Waiver by Failure to Seek Relief</u>. The failure of the DIP Lender to seek relief or otherwise exercise their rights and remedies under this Second Interim Order, the DIP Documents or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Lender.

47.    <u>Amendments and Waivers</u>. The Debtors and the DIP Lender are hereby authorized to enter into, in accordance with the terms of the applicable DIP Documents and without further order of the Court, any amendments to, modifications of, or waivers with respect to any of such

DIP Documents (and the payment of any fees, expenses, or other amounts payable in connection therewith) on the following conditions: (a) the amendment, modification, or waiver must not constitute a material change to the terms of such DIP Document; and (b) copies of the amendment, modification, or waiver must be filed and served upon counsel for any Committee and the United States Trustee, who shall have five (5) business days to file an objection to any such amendment. Any amendment, modification, or waiver that constitutes a material change, to be effective, must be approved by the Court upon motion and notice. For purposes hereof, a "material change" shall mean a change to a DIP Document that operates to shorten the term of the DIP Facility or the maturity of the DIP Obligations, to increase the aggregate amount of the DIP Facility, to increase the rate of interest other than as currently provided in or contemplated by such DIP Documents, to add specific Events of Default, or to enlarge the nature and extent of remedies available to the DIP Collateral Agent following the occurrence of an Event of Default. Without limiting the generality of the foregoing, no amendment of a DIP Document that postpones or extends any date or deadline therein or herein (including the expiration of the term of a DIP Facility), nor any waiver of an Event of Default, shall constitute a "material change" and any such amendment may be effectuated by the Debtors and the DIP Lender without the need for further approval of the Court.

48.     <u>Financial Institutions and Debtors' Accounts</u>. Notwithstanding anything to the contrary in this or any order of this Court the Debtors are authorized to enter into, and cause the financial institutions servicing the Debtors' deposit accounts to enter into, such deposit account control agreements and other collateral agreements with the DIP Lender and such financial institutions as the DIP Lender may reasonably require, or alternatively, the DIP Lender shall be entitled to enjoy the benefit of all control agreements to which the Debtors are a party, as set forth above, without the need to enter into any such new agreements.

49.     <u>Discharge.</u> The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in

full in cash and all commitments have been terminated in writing, on or before the effective date of such confirmed plan of reorganization or the DIP Lender has otherwise agreed in writing.

50.     <u>Survival of this Interim Order.</u>   The provisions of this Second Interim Order, including the claims, liens, security interests, and other protections granted to the DIP Lender or Card Processor, and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Cases; (b) converting any of the Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Cases or Successor Cases. The terms and provisions concerning the indemnification of the DIP Lender shall continue in the Cases or any Successor Cases, following dismissal of the Cases or any Successor Cases, and following termination of the DIP Documents or the indefeasible repayment of the DIP Obligations.

51.     <u>Binding Effect; Successors and Assigns</u>. The provisions of this Second Interim Order shall be binding upon all parties in interest in these Cases, including the Debtors, the DIP Lender,  and their respective successors and assigns (including any chapter 11 or chapter 7 trustee hereafter appointed for the estate of the Debtors, any examiner appointed pursuant to section 1104 of the Bankruptcy Code, any Committee, or any other fiduciary appointed as a legal representative of the Debtors or with respect to any property of the estate of the Debtors), and shall inure to the benefit of the Debtors, the DIP Lender, Card Processor and their respective successors and assigns. In no event shall any DIP Lender have any obligation to make available the DIP Facility to, or permit the use of the DIP Collateral by, any chapter 7 trustee, chapter 11 trustee, or similar responsible person appointed or elected for the estate of the Debtors.

52.     <u>Joint and Several</u>. The Debtors are jointly and severally liable for the DIP Obligations and all other obligations to the DIP Lender and Card Processor hereunder.

53.     <u>No Third Party Rights</u>. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

54.    <u>Objections Overruled</u>. Any and all objections to the relief requested in the Motion, to the extent that such objections are to entry of this Second Interim Order and that have not otherwise been withdrawn, waived, or resolved by consent at or before the Interim Hearing, and all reservations of rights included therein, are hereby OVERRULED and DENIED.

55.    <u>Service of Second Interim Order</u>. Promptly after the entry of this Second Interim Order, the Debtors shall serve copies of this Second Interim Order (which shall constitute adequate notice of the Final Hearing) in accordance with the Bankruptcy Rules and Local Rules.

56.    <u>Delaware Limited Liability Company Act</u>. So long as any potential claim has not previously been lawfully waived under the organizational documents of the applicable Debtors, no interested party shall be permitted to raise as a defense to any request for standing or to any Challenge the argument that creditors of such Debtor do not have the ability under applicable law to file derivative suits on behalf of limited liability companies under the Delaware Limited Liability Company Act, but all other objections, defenses, claims or arguments to any such request for standing or to any Challenge are expressly reserved and preserved in all respects.

57.    <u>Final Hearing.</u> The final hearing (the "<u>Final Hearing</u>") on the Motion shall be held on September 4, 2024 at 11:30 a.m. (Prevailing Eastern Time).

58.    <u>Objection Deadline</u>. Any objections to entry of the Final Order shall be filed with the Court on or before August 28, 2024 at 4:00 p.m. (Prevailing Eastern Time) and concurrently served upon and actually received by: (a) the Debtors, 1201 W. 5th Street, Suite T-400, Los Angeles, CA 90017; (b) proposed counsel to the Debtors, Raines Feldman Littrell LLP, Attn: Thomas J. Francella Jr., tfrancella@raineslaw.com and Shulman Bastian Friedman & Bui LLP, 100 Spectrum Center Drive; Suite 600 Irvine, CA 92618, Attn: Alan Friedman, afriedman@shulmanbastian.com, Melissa Davis Lowe, mlowe@shulmanbastian.com, and Max Casal, mcasal@shulmanbastian.com; (c) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Jonathan Lipshie, jon.lipshie@usdoj.gov); (d) counsel to the DIP Lender, Elkins Kalt Weintraub Reuben Gartside LLP, 10345 W Olympic Boulevard, Los Angeles,

CA 90064, Attention: Michael I. Gottfried, Esq. mgottfried@elkinskalt.com, Lauren N Gans, lgans@elkinskalt.com and local counsel to the DIP Lender, Richard Riley, RRiley@whitefordlaw.com, and David Gaffey, DGaffey@whitefordlaw.com; and (e) proposed counsel to the Committee, Lowenstein Sandler LLP, Attn: David M. Posner, dposener@lowenstein.com and Gianfranco Finizio, gfinizio@lowenstein.com and Morris James LLP, Eric J. Monzo, emonzo@morrisjames.com and Brya M. Keilson, bkeilson@morrisjames.com. In the event that no objections to entry of the Final Order are timely received, the Court may enter such Final Order without need for the Final Hearing. If an objecting party fails to appear at the Final Hearing and assert the basis for such objection before the Court, such objection shall be deemed to have been waived and abandoned by such objecting party.

59. <u>Effectiveness; Enforceability</u>. This Second Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Second Interim Order shall be valid, take full effect, and be enforceable immediately upon entry hereof; there shall be no stay of execution or effectiveness of this Second Interim Order; and any stay of the effectiveness of this Second Interim Order that might otherwise apply is hereby waived for cause shown.

60. <u>Authorization to Take Necessary Actions.</u> The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Second Interim Order in accordance with the Motion.

61. <u>Jurisdiction.</u> This Court (or the United States District Court for the District of Delaware as the case may be) retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Second Interim Order.

62. <u>Inconsistencies.</u> To the extent that any provision in the other DIP Documents are inconsistent with any of the provisions of this Second Interim Order, the provisions of this Second Interim Order shall govern and control.

63.    <u>Headings</u>. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Second Interim Order.

**Dated: August 14th, 2024**
**Wilmington, Delaware**

**KAREN B. OWENS**
**UNITED STATES BANKRUPTCY JUDGE**