**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: | Chapter 11 |
| ONE TABLE RESTAURANT BRANDS, LLC, *et al.*,[1] | Case No. 24-11553 (KBO) |
| Debtors. | (Jointly Administered) |

**AMENDED COMBINED DISCLOSURE STATEMENT
AND CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY
THE JOINTLY ADMINISTERED DEBTORS**

**RAINES FELDMAN LITTRELL LLP**
Thomas J. Francella Jr. (DE Bar No. 3855)
824 N. Market Street, Suite 805
Wilmington, DE 19801
Telephone: (302) 772-5805
Email: tfrancella@raineslaw.com

and

**SHULMAN BASTIAN FRIEDMAN BUI & O'DEA LLP**
Alan J. Friedman (admitted *pro hac vice*)
Melissa Davis Lowe (admitted *pro hac vice*)
100 Spectrum Center Drive; Suite 600
Irvine, CA 92618
Telephone:  (949) 340-3400
Facsimile:  (949) 340-3000
E-mail: afriedman@shulmanbastian.com
E-mail: mlowe@shulmanbastian.com

*Counsel to the Debtors and Debtors in Possession*

---

[1] The Debtors in these Cases, along with the last four (4) digits of their federal tax identification numbers, are: (1) One Table Restaurant Brands, LLC, a Delaware limited liability company (9853); (2) One Table Restaurant Operations, LLC, a Delaware limited liability company (7280), (3) Tender Greens OpCo, LLC, a Delaware limited liability company (7827); (4) Tocaya Holdings LLC, a Nevada limited liability company (8815); (5) Tocaya Organica, LLC, a California limited liability company (6720); (6) Tocaya Management, LLC, a Nevada limited liability company (6789); (7) BLT Steak LA LLC, a California limited liability company (4688); (8) Tocaya Venice LLC, a California limited liability company (0159); (9) Tocaya South Bay LLC, a California limited liability company (0401); (10) Tocaya Toluca LLC, a California limited liability company; and (11) Tocaya Santa Monica LLC, a California limited liability company (8134).  The Debtors' mailing address is:  1201 W. 5th Street, Suite T-310, Los Angeles, CA 90017.

10612785.1

**TABLE OF CONTENTS**

ARTICLE I        INTRODUCTION ...................................................................................................1

ARTICLE II       RULES OF INTERPRETATION ...........................................................................1

    2.1.    Rules of Interpretation ...................................................................................1

ARTICLE III      DEFINED TERMS ...............................................................................................2

ARTICLE IV       BACKGROUND ...................................................................................................8

    4.1.    Debtors' Business ...........................................................................................8

    4.2.    Historical Background ....................................................................................8

    4.3.    The Debtors' Bankruptcy Filing ....................................................................8

    4.4.    Schedules and Statements of Financial Affairs and Bar Dates ......................9

    4.5.    DIP Financing ...............................................................................................10

    4.6.    Sale of the Debtors' Assets and Global Settlement ......................................10

ARTICLE V        CONFIRMATION REQUIREMENTS AND PROCEDURES .......................12

    5.1.    Confirmation Procedures ..............................................................................12

    5.2.    Procedure for Objections ..............................................................................12

    5.3.    Requirements for Confirmation ....................................................................12

    5.4.    Classification of Claims and Interests ..........................................................13

    5.5.    Impaired Claims or Interests ........................................................................14

    5.6.    Feasibility .....................................................................................................14

    5.7.    Best Interests Test and Liquidation Analysis ...............................................14

    5.8.    Acceptance of the Plan .................................................................................16

ARTICLE VI       UNCLASSIFIED CLAIMS ................................................................................17

    6.1.    Administrative Claims ..................................................................................17

    6.2.    Professional Compensation Claims ..............................................................17

    6.3.    Priority Tax Claims .......................................................................................18

ARTICLE VII      CLASSIFICATION  AND  TREATMENT  OF  CLAIMS  AND
                INTERESTS ......................................................................................................18

    7.1.    Summary .......................................................................................................18

    7.2.    Identification of Classes ................................................................................18

    7.3.    Controversy Concerning Classification, Impairment or Voting Rights .................19

| | | |
|---|---|---|
| 7.4. | Treatment of Claims and Interests | 19 |
| 7.5. | Voting Classes, Presumed Acceptance by Non-Voting Classes | 20 |
| 7.6. | Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. | 21 |
| ARTICLE VIII | CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING | 21 |
| 8.1. | The Plan May Not Be Accepted. | 21 |
| 8.2. | The Plan May Not Be Confirmed. | 21 |
| 8.3. | Distributions to Holders of Allowed Claims Under the Plan May Be Inconsistent With Projections. | 21 |
| 8.4. | Objections to Classification of Claims. | 22 |
| 8.5. | Failure to Consummate the Plan. | 22 |
| 8.6. | Certain Tax Considerations. | 23 |
| ARTICLE IX | MEANS FOR IMPLEMENTATION OF THE PLAN | 23 |
| 9.1. | Implementation of the Plan | 23 |
| 9.2. | Funding of the Plan | 23 |
| 9.3. | Plan Administrator and Post-Effective Date Debtors | 23 |
| 9.4. | Wind-Down | 24 |
| 9.5. | Dissolution of the Post-Effective Date Debtors | 24 |
| 9.6. | Dissolution of the Committee | 24 |
| 9.7. | Cancellation of Interests | 24 |
| 9.8. | Substantive Consolidation of the Debtors for Purposes of the Plan | 25 |
| ARTICLE X | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 26 |
| 10.1. | Executory Contracts and Unexpired Leases Deemed Rejected Unless Previously Assumed or Rejected | 26 |
| 10.2. | Bar Date For Rejection Damages | 26 |
| ARTICLE XI | PROVISIONS GOVERNING RESOLUTION OF CLAIMS AND DISTRIBUTIONS OF PROPERTY UNDER THE PLAN | 26 |
| 11.1. | Claim Objections | 26 |
| 11.2. | Distribution Provisions | 27 |
| 11.3. | No Interest. | 30 |
| ARTICLE XII | DEBTOR RELEASES, INJUNCTION, AND RELATED PROVISIONS | 30 |
| 12.1. | Releases by the Debtors. | 30 |

10612785.1

12.2.    Exculpation and Limitation of Liability ...............................................30

12.3.    Injunction ...........................................................................................31

ARTICLE XIII    CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE .................31

13.1.    Conditions Precedent to Confirmation................................................31

13.2.    Conditions Precedent to the Effective Date ........................................32

13.3.    Waiver of Conditions..........................................................................32

13.4.    Effect of Failure of Conditions ..........................................................32

13.5.    Filing of Notice of the Effective Date.................................................33

ARTICLE XIV    MISCELLANEOUS ..........................................................................33

14.1.    Bankruptcy Court Jurisdiction ...........................................................33

14.2.    Modifications .....................................................................................34

14.3.    Successors and Assigns.......................................................................34

14.4.    Governing Law ...................................................................................34

14.5.    Reservation of Rights..........................................................................35

14.6.    Section 1146 Exemption .....................................................................35

14.7.    Section 1125(e) Good Faith Compliance.............................................35

14.8.    Further Assurances..............................................................................35

14.9.    Service of Documents..........................................................................35

14.10.   Filing of Additional Documents ..........................................................36

14.11.   No Stay of Confirmation Order ...........................................................36

10612785.1

## ARTICLE I
## INTRODUCTION

Pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., the Debtors in these Chapter 11 Cases hereby propose this amended combined disclosure statement and plan of liquidation under chapter 11 of the Bankruptcy Code. The Debtors are the plan proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

The Plan is a liquidating chapter 11 plan. The Plan provides for the proceeds from the Assets already liquidated to be distributed to holders of Allowed Claims in accordance with the terms of the Plan and the priority of claims provisions in the Bankruptcy Code.

Specifically, the Debtors have only Cash remaining on hand from the liquidation of their assets and the global resolution by and among various parties that resulted in a Cash payment to the Committee to be used to pay Committee professionals and General Unsecured Creditors. After the Effective Date, the Debtors will make a one-time distribution to holders of Allowed General Unsecured Claims equal to their Pro Rata share of the Distribution Fund. Importantly, BW/OTRB has agreed that in connection with the confirmation of the Plan, it will pay the BW/OTRB Backstopped Claims.

---

**The Debtors believe that the Plan maximizes the value of the Estates and Distributions to be received by creditors on account of Allowed Claims. The Debtors therefore strongly encourage all creditors who are eligible, to vote to ACCEPT the Plan. The Committee also supports the Plan and recommends that all unsecured creditors who are eligible to vote, vote to ACCEPT the Plan. If the Plan is not confirmed, unsecured creditors are not likely to receive any recovery in these Chapter 11 Cases.**

---

**ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS ARE ENCOURAGED TO READ THE PLAN IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019, AND IN THE PLAN, THE PLAN PROPONENT RESERVES THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN, OR ANY PART THEREOF, PRIOR TO ITS SUBSTANTIAL CONSUMMATION.**

## ARTICLE II
## RULES OF INTERPRETATION

2.1.    Rules of Interpretation

All capitalized terms not defined elsewhere in this Plan shall have the meanings assigned to them in the Defined Terms set forth in Article III. Any capitalized term used in the Plan that is not defined herein has the meaning ascribed to that term in the Bankruptcy Code and/or Bankruptcy Rules. For purposes of the Plan, any reference in the Plan to an existing

1

document or exhibit filed or to be filed means that document or exhibit as it may have been or may be amended, supplemented, or otherwise modified.

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neutral gender shall include the masculine, feminine and the neutral gender; (b) any reference herein to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) the words ''herein,'' "hereof" and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings of Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

All references herein to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE III
## DEFINED TERMS

The following capitalized terms used in the Plan shall have following meanings:

1. **"Administrative Bar Date"** means January 15, 2025.

2. **"Administrative Bar Date Order"** means that certain Order (I) Establishing Administrative Claims Bar Date, and (II) Approving Form and Notice Thereof entered on December 11, 2024 [D.I. 486].

3. **"Administrative Claim"** means a Claim for costs and expenses of administration under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries or commissions for services and payments for goods and other services); (b) Claims arising pursuant to section 503(b)(9) of the Bankruptcy Code for the value of goods received by the Debtors within 20 days prior to the Petition Date; and (c) all fees and charges assessed against the Estates under 28 U.S.C. §1930; provided, however, that the U.S. Trustee shall not be required to file a request for payment of fees and charges assessed against the Estates under 28 U.S.C. § 1930. As used herein, the term "Administrative Claim" shall exclude Professional Compensation Claims.

4. "**Administrative Tax Claim**" means an Administrative Claim by a Governmental

2

10612785.1

Unit for taxes under section 503(b)(1)(B), (C) or (D) (and for interest and/or penalties related to such taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the Petition Date through and including the Effective Date.

5.     "**Affiliate**" shall mean "affiliate" as defined in section 101(2) of the Bankruptcy Code.

6.     "**Allowed**" means (a) a Claim that has been scheduled by the Debtors in their Schedules as other than disputed, contingent or unliquidated which has not been superseded by a Filed proof of Claim and which scheduled Claim has not been amended; (b) a Claim that has been allowed by a Final Order; (c) a Claim that is allowed by the Debtors, as applicable; (d) a Claim that has been timely Filed by the applicable deadline for which no objection has been filed by the Claim Objection Deadline; or (e) a Claim that is allowed pursuant to the terms of this Plan.

7.     "**Assets**" means all tangible and intangible assets of every kind and nature of the Debtors and their Estates within the meaning of section 541 of the Bankruptcy Code.

8.     "**Ballot**" means the form approved by the Bankruptcy Court and distributed to each Holder of an Impaired Claim or Interest that is entitled to vote on the Plan.

9.     "**Balloting Agent**" means Stretto, Inc. or any successor appointed by the Bankruptcy Court.

10.     "**Bankruptcy Code**" means title 11 of the United States Code, as amended from time to time.

11.     "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Cases or, if such Bankruptcy Court ceases to exercise jurisdiction over the Chapter 11 Cases, such court or adjunct thereof that exercises jurisdiction over such Chapter 11 Cases in lieu of the United States Bankruptcy Court for the District of Delaware.

12.     "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure promulgated pursuant to 28 U.S.C. § 2075, as now in effect or hereinafter amended, together with the Local Rules of the Bankruptcy Court.

13.     "**Bar Date Order**" means the Order Establishing Bar Dates for Filing Claims and Approving the Form and Manner of Notice Thereof entered September 27, 2024 [D.I. 334].

14.     "**BW/OTRB**" means Breakwater Credit Opportunities Fund II and OTRB Corporate LLC.

15.     "**BW/OTRB Backstopped Claims**" means all, if any: (1) Allowed Administrative Claims; (2) Allowed Professional Compensation Claims; (3) Allowed Secured Claims; and (4) Allowed Priority Claims.

16.     "**Business Day**" means any day, other than a Saturday, a Sunday or a "legal holiday" as defined in Bankruptcy Rule 9006(a).

17.     "**Cash**" means legal tender of the United States of America and cash equivalents, including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire transfers and other similar forms of payment.

3

10612785.1

18. **"Chapter 11 Cases"** means the voluntary chapter 11 bankruptcy cases filed on July 17, 2024 by the following Entities: (1) One Table Restaurant Brands, LLC, a Delaware limited liability company (9853); (2) One Table Restaurant Operations, LLC, a Delaware limited liability company (7280), (3) Tender Greens OpCo, LLC, a Delaware limited liability company (7827); (4) Tocaya Holdings LLC, a Nevada limited liability company (8815); (5) Tocaya Organica, LLC, a California limited liability company (6720); (6) Tocaya Management, LLC, a Nevada limited liability company (6789); (7) BLT Steak LA LLC, a California limited liability company (4688); (8) Tocaya Venice LLC, a California limited liability company (0159); (9) Tocaya South Bay LLC, a California limited liability company (0401); (10) Tocaya Toluca LLC, a California limited liability company; and (11) Tocaya Santa Monica LLC, a California limited liability company.

19. **"Claim"** means any claim against the Debtors or any property of the Debtors within the meaning of section 101(5) of the Bankruptcy Code.

20. "**Claims Agent**" shall mean the claims agent appointed for the Chapter 11 Cases, Stretto, Inc. or any successor appointed by the Bankruptcy Court.

21. "**Claim Objection Deadline**" means the deadline for objecting to proofs of Claim, which shall initially be the later of (a) sixty (60) days after the Effective Date; and (b) such later date as may be fixed by the Bankruptcy Court in accordance with Section 11.1(b) of this Plan.

22. **"Class"** means a category of Holders of Claims or Interests as set forth in Article VII hereof pursuant to section 1122(a) of the Bankruptcy Code.

23. "**Confirmation Date**" means the date on which the Confirmation Order is entered by the Bankruptcy Court.

24. "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

25. "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be reasonably acceptable in form and substance to the Plan Proponent, the Committee and BW/OTRB.

26. "**Committee**" shall mean the official committee of unsecured creditors for the Chapter 11 Cases appointed by the U.S. Trustee pursuant to section 1102 of the Bankruptcy Code on August 2, 2024 [D.I. 80].

27. "**Contingent**" shall mean, with reference to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which, or the obligation to make payment on which, is dependent upon future events that may or may not occur.

28. "**Creditor**" shall have the meaning ascribed to such term in section 101(10) of the Bankruptcy Code.

29. "**Debtors" or "Debtors in Possession**" means, collectively, the above-captioned debtors and debtors in possession specifically identified on the cover page to this Plan.

30. **"Disallowed"** or "**Disallowed Claim**" shall mean with respect to any Claim, except as otherwise provided herein, a Claim or any portion thereof that (a) has been disallowed

4

10612785.1

by agreement with the Creditor, (b) has been disallowed by Final Order, (c) is listed in the Schedules in an unknown amount, as zero, as contingent, disputed, or unliquidated, or is not listed in the Schedules, and as to which no proof of Claim or Administrative Claim has been Filed, or (iv) has been withdrawn by the applicable creditor.

31. "**Disputed**" means, with respect to any Claim: (a) listed on the Schedules as unliquidated, disputed or contingent, unless a proof of Claim has been timely filed; (b) as to which the Debtors or the Committee has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules; or (c) as otherwise disputed by the Debtors or the Committee in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order.

32. "**Distribution(s)**" means the transfer of Cash or other property by the Plan Administrator to the Holders of Allowed General Unsecured Claims pursuant to this Plan.

33. "**Distribution Date**" means the date on which a Distribution is made pursuant to this Plan.

34. "**Distribution Fund**" means the sum of approximately $115,000.00.

35. "**Distribution Record Date**" means the Confirmation Date.

36. **Effective Date**" means the date upon which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with Article XIII of the Plan.

37. "**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

38. "**Estate**" or "**Estates**" means the estate of each Debtor created on the Petition Date by Section 541 of the Bankruptcy Code.

39. "**Exculpated Parties**" means, collectively, and in each case in his/her/its capacity as such: (a) the present and former officers, directors, and managers of the Debtors who served in such capacities at any point from and after the Petition Date, (b) the Debtors' Professionals, (c) the Committee's Professionals; and (d) the members of the Committee, solely in their capacity as such.

40. "**Executory Contract**" means a contract or unexpired real property lease to which any one or more of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

41. "**File" or "Filed**" means, with respect to any pleading, entered on the docket of the Chapter 11 Cases and properly served in accordance with the Bankruptcy Rules.

42. "**Final Fee Orders**" means the Orders entered on July 16, 2025 [D.I. 710] and July 18, 2025 [D.I. 7118] approving, on a final basis, the fees and expenses of the Professionals, through and including July 17, 2025, as well as certain additional sums after such date.

43. "**Final Order**" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for certiorari or move for re-argument or rehearing has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed

5

10612785.1

or from which certiorari was sought or has otherwise been dismissed with prejudice.

44.    "**Final Decree**" means the order entered pursuant to section 350 of the Bankruptcy Code and Bankruptcy Rule 3022 closing a Chapter 11 Case.

45.    "**General Bar Date**" means November 15, 2024, as established by the Bar Date Order.

46.    "**General Unsecured Claim**" means a Claim against the Debtors that is not a Secured Claim, Administrative Claim, Priority Tax Claim, Priority Non-tax Claim, Professional Compensation Claim, or Interest.

47.    "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

48.    "**Governmental Unit Bar Date**" means January 13, 2025, as established by the Bar Date Order.

49.    "**Holder**" means an Entity holding a Claim or Interest, as applicable.

50.    "**Impaired**" means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

51.    "**Insider**" shall have the meaning set forth in section 101(31) of the Bankruptcy Code.

52.    "**Interest**" means any equity interest in the Debtors that existed immediately prior to the Petition Date, including, without limitation: (a) any common equity interest in any of the Debtors that existed immediately prior to the Petition Date, including, without limitation, all issued, unissued, authorized or outstanding shares of common stock, together with any warrants, options or legal, contractual or equitable rights to purchase or acquire such interests at any time; (b) any preferred equity interest in any of the Debtors that existed immediately prior to the Petition Date, including, without limitation, all issued, unissued, authorized or outstanding shares of preferred stock; and, as to any of the foregoing, (c) any warrants, options or legal, contractual or equitable rights to purchase or acquire such interests.

53.    "**Petition Date**" means July 17, 2024.

54.    "**Plan**" means this combined disclosure statement and plan, prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules and any other applicable law, as it is amended, supplemented or modified from time to time.

55.    "**Plan Administrator**" means the Debtors, who will be responsible for making all Distributions as called for under the Plan.

56.    "**Plan Administrator Certificate**" means a certification filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made under the Plan.

57.    "**Plan Proponent**" means the Debtors.

58.    "**Priority Claims**" means all Priority Non-Tax Claims and Priority Tax Claims.

6

10612785.1

59.     "**Priority Non-Tax Claim**" means a Claim entitled to priority in payment pursuant to sections 507(a)(4), 507(a)(5), 507(a)(7) or 507(a)(9) of the Bankruptcy Code.

60.     "**Priority Tax Claim**" means a Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

61.     "**Pro Rata**" means the ratio of the amount of an Allowed Claim in a particular Class to the aggregate amount of all Allowed Claims in such Class.

62.     "**Professional**(s)" means an Entity employed pursuant to a Final Order in accordance with sections 327, 328, or 1103 of the Bankruptcy Code.

63.     "**Professional Compensation Claim**" means a Claim of a Professional pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code for professional services rendered or costs incurred on or after the Final Fee Orders through the Effective Date.

64.     "**Released Parties**" means each of (i) Breakwater Credit Opportunities Fund II; (ii) OTRB Corporate LLC.; (iii) the Committee and its members (solely in their capacity as such); and (iv) the professionals of each of the foregoing (solely in their capacity as such).

65.     "**Schedules**" means collectively, the schedules of assets and liabilities, schedules of executory contracts and statements of financial affairs Filed for each Debtor on August 16, 2024 at D.I. Nos. 158-168, and amended schedules filed on August 30, 2024 at D.I. Nos. 196-206.

66.     "**Secured Claim**" means a Claim that is secured (i) by a lien that is valid, perfected and enforceable under the Bankruptcy Code or applicable non-bankruptcy law or by reason of a Final Order; or (ii) as a result of rights of setoff under section 553 of the Bankruptcy Code, but in any event only to the extent of the value, determined in accordance with section 506(a) of the Bankruptcy Code, of the holder's interest in the Estates' interest in such property or to the extent of the amount subject to such setoff, as the case may be.

67.     "**Solicitation Procedures Order**" means the Order (I) Scheduling a Hearing on Plan Confirmation and Deadlines Related Thereto; and (II) Approving the Solicitation, Notice and Tabulation Procedures and the Forms Related Thereto entered on September___ , 2025 [D.I. No. __].

68.     "**Tax**" or "**Taxes**" shall mean all income, gross receipts, sales, use, transfer, payroll, employment, franchise, profits, property, excise, or other similar taxes, assessments or charges of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, additions to tax, or additional amounts imposed by any taxing authority of a Governmental Unit with respect thereto.

69.     "**Tocaya Holdings**" means Tocaya Holdings, LLC, one of the jointly administered debtors herein.

70.     "**Unimpaired**" means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

71.     "**U.S. Trustee**" means the Office of the United States Trustee for the District of Delaware.

7

10612785.1

72.     "**Voting Deadline**" shall mean October 15, 2025, at 4:00 p.m., (prevailing Eastern time), the date and time by which Ballots to accept or reject the Plan must be received by the Balloting Agent in order to be counted.

## ARTICLE IV
## BACKGROUND

### 4.1.   Debtors' Business

The Debtors operated two restaurant brands – Tender Greens, a "farm-to-fork" concept, and Tocaya, a modern Mexican eatery – which are fast casual restaurant chains with thirty-nine (39) restaurants throughout California and Arizona as of the Petition Date. A copy of the Debtors' organizational chart is attached hereto as Exhibit A.

### 4.2.   Historical Background

Tender Greens was founded by three chefs in 2006 in Culver City, California on the principle of "Good food for Everyone." Tender Greens provides healthy, fresh, high-quality chef-created meals for a reasonable price, filling an important gap in the restaurant market. Tocaya was founded in Venice Beach California in 2015 and rose to prominence in Los Angeles between 2015-2019 by serving high quality "Healthy Mexican Fare" in a high energy atmosphere.

The COVID-19 pandemic was catastrophic for both Tender Greens and Tocaya as customers effectively ceased visiting restaurants due to stay-at-home mandates. Revenue and profitability were severely impaired. While both Tender Greens and Tocaya managed to survive the peak of the pandemic, the ferocious pressures and stresses on each business forced the two to combine in August 2021 in an unusual 50/50 business combination (the "Combination"). One Table was formed to oversee both brands and provide a leveraged platform of shared people resources and supply chain synergies.

### 4.3.   The Debtors' Bankruptcy Filing

Tender Greens emerged from the pandemic with a 20% decline in gross sales and Tocaya with a 26% decline. While the Debtors expended significant efforts to rebuild each brand, the Debtors faced two significant structural headwinds.  First, the pandemic reduced one of the Debtors' most frequent user bases – office workers. Most of the Debtors' locations were selected (pre-pandemic) at least in part due to their proximity to nearby office districts, but post-pandemic, many workers work outside traditional office settings and office hours. The Los Angeles market continued to exhibit light and underutilized office space. Consequently, the Debtors no longer enjoyed the same volume of lunch-time workers as they did pre-pandemic. Second, the conversion from traditional dine-in or pick up to third party providers and delivered meals materially changed the Debtors' income stream. Third party sales composed between 30%-40% of the Debtors' gross sales, but include incremental cost pressures not required by traditional dine-in or pick-up options and the Debtors could not pass along the full cost to consumers.

8

Adding to the financial pressures were challenged real estate decisions made by both Tocaya and Tender Greens prior to the Combination which negatively impacted the Debtors' cash flow. Moreover, as a result of the pandemic, the Debtors entered into several agreements with various landlords regarding the payment of deferred rents. Although such deferred rent obligations have largely been repaid, the cost of repaying such obligations in addition to the Debtors' ongoing lease obligations harmed the Debtors' liquidity.

In addition, On November 20, 2021, Chixegg, LLC ("Chixegg"), a subsidiary investor group that was the majority owner of a Tocaya restaurant located in Playa Vista, California, sued Tocaya Holdings in Florida state court relating to an alleged obligation of Tocaya Holdings to purchase the membership units of Chixegg (the "Chixegg Lawsuit") pursuant to certain operating and lease agreements which predated the Combination. The total potential liability under the Chixegg Lawsuit was approximately $12 million. On August 9, 2023, the Debtors settled the Chixegg Lawsuit for a total amount of $8.5 million. The settlement included a $3.5 million initial payment due at signing along with a payment plan for the remaining amount owed.  The Debtors became unable to pay the total amount of the settlement.

Finally, in December of 2020, Tocaya entered into an exclusive agreement (the "Postmates Agreement") with Postmates, Inc. ("Postmates") which is a third party food delivery service company. Postmates was subsequently acquired by Uber Eats ("Uber") which is an online food ordering and delivery platform. Postmates and Uber shall hereafter be collectively referred to as "Uber/Postmates."  The Postmates Agreement was extremely important to the Tocaya business as it provided approximately $12 million in guaranteed annual income based upon a sales volume guarantee. These monies were paid monthly from January 2021 through February 2022. In February 2022, the Debtors received a breach of contract and two-week termination notice from Uber/Postmates.  The Debtors contested the allegations of Uber/Postmates but in March 2022, the Debtors and Uber/Postmates reached a settlement which, among other things, changed the sales volume guarantee of the Postmates Agreement to an income guarantee of $5 million. Such change resulted in a reduction in the Debtors' income of approximately $7 million annually.  The material change in the Postmates Agreement, its resulting loss of substantial moneys, and the subsequent loss of sales have been the biggest driver behind Tocaya's struggles.

Faced with a declining cash position and the prospect of shutting their doors, the Debtors filed the Chapter 11 Cases in order to preserve jobs, their vendor partner community, and both brands.

4.4.    Schedules and Statements of Financial Affairs and Bar Dates

On August 16, 2024, all Debtors filed their Schedules and Statements of Financial Affairs at D.I. Nos. 158-168.  On August 30, 2024, all Debtors filed amended Schedules and Statements of Financial Affairs at D.I. Nos. 196-206.

On September 27, 2024, pursuant to the Order Establishing Deadlines For Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof [D.I. 334], the Court set the following deadlines for the filing of claims: general bar date of July 17, 2024 and governmental bar date of January 13, 2025.

On December 11, 2024, pursuant to the Order (I) Establishing Administrative Claims Bar Date, and (II) Approving Form and Notice Thereof [D.I. 486], the Court set the last day to file administrative claims as January 15, 2025.

### 4.5.    DIP Financing

On July 18, 2024, the Debtors filed the Motion of the Debtors Pursuant to Sections 105, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rule 4001, and Local Rule 4001-2, for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing and Use Cash Collateral; (II) Granting Priming and Other Liens and Super-Priority Claims and Adequate Protection; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief [D.I. 14] (the "DIP Motion").

Among other things, the DIP Motion sought orders authorizing the Debtors to obtain postpetition financing from Breakwater Management LP in its capacity as lender (together with its affiliates, the "DIP Lender"), who acts as the administrative agent and collateral agent for Breakwater Credit Opportunities Fund II LP, H&W Irrevocable Trust, Randall Capital Group, LLC, 2014 MSM Irrevocable Trust, and Schuyler and Dina Joyner Revocable Trust Dated 11/12/2003 (collectively, the "Prepetition Lenders").

The Court entered three interim orders approving the DIP Motion on an interim basis before granting the DIP Motion on a final basis and entering the Final Order (I) Authorizing Debtors to Obtain Postpetition Financing and Use Cash Collateral; (II) Granting Priming and Other Liens and Super-Priority Claims and Adequate Protection; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief [D.I. 319] (the "Final DIP Order") on September 20, 2024.

### 4.6.    Sale of the Debtors' Assets and Global Settlement

On August 9, 2024, the Debtors filed their Motion for Entry of Orders: (I) (A) Approving Bidding Procedures and Protections in Connection With a Sale of Substantially All of Debtors' Assets Free And Clear Of Liens, Claims, Encumbrances and Interests; (B) Authorizing the Debtors to Designate a Stalking Horse Bid; (C) Scheduling an Auction and Sale Hearing; (D) Approving the Form And Manner of Notice Thereof; and (E) Approving Procedures Related to Assumption and Assignment of Certain Executory Contracts and Leases; (II) (A) Authorizing Sale of Substantially All of Debtors' Assets Pursuant to Successful Bidder(s)' Asset Purchase Agreement(s), Free and Clear of Liens, Claims, Encumbrances, and Other Interests; and (B) Approving Assumption and Assignment of Certain Executory Contracts and Leases; and (III) Granting Related Relief [D.I. 124] (the "Sale Motion") seeking to sell substantially all of their assets at auction to the highest bidder.

On August 22, 2024, the Court entered the Order: (I) (A) Approving Bidding Procedures and Protections in Connection With a Sale of Substantially All of Debtors' Assets Free And Clear Of Liens, Claims, Encumbrances and Interests; (B) Authorizing the Debtors to Designate a Stalking Horse Bid; (C) Scheduling an Auction and Sale Hearing; (D) Approving the Form And Manner of Notice Thereof; and (E) Approving Procedures Related to Assumption and

Assignment of Certain Executory Contracts and Leases [D.I. 178] (the "Bidding Procedures Order").

In accordance with the terms of the Bidding Procedures Order, on August 23, 2024 the Debtors filed the Stalking Horse Notice [D.I. 182] and on September 5, 2024, the Amendment to Stalking Horse Notice [D.I. 252] (collectively, the "Stalking Horse Notice").  Pursuant to the Stalking Horse Notice, the Debtors sought to designate an affiliate of the DIP Lender - OTRB Corporate, LLC (the "Purchaser") - as the stalking horse bidder for the Debtors' assets.

On September 20, 2024, the Court approved the designation of the Purchaser as the stalking horse bidder [D.I. 320] (the "Stalking Horse Order"). The Stalking Horse Order included a revised form of the asset purchase agreement (the "APA").  Pursuant to the APA, the Purchaser would acquire all of the Debtors' assets pursuant to a credit bid of the DIP Lender and the Prepetition Lender's loans.

On September 26, 2024, the Debtors filed the Debtors' Motion for Order Pursuant to 11 U.S.C.§ 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlement [D.I. 327] (the "Settlement Motion") which sought approval of the global resolution (the "Global Resolution") by and between the Debtors, the DIP Lender, the Prepetition Lender, and the Committee concerning the DIP Motion, the Sale Motion, and the Stalking Horse Notice.  The Global Resolution resolved the Committee's allegations that it had a basis to assert certain causes of actions against the Prepetition Lenders and the DIP Lender as to the validity, enforceability, extent, priority, or perfection of their mortgages, security interests, and liens, as well as its concerns that if the Stalking Horse Bidder were to be the winning bidder for the sale of the Debtors' assets, the Stalking Horse Bid would leave the Estates administratively insolvent and not provide for any recovery for unsecured creditors.

On October 7, 2024, the Court entered an Order approving the Settlement Motion and the Global Resolution.  As part of the Global Resolution, the DIP Lender agreed to keep the Estates administratively solvent until a plan was confirmed or the Chapter 11 Cases were dismissed, subject to certain limitations.  Moreover, the Global Resolution resulted in an additional $500,000 (on top of the $200,000 already allocated to the Committee in the DIP budget) (the total $700,000, the "Committee Fund") for the payment of fees and costs of the bankruptcy professionals retained by the Committee (the "Committee Professionals"), and the Committee Professionals explicitly agreed to limit their fees and costs such that they do not exceed the Committee Fund.

On October 9 and October 24, 2024, the Court entered orders approving the sale [D.I. 369 and 397  (the "Sale Orders"). The Sale Orders authorized, among other things, the Debtors and the Purchaser to close and otherwise consummate the sale of all of the Debtors' assets to the Purchaser (the "Closing").  The Closing occurred effective as of October 29, 2024. Accordingly, on October 31, 2024, the Debtors filed a Notice of Closing of the Sale [D.I. 424].

On June 20, 2025, the Debtors filed their Motion for Orders (I) Establishing Dismissal Procedures, (II) Authorizing Dismissal of the Debtors' Chapter 11 Cases, (III) Approving Final Fees and Expenses of Professionals, and (IV) Granting Related Relief [D.I. 669] (the "Dismissal

11

10612785.1

Motion"). By the Dismissal Motion, the Debtors sought to pay administrative and allowed priority claims and then use an administrator to pay unsecured creditors after the Chapter 11 Cases were dismissed. As noted in the Dismissal Motion, all Administrative Claims have already been paid.

The Dismissal Motion was denied and instead, the Debtors now propose this Plan to pay Allowed Claims and effectuate a distribution to holders of Allowed General Unsecured Claims.

## ARTICLE V
## CONFIRMATION REQUIREMENTS AND PROCEDURES

### 5.1.    Confirmation Procedures

On September __, 2025, the Court entered the Solicitation Procedures Order. Among other things, the Solicitation Procedures Order approved the adequacy of the disclosures in this Plan on an interim basis and set certain deadlines for the solicitation of the Plan, voting on the Plan, filing objections to the Plan and a hearing to consider approval of the Plan. The Confirmation Hearing has been scheduled for November 6, 2025 at 9:30 a.m. (prevailing eastern time) to consider (a) final approval of the Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by the Plan Proponent without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by Filing a notice with the Bankruptcy Court.

### 5.2.    Procedure for Objections

Any objection to the final approval of the Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or confirmation of the Plan must be made in writing and Filed with the Bankruptcy Court and served on the following parties so as to be actually received on or before October 15, 2025 at 4:00 p.m. (prevailing eastern time) upon counsel to the Debtors: Shulman Bastian Friedman Bui & O'Dea LLP, Attn: Alan Friedman, Attn: Melissa Lowe, 100 Spectrum Center Drive, Suite 600, Irvine, CA 92618, afriedman@shulmanbastian.com, mlowe@shulmanbastian.com, and Raines Feldman Littrell LLP, Attn: Thomas J. Francella, 824 N. Market Street, Suite 805, Wilmington, DE 19801, tfrancella@raineslaw.com and counsel to the Committee: Lowenstein Sandler LLP, Attn: David M. Posner, Esq. and Gianfranco Finizio, 1251 Avenue of the Americas New York, NY 10020 and Morris James LLP, Attn: Eric J. Monzo, Esq., 500 Delaware Avenue, Suite 1500 Wilmington, DE 19801; and (3) the United States Trustee to Jon Lipshie at jon.lipshie@usdoj.gov.

### 5.3.    Requirements for Confirmation

The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among other requirements, the Plan (a) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (b) must be feasible. The Bankruptcy Court must also find that: (i) the Plan

12

10612785.1

has classified Claims and Interests in a permissible manner; (ii) the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

5.4.    Classification of Claims and Interests

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those Claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified).  The Plan Proponent is required, under section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Plan Proponent believes the Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid or released prior to the Effective Date.  The Plan Proponent believes that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law.  It is possible that a Holder of a Claim or Interest may challenge the Plan Proponent's classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims

13

10612785.1

that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distribution received by Creditors. The projected recoveries are based on information available to the Plan Proponent as of the date hereof and reflect the Plan Proponent's views as of the date hereof only.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized herein. The Plan Proponent believes that the consideration, if any, provided under the Plan to Holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

### 5.5. Impaired Claims or Interests

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the Holder's legal, equitable or contractual rights are changed under such plan. In addition, if the Holders of Claims or Interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such Holders are not entitled to vote on such plan.

Under the Plan, Holders of Claims in Class 1 are Impaired and, therefore, are entitled to vote on the Plan. ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 1 (GENERAL UNSECURED CLAIMS).  No other Class is entitled to vote on the Plan.

### 5.6. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the debtors or any successor to the debtors (unless such liquidation or reorganization is proposed in the Plan). All Assets have been liquidated and the Plan provides for the distribution of the Distribution Fund to Holders of Allowed General Unsecured Claims.  Moreover, BW/OTRB has agreed to pay the BW/OTRB Backstopped Claims.  Therefore, the Plan Proponent believes that the liquidation pursuant to the Plan  meets the feasibility requirements of the Bankruptcy Code.

### 5.7. Best Interests Test and Liquidation Analysis

14

10612785.1

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code. To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 case were converted to chapter 7 cases under the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

Because the Plan is a liquidating plan and Cash is the sole remaining asset, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan.  However, the Plan Proponent believes that in a chapter 7 liquidation, there would be additional costs and expenses that the Estates would incur as a result of liquidating the Estates in a chapter 7 case.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee.  The Plan Proponent believes such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors. Conversion also would likely delay the liquidation process and ultimate distribution of the Debtors' Assets.  Ultimately, a conversion to chapter 7 would serve only to reduce the recovery to Allowed General Unsecured Claims due to the increase in Administrative Claims and Priority Claims.

Finally, although BW/OTRB has agreed to pay the BW/OTRB Backstopped Claims as part of the confirmation of the Plan, BW/OTRB has not agreed to do the same in the event the Chapter 11 Cases were converted to Chapter 7.  All Cash remaining after payment of the Administrative Claims incurred in connection with the Chapter 7 cases would be utilized to pay the Allowed Administrative and Priority Claims incurred in the Chapter 11 Cases.  As a result, there would no distribution to the holders of Allowed General Unsecured Claims in the event of a conversion to Chapter 7.

Accordingly, the Plan Proponent believes that Holders of Allowed Claims would receive less ($0) than anticipated under the Plan (1-2% in the case of General Unsecured Claims, and

15

100% in the case of Allowed Priority Unsecured Claims and Allowed Secured Claims)  if the Chapter 11 Cases were converted to Chapter 7 cases, and therefore, the classification and treatment of Claims and Interests in the Plan complies with section 1129(a)(7) of the Bankruptcy Code.

     5.8.    <u>Acceptance of the Plan</u>

The rules and procedures governing eligibility to vote on the Plan, solicitation of votes, and submission of ballots are set forth in the Solicitation Procedures Order. In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Class, excluding the votes of Insiders, must actually vote to accept the Plan.

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY MAIL THE BALLOT YOU RECEIVE. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY AND TO IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE HOLDER. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT OR YOU LOST YOUR BALLOT OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE DEBTORS' COUNSEL OR THE BALLOTING AGENT.

**YOUR BALLOT STATING HOW YOU ARE VOTING ON THE PLAN MUST BE RETURNED BY OCTOBER 15, 2025 at 4:00 p.m. (prevailing eastern time). THE BALLOT MUST BE MAILED TO THE FOLLOWING ADDRESS OR SUBMITTED THROUGH THE FOLLOWING E-BALLOTING PORTAL:**

**IF SUBMITTED THROUGH THE E-BALLOTING PORTAL:**
The Balloting Agent will accept Ballots if properly completed through the E-Balloting Portal. To submit your Ballot via the E-Balloting Portal, visit https://cases.stretto.com/onetable, click on the "File a Ballot" section of the Balloting Agent's website for the Debtors, and follow the instructions to submit your Ballot. **IMPORTANT NOTE: YOU WILL NEED THE UNIQUE E-BALLOT ID ON YOUR BALLOT TO RETRIEVE AND SUBMIT YOUR CUSTOMIZED ELECTRONIC BALLOT.**

**The Balloting Agent's E-Balloting Portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.**

**Each E-Ballot ID# is to be used solely for voting only those Claims described in your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable. If your Ballot is not received by the Balloting Agent on or before the Voting Deadline, and such Voting Deadline is not extended by the Debtors, your vote will not be counted.**

16

**IF BY FIRST CLASS MAIL, OVERNIGHT MAIL OR HAND DELIVERY:**
    One Table Restaurant Brands LLC, Ballot Processing
    c/o Stretto
    410 Exchange, Suite 100
    Irvine, CA 92602

**ARTICLE VI**
**UNCLASSIFIED CLAIMS**

    6.1.    Administrative Claims

    (a)    General.  Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors, each Holder of an Allowed Administrative Claim shall receive Cash equal to the unpaid portion of such Allowed Administrative Claim within thirty (30) days after the later of (a) the Effective Date, (b) the date such Claim is Allowed, or (c) such other date as is mutually agreed upon by Debtors and the Holder of such Claim.  The Debtors do not believe there are any unpaid Allowed Administrative Claims, other than accruing Quarterly Fees (defined below).

    (b)    Payment of Statutory Fees.  All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable ("Quarterly Fees") prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Debtors, the Reorganized Debtors, and any entity making disbursements on behalf of any Debtor or any Reorganized Debtor or making disbursements on account of an obligation of any Debtor or any Reorganized Debtor (each a "Disbursing Entity"), shall be jointly and severally liable to pay Quarterly Fees when due and payable.  The Debtors shall file with the Bankruptcy Court all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, the Reorganized Debtors, and any entity making disbursements on behalf of any Debtor or any Reorganized Debtor or making disbursements on account of an obligation of any Debtor or any Reorganized Debtor, shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due.  Notwithstanding the substantive consolidation of the Debtors called for in the Plan, each and every one of the Debtors, the Reorganized Debtors, and Disbursing Entities shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing any release under the Plan.

    6.2.    Professional Compensation Claims[2]

---

[2] The Bankruptcy Court has already approved, on a final basis, the fees and expenses of the Professionals, through and including July 17, 2025, as well as certain additional sums after such date through the Final Fee Orders.

17

10612785.1

All Professionals with Professional Compensation Claims shall File and serve on counsel for the Debtors, counsel for the Committee and the U.S. Trustee a supplemental application for final allowance of compensation and reimbursement of expenses no later than fourteen (14) days after the Effective Date.  Objections to Professional Compensation Claims must be Filed and served on the Debtors, the Committee, the U.S. Trustee, and the applicable Professional to whose application the objection is addressed no later than twenty-one (21) days after the date the application is Filed.  If no objections are Filed, the Bankruptcy Court may enter an order approving the Professional Compensation Claims without a hearing.

6.3.    Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the Holder of a Priority Tax Claim and the Debtors, any Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, on account of and in full and complete settlement and release of such Claim, Cash in an amount equal to the amount of such Allowed Priority Tax Claim no later than the Effective Date.

BW/OTRB has agreed to pay these claims on behalf of the Debtors.

6.4.    Priority Non-Tax Claims

The Debtors do not believe there exist any Priority Non-Tax Claims to be paid.

**ARTICLE VII**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

7.1.    Summary

(a)    In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan Proponent has not classified Administrative Claims and Priority Tax Claims, as described in Article VI. Accordingly, except for Administrative Claims, Professional Compensation Claims and Priority Tax Claims, all Claims against and Interests in the Debtors are placed in Classes as set forth below.

(b)    The following table classifies Claims against and Interests in the Debtors for all purposes, including voting, confirmation and Distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

7.2.    Identification of Classes

18

10612785.1

| Class | Estimates[3] | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1: Secured Claim of Maricopa County Treasurer | Claim 76 filed on October 24, 2024 asserting a Secured Claim in the amount of $92,482.29. Debtors dispute this claim. | No | No |
| Class 2: Secured Claim of San Diego County Treasurer and Tax Collector | Claim 91 filed on November 5, 2024 asserting a Secured Claim in the amount of $18,083.43. Debtors dispute this claim. | No | No |
| Class 3: General Unsecured Claims | Approx: $12 million<br><br>Recovery: Approximately 1% | Yes | Yes |
| Class 4: Equity Interests | Recovery: 0% | Yes | No (deemed to reject) |

7.3.    Controversy Concerning Classification, Impairment or Voting Rights

In the event a controversy or dispute should arise involving issues related to the classification, impairment or voting rights of any Creditor or Interest Holder under the Plan, whether before or after the Confirmation Date, the Bankruptcy Court may, after notice and a hearing, determine such controversy.

7.4.    Treatment of Claims and Interests

1.    Class 1 – Secured Claim of Maricopa County Treasurer

(a)    Classification: Class 1 consists of the Secured Claim of Maricopa County Treasurer as asserted in Claim 76.

(b)    Treatment: Debtors dispute the Secured Claim of Maricopa County Treasurer. If the Secured Claim of Maricopa County Treasurer is Allowed, the Allowed Claim amount will be paid in full within thirty days of entry of a final order allowing the Secured Claim of Maricopa County by BW or it will retain its lien on collateral that was not administered in these Cases and will not receive a distribution hereunder.

(c)    Voting: Class 1 is Unimpaired under the Plan. The Holder of Allowed Class 1 Claim is not entitled to vote to accept or reject the Plan.

---

[3] As more fully explained in Section 8.3 below, the estimated amount of Claims included in this chart are merely estimates only and subject to a full claims analysis still to be completed.

10612785.1

2.      Class 2 – Secured Claim of San Diego County Treasurer and Tax Collector

    (a)      Classification:  Class 2 consists of the Secured Claim of San Diego County Treasurer and Tax Collector as asserted in Claim 91.

    (b)      Treatment: Debtors dispute the Secured Claim of San Diego County Treasurer and Tax Collector. If the Secured Claim of the San Diego County Treasurer and Tax Collector is Allowed, the Allowed Claim amount will be paid in full within thirty days of entry of a final order allowing the Secured Claim of San Diego County Treasurer and Tax Collector by BW or it will retain its lien on its collateral that was not administered in these Cases and will not receive a distribution hereunder.

    (c)      Voting: Class 2 is Unimpaired under the Plan.  The Holder of Allowed Class 2 Claim is not entitled to vote to accept or reject the Plan.

3.      Class 3 – General Unsecured Claims

    (a)      Classification:  Class 3 consists of all General Unsecured Claims.

    (b)      Treatment: Each Holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, release and discharge of and in exchange for such Allowed General Unsecured Claim, its Pro Rata share of the Distribution Fund; provided however, in the event that any such Pro Rata share would result in a Distribution of less than $25.00, than no Distribution will be made on account such Allowed General Unsecured Claim and such Pro Rata share will be reallocated to the other Allowed General Unsecured Claims entitled to receive a Distribution.

    (c)      Voting: Class 3 is Impaired under the Plan.  The Holders of Allowed Class 3 Claims are entitled to vote to accept or reject the Plan.

4.      Class 4 – Interests

    (a)      Classification:  Class 4 consists of the shareholders and all Holders of equity in the Debtors.

    (b)      Treatment: Each Allowed Interest shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Allowed Interests shall be entitled to any recovery or Distribution under the Plan on account of such Interests.

    (c)      Voting: Class 4 is Impaired.  Holders of Class 4 Claims are not entitled to vote and are deemed to reject the Plan.

7.5.    Voting Classes, Presumed Acceptance by Non-Voting Classes.

20

10612785.1

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

7.6.   Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article VII of the Plan.

**ARTICLE VIII**
**CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING**

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

8.1.   The Plan May Not Be Accepted.

The Plan Proponent can make no assurances that the requisite acceptances to the Plan will be received in which case the Chapter 11 Cases will convert to Chapter 7.

8.2.   The Plan May Not Be Confirmed.

Even if the Plan Proponent receives the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Plan. Even if the Bankruptcy Court determined that the Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation had not been met, in which case, the Chapter 11 Cases would likely convert to Chapter 7.

8.3.   Distributions to Holders of Allowed Claims Under the Plan May Be Inconsistent With Projections.

The estimated recovery for Allowed General Unsecured Creditors is based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution. There can be no assurance that the estimated Claim amounts set forth in the Plan are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors, including but not limited to both the actual amount of Allowed General Unsecured

21

Claims and the funds available for Distribution to Allowed General Unsecured Claims. If the total amount of Allowed General Unsecured Claims is higher than the Plan Proponent's estimates, or the funds available for Distribution are lower than the Plan Proponent's estimates, the percentage recovery to Holders of Allowed General Unsecured Claims will be less than projected.

8.4.    Objections to Classification of Claims.

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims and Interests. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Plan Proponent believes that all Claims and Interests have been appropriately classified in the Plan. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Plan Proponent would seek to (i) modify the Plan to provide for whatever classification might be required for confirmation and (ii) use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Plan Proponent will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member. The Plan Proponent believes that under the Bankruptcy Rules, they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder. The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Plan Proponent believes that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation of the Plan and could increase the risk that the Plan will not be consummated. In the event that resolicitation would be required, the Chapter 11 Cases would likely convert to Chapter 7.

8.5.    Failure to Consummate the Plan.

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Confirmation Date and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of the Plan, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court.

8.6.    Certain Tax Considerations.

There are a number of material income tax considerations, risks and uncertainties associated with the liquidation described in this Plan. The Plan Proponent does not offer an opinion as to any federal, state, local or other tax consequences to Holders of Claims and Interests as a result of the confirmation of the Plan.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**ARTICLE IX**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

9.1.    Implementation of the Plan

The Plan will be implemented by the Plan Administrator in a manner consistent with the terms and conditions set forth in this Plan and the Confirmation Order.

9.2.    Funding of the Plan

The Plan will be funded by the Distribution Fund which, as of the Effective Date, should be approximately $115,000.  BW/OTRB has agreed to pay the BW/OTRB Backstopped Claims. For the avoidance of doubt, the Distribution Fund cannot be used to pay the BW/OTRB Backstopped Claims.  Specifically, OTRB Corporate LLC will pay the following:

(1) Claim 141 of the CDTFA in the amount of $204,764.38;
(2) Claim 139 of the CDTFA in the amount of $16,000.00;
(3) Claim 30 of the Alameda County Tax Collector in the amount of $8,223.41;
(4) Claim 137 of the CDTFA in the amount of $2,706.00;
(5) Claim 42 of the Franchise Tax Board in the amount of $1,653.52;
(6) Claim 43 of the Franchise Tax Board in the amount of $840.78;
(7) Claim 41 of the Franchise Tax Board in the amount of $838.79;
(8) Claim 92 of San Diego County Treasurer-Tax Collector in the amount of $196.15;
(9) Claim 20 of Arizona Department of Revenue in the amount of $94.44;
(10) Claim 36 of the Franchise Tax Board in the amount of $52.67;

In addition, Breakwater Credit Opportunities Fund II has agreed to pay Allowed Professional Compensation Claims up to a maximum amount of $35,000.00 and the Secured Claims of San Diego County Treasurer-Tax Collector (Claim 91) and Maricopa County Tax Collector (Claim 76), but only if they are Allowed.

9.3.    Plan Administrator and Post-Effective Date Debtors

23

The Post-Effective Date Debtors shall act as the Plan Administrator. Among other things, the Plan Administrator shall be responsible for: (1) winding down the Debtors' business and affairs as expeditiously as reasonably possible and administering the liquidation of the Post-Effective Date Debtors after the Effective Date, (2) resolving any Disputed Claims, (3) paying Allowed Claims, (4) filing appropriate tax returns, and (5) administering the Plan. The Plan Administrator shall provide a spreadsheet of all proposed distributions to be made under the Plan to the Committee's counsel at least five (5) business days' prior to making such distributions

9.4.    Wind-Down

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Estates and take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. Except to the extent necessary to complete the liquidation and wind-down of any remaining assets or operations, from and after the Effective Date, the Debtors (1) for all purposes, shall be deemed to have withdrawn their business operations from any state or province in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

9.5.    Dissolution of the Post-Effective Date Debtors

Upon a certification to be filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the Chapter 11 Cases, the Plan Administrator is authorized to take all necessary actions to dissolve the Post-Effective Date Debtors in, and withdraw the Post-Effective Date Debtors from, applicable states and provinces to the extent required by applicable law. The Plan Administrator shall have authority to seek to close the Chapter 11 Cases in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.

9.6.    Dissolution of the Committee

On the Effective Date, the Committee shall automatically dissolve, and its Professionals and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except with respect to (i) any applications for Professional Compensation Claims, including preparing same, objecting to same, defending same and attending any hearing with respect to same; and (ii) any motions or other actions seeking enforcement or implementation of the provisions of this Plan, or the Confirmation Order.

9.7.    Cancellation of Interests

On the Effective Date, all outstanding prepetition Interests in the Debtors shall be deemed cancelled without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors relating to, arising under, in respect of, or in connection with such securities, instruments, or agreements shall be deemed discharged, released and/or satisfied as to the Debtors. Following the Effective Date, the Plan Administrator will be

24

10612785.1

authorized to execute and file on behalf of creditors Form UCC-3 termination statements, mortgage releases or such other forms as may be necessary or appropriate to implement the provisions of Article VII of the Plan.

9.8.    Substantive Consolidation of the Debtors for Purposes of the Plan

The Plan Proponent analyzed, among other things, the Debtors' books and records, intercompany accounting practices, corporate structure, shared staff and services, financial reporting, the joint and several liability of some or \all of the Debtors on most if not all of the liabilities of the Debtors, and cash management practices.  Based on that analysis, the Plan contemplates and is predicated upon entry of an order substantively consolidating the Debtors' Estates and the Chapter 11 Cases as set forth below.  Moreover, all of the assets of the Debtors have been sold and liquidated by virtue of the Global Resolution.  The sale was based on a credit bid with no cash provided, other than the Committee Fund as part of the Global Resolution, and on which the Distribution Fund now exists.

Entry of the Confirmation Order shall constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Debtors for voting, confirmation and distribution purposes under the Plan.  Solely for such purposes, on and after the Effective Date: (a) all Assets (and all proceeds thereof) and liabilities of each Debtor shall be deemed merged or treated as though they were merged into and with the assets and liabilities of the other Debtors, (b) all guarantees of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint and several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors, (c) each and every Claim filed or to be filed in any of the Chapter 11 Cases shall be deemed filed against the consolidated Debtors, and shall be deemed one Claim against and obligation of the consolidated Debtors, and (d) for purposes of determining the availability of the right of set-off under section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may be set-off against the debts of the other Debtors.

The substantive consolidation effected pursuant to this section shall not affect (other than for the purposes set forth above), (i) the legal and corporate structures of the Debtors, or (ii) distributions from any insurance policies or proceeds of such policies.  This Plan shall be deemed to be a motion for entry of an order of the Bankruptcy Court approving the substantive consolidation of the Debtors' Estates and the Chapter 11 Cases.  Unless an objection to the substantive consolidation set forth in this Plan is made in writing by any creditor affected by same and is Filed with the Bankruptcy Court and served on the Plan Proponent on or before the Objection Deadline, or such other date as may be fixed by the Bankruptcy Court, the Bankruptcy Court may enter the Confirmation Order approving the substantive consolidation of the Debtors. In the event any such objections are timely Filed, a hearing with respect thereto will occur at the Confirmation Hearing.

10612785.1

## ARTICLE X
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

10.1.    Executory Contracts and Unexpired Leases Deemed Rejected Unless Previously Assumed or Rejected

On the Effective Date, except as provided herein, all Executory Contracts will be deemed rejected as of the Effective Date in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except with respect to any Executory Contract: (a) the Debtors previously assumed, assumed and assigned or rejected, or (b) for which, prior to the Effective Date, the Debtors have Filed a motion to assume, assume and assign, or reject on which the Bankruptcy Court has not ruled.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of all rejections of Executory Contracts pursuant to this Article and sections 365(a) and 1123 of the Bankruptcy Code.

10.2.    Bar Date For Rejection Damages

All Claims for damages arising from the rejection by the Debtors of an Executory Contract pursuant to Article 10.1 of this Plan shall not be enforceable against the Debtors or their properties or agents, successors, or assigns, unless a proof of Claim is filed with the Claims Agent so as to actually be received on or before the date that is thirty (30) days after the Effective Date.  For the avoidance of doubt, this Plan shall not serve to extend the deadline to submit any Claim arising from the rejection of an Executory Contract pursuant to section 365 of the Bankruptcy Code to the extent that the party asserting such Claim was subject to an earlier deadline.

## ARTICLE XI
## PROVISIONS GOVERNING RESOLUTION OF CLAIMS AND DISTRIBUTIONS OF PROPERTY UNDER THE PLAN

11.1.    Claim Objections

(a)    Right to Object to Claims.  Notwithstanding anything to the contrary herein, except insofar as a Claim is Allowed under the Plan on and after the Effective Date, the Debtors will have the authority to do any of the following with respect to any Claims or Interests: (1) file, withdraw or litigate to judgment objections to Claims; (2) settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (3) administer and adjust the Claims register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Bankruptcy Court.  For the avoidance of doubt, the Debtors shall have no obligation to object to or dispute (or expend funds to object to or dispute) any Claim where, in the Debtors' sole judgment, the cost of such objection or dispute is not warranted in light of the potential incremental benefit to the Holders of Allowed General Unsecured Claims.

(b)    Claim Objection Deadline.  All objections to Claims must be Filed and served on or before the expiration of the Claim Objection Deadline, as such deadline may be

26

extended from time to time on motion of the Debtors Filed before the expiration of the Claim Objection Deadline.

(c)    Claim Estimation.  Pursuant to section 502(c) of the Bankruptcy Code, the Debtors may request estimation or liquidation of any Disputed Claim that is contingent or unliquidated or any Disputed Claim arising from a right to an equitable remedy or breach of performance.

11.2.    Distribution Provisions

(a)    Timing of Distributions.  The Plan Administrator shall make a one-time Distribution to Holders of  Allowed General Unsecured Claims.  Any Distribution not made on the Distribution Date because the Claim relating to such Distribution had not been Allowed on that Distribution Date shall be held by the Post-Effective Date Debtors for Distribution after such Claim is Allowed.  No interest shall accrue or be paid on the unpaid amount of any Distribution.

(b)    Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date will be treated as the Holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Distribution Record Date.  The Plan Administrator shall have no obligation to recognize any transfer of any Claim occurring after the Distribution Record Date. In making any Distribution with respect to any Claim, the Plan Administrator shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of claim filed with respect thereto or on the Schedules as the Holder thereof as of the close of business on the Distribution Record Date and upon such other evidence or record of transfer or assignment that is known to the Plan Administrator as of the Distribution Record Date.

(c)    Cash Payments. Cash payments made pursuant to the Plan shall be in United States dollars by checks drawn on a domestic bank selected by the Plan Administrator or by wire transfer from a domestic bank, at the option of the Plan Administrator.

(d)    Time Bar to Cash Checks.  Checks issued by the Plan Administrator on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof.  Requests for the reissuance of any check that becomes null and void pursuant to this Section shall be made directly to the Plan Administrator by the Holder of the Allowed Claim to which the check was originally issued.  Any Claim in respect of such voided check shall be made in writing on or before the later of six months from the Effective Date or ninety (90) days after the date of issuance thereof.  After that date, all Claims in respect of voided checks shall be discharged and forever barred and the proceeds of those checks shall revert and be paid back to BW/OTRB.

(e)    Distributions on Account of Disputed Claims.  Except as otherwise provided in a Final Order or as agreed by the relevant parties, Distributions on account of Disputed Claims, if any, that become Allowed, shall be made by the Plan Administrator at such periodic intervals as the Plan Administrator determines to be reasonably prudent.

27

(f)      No Distributions Pending Allowance.  Notwithstanding anything herein to the contrary: (a) no Distribution shall be made with respect to any Disputed Claim until such Claim becomes an Allowed Claim (as applicable), and (b) unless agreed otherwise by the Debtors, no Distribution shall be made to any Entity that holds both an Allowed Claim and a Disputed Claim until such Entity's Disputed Claim becomes an Allowed Claim.

(g)      Distribution Reserve.   On and after the Effective Date, the Plan Administrator shall maintain in reserve such Cash from the applicable distributable assets as the Plan Administrator  deem reasonably necessary to satisfy Disputed Claims.

(h)      Delivery of Distributions and Undeliverable Distributions to Holders of Claims.

(i)      Address for Delivery of Distributions.  Except as otherwise provided in the Plan, Distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Plan Administrator, as set forth on the latest date of the following documents: (a) the address of payment set forth on the applicable proof of Claim Filed by such Holder; (b) the address reflected in the Schedules if no proof of Claim has been Filed, and (c) the address set forth in any written notices of address changes delivered to the Plan Administrator.

(ii)      Undeliverable Distributions.  The Plan Administrator, shall make one attempt to make the Distributions contemplated hereunder in accordance with the procedures set forth herein.  The Plan Administrator may, but shall have no obligation to, attempt to locate Holders of undeliverable or unclaimed Distributions.   Any Distributions returned to the Plan Administrator as undeliverable or are otherwise unclaimed shall remain in the possession of the Plan Administrator until such time as a Distribution becomes deliverable or claimed, and no further Distributions shall be made to such Holder unless such Holder notifies the Plan Administrator of its then current address.  Any Holder of an Allowed Claim or Interest entitled to a Distribution of property under this Plan that does not assert a claim pursuant to the Plan for an undeliverable Distribution, or notify the Plan Administrator of such Holder's then current address, within ninety (90) days of the date that such Distribution is first made shall have its claim for such undeliverable Distribution irrevocably waived and shall be forever barred from asserting any such claim against the Debtors or their respective property, and such Distribution shall be deemed unclaimed property under Article 11.2(h) above.

(iii)      After final Distributions have been made in accordance with the terms of the Plan, if the Plan Administrator determines that the aggregate amount of Unclaimed Distributions and Undeliverable Distributions is too impracticable to redistribute to Holders of Allowed Claims, such Cash shall be paid back to BW/OTRB.

28

(i)    Distribution Record Date.  As of 5:00 p.m. (prevailing Eastern time) on the Distribution Record Date, the transfer registers for Claims shall be closed.  The Debtors shall have no obligation to recognize the transfer or sale of any Claim that occurs after such time on the Distribution Record Date and shall be entitled for all purposes herein to recognize and make Distributions only to those Holders who are Holders of Claims as of 5:00 p.m. (prevailing Eastern time) on the Distribution Record Date.  Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to 5:00 p.m. (prevailing Eastern time) on the Distribution Record Date shall be treated as the Holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

(j)    Defenses and Setoff.  Nothing contained in this Plan shall constitute a waiver or release by the Debtors of any rights in respect of legal and equitable objections, defenses, setoffs, or recoupment.  To the extent permitted by applicable law, the Debtors may, but shall not be required to, set off or recoup against any Claim and the payments or other Distributions to be made under the Plan in respect of such Claim, claims of any nature whatsoever that arose before the Petition Date that the Estates or the Debtors may have against the Holder of such Claim.

(k)    Compliance with Tax Requirements.  Notwithstanding anything to the contrary in this Plan, the Plan Administrator shall be entitled to deduct any federal, state or local withholding taxes from any Distributions made with respect to Allowed Claims, as appropriate.  The Plan Administrator shall be authorized to take all actions necessary to comply with applicable withholding and reporting requirements, including, without limitation, applying a portion of any Distribution of Cash to be made under the Plan to pay applicable withholding Taxes.  Any amounts withheld pursuant to the immediately preceding sentence will be deemed to have been distributed and received by the applicable recipient for all purposes of the Plan.  Notwithstanding any other provision of the Plan, each Holder of an Allowed Claim that has received a Distribution under the Plan shall have sole and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any Governmental Unit, including income, withholding and other tax obligation, on account of such Distribution.  For tax purposes, Distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Claims until such principal amount is paid in full and then to any interest accrued on such Claim prior to the Petition Date, and the remaining portion of such Distributions, if any, will apply to any interest on such Claim after the Petition Date.  The Plan Administrator shall be authorized to require each Holder of a Claim to provide it with an executed Form W-9, Form W-8, or any other tax form, documentation or certification as may be requested by the Plan Administrator as a condition precedent to being sent a Distribution.  If a Holder of an Allowed Claim does not provide the Plan Administrator with an executed Form W-9, Form W-8 or other requested tax form within ninety (90) days after the date of the initial request, the Plan Administrator may, in its sole discretion (a) make such Distribution net of applicable withholding or (b) reserve such Distribution, in which case (i) such Holder shall be deemed to have forfeited the right to receive any Distribution under the Plan, (ii) any such Distribution shall revert to the Plan Administrator for all purposes, including but not limited to, for Distribution on account of other Allowed Claims and (iii) the Claim of the Holder originally entitled to such Distribution shall be irrevocably waived and forever barred without further order of the

29

Bankruptcy Court.  The Plan Administrator reserves the right to allocate and distribute all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens and similar encumbrances.

(l)    De Minimis Distributions.  If any Distribution under the Plan to the Holder of an Allowed General Unsecured Claim would be less than $25.00, the Debtors shall cancel such Distribution and said Distribution(s) shall be reallocated as set forth in Section 7.4.

11.3.    No Interest.

Unless otherwise specifically provided for herein, or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue, or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final Distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## ARTICLE XII
## DEBTOR RELEASES, INJUNCTION, AND RELATED PROVISIONS

12.1.    Releases by the Debtors.    Upon the Effective Date, for good and valuable consideration including without limitation the concessions from BW/OTRB in connection with the Final DIP Order, the APA, and its contributions to the Plan as set forth herein, to the fullest extent permissible under applicable law the Debtors release and discharge each of the Released Parties from any and all Claims, Causes of Action, or other Liabilities of any kind or nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, in law or equity, existing or arising as of the Effective Date; provided, however, that the foregoing shall not release or discharge any Released Party from (i) any obligations arising under or relating to the Plan or the transactions contemplated herein, (ii) any obligations arising under or relating to any APA or any Sale Order, or (iii) any liability for damages resulting from its gross negligence, bad faith, or willful misconduct, as determined by a Final Order entered by a court of competent jurisdiction.

12.2.    Exculpation and Limitation of Liability

(a)    The Exculpated Parties will neither have nor incur any liability to any entity for any claims or causes of action for any act or omission occurring on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to (i) preparation for the filing of the Chapter 11 Cases; (ii) the Chapter 11 Cases or in connection with the administration of the Chapter 11 Cases, (iii) the negotiation or approval of any agreements or pleadings that were either filed with the Bankruptcy Court or incident to the Chapter 11 Cases, (iv) formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the consummation of the Plan, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan, (v) any other postpetition act taken or omitted to be taken in connection with or in contemplation of liquidation of the Debtors, or (vi) the confirmation of the Plan; *provided, however*, that the foregoing provisions will have no effect on the liability of any Entity that

30

results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence or willful misconduct.

(b)      The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and Distributions pursuant to the Plan, and, therefore, are not, and on account of such Distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such Distributions made pursuant to the Plan.

12.3.   Injunction

EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST OR INTERESTS AGAINST ANY ONE OR MORE OF THE DEBTORS AND ANY SUCCESSORS, ASSIGNS OR REPRESENTATIVES OF SUCH PERSON, SHALL BE PRECLUDED AND PERMANENTLY ENJOINED ON AND AFTER THE EFFECTIVE DATE FROM (A) COMMENCING OR CONTINUING IN ANY MANNER ANY CLAIM, ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST ANY OF THE ASSETS TO BE DISTRIBUTED UNDER THIS PLAN, (B) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS OF ANY JUDGMENT, AWARD, DECREE, OR ORDER WITH RESPECT TO ANY OF THE ASSETS TO BE DISTRIBUTED UNDER THIS PLAN, (C) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND WITH RESPECT TO ANY OF THE ASSETS TO BE DISTRIBUTED UNDER THIS PLAN, AND (D) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER THAT DOES NOT CONFORM WITH THE PROVISIONS OF THE PLAN TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW..

TO BE CLEAR, AS THIS IS A PLAN OF LIQUIDATION, THE DEBTORS WILL NOT RECEIVE A DISCHARGE IN THE CHAPTER 11 CASES.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

## ARTICLE XIII
### CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

13.1.   Conditions Precedent to Confirmation

10612785.1

It shall be a condition to confirmation hereof that the following provisions, terms and conditions shall have been satisfied or waived pursuant to Article 13.4:

(a)      The Plan and the Confirmation Order shall be in a form and substance reasonably acceptable to the Plan Proponent, the Committee and BW/OTRB.

13.2.   Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to Article 13.4:

(a)      All of the schedules, documents, supplements and exhibits to the Plan shall have been filed in form and substance reasonably acceptable to the Plan Proponent, the Committee and BW/OTRB.

(b)      The Bankruptcy Court shall have entered a Final Order, in form and substance reasonably acceptable to the Plan Proponent, the Committee and BW/OTRB, confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

(c)      All authorizations, consents and regulatory approvals required, if any, in connection with the Plan's effectiveness shall have been obtained.

(d)      No order of a court shall have been entered and remain in effect restraining the Debtors from consummating the Plan and the transactions contemplated therein, and the Confirmation Order shall be in full force and effect.

(e)      All actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws, and are in form and substance acceptable to the Plan Proponent, the Committee and BW/OTRB.

(f)      There shall be no outstanding claims that rank senior to General Unsecured Claims other than Professional Compensation Claims and the BW/OTRB Backstopped Claims as expressly provided by Section 9.2 herein.

13.3.   Waiver of Conditions

The conditions to confirmation of the Plan and to the occurrence of the Effective Date set forth in this Article XIII may be waived at any time by the Debtors, with the prior written consent of the Committee.

13.4.   Effect of Failure of Conditions

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims by or Claims against the Debtors; (ii) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest or any other Entity; or (iii) constitute an admission, acknowledgment, offer or

32

undertaking by the Debtors, the Committee, any Creditors or Interest Holders or any other Entity in any respect.  In addition, the Debtors, the Committee, and all Holders of Claims against or Interests in the Debtors shall be restored to the status quo as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred.

13.5.    Filing of Notice of the Effective Date

On the Effective Date or as shortly thereafter as reasonably practicable, the Debtors shall File a notice of the Effective Date with the Bankruptcy Court.

**ARTICLE XIV**
MISCELLANEOUS

14.1.    Bankruptcy Court Jurisdiction

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain and have jurisdiction over the Chapter 11 Cases to the maximum extent as is legally permissible, including, without limitation, for the following purposes:

(a)    To allow, disallow, determine, liquidate, classify or establish the priority or secured or unsecured status of or estimate any Claim or Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Interests;

(b)    To ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(c)    To determine any and all applications or motions pending before the Bankruptcy Court on the Effective Date of the Plan, including without limitation any motions for the rejection, assumption or assumption and assignment of any Executory Contract;

(d)    To consider and approve any modification of the Plan, remedy any defect or omission, or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order;

(e)    To determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan or any Plan Documents or any entity's obligations in connection with the Plan or any Plan Documents, or to defend any of the rights, benefits, Estate property transferred, created, or otherwise provided or confirmed by the Plan or the Confirmation Order or to recover damages or other relief for violations thereof;

(f)    To consider and act on the compromise and settlement of any claim or cause of action by or against the Debtors and their Estates;

(g)    To decide or resolve any and all applications, motions, adversary proceedings, contested or litigated matters, and any other matters, or grant or deny any

33

10612785.1

applications involving the Debtors, or the Estates that may be pending on the Effective Date or that may be brought by the Debtors or any other related proceedings by the Debtors, and to enter and enforce any default judgment on any of the foregoing;

(h)     To decide or resolve any and all applications for compensation;

(i)     To issue orders in aid of execution and implementation of the Plan or any Plan Documents to the extent authorized by section 1142 of the Bankruptcy Code or provided by the terms of the Plan;

(j)     To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(k)     To interpret and enforce any orders entered by the Bankruptcy Court in the Chapter 11 Cases;

(l)     To enforce the exculpation and injunction provisions contained in Article XII herein; and

(m)     To enter an order closing these Chapter 11 Cases when all matters contemplating the use of such retained jurisdiction have been resolved and satisfied.

### 14.2.   Modifications

The Plan Proponent may alter, amend, or modify this Plan or any exhibits or schedules hereto under section 1127(a) of the Bankruptcy Code at any time prior to or after the Confirmation Date but prior to the substantial consummation of this Plan; *provided, however,* that any such alteration, amendment or modification does not materially and adversely affect the treatment of Holders of Claims or Interests under this Plan. Any Holder of a Claim that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.  Any alterations, amendments or modifications shall be provided to the U.S. Trustee, the Committee and BW/OTRB.

### 14.3.   Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### 14.4.   Governing Law

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

10612785.1

### 14.5.    Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by Debtors or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtors with respect to the Holders of Claims or Interests or other parties-in-interest; or (2) any Holder of a Claim or other party-in-interest prior to the Effective Date.

### 14.6.    Section 1146 Exemption

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

### 14.7.    Section 1125(e) Good Faith Compliance

The Plan Proponent and each of their respective Representatives, shall be deemed to have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

### 14.8.    Further Assurances

The Plan Proponent, all Holders of Claims receiving Distributions hereunder, the Holders of Interests in the Debtors and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

### 14.9.    Service of Documents

Any pleading, notice or other document required by the Plan to be served on or delivered to the Plan Proponent shall be sent by first class U.S. mail, postage prepaid as follows:

**RAINES FELDMAN LITTRELL LLP**
Thomas J. Francella Jr. (DE Bar No. 3855)
824 N. Market Street, Suite 805
Wilmington, DE 19801
Telephone: (302) 772-5805
Email: tfrancella@raineslaw.com

and

**SHULMAN BASTIAN FRIEDMAN BUI & O'DEA LLP**
Alan J. Friedman (admitted *pro hac vice*)
Melissa Davis Lowe (admitted *pro hac vice*)

35

100 Spectrum Center Drive; Suite 600
Irvine, CA 92618
Telephone:  (949) 340-3400
Facsimile:  (949) 340-3000
E-mail: afriedman@shulmanbastian.com
E-mail: mlowe@shulmanbastian.com

*Counsel to the Debtors and Debtors in Possession*

**LOWENSTEIN SANDLER LLP**
David M. Posner, Esq.
Gianfranco Finizio, Esq.
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 262-6700
Facsimile: (212) 262-7402
E-mail: DPosner@lowenstein.com
E-mail: GFinizio@lowenstein.com

**MORRIS JAMES LLP**
Eric J. Monzo, Esq.
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: emonzo@morrisjames.com

*Counsel to the Official Committee of Unsecured Creditors*

### 14.10. Filing of Additional Documents

On or before the Effective Date, the Plan Proponent may File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

### 14.11. No Stay of Confirmation Order

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Fed. R. Bankr. P. 3020(e) and 7062.

\* \* \* \* \*

Dated:  September 10, 2025.

10612785.1